1   MARK D. ROSENBAUM, SBN 59940
    mrosenbaum@aclu-sc.org
2   ACLU FOUNDATION OF SOUTHERN
    CALIFORNIA
3   1313 W. 8th Street
    Los Angeles, CA 90017
4   T: (213) 977-5220, F: (213) 417-2220

5   LAURENCE H. TRIBE, SBN 39441
    tribe@law.harvard.edu
6   HARVARD LAW SCHOOL*
    Hauser 420, 1575 Massachusetts Ave.
7   Cambridge, MA 02138
    T: (617) 495-1767
8
    GARY L. BLASI, SBN 70190
9   blasi@law.ucla.edu
    UCLA SCHOOL OF LAW*
10  405 Hilgard Avenue
    Los Angeles, California 90024
11  T: (310) 206-9431, F: (310) 206-1234

12  AMOS E. HARTSTON, SBN 186471
    ahartston@innercitylaw.org
13  INNER CITY LAW CENTER
    1309 East Seventh Street
14  Los Angeles, CA 90021
    T: (213) 891-2880. F: (213) 891-2888
15
    Attorneys for Plaintiffs
16

RONALD L. OLSON, SBN 44597
Ron.Olson@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Fl,
Los Angeles CA 90071-1560
T: (213) 683-9100, F: (213) 683-5111

JOHN C. ULIN, SBN 165524
John.Ulin@aporter.com
ARNOLD & PORTER, LLP
777 South Figueroa Street
Los Angeles, CA 90017
T: (213) 243-4228, F: (213) 243-4199

*for identification purposes only

(Additional counsel listed on next page)

17              UNITED STATES DISTRICT COURT

18          FOR THE CENTRAL DISTRICT OF CALIFORNIA

CV11-04846

19  GREGORY VALENTINI, ADRIAN           )  CASE NO.:
    MORARU, JANE DOE, and CHRIS          )
20  ROMINE, on behalf of themselves and  )  **CLASS ACTION**
    all those similarly situated, VIETNAM )
21  VETERANS OF AMERICA, and             )  **COMPLAINT FOR INJUNCTIVE,**
    CAROLINA WINSTON BARRIE,             )  **DECLARATORY, AND**
22                                        )  **MANDAMUS RELIEF**
              Plaintiffs,                 )
23                                        )
              vs.                         )
24                                        )
    ERIC SHINSEKI, in his official        )
25  capacity, Secretary, Department of    )
    Veterans Affairs; DONNA M. BEITER,    )
26  in her official capacity, Director, VA )
    Greater Los Angeles Healthcare System,)
27                                        )
              Defendants.                 )
28                                        )

1  Additional Counsel

2  PETER ELIASBERG, SBN 189110
   peliasberg@aclu-sc.org
3  DAVID B. SAPP, SBN 264464
   dsapp@aclu-sc.org
4  ACLU FOUNDATION OF SOUTHERN
   CALIFORNIA
5  1313 W. 8th Street
   Los Angeles, CA 90017
6  T: (213) 977-5220, F: (213) 417-2220

7  MELISSA A. TYNER, SBN 269649
   mtyner@innercitylaw.org
8  ELIZABETH HAMAN KUGLER, SBN 273928
   EKugler@innercitylaw.org
9  ADAM MURRAY, SBN 199430
   amurray@innercitylaw.org
10 INNER CITY LAW CENTER
   1309 East Seventh Street
11 Los Angeles, CA 90021
   T: (213) 891-2880. F: (213) 891-2888

12
   JAMES J. FINSTEN, SBN 234999
13 James.Finsten@aporter.com
   JACOB K. POORMAN, SBN 262261
14 Jacob.Poorman@aporter.com
   ARNOLD & PORTER, LLP
15 777 South Figueroa Street
   Los Angeles, CA  90017
16 T: (213) 243-4228, F: (213) 243-4199

17 JONATHAN MASSEY
   jmassey@masseygail.com
18 *Pro Hac Vice application pending*
   MASSEY & GAIL LLP
19 1325 G St. NW, Suite 500
   Washington, D.C. 20005
20 T: (202) 652-4511, F: (312) 379-0467

21 LEONARD GAIL
   lgail@masseygail.com
22 *Pro Hac Vice*
   MASSEY & GAIL LLP
23 50 East Washington St., Suite 400
   Chicago, IL 60602
24 T: (312) 283-1590, 0F: (312) 379-0467

25

26

27

28

The following allegations are based on information and belief, unless otherwise specified:

## **INTRODUCTION**

1.      No veteran entered military service severely mentally disabled and homeless.  We, as a people, owe our security and the preservation of our most cherished values to our military service members and our veterans, who serve our nation not for remuneration or glory, but out of fealty to honor, duty, and sacrifice.  One horrific consequence of war is that it exacts heavy and lifelong consequences on the young men and women who made lofty commitments on our behalf: many return suffering from physically invisible wounds of mental illness, Post Traumatic Stress Disorder (PTSD), or brain traumas.  For countless veterans, military service has rendered them unable to resume their civilian lives, sustain their family relationships, hold down jobs or continue their educations, or even to maintain a permanent residence.

2.      In March 2009, President Obama stated as to our veterans: "These heroes have a home.  It's the country they served, the United States of America, and until we reach a day when not a single veteran sleeps on our nation's streets, our work remains unfinished."  But for an estimated 107,000 homeless veterans nationwide, conservatively 8,200 (or 8 percent) of whom live in the Greater Los Angeles area,[1] these fine words of a promised home remain aspirational rhetoric, not the hard truths of their daily lives.

3.      Many veterans who entered military service with sound bodies and minds return to civilian life bearing scars both visible and invisible.  The invisible scars include PTSD and other mental disorders either caused or aggravated by their

---

[1] The U.S. Department of Veterans Affairs (DVA) is the source of these estimates, which are conservative and likely undercount the number of homeless veterans nationally and in the Greater Los Angeles area.  Numerous researchers, advocates, and local officials have argued that DVA's estimates are inaccurately low, and other estimates place the number of homeless veterans in Los Angeles at 20,000.

experiences.  An incontrovertible body of research has established the close causal and mutually reinforcing interrelationships between severe mental disabilities and chronic homelessness.  Over the past decade or more, numerous scientific studies have demonstrated, consistent with common sense, that homeless individuals with severe mental disorders and/or addiction disease resulting from those disorders can meaningfully access and benefit from medical and mental health services only after they are stabilized in stable and permanent housing connected to appropriate services and support – generally referred to as "permanent supportive housing."

4.      In fact, research has confirmed that the only way that individuals suffering from psychiatric conditions such as PTSD, brain trauma, paranoid schizophrenia, and bipolar disorder consistently are able to meaningfully access and benefit from medical and psychiatric services is when they first permanently reside in appropriate supportive housing.  Moreover, absent such housing, these conditions worsen, leading to the creation of additional problems impairing the capacity of these individuals to conduct everyday life.  Homelessness itself exposes veterans to further trauma that itself can both cause and aggravate PTSD and other disorders.  For veterans with severe mental disabilities incurred as a result of their service to this country, effective treatment requires the stability and regularity afforded by permanent housing readily accessible to ongoing comprehensive care and supportive services.

5.      The U.S. Department of Veterans Affairs (DVA) has acknowledged these conclusions, stating, for example, in a supplement to a 2009 report to Congress on homelessness: "For the large percentage of veterans with disabilities, permanent supportive housing would be effective in helping them achieve long-term stability." Nonetheless, DVA and its constituent healthcare systems do not systematically utilize permanent supportive housing to ensure that severely disabled veterans have the stability and support they need to meaningfully access the medical treatment and other services for which they are otherwise eligible.

6.      Los Angeles is the homeless veterans capital of the United States.  This is true despite the fact that the focal point for the VA Greater Los Angeles Healthcare System ("VA GLA") is the West Los Angeles Medical Center & Community Living Center campus ("WLA Campus"), a 387-acre parcel located five miles from the Pacific Ocean in Los Angeles.  This land was donated in 1888 to the predecessor body to DVA for the specific purpose of establishing and permanently maintaining a soldier's home for disabled war veterans on that land.  For some 80 years, DVA's predecessors operated a Pacific Branch Soldier's Home at this site in conformity with the 1888 deed, which provided a permanent home for tens of thousands of disabled veterans who resided on the campus and were able to access necessary medical and therapeutic services available there.

7.      Beginning in the 1960s and 1970s, however, DVA's predecessor ceased accepting new residents at the WLA Campus, and structures dedicated to permanent housing were repurposed or fell into disuse and became badly in need of repair and renovation.  All new construction and renovation projects were focused on expanding medical and short-term treatment facilities.  There are today more than 100 buildings on the WLA Campus, many vacant, closed, or underutilized.  In contrast to what once existed, with the exception of geriatric nursing beds, no permanent housing is available to veterans on the WLA Campus.

8.      The VA GLA system, including the WLA Campus, does not provide appropriate care to all veterans, because it has been intentionally designed so that the most severely disabled veterans cannot meaningfully access the medical, mental health, and residential care services to which they are entitled under DVA's medical benefits program.  Nor does VA GLA make reasonable accommodations for the disabilities suffered by these veterans so that they can access the services provided through DVA's medical benefits program on the same terms as veterans who are not disabled or who suffer different disabilities.  VA GLA does not offer permanent housing for any disabled veterans on the WLA Campus, including homeless veterans

1  who suffer from severe mental disabilities or brain injuries that render them unable

2  to obtain the treatment and care they desperately need without stable housing.

3       9.     Plaintiffs in this case include severely disabled veterans who suffer from

4  mental disabilities and/or brain injuries and, as a result, are homeless and cannot

5  access necessary medical and mental health treatment they require to have a chance

6  at leading the normal life that was theirs before they began military service.

7       10.    Greg Valentini is an Army veteran who served in Afghanistan as part of

8  Operation Enduring Freedom (OEF) and in Iraq as part of Operation Iraqi Freedom

9  (OIF).  His unit, the 101st Airborne Division, participated in the initial invasion of

10  Afghanistan in 2001 and the assault on Tora Bora intended to capture Osama bin

11  Laden and other senior al Qaeda and Taliban leaders.  His unit also was part of the

12  initial invasion force in Iraq in 2003 and saw heavy combat in Karbala.  While in

13  Afghanistan and Iraq, Mr. Valentini witnessed numerous fellow soldiers and

14  civilians die and was himself regularly in great peril under heavy fire.  Upon his

15  return to the United States following his discharge, Mr. Valentini began experiencing

16  symptoms of what was later diagnosed as a severe case of PTSD.  He was constantly

17  on alert and unable to concentrate on basic details of everyday life, he had graphic

18  nightmares about things he witnessed during his wartime service, and he began to

19  think about suicide as a way to escape the constant stress of feeling that he never left

20  the combat zone.  Mr. Valentini began self-medicating himself with

21  methamphetamine to cope with the recurring violent thoughts and stress.  Eventually,

22  Mr. Valentini became homeless.  When he went to the WLA Campus for help, he

23  was briefly housed in a short-term treatment program, but was discharged and

24  returned to the street.  He has now been sporadically homeless for several years and

25  requires a safe, secure, and stable residence in order to meaningfully access

26  necessary treatment for his mental disabilities.

27       11.    Adrian Moraru is a Marine veteran who was deployed to Iraq as part of

28  the initial invasion force in OIF.  While he was stationed in Karbala following the

1   initial invasion, he always had to remain "on alert" and needed eyes in the back of

2   his head, because of the constant threat he and his comrades faced. In contrast to the

3   initial invasion, when he knew who the enemy was, during this period he could not

4   interact with civilians without worrying that he would be attacked. He also was

5   exposed to a chemical without chemical warfare gear while he was in Iraq.

6   Following his discharge, he experienced a violent seizure and developed painful

7   boils on his groin, back, and arms. Mr. Moraru recalls going "schizo" when he

8   returned to his home in Philadelphia, causing him to destroy his mother's living

9   room and to have the impulse to kill her. He thereafter lived in a car for several

10  months. After other violent incidents, Mr. Moraru eventually came to Los Angeles,

11  where he was homeless and spent his days and nights marching up and down

12  Wilshire Boulevard. When he went to the WLA Campus and sought residential

13  services, he was housed at a temporary shelter in a room with three other men and

14  was discharged when he assaulted another resident. He was thereafter arrested in

15  Santa Monica and charged with making a criminal threat. As a result of his mental

16  disability, Mr. Moraru is at times overcome by strong impulses and often is not able

17  to understand why he behaves as he does. He requires a safe, secure, and stable

18  residence accessible to treatment for his mental disabilities.

19      12.   Jane Doe[2] is an Army veteran who completed Advanced Individual

20  Training in Radio Communications at Fort Dix, New Jersey in 1974. While serving

21  in the military, she experienced several sexual assaults. VA GLA psychiatrists have

22  diagnosed Ms. Doe with PTSD secondary to military sexual trauma. She suffers

23  frequent flashbacks and nightmares and has been unable to secure or maintain a job

24  as a consequence of her mental disabilities. She has been homeless for many years.

25  _____

26  [2] Jane Doe has been the victim of several sexual assaults and is currently suffering extreme PTSD symptoms, such that public disclosure of her trauma may compound and exacerbate her symptoms, and she is currently seeking medical, mental health and other services and benefits from

27  DVA and consequently fears retaliation. For these and other reasons, a pseudonym is used to protect her identity and to protect her from harm. Plaintiffs have filed an application seeking

28  permission to allow Ms. Doe to proceed under a pseudonym concurrently with this Complaint.

1  Ms. Doe requires a safe, secure, and stable residence to access appropriate treatment

2  for her mental disabilities.

3       13.    Chris Romine is an Army veteran who was deployed to Iraq in 2003 as

4  part of the initial invasion force for OIF.  His duties involved escorting convoys, and

5  he witnessed two close friends die during these operations.  He saw one friend get

6  crushed by a vehicle and the other burn to death.  Following his discharge, he had

7  difficulty adjusting to civilian life as a result of what was later diagnosed as PTSD

8  and re-enlisted in the Army.  He was subsequently sent to Iraq again.  In addition to

9  convoy protection and the constant heightened vigilance that it required, his unit

10  responded to roadside bomb attacks on U.S. forces, which required him to regularly

11  witness the gruesome consequences of roadside bomb attacks on U.S. soldiers.  Mr.

12  Romine turned to illicit drugs to self-medicate his untreated PTSD, and, upon his

13  return to the United States following his second deployment, he became homeless

14  and lived on the streets of Santa Monica and Los Angeles.  Since that time, he has

15  tried to obtain housing and services through nearly every facility available at the

16  WLA Campus, but he has not been able to obtain permanent housing.  Although he

17  is currently in a transitional housing program, Mr. Romine requires a safe, secure,

18  and stable residence in order to meaningfully access necessary treatment for his

19  mental disabilities and resulting substance abuse disorder.

20       14.    Plaintiffs and other similarly situated veterans are being denied

21  meaningful access to the medical, mental health, and other services offered by VA

22  GLA, solely by virtue of their disabilities, which represents unlawful discrimination

23  under Section 504 of the Rehabilitation Act of 1973.  Because permanent supportive

24  housing is the only approach that consistently allows individuals like Plaintiffs who

25  suffer from serious mental disabilities meaningful access to the medical, mental

26  health, and other services to which they are entitled by virtue of their service to this

27  country, VA GLA is obligated to provide permanent supportive housing to Plaintiffs

28  and other homeless veterans suffering from serious mental disabilities as a

1   reasonable accommodation for their disabilities.

2       15.    For seriously disabled veterans in the Los Angeles area, permanent

3   supportive housing is an especially reasonable accommodation because of the

4   availability of the WLA Campus, which DVA owns because private citizens donated

5   the land to DVA's predecessor in 1888 for the express purpose of establishing and

6   permanently maintaining housing for disabled veterans. The WLA campus has

7   numerous vacant and underutilized buildings that could be used specifically for that

8   purpose. Such a use would be fully consistent with the intent of the individuals who

9   donated the land to the federal government in 1888 for the purpose of establishing

10  and permanently maintaining a home for disabled veterans.

11      16.    The donation of the land on which the WLA Campus now sits created a

12  charitable trust, under which DVA, as the successor trustee, is obligated to use the

13  land only for purposes that directly contribute to the public purpose for which the

14  land was donated. Although VA GLA does offer medical care and residential care

15  on the WLA Campus, it has misappropriated a substantial portion of the land for uses

16  that are in no way related to housing or caring for veterans. In lieu of the permanent

17  housing that once operated on the WLA Campus, numerous commercial and other

18  non-DVA programs now operate on the WLA Campus pursuant to leases,

19  memoranda of understanding, revocable licenses, or enhanced sharing agreements

20  entered into by VA GLA – perhaps because, according to VA GLA, the WLA

21  Campus "is perceived to be one of the most valuable parcels of real estate in the

22  western United States." WEST LOS ANGELES VA MEDICAL CENTER, VETERANS

23  PROGRAMS ENHANCEMENT ACT OF 1998 (VPEA) DRAFT MASTER PLAN 8 (Jan. 2011)

24  [hereinafter "VA GLA MASTER PLAN"], *available at*

25  http://www.scribd.com/doc/48127448/WLA-VA-Draft-Master-Plan. As a result of

26  these land deals, veterans have limited access to, or are altogether prohibited from

27  accessing, approximately 110 acres of the 387-acre WLA Campus (nearly 30 percent

28  of the grounds). In fact, the current agreements render those 110 acres unavailable to

1    provide housing or otherwise expand the services offered to disabled veterans.

2       17.    There has never been a public accounting of how much money VA

3   GLA receives under these land deals; who receives payments under these deals; the

4   purposes for which the revenue received, if any, has been used; or the process by

5   which these deals were negotiated. The VA GLA-approved private uses of land on

6   the WLA Campus include:

7      •   Ten acres near the hospital are leased to Enterprise Rent-A-Car and

8         Tumbleweed Transportation, a charter bus operator, for vehicle storage and/or

9         sales;

10     •   Sodexho Marriott operates a laundry facility and an adjacent water softening

11        unit for processing linen from surrounding hotels;

12     •   An energy company has been operating active oil wells on approximately 2.5

13        acres for 23 years and 1.5 acres are subject to an enhanced sharing agreement

14        with TMC, LLC to operate a farmer's market;

15     •   Richmark Entertainment operates the Wadsworth Theater for commercial

16        productions, and, although it was originally constructed as an entertainment

17        center for veterans, veterans are charged full price for all events held there;

18        Richmark also operates the Brentwood Theater on the WLA Campus;

19     •   Westside Services LLC operates parking areas throughout the WLA Campus

20        on behalf of businesses and other establishments in the surrounding

21        community;

22     •   UCLA utilizes the Jackie Robinson Baseball Stadium and complex for its

23        collegiate team and summer baseball camps;

24     •   Brentwood Private School utilizes 20 acres, on which it has constructed

25        athletic fields, a track, tennis courts, and a swimming pool;

26     •   The City of Los Angeles utilizes 12 acres as a public park, which includes a

27        fenced dog run, athletic fields, and a parking lot;

28     •   Two soccer clubs use MacArthur Field, where veterans once played softball,

1  and an adjacent parking lot; and

2  • Movie and television production companies utilize portions of the WLA

3  Campus for short-term, non-recurring filming projects, and other private

4  parties rent portions of the land for one-time events, such as fundraisers and

5  weddings.

6  18.   DVA and VA GLA officials, including Defendant Eric Shinseki, the

7  Secretary of DVA, and Defendant Donna M. Beiter, the Director of VA GLA, have

8  resisted attempts by descendents of the individuals who donated the land in 1888,

9  including Plaintiff Carolina Winston Barrie and her family, along with veterans,

10  community, and philanthropic organizations to obtain information about these land

11  deals and to retain the original intent of the 1888 land grant.  At the same time, VA

12  GLA transferred a parcel of land on the WLA Campus to the State of California to

13  build a geriatric care facility, and inserted a provision in the deed under which title

14  will revert to the federal government if the State ceases using the land "as a nursing

15  home or for domiciliary uses, as agreed upon in the original deed."  VA GLA

16  MASTER PLAN at 10.  Thus, VA GLA has acknowledged the original intent behind

17  the 1888 land transfer and even imposed a duty to honor that intent on the State,

18  while openly using portions of the WLA Campus for purposes plainly inconsistent

19  with that intent.

20  19.   Through this suit, Plaintiffs seek to vindicate their rights while shining a

21  light on the crisis of homelessness among veterans, particularly in the Greater Los

22  Angeles area, and on the misuse of the WLA Campus.  For now the Obama

23  administration's goal of ending homelessness among veterans is merely a lofty

24  aspiration.  Concrete action is necessary to accomplish that goal.  As DVA has

25  acknowledged, a critical step in achieving that goal is to provide permanent

26  supportive housing as a reasonable accommodation for veterans like Plaintiffs

27  Valentini, Moraru, Doe, and Romine, who suffer from a mental disability and/or

28  brain injury that renders them unable to obtain or maintain stable housing and who

9

1  require stable housing to meaningfully access the services to which they are entitled.

2  Given the availability of the WLA Campus, the history of the 1888 donation of the

3  land that created a charitable trust, and the Greater Los Angeles area's status as the

4  capital of veteran homelessness, it is especially reasonable and appropriate to

5  develop such programs in Los Angeles.  Through this lawsuit, Plaintiffs seek to

6  compel defendants to do just that.

7     20.    Plaintiffs Valentini, Moraru, Doe, and Romine seek declaratory and

8  injunctive relief on behalf of themselves and a class of similarly situated disabled

9  homeless veterans to remedy the unlawful discrimination against Plaintiffs solely by

10 reason of their disabilities, and Plaintiff Vietnam Veterans of America joins them in

11 seeking this relief.  Additionally, all Plaintiffs seek declaratory, injunctive, and

12 mandamus relief to enforce the charitable trust that was created by the 1888 deed

13 that transferred the land to the federal government for the express purpose of

14 establishing and *permanently* maintaining a home for disabled veterans and seek an

15 accounting of the monies obtained through land deals and other for-profit use of the

16 WLA Campus inconsistent with the trust requiring use of the land for maintaining a

17 home for disabled veterans.

18

19                          **JURISDICTION**

20     21.    This Court has jurisdiction over Plaintiffs' claims for injunctive relief

21 based on 28 U.S.C. § 1331, because those claims arise under federal statutes and

22 federal common law.

23     22.    Additionally, this Court has jurisdiction over Plaintiffs' claims under

24 Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 793) based on 28 U.S.C.

25 § 1343(a)(4), because those claims seek to secure equitable relief under an Act of

26 Congress.

27     23.    To the extent Plaintiffs' claims to enforce the terms of the charitable

28 trust and for an accounting of profits do not present a federal question sufficient to

1 | confer jurisdiction under 28 U.S.C. § 1331, this Court has jurisdiction over those
2 | claims under 28 U.S.C. § 1367.

3 |     24.    Finally, this Court has jurisdiction over Plaintiffs' alternative claim for
4 | mandamus relief under 28 U.S.C. § 1361.

5 |     25.    Pursuant to the Court's jurisdiction over this matter, Plaintiffs Valentini,
6 | Moraru, Doe, and Romine bring this action on behalf of themselves and all other
7 | persons similarly situated, with respect only to the first and second causes of action
8 | in this Complaint.

9 |

10 | **VENUE**

11 |     26.    Venue is proper in the Central District of California under 28 U.S.C.
12 | § 1391(b) because all of the acts and/or omissions complained of herein occurred or
13 | will occur in the District.

14 |

15 | **PARTIES**

16 |     27.    Plaintiff Greg Valentini is a 33-year old citizen of the United States and
17 | a resident of Los Angeles County, California. Mr. Valentini is an Army veteran who
18 | became severely disabled as a result of his service to this country, including tours of
19 | duty in Afghanistan and Iraq. He is eligible for medical benefits from DVA.
20 | Because he resides in Los Angeles, he seeks treatment from VA GLA.

21 |     28.    Plaintiff Adrian Moraru is a 37-year old lawful permanent resident of
22 | the United States and a resident of Los Angeles County, California. Mr. Moraru is a
23 | veteran who became severely disabled after serving this country as a Marine,
24 | including a tour of duty in Iraq. He is eligible for medical benefits from DVA.
25 | Because he resides in Los Angeles, he seeks treatment from VA GLA.

26 |     29.    Plaintiff Jane Doe is a 54-year old citizen of the United States and a
27 | resident of Los Angeles County, California. Ms. Doe is an Army veteran who
28 | became severely disabled as a result of her service to this country. She is eligible for

medical benefits from DVA. Because she resides in Los Angeles, she seeks treatment from VA GLA.

30.    Plaintiff Chris Romine is a 35-year old citizen of the United States and a resident of Los Angeles County, California. Mr. Romine is a veteran of the United States Army who became severely disabled after serving this county, including two tours of duty in Iraq. He is eligible for medical benefits from DVA. Because he resides in Los Angeles, he seeks treatment from VA GLA.

31.    Plaintiff Vietnam Veterans of America (VVA) is a membership-based organization with over 65,000 members across the country. It is the only national Vietnam veterans organization congressionally chartered and exclusively dedicated to Vietnam-era veterans and their families. VVA's goals are to promote and support the full range of issues important to Vietnam veterans, to create a new identity for this generation of veterans, and to change public perception of Vietnam veterans. VVA operates 46 state councils, including the Vietnam Veterans of America, California State Council (VVA-CSC). Hundreds of VVA-CSC members reside within VA GLA's service area. Some of these members have serious mental disabilities and are at risk of becoming homeless.

32.    Plaintiff Carolina Winston Barrie is a citizen of the United States and a resident of Los Angeles County, California. Ms. Barrie is a direct descendant of Arcadia B. de Baker, who, together with United States Senator John P. Jones, donated the land on which VA GLA's WLA Campus is now located.

33.    Defendant Eric Shinseki is the Secretary of DVA. He is sued in his official capacity. DVA is a federal agency with headquarters in Washington, D.C. and successor entity to the National Home for Disabled Volunteer Soldiers. DVA oversees the Veterans Health Administration, which operates the United States' largest integrated health care system consisting of 153 medical centers and numerous community-based outpatient clinics, community living centers, vet centers and domiciliaries.

34.     Defendant Shinseki's official duties as Secretary of DVA include the proper execution and administration of all laws and programs administered by DVA and the control, direction, and management of DVA.  *See* 38 USCA § 303.  As Secretary of DVA, Defendant Shinseki has the ultimate responsibility for ensuring that DVA and its constituent agencies and programs comply with relevant federal law, regulations, and policies, as well as ensuring that DVA maintains compliance with contracts and land grants such as the 1888 deed referenced in this Complaint.

35.     Defendant Donna M. Beiter is the Director of VA GLA.  She is sued in her official capacity.  VA GLA maintains its headquarters in Los Angeles, California, and serves veterans in Los Angeles, Ventura, Santa Barbara, San Luis Obispo, and Kern counties in Southern California.  VA GLA is one of five health care systems operated by VA Desert Pacific Healthcare Network, which is one of 21 Veterans Integrated Services Networks (VISNs) operated nationwide by DVA to provide preventive and primary care, acute hospital care, mental health services, specialty care, and long-term care to veterans.

36.     Defendant Beiter's official duties as Director of VA GLA include supervising the day-to-day operations and services offered by all the institutions operated by VA GLA, including all programs operated at the WLA Campus, and ensuring that VA GLA complies with relevant federal law, regulations, and policies. As the Director of VA GLA, Defendant Beiter has final authority to approve matters related to program design, criteria for admission and continued treatment, and the particular components and nature of all services offered by VA GLA, as well as final decision-making authority related to use of the WLA Campus and any contracts with third parties for access to and use of the WLA Campus.

//
//
//
//

# FACTUAL ALLEGATIONS

## The Crisis of Veteran Homelessness

37.     As Defendant Shinseki said in 2009, "Those who have served this nation as Veterans should never find themselves on the streets, living without care and without hope." Sadly, tens of thousands of veterans find themselves in that position every night, homeless like Plaintiffs Valentini, Moraru, Doe, and Romine. The majority of these individuals, including Plaintiffs Valentini, Moraru, Doe, and Romine, suffer from serious mental health disorders and/or brain injuries.

38.     One out of every 168 veterans experiences homelessness during the course of a year,[3] and DVA estimated that 107,000 veterans were homeless on any given night in 2009.[4] Veterans are overrepresented in the homeless population and are about 50 percent more likely to become homeless compared to all Americans.[5]

39.     Although reliable data is difficult to find, recent veterans who served in OEF and OIF and related operations are at especially high risk of becoming homeless. In December 2010, DVA estimated that over 9,000 OEF/OIF veterans were homeless, and that number is expected to grow as additional service members leave military service.[6]

---

[3] U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT & U.S. DEPARTMENT OF VETERANS AFFAIRS, VETERAN HOMELESSNESS: A SUPPLEMENTAL REPORT TO THE 2009 ANNUAL HOMELESS ASSESSMENT REPORT TO CONGRESS i, *available at* http://www.hudhre.info/documents/2009AHARVeteransReport.pdf (last accessed May 29, 2011).

[4] JOHN KUHN AND JOHN NAKASHIMA, THE SIXTEENTH ANNUAL PROGRESS REPORT: COMMUNITY HOMELESSNESS ASSESSMENT, LOCAL EDUCATION AND NETWORKING GROUP (CHALENG) FOR VETERANS (FY 2009) SERVICES FOR HOMELESS VETERANS ASSESSMENT AND COORDINATION 23 (March 17, 2010), *available at* http://www.va.gov/HOMELESS/docs/chaleng/chaleng_sixteenth_annual_report.pdf.

[5] U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT & U.S. DEPARTMENT OF VETERANS AFFAIRS, VETERAN HOMELESSNESS: A SUPPLEMENTAL REPORT TO THE 2009 ANNUAL HOMELESS ASSESSMENT REPORT TO CONGRESS 12, *available at* http://www.hudhre.info/documents/2009AHARVeteransReport.pdf (last accessed May 29, 2011).

[6] Bob Woodruff, Ian Cameron & Christine Romo, "Coming Home Homeless: The New Homeless Among Veterans," ABC NEWS (Dec. 26, 2010), *available at* http://abcnews.go.com/ThisWeek/coming-home-homeless-homeless-veterans/story?id=12478952.

1    40.    Between 44,000 to 66,000 veterans are believed to be experiencing

2  chronic homelessness.[7]  Individuals meet the federal definition of chronic

3  homelessness if they have "a disabling condition" and have "either (a) been

4  continuously homeless for a year or more OR (b) [have] had at least 4 episodes of

5  homelessness in the past three years." 24 C.F.R. §91.5.  Veterans are more likely to

6  be chronically homeless than non-veterans.[8]

7

8                      **Causes of Chronic Homelessness**

9    41.    In the late 1990s, researchers began studying individuals who remained

10  homeless for extended periods, often for years and decades, or who frequently cycled

11  in and out of homelessness, to try to understand the causes of chronic homelessness

12  and the barriers that prevent these individuals from attaining and maintaining stable

13  housing.[9]  This body of research has established the close correlation between

14  homelessness and disabilities, particularly mental health and substance abuse

15  disorders.[10]  It has also identified numerous barriers that prevent chronically

16  homeless individuals from accessing the services intended to assist them in

17  overcoming chronic homelessness.

18    42.    First, for individuals with serious mental disabilities, the disability itself

19        [7] UNITED STATES INTERAGENCY COUNCIL ON HOMELESSNESS, OPENING DOORS: FEDERAL
20  STRATEGIC PLAN TO PREVENT AND END HOMELESSNESS 20 (2010), *available at*
    http://www.usich.gov/PDF/OpeningDoors_2010_FSPPreventEndHomeless.pdf.

21        [8] *See* MARTHA R. BURT, HOMELESSNESS: PROGRAMS AND THE PEOPLE THEY SERVE 11-3 to -
    6 (1999), *available at* http://www.huduser.org/portal/publications/pdf/home_tech/tchap-11.pdf
22  (finding that 32 percent of homeless veterans reported being homeless for over 13 months, while
    only 17 percent of homeless non-veterans reported this extended length of homelessness).

23        [9] *See* Randall Kuhn & Dennis P. Culhane, *Applying Cluster Analysis to Test a Typology of*
24  *Homelessness by Pattern of Shelter Utilization: Results from the Analysis of Administrative Data,*
    26 AM. J. COMMUNITY PSYCHOL. 207, 225 (1998) (finding the chronically homeless have higher
25  levels of mental health, substance abuse, and medical problems).

        [10] *See, e.g.,* David P. Folsom et al., *Prevalence and Risk Factors for Homelessness and*
26  *Utilization of Mental Health Services Among 10,340 Patients with Serious Mental Illness in a*
    *Large Public Mental Health System,* 162 A.J. PSYCHIATRY 370 (2005) (finding that between one-
27  fourth and one-third of persons experiencing homelessness have current severe psychiatric
    conditions, such as schizophrenia, major depression, and bipolar disorder, and that 50 percent of
28  these individuals have co-occurring substance abuse disorder).

is a barrier both to acquiring and maintaining stable housing and to accessing medical and mental health care, shelter, and other vital services once these individuals become homeless.[11]  Without supports or assistance, these individuals cannot access available services to treat the disability or to meet their basic needs. For example, many individuals with severe mental illness or cognitive impairment are not capable of completing applications or persisting through intake processes without substantial assistance, which is often not provided.[12]  Similarly, individuals with PTSD frequently experience memory loss and other cognitive impairments that result in difficulty remembering appointments, which can lead to dismissal from programs for "noncompliance."  Additionally, for some individuals with severe mental disabilities, their disabilities prevent them from functioning in the settings in which the services are offered, such as individuals whose disabilities prevent them from sharing living space or sleeping quarters with others, but who are required to complete a transitional housing program that requires dorm-style living before they are eligible for permanent housing.

43.    Lack of housing also exacerbates mental disabilities and creates new health problems, thereby impairing the individual's ability to function and impeding the individual's ability to access necessary services.  For example, the experience of homelessness is inherently stressful, requiring constant vigilance to avoid danger, and exposes homeless individuals to increased risks of trauma, leading to PTSD or aggravating already existing PTSD and other mental disorders.[13]  For individuals

---

[11] *See, e.g.*, Amy L. Drapalski et al., *Perceived Barriers to Medical Care and Mental Health Care Among Veterans with Serious Mental Illness*, 59 PSYCHIATRIC SERVICES 921 (2008), *available at* http://ps.psychiatryonline.org/cgi/content/abstract/59/8/921 (finding that psychiatric symptoms and mental illness severity pose one of the most significant barriers to medical and mental health care).

[12] *See* Michael D. Nino et al., *Who are the Chronically Homeless? Social Characteristics and Risk Factors Associated with Chronic Homelessness*, 19 J. SOC. DISTRESS & HOMELESS 41 (2010) (finding chronically homeless individuals were more likely to report that paper work for government benefits was too difficult to complete).

[13] *See* Bruce D. Levy & James J. O'Connell, *Health Care for Homeless Persons*, 350 NEW ENG. J. MED. 2329, 2330 (2004) (finding that life on the street increases social isolation and the risk of psychiatric conditions).

whose disability causes paranoia or severe anxiety, the uncertainty and diminished security and safety created by homelessness exacerbate the mental disability.[14]  For many individuals with serious mental disabilities, effective health treatment presupposes stability and regularity, which is simply not possible for chronically homeless individuals to achieve.[15]  Additionally, individuals experiencing homelessness frequently suffer from chronic and acute health conditions that are caused or exacerbated by the lack of stable shelter, including respiratory disorders, cardiovascular diseases, frostbite and hypothermia, skin diseases, diabetes, liver disease, and traumatic injuries due to assaults, falls, and accidents.[16]

44.   Thus, homelessness resulting from mental disability, and mental disability aggravated by homelessness, interfere both with the ability to obtain treatment and with amelioration of the mental disability itself, including the ability to obtain appropriate psychotropic medications.  Accessing these services requires capacities to understand, plan, and follow procedures and to tolerate waiting rooms and other conditions that are frequently beyond the impaired abilities of chronically homeless individuals with mental disabilities.  Lacking effective access to appropriate medication and supervised treatment, homeless individuals with mental disabilities frequently resort to inappropriate medication, in the form of illegal drugs that can have powerful psychotropic effects but are also most often addictive and

---

[14] *See* Kevin M. Fitzpatrick et al., *Dangerous Places: Exposure to Violence and Its Mental Health Consequences for the Homeless*, 69 A.J. ORTHOPSYCHIATRY 438, 444-45 (1999), *available at* http://onlinelibrary.wiley.com/doi/10.1037/h0080392/pdf (finding that patients experiencing anxiety and paranoia were "significantly affected by the perceived dangers inherent in the homeless environment").

[15] *See* Deborah L. Dennis et al., *The Physical and Mental Health Status of Homeless Adults*, 2 HOUSING POL'Y DEBATE 815, 822 (1991), *available at* http://www.knowledgeplex.org/kp/text_document_summary/scholarly_article/relfiles/hpd_0203_d ennis2.pdf ("Homeless persons present a more advanced state of [mental] illness and are less likely, due to their homeless situation, to follow even the simplest of treatment regimens.").

[16] *See* Bruce D. Levy & James J. O'Connell, *Health Care for Homeless Persons*, 350 NEW ENG. J. MED. 2329, 2330 (2004); *see also* Mayur M. Desai & Robert A. Rosenheck, *Unmet Need for Medical Care Among Homeless Adults with Serious Mental Illness*, 27 GEN. HOSP. PSYCHIATRY 418 (2005) (finding that 43.6 percent of persons who are homeless and have serious mental illnesses had unmet needs for medical care at the time of program entry).

1  come with negative side effects.[17]

2      45.    The lack of housing itself, especially combined with a serious mental

3  disability, is a formidable barrier to accessing services.  For many homeless

4  individuals, the immediacy of the daily struggle for shelter, food, and other

5  necessities relegates medical and mental health needs to a distant priority.[18]  Thus,

6  common illnesses and injuries are left untreated, leading to increased emergency

7  hospital visits and acute care admissions.[19]

8      46.    In sum, a robust body of research has established that the subset of the

9  homeless population who, like Plaintiffs Valentini, Moraru, Doe, and Romine, suffer

10  from severe mental illnesses, such as PTSD, paranoid schizophrenia, and bipolar

11  disorder, are unable to meaningfully access the range of services offered to homeless

12  individuals to meet their day-to-day needs, including shelter, or to obtain appropriate

13  health care, mental health are, or addiction treatment, due to symptoms of their

14  disabilities and their lack of stable housing.

15

16  **Factors that Make Veterans Especially Susceptible to Chronic Homelessness**

17      47.    Like other homeless populations, homeless veterans' risk factors for

18  chronic homelessness include poverty, joblessness, mental illness, and substance

19  abuse.[20]  Due to the relatively higher incidence of mental illness and substance abuse

20  disorders among veterans, however, veterans are particularly vulnerable to chronic

21

---

22      [17] *See* Timothy P. Johnson & Michael Fendrich, *Homelessness and Drug Use: Evidence from a Community Sample*, 32 AM. J. PREVENTATIVE MED. S211, S212 ("Homeless individuals . . .

23  abuse drugs and alcohol in an attempt to provide self-medication for psychiatric or physical health problems.").

24      [18] *See* Dennis, *supra* note 15, at 826 (finding mentally ill homeless persons often do not receive needed physical and mental health care because they "giv[e] higher priority to other basic

25  needs, such as procuring food and shelter on a daily basis.").

26      [19] Margot B. Kushel et al., *Factors Associated with the Health Care Utilization of Homeless Persons*, 285 JAMA 200 (2001) (finding that compared with the general population, the homeless

27  are 3 times more likely to seek emergency care at least once in a year).

28      [20] Robert A. Rosenheck & Peter Koegel, *Characteristics of Veterans and Nonveterans in Three Samples of Homeless Men*, 44 HOSP. & COMMUNITY PSYCHIATRY, 858, 861 (1993).

1  homelessness.[21]  Although military service as such is not predictive of homelessness,

2  military service is strongly associated with factors that contribute to homelessness.[22]

3  For example, combat exposure and the stress related to deployment contribute to

4  high levels of social isolation upon returning home, psychiatric disorders, and

5  substance abuse disorders, all of which, in turn, contribute directly to

6  homelessness.[23]

7      48.    Veterans of the post-Vietnam All-Volunteer Force era have an even

8  higher risk of mental-illness-induced homelessness than veterans from earlier eras.[24]

9  Researchers have identified several causes for the increased risk of mental illness

10  and subsequent homelessness of veterans of recent conflicts, including waning public

11  support and lower morale among troops, the nature of modern warfare resulting in

12  unexpected threats to life via roadside bombs and improvised explosive devices, and

13  multiple and more-lengthy deployments.[25]  According to one study, one in five

14  soldiers who were deployed as part of OEF/OIF returned home with symptoms of

15  PTSD or major depression, which is a substantially higher rate than the general

16

17  [21] See, e.g., Robert Rosenheck et al., *The Proportion of Veterans Among Homeless Men*, 84 AMERICAN J. OF PUB. HEALTH 466 (1994) (finding that higher prevalence of psychiatric illness, substance abuse, and, especially antisocial personality disorder among veterans is a contributor to

18  their greater vulnerability to homelessness).

19  [22] See, e.g., Robert Rosenheck & Alan Fontana, *A Model of Homelessness Among Male Veterans of the Vietnam War Generation*, 151 AM. J. PSYCHIATRY 421, 425 (1994) (reporting

20  significant indirect effects on homelessness resulting from war zone traumatic experience).

21  [23] *Id.* at 421 (finding that post-military social isolation, psychiatric disorder, and substance abuse had the strongest direct effects on homelessness).

22  [24] See, e.g., Karen H. Seal et al., *Trends and Risk Factors for Mental Health Diagnoses Among Iraq and Afghanistan Veterans Using Department of Veterans Affairs Health Care, 2002-*

23  *2008*, 99 AM. J. PUB. HEALTH 1651 (2009) (documenting that 37 percent of veterans returning from Iraq and Afghanistan who utilized DVA health care system between 2002 and 2008 received a

24  mental health diagnosis); Anna Kline, et al., *The Relationship Between Military Service Eras and Psychosocial Treatment Needs Among Homeless Veterans with a Co-Occurring Substance Abuse*

25  *and Mental Health Disorder*, 5 J. DUAL DIAGNOSIS 358 (2009) (finding that mentally ill, substance-abusing veterans of recent conflicts became homeless at an earlier age than other

26  veterans and were more likely to attribute their homelessness to mental health problems).

27  [25] *See Seal, supra* note 24, at 1656; *see also* Charles S. Milliken, et al., *Longitudinal Assessment of Mental Health Problems Among Active and Reserve Component Soldiers Returning*

28  *from the Iraq War*, 298 JAMA 2141 (2007) (finding combat exposure was associated with higher rates of PTSD among veterans of OIF).

1  population.[26]

2

## Without Stable Housing, Seriously Disabled Individuals
## Cannot Meaningfully Access Critical Services

49.    Although addressing the needs of homeless individuals with serious mental illness is complex, research conducted over the last few decades confirms that stable housing is a precondition to effective treatment of severe mental disorders and/or associated addiction disease.  With the stability and security of permanent housing, the formerly homeless veteran with severe disabilities can meaningfully access mental health, physical health, substance abuse, vocational, and other services. Permanent supportive housing is thus intended specifically for homeless individuals with disabilities who, without housing, cannot access and make effective use of the treatment and services they need to stay stable; and who, without such treatment and supportive services, cannot access and maintain stable housing.

50.    A significant body of evidence demonstrates that permanent supportive housing has successful long-term housing outcomes for previously chronically homeless persons, including those with the most severe impediments.[27]  In addition to housing stability, studies have shown enormous benefits for participants in permanent supportive housing programs.  Documented outcomes include improved mental health status, decreased substance abuse, increased average income, and improved quality of life.[28]

---

[26] THE INVISIBLE WOUNDS OF WAR: PSYCHOLOGICAL AND COGNITIVE INJURIES, THEIR CONSEQUENCES, AND SERVICES TO ASSIST RECOVERY,  at xxi (Terri Tanielian & Lisa H. Jaycox eds., RAND Corporation 2008), *available at* http://www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG720.pdf.

[27] *See, e.g.* Sam Tsemberis & Ronda F. Eisenberg, *Pathways to Housing: Supported Housing for Street-Dwelling Homeless Individuals with Psychiatric Disabilities.* 51 PSYCHIATRIC SERVICES 487, 491 (2000) (finding 88 percent housing-retention rate for permanent supportive housing program over five-year period – a much lower risk of homelessness than in traditional residential treatment programs);.

[28] *See, e.g.,* PERLMAN , *supra* note 27 (finding that 50 percent of residents in the Denver program had improved mental health status, 64 percent reported improved quality of life, and 15 percent had decreased substance abuse, and that average monthly income rose from $185 to $431); *(cont'd)*

51.     Aside from individual benefits for veterans, permanent supportive housing also provides substantial cost savings to government at all levels.  When left on the streets, the homeless utilize a substantial array of community resources in the form of increased health care utilization, emergency room care, public health services, and continuing use of expensive temporary shelters.  Numerous studies have demonstrated that permanent supportive housing offers substantial cost savings when compared to alternative homeless interventions.  For example, Dennis Culhane, a professor at the University of Pennsylvania who also serves as the Director of Research for the National Center on Homelessness Among Veterans at DVA, conducted a comprehensive study of permanent supportive housing that tracked the costs associated with nearly 10,000 homeless persons with mental illness in New York City for two years while they were homeless and two years after they were housed.  Dr. Culhane found that supportive housing created average annual savings of $16,282 per person.  Seventy-two percent of the savings resulted from a decline in the use of public health services, 23 percent of the savings resulted from a decline in shelter use, and the remaining 5 percent of the savings resulted from reduced incarceration of homeless people.  The reduction in expenditures in these areas nearly covered the cost of developing, operating, and providing supportive housing services, resulting in a net cost to the government of only $995 per unit per year.[29]  A study conducted by the Economic Roundtable for the Los Angeles

---

*(cont'd from previous page)*

Joy A. Livingston & Debra Srebnik, *Approaches to Providing Housing and Flexible Supports for People with Psychiatric Disabilities*, 16 PSYCHOSOCIAL REHABILITATION J. 27 (1992) (finding participants in permanent supportive housing programs had greater housing satisfaction, improved housing stability, and greater psychological well-being).

[29] *See* Dennis P. Culhane et al., *Public Service Reductions Associated with Placement of Homeless Persons with Severe Mental Illness in Supportive Housing*, 13 HOUSING POL'Y DEBATE 107 (2002); *see also* DANIEL FLAMING ET AL., WHERE WE SLEEP: COSTS WHEN HOMELESS AND HOUSED IN LOS ANGELES 26 (2009) (documenting $2,291 average monthly cost savings for each chronically homeless Los Angeles participant); MASSACHUSETTS HOUSING AND SHELTER ALLIANCE, HOME AND HEALTHY FOR GOOD: A STATEWIDE HOUSING FIRST PROGRAM (2010) (documenting cost savings of $9,507 per resident per year, including reduction in medical costs from $26,124 per person per year to $8,500); Tia E. Martinez & Martha R. Burt, *Impact of Permanent Supportive Housing on the Use of Acute Care Health Services by Homeless Adults*, 57

*(cont'd)*

Homeless Services Authority found that the public costs attributed to chronically homeless persons in permanent supportive housing averaged $27,504 per year less than the costs attributed to similar persons when they were on the streets or in shelters.[30]

52.     Finally, communities with permanent supportive housing programs are safer, more efficient, and more attractive.  In some instances, property values in neighborhoods surrounding permanent supportive housing programs have increased.[31]

53.     The success of permanent supportive housing has been replicated in Los Angeles, as exemplified by Project 50 and later by other similar projects in the region.  Spearheaded by Los Angeles County Supervisor Zev Yaroslavsky, the goal of Project 50 was to identify, then place into permanent supportive housing, the 50 most vulnerable people who were sleeping on the streets of Skid Row.  Many of these individuals had been designated "shelter resistant," because they preferred sleeping on the streets to being in a crowded shelter situation.  But all of those offered their own housing, albeit a small, private room in a nonprofit housing facility, accepted the offer.  Forty-nine people were placed into permanent supportive housing, and 88 percent remained housed one year later.  Ninety-one percent of

---

(cont'd from previous page)
PSYCHIATRIC SERVICES 992 (2006) (documenting $1,300 public cost reduction per resident in San Francisco); THE HEARTLAND ALLIANCE, SUPPORTIVE HOUSING IN ILLINOIS: A WISE INVESTMENT (2009) (documenting overall savings of $854,477 over two years); ERIC HIRSCH & IRENE GLASSER, RHODE ISLAND'S HOUSING FIRST PROGRAM FIRST YEAR EVALUATION (2007) (documenting cost savings of $8,839 per person per year).

[30] FLAMING, *supra* note 29.

[31] *See, e.g.,* FURMAN CENTER FOR REAL ESTATE & URBAN POLICY, THE IMPACT OF SUPPORTIVE HOUSING ON SURROUNDING NEIGHBORHOODS: EVIDENCE FROM NEW YORK CITY 6-7 (2008), *available at* http://furmancenter.org/files/FurmanCenterPolicyBriefonSupportiveHousing_LowRes.pdf (examining the impact of 7,500 supportive housing units in New York City and finding a statistically significant rise in the value of nearby properties); ARTHUR ANDERSEN, CONNECTICUT SUPPORTIVE HOUSING DEMONSTRATION PROGRAM: FINAL PROGRAM EVALUATION REPORT chp. III (2002), *available at* http://documents.csh.org/documents/pubs/CT2002Evaluation.pdf (finding supportive housing improved neighborhood safety and beautification and increased or stabilized property values).

1  tenants were diagnosed with a mental illness and 84 percent reported a history of

2  substance abuse.  Similar to other studies, Project 50 showed that health care costs

3  for participants declined from $677,000 the year prior to participation in the program

4  to $185,000 for the year after they began living in supportive housing.[32]

5       54.   In short, both experience and empirical research have demonstrated that

6  permanent supportive housing is the only approach that consistently ensures that

7  individuals with serious mental disabilities are able to meaningfully access necessary

8  medical care, mental health services, and other social services.

9       55.   These lessons can and must be applied to address the crisis of chronic

10  veteran homelessness in order to ensure that our veterans receive the medical care

11  and support to which they are entitled and that they deserve, as even DVA itself has

12  recognized.  According to a report recently co-authored by DVA, "[f]or the large

13  percentage of veterans with disabilities, permanent supportive housing would be

14  effective in helping them achieve long-term stability."[33]

15

16  **The Crisis of Veteran Homelessness in the Greater Los Angeles Area**

17       56.   According to a 2009 survey conducted by VA GLA staff, there were

18  8,197 homeless veterans on any given day within VA GLA's coverage area, so

19  approximately 8 percent (8,197 of the estimated 107,000) of all homeless veterans in

20  the United States lived within VA GLA's coverage area in 2009.[34]

21       57.   In 2011, VA GLA released data about the homeless veteran population

22  that had received services from VA GLA in fiscal year 2010.  Of the 6,397 homeless

23  veterans that VA GLA documented as having received services in fiscal year 2010,

24  ───────────────
    [32] *See Project 50 – 1 year Progress Report*, L.A. CNTY. BD. SUPERVISORS (Feb. 4, 2009),

25  http://zev.lacounty.gov/wp-content/uploads/Project50-ONE-YEAR-SNAPSHOT-2.4.09.pdf.

    [33] U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT & U.S. DEPARTMENT OF

26  VETERANS AFFAIRS, VETERAN HOMELESSNESS: A SUPPLEMENTAL REPORT TO THE 2009 ANNUAL
    HOMELESS ASSESSMENT REPORT TO CONGRESS 30, *available at*

27  http://www.hudhre.info/documents/2009AHARVeteransReport.pdf (last accessed May 29, 2011).

    [34] *See* JOHN NAKANISHI, CHALENG 2009 SURVEY RESULTS SUMMARY VISN 22,

28  *available at* http://www.va.gov/HOMELESS/docs/chaleng/chaleng_visn_22.pdf.

more than half served in the U.S. Armed Forces after the Vietnam War.  Their average age was 51.  Ninety-five percent were male, 52 percent were African-American, 29 percent were white, and 14 percent were Latino.  About 34 percent had been homeless for one year or longer.  Forty-eight percent indicated a serious substance abuse problem.  In total, 46 percent had a serious psychiatric disorder, including psychosis and PTSD.  Twenty-six percent had both a substance abuse problem and a serious psychiatric disorder, and 52 percent reported at least one serious medical problem.  VA GLA reported providing services to 130 homeless veterans who had served in Iraq or Afghanistan.[35]

58.     Thus, Defendants know or should know that the population of veterans served by VA GLA includes numerous disabled individuals, who, like Plaintiffs Valentini, Moraru, Doe, and Romine, cannot meaningfully access the medical and other benefits to which they are entitled unless they have stable housing that is linked to the services provided by VA GLA.

### Overview of Veterans' Benefits Programs

59.     There are three administrations within DVA: the Veterans Health Administration (VHA), the Veterans Benefits Administration (VBA), and the National Cemetery Administration (NCA).  The VHA is tasked with providing "a complete medical and hospital service for the medical care and treatment of veterans . . . ."  38 U.S.C. § 7301(b).[36]

---

[35] *See* JOHN NAKASHIMA, VA PROGRAMS FOR HOMELESS VETERANS AT VA GREATER LOS ANGELES HEALTHCARE SYSTEM: AN OVERVIEW OF THE COMPREHENSIVE HOMELESS CENTER (January 14, 2011).

[36] The VBA administers "nonmedical benefits programs . . . which provide assistance to veterans and their dependents and survivors." 38 U.S.C. § 7701(a).  To be eligible for disability compensation benefits from the VBA, veterans must present: evidence of a medical diagnosis of the current impairment; evidence of an in-service incident or an aggravation of the disease or injury causing the impairment; and medical proof of a connection between the in-service incident or aggravation and the current disability.  For the purposes of disability compensation, "[s]ervice-connected means . . . that such disability was incurred or aggravated . . . in line of duty in the active military, naval, or air service." 38 C.F.R. § 3.1(k).  If a veteran is found eligible for disability compensation, DVA uses a schedule to set the amount of earnings impairment on a percentage basis. 38 U.S.C. § 1155. The NCA is "responsible for the internment of deceased servicemembers *(cont'd)*

60.     To qualify for VHA benefits, a former service-member must have been "discharged or released" from service "under conditions other than dishonorable," 38 U.S.C. § 101(2), and must have performed "active duty" in the military, 38 U.S.C. § 101(2). There is no length of service requirement for former enlisted persons who started active duty before September 8, 1980, or for former officers who first entered active duty before October 17, 1981. 38 U.S.C. § 5303A(b)(2). All other veterans must have 24 months of continuous active duty unless they qualify for an exception to the minimum service requirement. 38 U.S.C. § 5303A(b)(1). Exceptions to the minimum service requirement include discharges "for a disability incurred or aggravated in the line of duty." 38 U.S.C. § 5303A(b)(3)(B).

61.     Veterans who qualify for VHA benefits are placed into one of eight "priority groups" established by DVA regulations to determine their eligibility for benefits. *See* 38 C.F.R. § 17.36(b). Veterans in the highest priority groups, 1 through 3, have service-connected disabilities of varying degrees. 38 C.F.R. § 17.36(b)(1)-(3). Veterans in priority group 4 have serious disabilities that are not service-connected. 38 C.F.R. § 17.36(b)(4). Priority group 5 consists of low-income veterans. 38 C.F.R. § 17.36(b)(5). Priority group 6 includes veterans exposed to certain toxic substances, as well as recent combat veterans. 38 C.F.R. § 17.36(b)(6). Veterans in priority groups 7 and 8 have no compensable service-connected disabilities and have greater incomes than those in priority group 5. 38 C.F.R. § 17.36(b)(6)-(7). "A veteran will be placed in the highest priority category or categories for which the veteran qualifies." 38 C.F.R. § 17.36(d)(3)(ii).

62.     Depending on the amount of funding provided by Congress, DVA may "prioritize" the higher priority groups and provide VHA benefits only to veterans in those priority groups. Currently, however, any veteran who falls within any one of

---

*(cont'd from previous page)*
and veterans," and controls all "cemeteries under the jurisdiction of the Veterans' Administration . . . ." 38 U.S.C. § 2400.

1  the first seven priority groups is eligible for the full VHA benefits package, and some

2  veterans who fall within priority group 8 are also eligible.

3       63.    Additionally, regardless of whether a veteran is enrolled in the VHA

4  benefits program, DVA must provide hospital care and medical services "to any

5  veteran for a service-connected disability," 38 U.S.C. § 1710(a)(1)(A), "[e]ven if

6  [the veteran is] not enrolled in the VA healthcare system." 38 C.F.R. § 17.37(b).

7  DVA must also provide hospital care and medical services "to any veteran who has a

8  service-connected disability rated at 50% or more," regardless of whether the

9  treatment concerns the disability, 38 U.S.C. § 1710(a)(1)(B), and even if the veteran

10 is not enrolled in the medical benefits program. 38 C.F.R. § 17.37(a).

11      64.    The benefits package offered through VHA includes outpatient medical,

12 surgical, and mental healthcare; inpatient hospital, medical, surgical, and mental

13 healthcare; prescription drug coverage; emergency care; substance abuse treatment,

14 and other services. *See* 38 C.F.R. § 17.38(a). Subject to congressional

15 appropriations, the VA must also "provide nursing home care . . . (1) to any veteran

16 who is in need of such care for a service-connected disability, and (2) to any veteran

17 who is in need of such care and who has a service-connected disability rated at 70

18 percent or more." 38 U.S.C. § 1710A(a). Thus, VHA provides preventive and

19 primary care, acute hospital care, mental health services, specialty care, and long-

20 term care, which includes residential treatment and housing services in some

21 circumstances. These services are collectively referred to herein as "VHA benefits."

22

## VA GLA Serves Veterans in the Greater Los Angeles Area
## Who Are Eligible for VHA Benefits

25      65.    VHA provides VHA benefits to eligible veterans through twenty-one

26 (21) Veterans Integrated Services Networks (VISNs) around the country.

27      66.    VA Desert Pacific Healthcare Network is the VISN that provides

28 services to veterans in Southern California and Southern Nevada. These services are

1  delivered through five healthcare systems – one in Southern Nevada and four in

2  Southern California.  Each healthcare system operates a medical center with a

3  hospital and other inpatient and outpatient services, as well as varying numbers of

4  community clinics and vet centers.

5      67.    VA GLA is one of these healthcare systems.  The coverage area for VA

6  GLA includes all or parts of Los Angeles County, Ventura County, Kern County,

7  Santa Barbara County, and San Luis Obispo County.

8      68.    As the Director of VA GLA, Defendant Beiter is the VA GLA official

9  with final responsibility and authority to approve, modify, or terminate programs or

10  services offered as part of the VHA benefits delivered by VA GLA, and she is the

11  sole VA GLA official with responsibility and authority to approve specific uses of

12  the WLA Campus, including entering into land use agreements with private and

13  public entities.

14      69.    The focal point of services offered by VA GLA is the WLA Campus.

15  The WLA Campus is a 387-acre parcel located about five miles from the Pacific

16  Ocean in an unincorporated area of Los Angeles County surrounded by the City of

17  Los Angeles.  It is located between Sunset Boulevard to the north, Ohio Avenue to

18  the south, Interstate Highway 405 to the east, and San Vicente Boulevard to the west.

19  In addition to the array of services available at the WLA Campus, VA GLA operates

20  three ambulatory care centers, nine community clinics, and five vet centers

21  throughout its coverage area.

22

23  **History of the WLA Campus**

24      70.    The land on which the WLA Campus is now located was donated to the

25  federal government in 1888 by United States Senator John P. Jones and Arcadia B.

26  de Baker for the purpose of establishing and permanently maintaining a soldier's

27  home for disabled war veterans on that land.

28      71.    In 1865, Congress incorporated the National Home for Disabled

Volunteer Soldiers ("National Home") to operate branch homes throughout the nation for soldiers who had been honorably discharged. The branch homes were intended as true homes offered as a debt of gratitude to those who had served the country. Accordingly, residents were provided housing, food, medical care, recreation activities, and employment opportunities. There were no limitations on how long a veteran could stay at a branch home once admitted.

72.   Additionally, "disability" for the purposes of admission was interpreted broadly. Veterans with physical wounds from their military service were admitted, as well as individuals with recurring illnesses or psychological trauma that rendered them unable to support themselves in civilian life. Although veterans could receive medical treatment while they stayed at a branch home, many residents of the branch homes did not require or receive ongoing medical care.

73.   Thus, the National Home offered the promise of a *permanent* home for veterans who had served their country and, by virtue of their service, were not able to support themselves in civilian life.

74.   Between 1865 and 1870, the National Home's Board of Governors opened four branch homes east of the Rocky Mountains. In 1887, Congress authorized the National Home's Board of Governors to establish a branch home west of the Rocky Mountains. The legislation authorized the Board of Governors to acquire land for this purpose.

75.   In 1888, Senator John P. Jones and Arcadia B. de Baker donated the land on which the WLA Campus now sits to the National Home for the purpose of establishing and permanently maintaining the branch home authorized by the 1887 legislation.[37] The deed conveying the land ("1888 Deed") provided, in pertinent part,

---

[37] The 1888 Deed conveyed 300 acres to the National Home. In 1899 and 1921, successors to Senator Jones and Mrs. de Baker conveyed additional land to the National Home to further the purpose of permanently maintaining the National Home. All 387 acres of the WLA Campus were conveyed through the 1888 Deed and the two later deeds from the original donors' successors.

In 1888, John Wolfskill also conveyed 300 acres of adjacent land to the National Home. The land conveyed by that deed is now used as a national cemetery and federal buildings and is not a part of the WLA Campus.

WITNESSETH: That whereas by an act of Congress approved March 2nd, 1887, to provide for the location and erection of a branch home for disabled volunteer soldiers West of the Rocky Mountains, the Board of Managers of the National Home for Disabled Volunteer Soldiers, were authorized, empowered and directed to locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers, to be by such Board, located at such place in the States West of the Rocky Mountains as to said Board should appear most desirable and advantageous. . . .

And whereas, the parties hereto of the first part [grantors] in consideration that the party hereto of the second part [National Home] should locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers on a site to be selected by its Board of Managers along the dividing line between the Ranchos San Jose de Buenos Ayres and San Vicente y Santa Monica offered to donate to the said party of the second part, three hundred acres of land, being a portion of said Rancho San Vicente y Santa Monica, belonging to them, the said parties of the first part, on which to locate, establish, construct and permanently maintain such branch of said National Home for Disabled Volunteer Soldiers. . . .

Now therefore, in consideration of the premises and of the location, establishment, construction and permanent maintenance of a branch of said National Home for Disabled Volunteer Soldiers on such tract of land so selected and of the benefits to accrue to the said parties of the first part, owners of the said Rancho San Vicente y Santa Monica, by such location have given and granted and by these presents do give and grant unto the said party of the second part, all the following described land and premises, situate lying and being in the County of Los Angeles, State of California and particularly bounded and described as follows: . . . for the purpose of such branch Home for Disabled Volunteer Soldiers to be thereon so located, established, constructed and permanently maintained.

76.     The Pacific Branch of the National Home ("Pacific Branch Home")

opened in 1888 and housed approximately one thousand veterans in temporary

barracks until the permanent quarters were completed in 1891 and 1893.

77.     Consistent with the goal of providing a home for soldiers, the grounds at

the Pacific Branch Home were transformed into a beautiful, park-like setting.  A

hospital and other buildings were erected on the campus throughout the 1890s.  The

1   Pacific Branch Home also built a trolley line and erected a streetcar depot, which
2   transported freight and mail to and from the campus.  Residents could easily travel to
3   the nearby Santa Monica beaches from the campus for rest and recreation.  A chapel
4   was built in 1900 to hold daily services and burial services for deceased veterans.  In
5   the early 1900s, the Pacific Branch Home built dormitories with wide porches to
6   replace the original barracks and opened a dining hall that could seat 760 members at
7   one time.  A post office with more than 600 private letter boxes operated on the
8   campus, as well as a store where residents could eat lunch and purchase cigars, fruits,
9   candy and other articles.

10      78.     In addition to ensuring residents' access to housing, food and medical
11  care, the Pacific Branch Home also developed the campus to provide educational and
12  vocational activities for the veteran residents.  For example, the Pacific Branch
13  Home boasted a library with more than 10,000 volumes and newspapers and
14  periodicals from around the country.  The residents grew vegetables and tended
15  orchards and livestock on the campus, supplying their own needs and selling the
16  surplus.  The Pacific Branch Home maintained a baseball team and athletic facilities,
17  built a billiard hall for the residents, founded an aviary where residents could spend
18  time, and developed work programs to employ residents around the campus in
19  various capacities.  The Pacific Branch Home also had a home band that performed
20  daily, and lectures and movies were regularly hosted on the campus.  Residents could
21  attend all events on the campus free of charge.  By 1922, approximately 4,000
22  veterans were provided permanent housing at the Pacific Branch Home, with about
23  600 of them under hospital care.

24      79.     In 1930, Congress consolidated the National Home with other veterans'
25  programs in the newly established Veterans Administration, the immediate
26  predecessor to DVA.  Accordingly, control over the various branch homes, including
27  the Pacific Branch Home, transferred to the Veterans Administration.  Title to the
28  land upon which the branch homes were situated was also transferred to the Veterans

1  Administration as the National Home's successor-in-interest to all land to which the

2  National Home held title.

3      80.     The Pacific Branch Home campus experienced tremendous

4  development from the 1930s to 1950s, and many of the existing buildings on the

5  WLA Campus were erected during this time.  For instance, the Veterans

6  Administration built additional hospital buildings and medical care centers on the

7  campus, in addition to updating and upgrading the hospital and the residences for

8  disabled veterans who continued to reside on the campus.  It appears, however, that,

9  beginning in the 1960s and 1970s, new residents were not accepted at the campus,

10  and the structures formerly dedicated to permanent housing were repurposed or fell

11  into disuse.  DVA was established as a cabinet-level agency in 1989.

12      81.     Today, there are approximately 104 buildings on the WLA Campus.

13  Many of the buildings are vacant, closed, or underutilized.  With the exception of

14  geriatric nursing care beds, no permanent housing is available to disabled veterans on

15  the WLA Campus.  Instead, VA GLA offers only inpatient hospital care and

16  emergency or transitional shelter beds for disabled and homeless veterans on the

17  WLA Campus, even though it has built 13 houses on the WLA Campus to house VA

18  GLA senior staff.  Indeed, in contrast to the original intent of the grantors that the

19  land be used to provide a permanent home to disabled veterans, the mission

20  statement of VA GLA, which now operates and controls the WLA Campus, focuses

21  exclusively on providing medical treatment to veterans and serving as a research and

22  teaching hospital.

23      82.     According to VA GLA, the WLA Campus "is perceived to be one of the

24  most valuable parcels of real estate in the western United States."  VA GLA MASTER

25  PLAN at 8.  Numerous commercial and other non-DVA programs operate on the

26  WLA Campus under leases, memoranda of understanding, revocable licenses, or

27  enhanced sharing agreements, all of which were approved by Defendant Beiter or her

28  predecessors as Director of VA GLA.  As a result of these land use deals, veterans

1  have limited access to or are altogether prohibited from accessing 110 acres of the

2  387-acre WLA Campus, and DVA and VA GLA cannot utilize that land to provide

3  housing to veterans or otherwise expand the services offered to veterans on the WLA

4  Campus.  In addition, portions of the land have been offered for rent in connection

5  with events and for various other for-profit uses, including filming for movies and

6  television shows.

7     83.   There has not been a public accounting of how much money VA GLA

8  has received under these private deals and where any such revenue has been directed.

9

10  **Services Currently Offered by VA GLA at the WLA Campus**

11     84.   The VA GLA operates the West Los Angeles Medical Center on the

12  WLA Campus, offering care in the following areas: medicine, surgery, psychiatry,

13  physical medicine and rehabilitation, neurology, oncology, dentistry, geriatrics, and

14  extended care.  Research and academic medical training are also conducted on-site.

15  In addition to the services offered on the WLA Campus, veterans can access certain

16  outpatient services from VA GLA through three ambulatory care centers and eleven

17  community treatment centers.  The WLA Campus contains numerous medical and

18  residential treatment facilities, including inpatient and outpatient health care and

19  mental health care and geriatric long-term care services.  Unfortunately, as the

20  experiences of Plaintiffs Valentini, Moraru, Doe, and Romine detailed below

21  demonstrate, the system has been designed not to address the needs of the most

22  severely disabled veterans, and seriously disabled veterans cannot meaningfully

23  access the medical and residential care services to which they are entitled under the

24  VHA benefits program.

25     85.   The 953-bed James Wadsworth Hospital provides inpatient and

26  outpatient services to veterans.  Inpatient medical services include all acute medical,

27  surgical, rehabilitative, and mental health care for veterans in the Greater Los

28  Angeles area.  The hospital is also the primary referral center for cardiology,

neurosurgery, and radiation oncology. Outpatient services provided at the hospital include primary care exams, services provided by clinical specialists, immunizations, and preventative screenings.

86.     VA GLA operates a skilled geriatric nursing facility on the WLA Campus. The 352-bed Community Living Center provides supportive, rehabilitative, and hospice services to elderly veterans, although only 226 of the beds are currently operating.

87.     VA GLA provides long-term rehabilitative care on the WLA Campus at the West Los Angeles Polytrauma Site. This facility is dedicated to patients with injuries to more than one physical region or organ system resulting in physical, cognitive, psychological, or psychosocial impairments and functional disabilities. Services are provided primarily on an outpatient basis.

88.     VA GLA offers psychiatric, mental health, and substance abuse services at several facilities on the WLA Campus. Treatment programs are available for alcohol and substance abuse, PTSD, and serious mental illness. VA GLA offers some of these services on an outpatient basis, including counseling, group sessions, medication management, and a day treatment center.

89.     VA GLA offers no permanent supportive housing to disabled veterans. Temporary shelter services are offered through the 321-bed Domiciliary Residential Rehabilitation and Treatment Program ("Domiciliary"). This program provides temporary shelter beds along with medical, psychiatric, and substance abuse treatment, as well as other therapeutic services. A substantial number of the beds are dedicated to programs focused on substance abuse recovery and not tailored to address serious mental health needs. Veterans are assigned to a Domiciliary bed on a short-term or intermediate basis; the length of stay ranges from 30 days to a maximum of two years. The Domiciliary is structured so that residents generally live in a barracks-style room with two or three other residents, even if they suffer from a mental health condition that makes it difficult or impossible to function in

such tight quarters with other people, particularly strangers. Although a limited number of single rooms are available (fewer than 20), veterans generally must "earn" their way into in a single room by maintaining compliance with the treatment program over a period of time. Additionally, veterans assigned to a Domiciliary bed are discharged if they use alcohol or drugs and may be discharged for not fully participating in treatment or group sessions mandated by the Domiciliary staff, or for failing to make sufficient progress toward treatment goals.

90.   In total, VA GLA operates facilities on the WLA Campus with approximately 1500 beds, of which more than 1150 are dedicated to inpatient hospital care or skilled nursing care for elderly veterans. VA GLA stated in a January 2011 report, however, that it currently operates only 740 beds on the WLA Campus, including 261 acute hospital beds, 158 nursing home beds, and 321 Domiciliary beds. Additionally, VA GLA stated in its 2010 Annual Report that it operates only 770 beds, including 226 acute hospital beds, 188 skilled nursing home beds, 52 non-acute hospital beds, and 304 Domiciliary beds. By any available measure, VA GLA presently maintains no more than 321 beds, through the Domiciliary, that could provide housing to veterans who suffer from serious mental illness and therefore need housing to access and benefit from services in a meaningful way. These beds, however, are not made available as permanent supportive housing, but rather are used as temporary shelter with limitations on eligibility that often exclude homeless veterans with serious disabilities. Moreover, of these beds, a substantial number are set aside for substance abuse treatment programs, and these programs are not designed to provide services sufficient or appropriate to address serious mental health conditions.

91.   In addition to the beds operated by VA GLA, several residential programs are operated by third parties on the WLA Campus, including a geriatric care facility operated by the State of California and shelter and residential treatment programs operated by two non-profit organizations.

92.     The Veterans Home of California, which opened on the WLA Campus in 2010, is run by the State of California and provides nursing care for veterans over age 62.  The 396-bed home includes an 84-bed elderly residential care facility, a 252-bed skilled nursing facility, and a 60-bed memory care unit designed for Alzheimer's and dementia patients.  At present, this facility is operating at less than 10 percent of its maximum capacity.

93.     The Haven is an emergency housing program run by the Salvation Army of Southern California on the WLA Campus.  Its goal is to provide housing and support services to 225 homeless or at-risk veterans.  The Haven includes five programs: short-term housing for 35 veterans in Alpha Center, transitional housing focused on substance abuse recovery for 95 veterans at Victory Place, supportive housing for 15 female veterans at Naomi House, a board and care facility for 90 mentally ill veterans at Exodus Lodge, and senior housing for 25 male veterans age 60 and older.

94.     New Directions, Inc. operates two residential programs on the WLA Campus.  The New Directions' Regional Opportunity Center serves 156 veterans, including 24 beds for detoxification, 24 beds for "Shelter Plus Care" transitional housing for elderly or disabled veterans, and 108 beds for residential substance abuse and mental health programs.  The New Directions North provides substance abuse treatment and mental health services in a smaller setting for up to 50 homeless veterans with co-occurring mental illnesses.

95.     As with the VA GLA-run Domiciliary, virtually all of the emergency and transitional beds operated by the non-profit providers on the WLA Campus require residents to share rooms.  Moreover, although the services provided at these facilities are appropriate and necessary for some veterans and the availability of emergency and transitional beds on the WLA Campus is important for some veterans, these programs are neither designed nor intended to meet the needs of veterans who suffer from severe mental disabilities or brain injury.  Finally, by their nature as

1 │ short-term and transitional beds, these programs cannot provide the long-term
2 │ stability that veterans with severe disabilities require in order to meaningfully access
3 │ medical and therapeutic services available on the WLA Campus.

4 │      96.   The Salvation Army also operates the 40-unit Westwood Transitional
5 │ Village on the WLA Campus. Only homeless families are eligible. Approximately
6 │ 150 individuals live in the Village, with families of veterans making up 40 percent of
7 │ the residential population. The Village is a supportive housing program that
8 │ provides residents with counseling, case management, educational training,
9 │ employment placement assistance, medical clinic services, and childcare.

10 │      97.   In addition to the residential beds available on the WLA Campus, VA
11 │ GLA has contracted with private providers within its service area to secure around
12 │ 1,200 transitional housing beds for veterans. The duration of these programs is
13 │ between three and eighteen months. VA GLA also contracts with private providers
14 │ in the community for short-term residential treatment (detoxification) beds. Veterans
15 │ in these programs have to travel to the WLA Campus or another VA GLA service
16 │ location if they wish to access services from VA GLA.

17 │      98.   VA GLA also reported that in fiscal year 2010 it received 550 housing
18 │ subsidy vouchers for veterans. A 2009 report prepared by VA GLA reflected that
19 │ there were only 1,317 permanent housing beds accessible to veterans in its service
20 │ area that are "veteran-specific." These beds are not located near the WLA Campus,
21 │ so disabled veterans, including veterans with serious mental disabilities or brain
22 │ injuries, who are placed in these beds must travel to the WLA Campus or another
23 │ VA GLA service location if they wish to access services from VA GLA.

24 │      99.   In short, VA GLA does not offer permanent housing to disabled
25 │ veterans on the WLA Campus, where the actual medical and other therapeutic
26 │ services for veterans are delivered. Instead, VA GLA offers only a limited number
27 │ of emergency or transitional beds and time-limited residential treatment beds on the
28 │ WLA Campus with qualification requirements that often exclude disabled veterans

1  who are chronically homeless.  To the extent that veterans have access to additional

2  transitional housing beds through VA GLA contracts with off-site providers and to a

3  limited stock of permanent housing through VA GLA's housing voucher program,

4  these beds are not located near the WLA Campus and other VA GLA facilities where

5  VHA benefits are offered.

6

7  **Plaintiffs Have Been Denied Access to the VHA Benefits**

8  **Offered by VA GLA Solely by Reason of Their Disabilities**

9      100.  Although Defendant Shinseki and other senior officials within DVA and,

10  more specifically, Defendant Beiter and other senior officials within VA GLA, are

11  aware that a substantial number of veterans eligible for VHA benefits within the VA

12  GLA service area suffer from severe mental disabilities or brain injuries that require

13  that they have housing in order to meaningfully access effective services, the VHA

14  benefits program offered through VA GLA effectively excludes these veterans or

15  creates substantial and, in some cases, insurmountable barriers to accessing

16  necessary medical, mental health, and other services to which these veterans are

17  entitled under the VHA benefits program.

18      101.  As the experiences of Plaintiffs reveal, Defendant Beiter has decided

19  not to serve the most severely disabled veterans by structuring and designing the

20  existing VHA benefits program at VA GLA in a way that does not provide the

21  services necessary to treat Plaintiffs' serious mental disabilities, while providing

22  services that meet the needs of non-disabled veterans and less seriously disabled

23  veterans.  Defendant Shinseki has knowingly allowed this situation to continue and

24  refused to exercise his authority to remedy the discrimination.  Additionally, as a

25  result of Defendant Beiter's actions and Defendant Shinseki's refusal to act, severely

26  disabled veterans are denied meaningful access to VHA benefits solely by virtue of

27  their disabilities.

28

**Greg Valentini**

102.   Plaintiff Greg Valentini was born in Hawaiian Gardens and grew up in Southern California.  He is currently 33 years old.  He served multiple combat tours in Afghanistan and Iraq.  Since coming home, he has been diagnosed with severe PTSD and has struggled with homelessness, substance abuse, and thoughts of suicide.

103.   Mr. Valentini grew up in Long Beach and Lakewood.  He went to Lakewood High School, where he played baseball and basketball.  His father, a Marine, instilled in him a sense of duty and service.  After working with the Lakewood Department of Parks and Recreation and several other odd jobs, Mr. Valentini decided to join the Army to finance his higher education and enlisted in May 2000.

104.   Mr. Valentini received basic training in Fort Benning, Georgia, and was selected for further training at Fort Bragg, North Carolina.  He was assigned to the 82nd Airborne Division and then to the 101st Airborne Division.  In October 2001, he was deployed to Afghanistan as part of the initial assault on the Taliban and al-Qaeda after September 11.

105.   Mr. Valentini's first mission was to take control of the Taliban-held airport at Kandahar, which involved heavy combat.  Many of his fellow soldiers were killed.  He also witnessed a number of civilian deaths and was tasked with transporting the dead bodies of the civilians.

106.   In February and March of 2002, Mr. Valentini's unit was part of Operation Anaconda in the Tora Bora Mountains, searching for Osama bin Laden and other elements of the al-Qaeda and Taliban leadership.  He took part in significant ground fighting, under nearly constant sniper fire and mortar bombardment.  Again, he witnessed the gruesome deaths of numerous civilians, including children.

107.   In February 2003, Mr. Valentini's unit was taken out of Afghanistan and reassigned as part of the invasion force in Iraq.  The unit's assignment was to

clear, secure, and hold certain key areas near Karbala while other forces moved toward Baghdad. He again experienced heavy combat, involving the deaths of soldiers and civilians.

108. Although his tour of duty was slated to end in March 2003, Mr. Valentini was "stop-lossed" and continued to serve in combat operations in Iraq for several more weeks. He was honorably discharged in May 2003.

109. In recognition of his service, Mr. Valentini has received the Army Commendation Medal, the Army Achievement Medal, the National Defense Service Medal, the Armed Forces Expeditionary Medal, the Army Service Ribbon, and the Expert Marksmanship Qualification Badge with Rifle Bar. As a consequence of his service and experiences in Afghanistan and Iraq, he also developed what was later diagnosed as a severe case of PTSD.

110. On returning to life as a civilian, Mr. Valentini moved back in with his father in the Long Beach area and tried to attend Long Beach City College on the "G.I. Bill." He studied the administration of justice with the goal of becoming a police officer, but he had trouble relating to his classmates and controlling his emotions. When someone would comment on the Iraq or Afghanistan wars, for example, he became uncontrollably angry, leading to several altercations.

111. Mr. Valentini felt constantly "on alert," as if he was in combat. He could not focus on conversations, instead paying attention to his surroundings, as if expecting an ambush. He would repeatedly get up to check if doors were locked and stare compulsively at passing cars to see if anything seemed suspicious. He was paranoid that passers-by were investigating him in some way. Because he felt that he had to be constantly vigilant to protect himself and the people around him, he had trouble sleeping. When he managed to sleep, he had graphic nightmares about things he witnessed during his wartime service.

112. Mr. Valentini soon began to think about suicide as a way to escape the constant stress of feeling that he never left the combat zone. Three or four times a

1 | week, he spent hours thinking about where and how to kill himself. As he became
2 | angrier, the suicidal thoughts increased in frequency. He told those closest to him
3 | that he wished he had died in Afghanistan or Iraq; coming home in a flag-draped
4 | coffin, he said, would have been better than coming home to a community that did
5 | not understand what he was going through.

6 | 113. In order to deal with the stress, Mr. Valentini started using
7 | methamphetamine. The methamphetamine kept him awake, and kept his mind away
8 | from thoughts of war. It also made him so exhausted that he was able to fall asleep
9 | instead of lying awake thinking about what he saw in Iraq and Afghanistan, and
10 | when he slept, he experienced fewer nightmares. Eventually his father ordered him
11 | to go to the DVA hospital in Long Beach. A doctor there diagnosed Mr. Valentini
12 | with severe PTSD.

13 | 114. Mr. Valentini managed to remain sober for about 16 months, from 2004
14 | to 2006, and continued living with his father during this time. Eventually, however,
15 | he again turned to methamphetamine to cope with the recurring violent thoughts and
16 | stress, and he left his father's house. In 2006, he began sleeping in a tent near the
17 | Long Beach Airport. He collected cans, and paid $1 to shower at the YMCA. When
18 | he ran out of money he ate discarded fast food he found on the street, first wiping off
19 | the ants, and bathed in the lake by a golf course. He learned which public restrooms
20 | he could use in the area. He stole from businesses to pay for the drugs he used to
21 | cope with his stress and to take his mind off a reality that embarrassed him.
22 | Sometimes other homeless veterans joined him by the airport, sleeping nearby.

23 | 115. Mr. Valentini continued living on the streets until 2008, when, after
24 | several rainstorms, his father agreed to let him move back into the house. When he
25 | began using methamphetamine again after four months, however, his father asked
26 | him to leave. Mr. Valentini was again homeless, and aside from a few short respites,
27 | has been homeless since. He was briefly admitted to the Domiciliary but felt that the
28 | staff seemed more interested in finding reasons to kick him out than helping him,

which made him more anxious and stressed.  In the Domiciliary, he was forced to share a room with three other veterans also struggling with addiction and who also had difficulty interacting with other people.  One of those roommates told Mr. Valentini that his brother could supply him with methamphetamine, which made it easier for Mr. Valentini to relapse.  That roommate soon died after overdosing on heroin.

116.   Since October 2008, Mr. Valentini has spent time on the streets, in shelters, in his father's house, in a girlfriend's house, and in jail for petty theft or commercial burglary to obtain money for drugs.  He has difficulty managing his PTSD symptoms in these circumstances; he feels constantly in "combat mode," always on alert, continuously anxious and tense.  As a condition of his probation, he was sent to a transitional housing and treatment facility operated by a non-profit organization, where he is now staying.  He is currently clean, although he has experienced several relapses.

117.   Mr. Valentini is concerned about what will happen after his probation ends and he must leave his transitional housing placement.  He wants to concentrate on treating his PTSD and overcoming his addiction, but he finds it difficult to do so without stable housing.  Mr. Valentini also finds it difficult to take public transportation, because riding with a group of strangers triggers his PTSD.  Prior to taking the bus to the WLA Campus to access treatment, he must spend a half-day or more mentally preparing himself for the trip.  Once on the bus, he feels that he must station himself near an exit and maintain a visual map of where the location of everyone and everything.  On numerous occasions he has felt so overwhelmed that he had to get off the bus before reaching his destination, causing him to miss important appointments.

118.   Mr. Valentini's goal is to complete his college degree and obtain a Masters in Social Work at USC, where there is a military social work program.  He is currently taking classes at Los Angeles City College; he sits in the back of the

classroom, near the exit, where he feels safest. He wants to help other combat veterans avoid what he has gone through. Without stable housing, however, Mr. Valentini feels unable to manage his PTSD and addiction effectively. He continues to worry that he will be on the streets again soon.

119. Since coming home after his service in Iraq and Afghanistan, Mr. Valentini has met and befriended many other veterans with serious PTSD who have, like him, medicated themselves with street drugs. He knows that those drugs bring only temporary relief, but he finds it difficult to address his PTSD without a safe, stable place to live.

**Adrian Moraru**

120. Plaintiff Adrian Moraru is 37 years old. He was born in Romania and is a legal permanent resident of the United States. After his service in Iraq as a Marine, he was diagnosed with PTSD and bipolar disorder.

121. Mr. Moraru grew up in Philadelphia, Pennsylvania. He enlisted in the Marines in 1999 at age 26 and trained at Parris Island. He was stationed at Twentynine Palms, California, and served in Okinawa before being sent to Iraq as part of the initial invasion force for OIF.

122. In March 2003, Mr. Moraru's unit encountered a chemical pool while on a convoy to Baghdad. He and his fellow Marines were not wearing chemical warfare protection gear and were exposed to the chemical for 10 to 15 minutes. After his unit reached Baghdad, they were sent to Karbala. In April 2003, while assigned to guard an Iraqi bank, he stated in a media interview that he always had to remain "on alert" and needed eyes in the back of his head. He commented, "Sometimes, it seems like I survived the war and I could be shot in the back by a 9-year-old. It was almost easier during the war. At least you knew where the enemy came from. Here, it could be anyone." When his term of service ended after returning from Iraq in June 2003, he held the rank of corporal.

42

123.  Mr. Moraru lived in Las Vegas until the summer of 2005, when he moved to Philadelphia to pursue an employment opportunity.  He worked for several months installing satellite dishes for Direct TV and lived with his parents.

124.  One day in August 2005, Mr. Moraru suddenly experienced uncontrollable rage and went into his mother's living room and destroyed the contents of the room while his mother hid in the basement.  After that incident, he spent a week or two at a mental hospital.

125.  Mr. Moraru stayed with his sister in Philadelphia for several weeks after leaving the hospital, but she had young children and eventually asked him to leave. Because his parents refused to let him back into their house, he moved into a car parked on the street in front of the house, sleeping there for about six months, through the winter, until around March 2006.  During this time he developed boils on his hand and groin that he believes are a result of his exposure to the chemical pool in Iraq.  Although he was in tremendous pain, his paranoia prevented him from seeking medical treatment.  No one from DVA contacted Mr. Moraru or his family during this time, or attempted to connect him to any services that might help him.

126.  Because Mr. Moraru continued to argue with his father, his father no longer allowed him to sleep in the car.  Mr. Moraru flew to Las Vegas, where two of his friends from the Marines lived.  One of the friends arranged a job for him at a 7-Eleven.  Due to his mental state, however, he was unable to work more than one pay period.  He took the $430 he earned and took the bus to San Diego, though he had no contacts in the city.  After exhausting the last of his money in less than a week, he began collecting cans and eating out of trash bins around Ocean Beach.  He stayed in San Diego for about eight months.  During that time he lost his ID and his green card expired, and he had no money to renew it.  He also developed a large boil on his back that he believes is a result of exposure to the chemicals in Iraq.  He stopped drinking after getting the boil.

127.  After eight months in San Diego, Mr. Moraru's friend in Las Vegas

1   wired him enough money to take the train to Los Angeles.  Things deteriorated
2   further upon his arrival there.  He stopped collecting cans and obsessively marched
3   up and down Wilshire Boulevard between downtown and the beach, walking up to
4   20 miles a day and collapsing to sleep when he could not walk further.

5       128.   Mr. Moraru eventually stopped marching in Beverly Hills.  One day, he
6   was struck with the impulse to pick up a chain that was used to secure chairs on a
7   restaurant patio.  He does not know what possessed him to take the chain.  Four
8   police officers approached him and told him to drop it.  When he stood up with a
9   stick in his hand, they subdued and arrested him.  During his subsequent arrest and
10  booking, he told everyone that he was God.

11      129.   As a part of a plea deal, Mr. Moraru was released for 30 days served in
12  county jail and received three years probation.  He then walked to Westwood and
13  slept behind the Equinox health club for about three months.  During this time,
14  because he had stopped drinking, he was able to save $160.

15      130.   Around August 2009, Mr. Moraru went back to Las Vegas, where his
16  friend helped him get a ticket to Philadelphia.  He moved back in with his parents,
17  but had trouble staying in a house with other people, and they again asked him to
18  leave.  He then moved his remaining belongings from his parents' house to a lot
19  behind a Wawa convenience store, where he slept.  He told passers-by that he owned
20  the store.  When the police forced him to leave, he moved to another Wawa location.
21  He does not know what possessed him to stay near Wawa stores.

22      131.   After some time, Mr. Moraru's parents allowed him to move into their
23  garage.  His sister helped him renew his green card, because he could not afford the
24  $375 renewal fee.  He never went to DVA facilities in Philadelphia, because he did
25  not believe there was anything wrong with him.

26      132.   After managing to save $90, Mr. Moraru flew back to Los Angeles in
27  August 2010 and again slept behind the Equinox.  The next month he suffered a
28  violent seizure.  Several other homeless residents of the area, whom he had gotten to

know, suggested he visit the WLA Campus.  After arriving there early in the morning, he waited hours to be seen and saw other vets with mental disabilities leave because they could not wait any longer.  He briefly saw a doctor who again told him to sit and wait.  After waiting until 4:30 p.m., he left.

133.  Mr. Moraru later visited the WLA Campus again and forced himself to wait for his name to be called.  He received a physical, was referred to see a psychiatrist, and was then placed in The Haven, where had to share a room with three other residents.  Moreover, treatment at The Haven focused on alcoholism and drug addiction, but he had stopped drinking and did not use drugs.  VA GLA staff did not inform him of other options, if any existed.  After ten days at The Haven, he assaulted another resident and was forced to leave the program.

134.  He again became homeless, this time in Abbot Kinney park in Santa Monica, and his condition continued to deteriorate.  He spent his entire day cleaning up the park, picking up cigarette butts and other garbage.

135.  Mr. Moraru continued to try to attend his appointments at the WLA Campus with Dr. McKenna, a psychiatrist.  She diagnosed him with PTSD and bipolar disorder.  He saw Dr. McKenna about once every month to manage his seizure medication.  He received no medication for his PTSD or his bipolar disorder.

136.  At one point, a VA GLA employee asked Mr. Moraru if he wanted housing.  He replied that he did not need housing because he was "living" in Santa Monica.  His mental condition prevented him from seeing anything wrong with sleeping in the park and picking up garbage all day.  In addition, his bad experience at The Haven left him with a negative impression of housing offered through VA GLA.

137.  About six weeks ago, Mr. Moraru picked up some pipes in the park that he thought were garbage.  Someone told him to put them down.  He became angry, told the man that he would beat him, and threw the pipes in a dumpster.  The next day, he was arrested and charged with robbery and criminal threat.  Mr. Moraru

1 | accepted a plea deal to participate in a transitional housing program run by a non-
2 | profit organization in Hollywood for one-year as a condition of probation. He has
3 | been staying there for about a month.

4 |     138. Mr. Moraru wants a private apartment that will allow him to go to the
5 | WLA Campus for appropriate treatment and medications. He does not know what
6 | he will do when he finishes the transitional housing program, and he is afraid that if
7 | he has to leave the program he will have nowhere to go but back to living on the
8 | streets, where his mental health will continue to deteriorate.

9 |

10 | **Jane Doe**

11 |     139. Plaintiff Jane Doe was born in Pasadena, California. She is a veteran
12 | and is currently homeless. VA GLA psychiatrists have diagnosed her with PTSD
13 | related to military sexual trauma.

14 |     140. Ms. Doe's family has deep ties to the military, and five of her six
15 | brothers served in the military. Her brother Donald was a Marine and served in
16 | Vietnam. He died in 2005. Her brother George served in Vietnam and was a POW.
17 | He used drugs after the war and died in 2005. Her brother Bill served seven tours in
18 | Vietnam. He has addiction issues and a 100 percent service-connected disability.
19 | Her brother Phillip served in the Gulf War and now has PTSD. He developed
20 | asthma from CS gas exposure and now uses drugs. Like Ms. Doe, he is homeless
21 | and lives in Los Angeles. Her brother Hamilton served in the Gulf War.

22 |     141. Ms. Doe joined the military after obtaining her GED at the age of 16,
23 | planning to make a career of it. In 1974, she went to Fort Jackson, South Carolina
24 | for basic training. She then completed Advanced Individual Training in Radio
25 | Communications at Fort Dix, New Jersey. In the barracks, she was attacked and
26 | raped by a group of women. She was raped again by a mess sergeant in the back seat
27 | of military vehicle while another man looked on.

28 |

142.   In December 1974, Ms. Doe was sent to Germany and worked as a radio operator. She returned to the United States, was briefly stationed at Fort Sam Houston in Texas, and was then sent back Germany. While in Germany, she was again sexually assaulted by a group of men. After that incident, she was hospitalized in a psychiatric care unit. Because she felt ashamed, she did not report the sexual assaults at the time.

143.   Ms. Doe's mother became ill in 1980, and she received a humanitarian discharge to help take care of her. She obtained a job with Bank of America in the collections department, but quit because of job circumstances that exacerbated her PTSD symptoms. She then held various security jobs, but had difficulty keeping them because she frequently lost her temper, which is a consequence of her PTSD. During this time, however, she did not realize that she suffered from PTSD.

144.   In 1997, Ms. Doe lost her security job, and one of her brothers drove her to the WLA Campus because she was having a mental breakdown. She was immediately committed to the psychiatric ward and placed on suicide watch. This was the first time she received services from DVA.

145.   Ms. Doe was diagnosed with PTSD secondary to military sexual trauma. Because there was no women's clinic at VA GLA at the time, she was transferred to the Domiciliary. At that time, there were only five or six other women there, but she had to share a room with three other women. She was in constant fear of being attacked. When she was able to sleep, she would wake up with nightmares.

146.   There were no women's therapy groups at the Domiciliary, so Ms. Doe had to participate in group sessions for addiction, even though she had no addiction issues. The sessions did not help with her PTSD, because the sessions focused only on addiction and the facilitators never discussed flashbacks or nightmares, which were two of her main problems. Ms. Doe also met once a week with a psychologist, Dr. Vivian Gold, who worked well with her. During these sessions, she was able to talk about her PTSD symptoms. She eventually was transferred to a single room,

1   which lessened her anxiety and fear considerably.  As a result of her sessions with Dr.
2   Gold and having a safe, secure place to live, Ms. Doe felt like she was starting to
3   make progress.

4        147.   But three or four months later, a board at the VA GLA created a
5   discharge summary.  Ms. Doe knew that she was not yet in a position to live
6   successfully on her own.  She told the board that she was still having intense
7   flashbacks about her trauma, but they nonetheless forced her to leave sometime in
8   1999.

9        148.   When Ms. Doe left the Domiciliary, there were no transitional services
10  so she was told to go to Skid Row.  She moved into a room at the Boyd Hotel for
11  $250 per month.  She never felt safe there, because she could access a bathroom only
12  by leaving her room and walking down a public hallway and there were people
13  living in cardboard boxes around the Boyd Hotel and lots of open drug use in and
14  around the hotel.  Although she tried to continue seeing Dr. Gold, VA GLA told her
15  that Dr. Gold worked only with people living at the Domiciliary.  She instead
16  received psychological services at the mental health day treatment building on the
17  WLA Campus.

18       149.   Being forced to leave the WLA Campus for a Skid Row hotel was a
19  major setback in Ms. Doe's treatment.  She did not feel secure even in her own bed
20  and began having difficulty sleeping and experiencing acute anxiety.  She had to take
21  the bus to the WLA Campus for counseling, but traveling on the bus was difficult
22  because her PTSD caused her extreme anxiety when she was around crowds of
23  strangers.  Consequently, traveling to the WLA Campus to access mental health
24  services was a problem.

25       150.   Ms. Doe then moved back to Pasadena, but when her brother kicked her
26  out of the house, she lived out of her car.  She continued to suffer from severe PTSD
27  symptoms, because she had not received appropriate treatment or support after she
28  was discharged from the Domiciliary.  She did not know where to turn for help.

151. In 2008, Ms. Doe tried to go back to the Domiciliary but was told it had no programs for women with PTSD. Instead, she was referred to The Haven, a transitional shelter on the WLA Campus. She stayed at Naomi House, a women's shelter on the third floor of an otherwise all-male building. As a rape victim, it was very difficult for her to leave and to enter the building with all the men around. Additionally, there were no programs to meet her PTSD needs.

152. Eventually, the Domiciliary began a program for women with PTSD, and Ms. Doe was accepted. By the time she transferred there, however, VA GLA had replaced the PTSD program with an addiction recovery program. When she and a few other women with PTSD who enrolled in the program complained, VA GLA simply changed the title to a "recovery" program without changing the content or therapeutic approach. The mandated group sessions focused exclusively on drug and alcohol addiction, and her therapist was a drug addiction specialist, with no training in military sexual trauma or PTSD. Her third session with the addiction specialist focused on discharge planning, which made her feel as though she was being pushed out the door as soon as she had arrived, regardless of whether she was doing better or receiving the care she needed.

153. The Domiciliary tried to discharge her after only four months, but Ms. Doe persuaded the staff to extend her stay by two months. She had difficulty concentrating on her treatment because she worried about where she would live after the two-month extension ended.

154. Ms. Doe was eventually discharged from the Domiciliary because she did not take a mandatory urine-analysis test. She simply forgot to show up for the test, which should not have been surprising to the staff because her records reflect that short-term memory loss is one symptom of her PTSD.

155. Ms. Doe told the staff that she did not feel safe on the streets and had not made enough progress to feel stable. The only options she was offered were a shared room at New Directions or psychiatric hospitalization, and she rejected the

former because of the shared-room requirement and the latter because she did not believe it would be helpful. About an hour before she was supposed to leave, she was handcuffed and taken to the mental lock-up ward, where she stayed overnight on a psychiatric hold. The doctors at the ward discharged her the next day because she did not meet the criteria for involuntary commitment. VA GLA referred her to the Salvation Army Bell Shelter, a large dormitory-style homeless shelter, but her PTSD prevented her from staying in such a setting.

156. Two days later, Ms. Doe learned that a slot opened for her at a specialized DVA program in Menlo Park for women who experienced sexual trauma. She was denied admission, however, because she did not meet the admission requirement of having a stable place to live after completion of the program.

157. Ms. Doe is currently living with her sister-in-law and continuing to see a therapist at the WLA Campus. Her unsettled living situation exacerbates some of her PTSD symptoms, which undermines her treatment. She continues to have flashbacks and nightmares and is embarrassed when people see her with those symptoms. When she does not have a private space, she tries to repress her trauma so the symptoms do not surface. She knows this is not healthy and makes it harder for her to be open in her treatment sessions.

158. Ms. Doe wants to find her own place that is safe and secure and will provide her ready access to her doctor at the WLA Campus so that she can receive the treatment she needs. She is trying to find a place to live in Los Angeles, but it has been difficult to find an apartment because her credit history is poor after being homeless for four years. VA WLA has not offered her any permanent housing.

**Chris Romine**

159. Plaintiff Chris Romine grew up in Madera, California. At 16 he was shot in a drive-by shooting that severed his femoral artery. He graduated from high school in Madera and then worked in construction.

160.   In order to seek a better life, Mr. Romine joined the Army at age 19.  He was trained to be a military police officer at Fort McClellan, Alabama.   Following training, he was assigned to Fort McClellan itself.  Part of his assignment was to work as an undercover military investigator, assigned to purchase drugs being sold on the base.  In the course of that duty he was exposed to drugs and drug use for the first time.  He later received Special Reaction Team (SRT) training at Fort Polk, Louisiana, similar to that provided to civilian SWAT police officers.

161.   In March 2003, Mr. Romine's unit was sent to Iraq as part of the initial invasion force in OIF.  His first assignment was guarding prisoners of war at Camp Bucca and providing escort to convoys between Camp Bucca and Basra.  In the course of his convoy protection duties, he saw two close friends die in vehicles in front of his.  One was crushed by his vehicle, and the other burned to death.

162.   Mr. Romine was honorably discharged in 2003 and returned to the United States.  He remained very troubled by what he experienced and began, for the first time in his life, to take hard drugs, primarily illicitly obtained Vicodin and Oxycodone, in order to dull his memories and to become numb to his daily life.

163.   Unable to adjust to civilian life, Mr. Romine reenlisted in the U.S. Army in 2005.  Given a choice of either a substantial monetary reenlistment bonus or his choice of assignments, he chose to be assigned to the Special Warfare Center at Fort Bragg, North Carolina, for training as a special operations soldier.  A mistake by his recruiter resulted in his being rejected from the Special Warfare Center because he had not completed a necessary screening course.  He was then reassigned to a military police brigade attached to the 108th Airborne Division and deployed back to Iraq.

164.   Once back in Iraq, Mr. Romine continued to treat what was later diagnosed as PTSD by self-medicating with drugs, primarily Percoset, which he bought from Army medics.  In addition to convoy protection and the constant heightened vigilance that it required, his unit was assigned to "clean up duty"

51

following roadside bomb attacks on U.S. forces. This duty included dealing with the body parts and gore that remained after the dead and wounded U.S. soldiers were removed. In addition to using drugs, Mr. Romine began drinking heavily, in order to cope with his disability. On two instances, he was found drunk on duty. As a result, he was discharged again in 2007, this time under other than honorable conditions.

165.   Mr. Romine returned to Huntington Beach to live with his uncle, also a military veteran. Seeing his condition, his uncle insisted that he go to the Long Beach DVA hospital for treatment, which he did. He was drug free for a time, but did not get effective treatment for his PTSD and relapsed. He was homeless on the streets of Santa Monica and West Los Angeles for a time. Since that time, he has tried to obtain housing and services through nearly every facility available at the WLA Campus, but he has not been able to obtain permanent housing.

166.   Mr. Romine continued to experience intermittent periods of drug use and sobriety, including a period of about four months living with other veterans in a street encampment near the WLA Campus. A variety of petty offenses resulted in his incarceration in the jails of both Los Angeles and Orange Counties. During his last incarceration, a DVA employee arranged for his placement at a transitional housing program. This is the most suitable living arrangement Mr. Romine has had so far, but it is still a temporary living arrangement. Until he achieves some certainty in his housing and living arrangements over the longer term, Mr. Romine does not believe that he will be able to address either his PTSD or the addictions that resulted from it.

**Permanent Supportive Housing Is a Reasonable Accommodation to Ensure Plaintiffs Have Meaningful Access to Services to Which They Are Entitled**

167.   Plaintiffs' experiences demonstrate that Defendants have discriminated and will continue to discriminate against Plaintiffs and other veterans suffering from serious mental disabilities solely by virtue of their disabilities. Defendants have

1  denied Plaintiffs meaningful access to services offered by VA GLA in numerous
2  ways, which include, but are not limited to:

3  • Imposing conditions for access to or continued participation in programs or
4    services that Plaintiffs cannot satisfy as a result of symptoms or characteristics
5    of their disabilities;

6  • Providing services or treatment in settings that Plaintiffs are unable to access
7    as a result of symptoms or characteristics of their disabilities;

8  • Failing to provide sufficient assistance to Plaintiffs when their symptoms or
9    characteristics of their disabilities prevent them from identifying available
10   services from which they would benefit, or applying for or otherwise
11   navigating the intake, screening, or referral processes to access those services;

12 • Failing to provide treatment and support that is necessary for the appropriate
13   treatment of Plaintiffs' disabilities, while providing appropriate treatment and
14   support to veterans who do not have disabilities or who suffer from different
15   disabilities; and

16 • Failing to provide the reasonable accommodation of permanent supportive
17   housing to those veterans who, by reason of their mental disabilities, are
18   unable to meaningfully access appropriate treatment without it.

19     168.   Scholars and researchers have reached the conclusion that permanent
20  supportive housing is the only approach that consistently allows severely disabled
21  individuals like Plaintiffs to access a broad array of social services, including
22  medical care and mental health services.[38] Accordingly, offering permanent
23  supportive housing is a necessary and reasonable accommodation to ensure that
24  Plaintiffs and other veterans with serious mental disabilities and brain injuries can
25  meaningfully access the VHA benefits that they are entitled to receive from VA

26  _____
    [38] *See generally* U.S. DEP'T OF HEALTH AND HUMAN SERV., MEDICAID AND PERMANENT
    SUPPORTIVE HOUSING FOR CHRONICALLY HOMELESS INDIVIDUALS: LITERATURE SYNTHESIS AND
27  ENVIRONMENTAL SCAN (2011), *available at* http://aspe.hhs.gov/daltcp/reports/2011/ChrHomlr.pdf
    (summarizing dozens of published and unpublished studies demonstrating effectiveness of
28  permanent supportive housing and its economic benefits).

GLA.

169.   As noted above, numerous studies have demonstrated that permanent supportive housing is cost-effective, underscoring its reasonableness as an accommodation for seriously disabled veterans.  In addition to those studies, which measure cost-savings across agencies, several studies have focused on the net economic impact only for the agency providing the permanent supportive housing. This research demonstrates that systems like VA GLA that provide medical care, substance abuse treatment, and emergency and transitional beds are likely to achieve substantial cost savings as a result of moving to a permanent supportive housing model for chronically homeless clients, for several reasons.  First, once placed in permanent supportive housing, tenants' reliance on emergency shelters diminishes to almost zero.[39]  Second, there is a significant reduction in tenants' reliance on emergency room and acute medical services.[40]  By shifting tenants away from emergency inpatient treatment, permanent supportive housing puts its residents in a better position to engage in more regular and less expensive outpatient and preventative treatments.  Finally, reliance on substance abuse treatment centers and detoxification facilities significantly decreases for supportive housing participants.[41]

170.   Defendant Shinseki recently acknowledged that permanent supportive housing is a critical component of services that need to be available to seriously disabled veterans so that they can access needed mental health and therapeutic

---

[39] See, e.g., MELANY MONDELLO, ET AL., COST OF HOMELESSNESS: COST ANALYSIS OF PERMANENT SUPPORTIVE HOUSING (2007), available at http://www.mainehousing.org/Documents/HousingReports/CostOfHomelessness.pdf (finding 98 percent reduction in shelter visits among 99 tenants of Maine program).

[40] See, e.g., Tia E. Martinez & Martha R. Burt, Impact of Permanent Supportive Housing on the Use of Acute Care Health Services by Homeless Adults, 57 PSYCHIATRIC SERVICES 992 (2006) (finding total number of emergency room visits for sample decreased by 56 percent and total hospital admissions decreased by 44 percent).

[41] See THOMAS L. MOORE, ESTIMATED COST SAVINGS FOLLOWING ENROLLMENT IN THE COMMUNITY ENGAGEMENT PROGRAM: FINDINGS FROM A PILOT STUDY OF HOMELESS DUALLY DIAGNOSED ADULTS (2006), available at http://documents.csh.org/documents/policy/PortlandCostStudy.pdf (finding 93 percent decrease in drug and alcohol treatment nights for residents of Oregon project).

1   services.  He said, "Providing assistance in mental health, substance abuse treatment,

2   education and employment goes hand-in-hand with preventive steps and permanent

3   supportive housing."  He continued, "We continue to work towards our goal of

4   finding every veteran safe housing and access to needed services."  Furthermore, as

5   noted above, DVA recently acknowledged that permanent supportive housing is an

6   effective approach to ensuring homeless veterans with mental disabilities are able to

7   access the services they need to treat their conditions.

8

9   **Providing Permanent Supportive Housing through the WLA Campus**

10   **Is Especially Reasonable**

11          171.   Providing permanent supportive housing to veterans who suffer from

12   serious mental disabilities or brain injuries is all the more reasonable within VA

13   GLA's service area for several reasons.

14          172.   First, the WLA Campus has considerable available land and buildings

15   that could be adapted to provide permanent supportive housing.  Dozens of buildings

16   on the WLA Campus are vacant or underutilized, and some of these buildings

17   formerly provided permanent housing to veterans.  In fact, Defendant Beiter and

18   other VA GLA officials identified three buildings – Building 205, Building 206, and

19   Building 209 – as buildings that could be made available for some homeless housing.

20   Although VA GLA officials announced in June 2010 a $20 million appropriation

21   from DVA to renovate Building 209, Defendant Beiter and other VA GLA officials

22   have taken no concrete steps to begin that project.  Nor have they released any plans

23   related to the building design or identified the therapeutic approach or scope of

24   housing and supportive programming that would be offered if they do, in fact,

25   renovate Building 209.  Additionally, they have taken no steps to recruit and hire

26   appropriate staff for such a facility.  VA GLA officials have stated that the Building

27   209 renovation project would take at least four years, and VA GLA acknowledged in

28   January 2011 that VA GLA is "not commit[ed] to any specific project, construction

1   schedule, or funding priority" for the WLA Campus and that "[e]ach development

2   proposal must be approved individually by [Defendant Beiter], the [VISN Director],

3   and national VA officials."  VA GLA MASTER PLAN at 10.

4        173.   Additionally, VA GLA recently announced Project 60, which is

5   modeled on the County of Los Angeles' Project 50.  As part of Project 60, VA GLA

6   will "collaborate with Federal, County and local government and non-profit agencies

7   to move 60 of the most vulnerable, chronically homeless Veterans off the streets and

8   into permanent supportive housing," and Project 60 participants will get housing "no

9   matter how ready they are to receive mental health and substance abuse services – or

10   despite any treatment failures and setbacks."[42]  Accordingly, Defendant Beiter does

11   not need to create a new program or substantially alter existing services to provide

12   permanent supportive housing as an accommodation for Plaintiffs and similarly

13   situated veterans.

14        174.   Finally, the federal government acquired the land that now makes up the

15   WLA Campus under the 1888 Deed, and it is clear that the donors intended that the

16   government use the land to establish and permanently provide a *home* to disabled

17   veterans.  Citizens donated the land precisely so that the federal government could

18   provide permanent housing and care for disabled veterans like Plaintiffs.

19

20   **Current Commercial Uses of the WLA Campus Preclude Use of that Land to**

21   **Provide Housing and Care for Plaintiffs and Other Seriously Disabled Veterans**

22        175.   Beginning at least as early as 1989, VA GLA began leasing portions of

23   the WLA Campus to private entities and has since entered into a range of land use

24   agreements, including long- and short-term leases, memoranda of understanding,

25   revocable licenses, and enhanced sharing agreements, with both for-profit and not-

26   for-profit entities.  Additionally, VA GLA transferred ownership of 13.5 acres to the

---

27   [42] VA GREATER LOS ANGELES HEALTHCARE SYSTEM, PROJECT 60 FACT SHEET, *available at*
28   http://www.losangeles.va.gov/documents/11-02-15_Fact_Sheet_Project_60.pdf (last accessed May 30, 2011).

1  State of California to construct the 396-bed geriatric care facility that the State now
2  operates on the WLA Campus.  As of January 2011, VA GLA acknowledged 21
3  current land use agreements.  *See* VA GLA MASTER PLAN at 36-37.

4        176.   VA GLA's hospital complex is located on the southern portion of WLA
5  Campus.  VA GLA has leased approximately 10 acres near the hospital to Enterprise
6  Rent-A-Car and Tumbleweed Transportation, a charter bus operator, for vehicle
7  storage.  Since 2001, VA GLA also has allowed Westside Services, LLC to operate
8  parking areas throughout the WLA Campus as remote parking sites for nearby
9  businesses.  The American Red Cross has a 50-year lease on a parcel of land near the
10 hospital and has operated its district headquarters there since 1989.

11       177.   Large sections of the central portion of the campus are also unavailable
12 for veteran housing or services as a result of private land use agreements.
13 For example, Sodexho Marriott operates a laundry facility in Building 224 and an
14 adjacent water softening unit for processing linen from surrounding hotels.
15 Richmark Entertainment contracted with VA GLA to operate the Wadsworth Theatre,
16 which was built in 1939 as an entertainment center for veterans, and the Brentwood
17 Theater.  Veterans are charged full price for all events held at those theaters.  UCLA
18 utilizes the Jackie Robinson Baseball Stadium on the east side of the WLA Campus.
19 An energy company has operated active oil wells on approximately 2.5 acres since
20 1988, and 1.5 acres are subject to an enhanced sharing agreement with TCM, LLC to
21 operate a farmer's market.  Additional land on this portion of the campus is used by
22 Westside Services, LLC as remote parking for non-DVA programs.

23       178.   In the northern area of the campus, the overwhelming majority of land
24 is unavailable for use by veterans or by VA GLA to provide services or housing to
25 veterans as a result of private land agreements.  The City of Los Angeles built
26 Barrington Park, a 12-acre property that includes a parking lot, a baseball diamond,
27 athletic fields, and a dog park.  Brentwood School utilizes 20 acres, on which it has
28 constructed athletic fields, a track, tennis courts, and a swimming pool, under an

1   enhanced use agreement.  Two soccer clubs use MacArthur Field, where veterans
2   once played softball, and an adjacent parking lot.

3   179.   These uses are plainly inconsistent with the intent of the 1888 Deed that
4   the federal government establish and permanently maintain a home for disabled
5   veterans, because they are not directly related to providing housing or medical and
6   other therapeutic care to disabled veterans.

7   180.   Despite repeated efforts by Plaintiff Barrie and her family and several
8   veteran, community, and philanthropic groups to obtain information about these land
9   deals, there has not been a public accounting of how these deals were reached, what
10  their details are, how much revenue is generated by them, and how such revenue, if
11  any, is used.  In fact, the total fiscal year budget reported in VA GLA's 2010 Annual
12  Report has an asterisk next to it, indicating that the figure does not include
13  "alternative revenue."

14  181.   Additionally, when DVA transferred the land to the State of California
15  for the operation of the nursing care facility, the deed included a provision specifying
16  that title would revert to the federal government if the State ceased using the land as
17  a nursing home or for domiciliary purposes.  VA GLA characterized this provision
18  as requiring the State of California to use the land "as a nursing home or for
19  domiciliary uses, as agreed upon in the original deed."  VA GLA MASTER PLAN at 10.
20  Even though VA GLA blatantly uses portions of the WLA Campus for purposes
21  plainly inconsistent with the original 1888 Deed, DVA imposed on the State of
22  California the obligation to use the parcel transferred to it consistent with the original
23  intent, at the risk of losing title to the land.

24

25  **Defendants Shinseki and Beiter Have Personal Knowledge that VA GLA's**
26  **Current Practices Are Discriminatory and that the WLA Campus Is Being**
27  **Misused and the Direct and Specific Authority to Remedy the Violations**

28  182.   Defendant Shinseki has personal knowledge about the chronic

1  homelessness crisis among veterans.  For example, numerous news accounts reflect

2  that in November 2009 Defendant Shinseki acknowledged the serious problem of

3  homelessness among veterans, and in particular among veterans recently returned

4  from Iraq and Afghanistan.  Additionally, in 2010, the U.S. Interagency Council on

5  Homelessness (USICH), of which Defendant Shinseki is a member, released a report

6  on homelessess.  The report included a discrete section on veteran homelessness,

7  which included quotes from Defendant Shinseki.  That section of the report

8  described the number of homeless veterans and the number of chronically homeless

9  veterans and acknowledged that veterans were overrepresented in the homeless

10  population.  Defendant Shinseki also issued a press release in February 2011

11  announcing that DVA and the U.S. Department of Housing and Urban Development

12  had released a supplement to a 2009 report to Congress on homeless, and that report

13  included substantial data on the number of homeless veterans and chronically

14  homeless veterans in the United States.

15       183.  Defendant Shinseki also has personal knowledge about the necessity of

16  permanent supportive housing for this population to meaningfully access the VHA

17  services to which they are entitled.  For example, when DVA and the U.S.

18  Department of Housing and Urban Development released the supplement to the 2009

19  report to Congress on homeless in February 2011, Defendant Shinseki stated,

20  "Providing assistance in mental health, substance abuse treatment, education and

21  employment goes hand-in-hand with preventive steps and permanent supportive

22  housing." He continued, "We continue to work towards our goal of finding every

23  veteran safe housing and access to needed services." Additionally, the 2010 USICH

24  report noted that, "[l]ike other populations, the complexity of navigating systems

25  makes it difficult for Veterans to get their needs met," and that "[v]eterans

26  experiencing chronic homelessness benefit from . . . increasing access to permanent

27  supportive housing."

28       184.  Defendant Shinseki and his predecessors as Secretary of DVA have also

1  received dozens of letters over the years drawing attention to DVA's failure to

2  provide appropriate services at the WLA Campus to homeless veterans suffering

3  from mental disabilities, as well as the misuse of the WLA Campus. For example,

4  local veterans groups and activists have sent Defendant Shinseki dozens of letters

5  demanding appropriate housing and services for disabled veterans on the WLA

6  Campus. In fact, Defendant Shinseki received correspondence from local veteran

7  and activist Robert Rosebrock in December 2010 that not only addressed the misuse

8  of land at the WLA Campus, but also specifically mentioned one homeless veteran's

9  circumstances and his need for stable housing in order to meaningfully access

10 services at the WLA Campus. Additionally, in January 2011, the law firm Dilworth

11 Paxson LLP sent Defendant Shinseki a letter and a detailed report prepared by the

12 Metabolic Studio regarding the history of the WLA Campus and noting DVA's

13 breach of its fiduciary obligation under the 1888 Deed. The General Counsel for

14 DVA responded shortly thereafter with a letter contending DVA was fulfilling its

15 obligations under the 1888 Deed. Plaintiff Barrie also has sent numerous letters to

16 Defendant Shinseki's predecessors regarding VA GLA's misuse of the WLA

17 Campus for purposes unrelated to providing housing or supportive services to

18 disabled veterans and received at least one response from the Office of the Secretary

19 of DVA.

20    185.   Defendant Shinseki, as Secretary of DVA, also has authority to

21 promulgate regulations that guide DVA's and VA GLA's development and

22 implementation of programs, including VHA benefits. Although aware that

23 homeless veterans with serious mental disabilities and brain injuries cannot

24 meaningfully access medical, mental health, and other services available under the

25 VHA benefits program, Defendant Shinseki has not promulgated regulations

26 requiring that DVA or its health systems, including VA GLA, provide permanent

27 supportive housing as a reasonable accommodation.

28    186.   Thus, as a cabinet-level secretary with responsibility for ensuring DVA

1 | complies with federal anti-discrimination laws and its fiduciary obligations,

2 | Defendant Shinseki has specific knowledge of the violations detailed in this

3 | Complaint and direct responsibility and authority to provide the remedies sought in

4 | this Complaint, but he has failed to exercise that authority.

5 |      187. Defendant Beiter has personal knowledge that VA GLA serves

6 | numerous veterans who suffer from serious mental disabilities and are homeless. As

7 | Director of VA GLA, Defendant Beiter is responsible for ensuring that VA GLA

8 | complies with all DVA regulations and policies, including the requirements that it

9 | convene an annual meeting with community partners to assess the need for services

10 | to homeless veterans and that it provide survey results to DVA on the homeless

11 | population within its service areas annually. Defendant Beiter authorized VA GLA

12 | to release its 2009 homelessness survey results, which reflected that more than 8,000

13 | homeless individuals resided within VA GLA's service area.

14 |      188. Defendant Beiter has personal knowledge that homeless veterans within

15 | VA GLA's service area are denied meaningful access to the services currently

16 | offered by VA GLA. For example, officials from the City of Santa Monica have met

17 | with Defendant Beiter and other senior VA GLA officials on numerous occasions

18 | and argued that VA GLA is failing to provide homeless veterans who reside within

19 | the geographic limits of Santa Monica with meaningful access to VHA services.

20 |      189. Additionally, VA GLA prepared and published a report on January 11,

21 | 2011 that purported to summarize the history and current scope of services offered

22 | by VA GLA for homeless veterans. This report acknowledged "there is a sub-

23 | population of Veterans who have serious chronic mental health and substance abuse

24 | problems: these Veterans require intensive treatment beyond the scope current

25 | homeless transitional housing programs." The report further acknowledged that VA

26 | GLA did not currently offer any programs that meet the needs of this group. As the

27 | Director of VA GLA, Defendant Beiter has final authority to approve the preparation

28 | and release of reports such as the January 11, 2011 homelessness report and is aware

1   of the contents of that report.

2       190.   VA GLA also recently launched Project 60. Through this initiative, VA

3   GLA plans to target 60 vulnerable, chronically homeless veterans and connect them

4   with permanent supportive housing, including the supportive resources and services

5   necessary to stabilize and improve medical and mental health. The impetus behind

6   the development and planned implementation of Project 60 was the recognition that

7   chronically homeless veterans cannot meaningfully access services offered by VA

8   GLA. As the Director of VA GLA, Defendant Beiter has final authority to authorize

9   initiatives like Project 60 and is aware of the factors that prompted VA GLA to

10  develop Project 60.

11      191.   Defendant Beiter's official duties require that she oversee and manage

12  day-to-day operations of VA GLA, including approving program design, authorizing

13  VA GLA to offer particular services, establishing admission and other criteria for the

14  various programs offered through VA GLA, and ensuring that DVA complies with

15  federal anti-discrimination laws and its fiduciary obligations. She has, in fact,

16  approved and authorized the programs and services currently offered by VA GLA

17  and is the sole official within VA GLA with authority to approve new programs, to

18  set funding priorities, and to authorize modifications to existing programs that

19  require renovation or modification of existing structures. *See* VA GLA MASTER

20  PLAN at 10. Thus, Defendant Beiter has direct control over and responsibility for the

21  design and implementation of the current VHA benefits program offered through VA

22  GLA and has elected not to offer permanent supportive housing to Plaintiffs and

23  similarly situated veterans as a reasonable accommodation for their disabilities.

24      192.   As the Director of VA GLA, Defendant Beiter is also personally aware

25  of the many contracts and land deals under which private entities utilize the WLA

26  Campus, where her office is located, for purposes inconsistent with the 1888 Deed.

27  The Veterans Programs Enhancement Act of 1998 required that VA GLA develop a

28  master land use plan for the WLA Campus. In January 2011, VA GLA released a

draft master plan, as required by the 1998 legislation. As the Director of VA GLA, Defendant Beiter was involved in and had direct responsibility to review and authorize the release of the draft master plan.

193. The draft master plan included a summary of the history of the WLA Campus, including the 1888 Deed, and acknowledged that the 1888 Deed required that the land be used for housing disabled veterans. *See* VA GLA MASTER PLAN at 10 (noting use of the land "as a nursing home or for domiciliary uses [was] agreed upon in the original deed"). The draft master plan also documented the many private land deals that limit VA GLA's ability to use the WLA Campus to provide housing and supportive services to disabled veterans. *See* VA GLA MASTER PLAN at 36-37 (summarizing "Current Land Use Agreements").

194. Defendant Beiter has also received correspondence from local activists detailing the many current uses of the WLA Campus that are inconsistent with the 1888 Deed. She also has been confronted by City of Santa Monica officials regarding the private land deals and her failure to ensure that the WLA Campus is used to provide housing to disabled veterans consistent with the 1888 Deed.

195. As the Director of VA GLA, Defendant Beiter has final decision-making authority related to uses of the WLA Campus. *See* VA GLA MASTER PLAN at 10 ("Each development proposal [for the WLA Campus] must be approved individually by the GLAHS Director [Defendant Beiter], the [VISN director], and national VA officials as required by VA regulation governing the specific project."). She and her predecessors as Director of VA GLA approved each land deal for the WLA Campus described in this Complaint.

196. Accordingly, Defendant Beiter has specific knowledge of the violations detailed in this Complaint, she or her predecessors as Director of VA GLA were directly responsible for and authorized the conduct that gave rise to the violations detailed in this Complaint, and she has the direct responsibility and authority to provide the relief sought in this Complaint.

197.   The violations of Plaintiffs' rights by Defendants outlined above are ongoing and will continue unless this Court grants the relief Plaintiffs seek in this Complaint.

## CLASS ALLEGATIONS

198.   Plaintiffs Valentini, Moraru, Doe, and Romine bring the first and second causes of action detailed below on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.   For those causes of action, those Plaintiffs seek injunctive and declaratory relief applicable to members of the Plaintiff Class, as defined below.

199.   The plaintiff class consists of:

*Veterans who are eligible for the benefits provided by the Veterans Health Administration and reside within the service area of the VA Greater Los Angeles Healthcare System, and who suffer from a mental disability and/or brain injury that renders them unable to obtain or maintain stable housing.*

200.   Class action status for this litigation is proper because:

      (a)   The plaintiff class is so numerous that joinder of all members is impractical;

      (b)   There are questions of law and fact common to the class;

      (c)   Plaintiffs' claims are typical of the claims of the class, in that Plaintiffs are and were denied meaningful access to VHA benefits offered by VA GLA solely by reason of their serious mental or physical disability;

      (d)   Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Plaintiffs and the other class members; and

      (e)   Plaintiffs can adequately represent the interests of the class members and have retained counsel experienced in class action litigation.

201.   Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final declaratory and injunctive relief

appropriate with respect to the class as a whole, under Federal Rule of Civil Procedure 23(b)(2).

## FIRST CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 793

### (Intentional Discrimination)

### (Plaintiffs Valentini, Moraru, Doe, Romine, and Vietnam Veterans of America Against All Defendants)

202. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

203. Plaintiffs are disabled within the meaning of the Rehabilitation Act and otherwise eligible for the VHA benefits offered by DVA, a federal agency, but defendants have intentionally defined and provide the VHA benefits offered by VA GLA so as not to serve Plaintiffs' severe disabilities, in violation of Section 504 of the Rehabilitation Act of 1973.

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 793

### (Meaningful Access)

### (Plaintiffs Valentini, Moraru, Doe, Romine, and Vietnam Veterans of America Against All Defendants)

204. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

205. Plaintiffs are disabled within the meaning of the Rehabilitation Act and otherwise eligible for the VHA benefits offered by DVA, a federal agency, but defendants have defined and provide the VHA benefits offered by VA GLA in a way that effectively denies Plaintiffs meaningful access to those benefits, in violation of Section 504 of the Rehabilitation Act of 1973.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty as Trustee of Charitable Trust (Injunctive Relief)

### (All Plaintiffs Against All Defendants)

206.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

207.  The 1888 Deed created a charitable trust, and, as the successor-in-interest to the National Soldiers' Home, DVA holds that land, on which the WLA Campus now sits, in trust for the intended beneficiaries of the charitable trust, disabled veterans, and must use the land only for purposes that directly contribute to the establishment and permanent operation of a home for disabled veterans.

208.  By authorizing the many uses of the WLA Campus that do not directly contribute to the operation of a home for disabled veterans, Defendants have breached their fiduciary duties as trustees of the charitable trust.

## FOURTH CAUSE OF ACTION

### Accounting for Profits

### (All Plaintiffs Against All Defendants)

209.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

210.  The 1888 Deed created a charitable trust, and, as the successor-in-interest to the National Soldiers' Home, DVA holds that land, on which the WLA Campus now sits, in trust for the intended beneficiaries of the charitable trust, disabled veterans, and must use the land only for purposes that directly contribute to the establishment and permanent operation of a home for disabled veterans.

211.  By authorizing the many uses of the WLA Campus that do not directly contribute to the operation of a home for disabled veterans, Defendants have breached their fiduciary duties as trustees of the charitable trust, and the financial

1  arrangements and payment structure from these uses are complicated and the
2  information about them is within the control of the defendant, such that an
3  accounting is necessary.
4
5  ## FIFTH CAUSE OF ACTION
6  ### Breach of Fiduciary Duty as Trustee of Charitable Trust (Mandamus Relief)
7  ### (All Plaintiffs Against All Defendants)
8      212.   Plaintiffs incorporate by reference the foregoing paragraphs of this
9  Complaint as though fully set forth herein.
10     213.   The 1888 Deed created a charitable trust, and, as the successor-in-
11 interest to the National Soldiers' Home, DVA holds that land, on which the WLA
12 Campus now sits, in trust for the intended beneficiaries of the charitable trust,
13 disabled veterans, and must use the land only for purposes that directly contribute to
14 the establishment and permanent operation of a home for disabled veterans.
15     214.   As trustees of the charitable trust, Defendants have a non-discretionary
16 fiduciary duty, which they have breached by authorizing the many uses of the WLA
17 Campus that do not directly contribute to the operation of a home for disabled
18 veterans.
19     215.   Plaintiffs have no adequate remedy at law to compel defendants to cease
20 breaching their fiduciary duty as trustees of the charitable trust.
21
22 ## REQUEST FOR RELIEF
23     Plaintiffs therefore respectfully request that this Court grant the following
24 relief:
25     A.   Certify a class for the first and second causes of action in this Complaint
26 pursuant to Federal Rule of Civil Procedure 23, in accordance with the allegations in
27 this Complaint and the forthcoming class certification motion.
28     B.   Enter an injunction directing that Defendants provide Plaintiffs and the

67

1 Plaintiff Class permanent supportive housing as a reasonable accommodation for
2 their disabilities so Plaintiffs and the Plaintiff Class can reasonably access the VHA
3 benefits for which they are eligible.

4       C.     Enter an injunction prohibiting Defendants from utilizing the WLA
5 Campus for any purpose that is not directly related to providing a home for disabled
6 veterans or, in the alternative, enter an order mandating that defendants refrain from
7 allowing the current uses of the WLA Campus for purposes that are not directly
8 related to providing a home for disabled veterans to continue.

9       D.     Enter an injunction requiring an accounting of profits of all money
10 received by DVA or VA GLA as a result of land use agreements for the WLA
11 Campus under which the land is used for any purpose that is not directly related to
12 providing a home for disabled veterans and requiring that Defendants deposit all
13 such money in account to be used solely for the purpose of providing housing and
14 housing-connected supportive services to disabled veterans at the WLA Campus.

15       E.     Declare that the design and implementation of the VHA benefits
16 program within VA GLA by defendants intentionally discriminates against Plaintiffs
17 and the Plaintiff Class solely by reason of their disabilities.

18       F.     Declare that defendants are denying Plaintiffs and the Plaintiff Class
19 meaningful access to the VHA benefits offered by VA GLA solely by virtue of their
20 disabilities.

21       G.     Declare that the federal government's acceptance of the land transferred
22 under the 1888 Deed created a charitable trust.

23       H.     Declare that defendants have breached and continue to breach their
24 fiduciary duties as trustees of the charitable trust by allowing VA GLA to use the
25 WLA Campus for purposes that are not directly related to providing a home for
26 disabled veterans.

27       I.     Grant such other relief as this Court deems just and proper, including
28 but not limited to awarding attorney's fees under 29 U.S.C. § 794a and any other

1  applicable statutes and awarding costs under 28 U.S.C. § 1920 and any other

2  applicable statute.

3

4  Respectfully Submitted,

5

6  Dated:   June 7, 2011            By: _____
                                         Mark D. Rosenbaum
7                                        ACLU Foundation of Southern
8                                        California

9  Dated:   June 7, 2011            By: _____
                                         David B. Sapp
10                                       ACLU Foundation of Southern
11                                       California

12

13 Dated:   June 7, 2011            By: _____
                                         Laurence H. Tribe
14

15

16
   Dated:   June 7, 2011            By: _____
17                                       Ronald L. Olson
18                                       Munger, Tolles & Olson, LLP

19

20 Dated:   June 7, 2011            By: _____
                                         Amos Hartston
21                                       Inner City Law Center

22

23 Dated:   June 7, 2011            By: _____
                                         John C. Ulin
24                                       Arnold & Porter, LLP

25

26
   Dated:   June 7, 2011            By: _____
27                                       Gary L. Blasi

28

1    Dated:  June 7, 2011                     By:  _Jonathan Massey (ds)_
2                                                  Jonathan Massey
                                                   Massey & Gail LLP
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28