1  MARK D. ROSENBAUM, SBN 59940
   mrosenbaum@aclu-sc.org
2  ACLU FOUNDATION OF SOUTHERN
   CALIFORNIA
3  1313 W. 8th Street
   Los Angeles, CA 90017
4  T: (213) 977-5220, F: (213) 417-2220

5  RONALD L. OLSON, SBN 44597
   Ron.Olson@mto.com
6  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, 35th Fl,
7  Los Angeles CA 90071-1560
   T: (213) 683-9100, F: (213) 683-5111

8

9  JOHN C. ULIN, SBN 165524            LAURENCE H. TRIBE, SBN 39441
   John.Ulin@aporter.com               tribe@law.harvard.edu
10 ARNOLD & PORTER, LLP                HARVARD LAW SCHOOL*
   777 South Figueroa Street           Hauser 420, 1575 Massachusetts Ave.
10 Los Angeles, CA  90017              Cambridge, MA 02138
11 T: (213) 243-4228, F: (213) 243-4199  T: (617) 495-1767
                                       *For identification purposes only
12 (Additional counsel listed on next page)

13 Attorneys for Plaintiffs

14

15            UNITED STATES DISTRICT COURT

15         FOR THE CENTRAL DISTRICT OF CALIFORNIA

16

17 GREGORY VALENTINI, ADRIAN          ) Case No.: CV-11-04846 SJO (MRWx)
   MORARU, JANE DOE, ZACHARY          ) The Honorable James S. Otero
17 ISAAC, WILLIE FLOYD, LEROY         )
18 SMITH, JR., LESLIE RICHARDSON,     )
   WAYNE EARLY, LAWRENCE              )
19 GREEN, and DEMETRIOUS             ) CLASS ACTION : FIRST
   KASSITAS, on behalf of themselves and ) AMENDED COMPLAINT FOR
20 all those similarly situated, VIETNAM ) INJUNCTIVE, DECLARATORY,
   VETERANS OF AMERICA, and          ) MANDAMUS, AND ACCOUNTING
21 CAROLINA WINSTON BARRIE,          ) RELIEF
                                      )
22            Plaintiffs,             )
                                      )
23       vs.                          )
                                      )
24 ERIC SHINSEKI, in his official     )
   capacity, Secretary, Department of )
25 Veterans Affairs; DONNA M. BEITER, )
   in her official capacity, Director, VA )
26 Greater Los Angeles Healthcare System, )
                                      )
27            Defendants.             )
                                      )
28 _____   )

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 2 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Additional Counsel

GARY L. BLASI, SBN 70190
blasi@law.ucla.edu
UCLA SCHOOL OF LAW*
405 Hilgard Avenue
Los Angeles, California 90024
T: (310) 206-9431, F: (310) 206-1234

AMOS E. HARTSTON, SBN 186471
ahartston@innercitylaw.org
INNER CITY LAW CENTER
1309 East Seventh Street
Los Angeles, CA 90021
T: (213) 891-2880. F: (213) 891-2888

PETER ELIASBERG, SBN 189110
peliasberg@aclu-sc.org
DAVID B. SAPP, SBN 264464
dsapp@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
T: (213) 977-5220, F: (213) 417-2220

MELISSA A. TYNER, SBN 269649
mtyner@innercitylaw.org
ELIZABETH HAMAN KUGLER, SBN
273928
EKugler@innercitylaw.org
ADAM MURRAY, SBN 199430
amurray@innercitylaw.org
INNER CITY LAW CENTER
1309 East Seventh Street
Los Angeles, CA 90021
T: (213) 891-2880. F: (213) 891-2888

JAMES J. FINSTEN, SBN 234999
James.Finsten@aporter.com
JACOB K. POORMAN, SBN 262261
Jacob.Poorman@aporter.com
ARNOLD & PORTER, LLP
777 South Figueroa Street
Los Angeles, CA 90017
T: (213) 243-4228, F: (213) 243-4199

JONATHAN MASSEY
jmassey@masseygail.com
*Pro Hac Vice application pending*
MASSEY & GAIL LLP
1325 G St. NW, Suite 500
Washington, D.C. 20005
T: (202) 652-4511, F: (312) 379-0467

LEONARD GAIL
lgail@masseygail.com
*Pro Hac Vice*
MASSEY & GAIL LLP
50 East Washington St., Suite 400
Chicago, IL 60602
T: (312) 283-1590, 0F: (312) 379-0467

JOHN RAPPAPORT, SBN 254459
John.Rappaport@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Fl,
Los Angeles CA 90071-1560
T: (213) 683-9100, F: (213) 683-5111

*For identification purposes only*

The following allegations are based on information and belief, unless otherwise specified:

## **INTRODUCTION**

1.    No veteran entered military service severely mentally disabled and homeless.  We, as a people, owe our security and the preservation of our most cherished values to our military service members and our veterans, who serve our nation not for remuneration or glory, but out of fealty to honor, duty, and sacrifice. One horrific consequence of war is that it exacts heavy and lifelong consequences on the young men and women who made lofty commitments on our behalf: many return with physically invisible wounds of mental illness, Post Traumatic Stress Disorder (PTSD), or brain traumas.  For countless veterans, military service has rendered them unable to resume their civilian lives, sustain their family relationships, hold down jobs or continue their educations, or even to maintain a permanent residence.

2.    In March 2009, President Obama stated as to our veterans: "These heroes have a home.  It's the country they served, the United States of America, and until we reach a day when not a single veteran sleeps on our nation's streets, our work remains unfinished."  But for an estimated 107,000 homeless veterans nationwide, conservatively 8,200 (or 8 percent) of whom live in the Greater Los Angeles area,[1] these fine words of a promised home remain aspirational rhetoric, not the hard truths of their daily lives.

3.    Many veterans who entered military service with sound bodies and minds return to civilian life bearing scars both visible and invisible.  The invisible scars include PTSD and other mental disorders either caused or aggravated by their experiences.  An incontrovertible body of research has established the close causal and mutually reinforcing interrelationships between severe mental disabilities and

---

[1] The U.S. Department of Veterans Affairs (DVA) is the source of these estimates, which are conservative and likely undercount the number of homeless veterans nationally and in the Greater Los Angeles area.  Numerous researchers, advocates, and local officials have argued that DVA's estimates are inaccurately low, and other estimates place the number of homeless veterans in Los Angeles at 20,000.

chronic homelessness.  Over the past decade or more, numerous scientific studies have demonstrated, consistent with common sense, that homeless individuals with severe mental disorders and/or addiction disease resulting from those disorders can meaningfully access and benefit from medical and mental health services only after they are stabilized in stable and permanent housing connected to appropriate services and support – generally referred to as "permanent supportive housing."

4.    In fact, research has confirmed that the only way that individuals with psychiatric conditions such as PTSD, brain trauma, paranoid schizophrenia, and bipolar disorder consistently are able to meaningfully access and benefit from medical and psychiatric services is when they first permanently reside in appropriate supportive housing.  Moreover, absent such housing, these conditions worsen, leading to the creation of additional problems impairing the capacity of these individuals to conduct everyday life.  Homelessness itself exposes veterans to further trauma that itself can both cause and aggravate PTSD and other disorders.  For veterans with severe mental disabilities incurred as a result of their service to this country, effective treatment requires the stability and regularity afforded by permanent housing readily accessible to ongoing comprehensive care and supportive services.

5.    The U.S. Department of Veterans Affairs (DVA) has acknowledged these conclusions, stating, for example, in a supplement to a 2009 report to Congress on homelessness: "For the large percentage of veterans with disabilities, permanent supportive housing would be effective in helping them achieve long-term stability." Nonetheless, DVA and its constituent healthcare systems do not systematically utilize permanent supportive housing to ensure that severely disabled veterans have the stability and support they need to meaningfully access the medical treatment and other services for which they are otherwise eligible.

6.    Los Angeles is the homeless veterans capital of the United States.  This is true despite the fact that the focal point for the VA Greater Los Angeles

1  Healthcare System ("VA GLA") is the West Los Angeles Medical Center &
2  Community Living Center campus ("WLA Campus"), a 387-acre parcel located five
3  miles from the Pacific Ocean in Los Angeles.  This land was donated in 1888 to the
4  predecessor body to DVA for the specific purpose of providing housing for veterans
5  with disabilities.  The deed called for establishing and permanently maintaining a
6  soldier's home for disabled war veterans on that land.  For some 80 years, DVA's
7  predecessors operated a Pacific Branch Soldier's Home at this site in conformity
8  with the 1888 deed, which provided a permanent home for tens of thousands of
9  disabled veterans who resided on the campus and were able to access necessary
10 medical and therapeutic services available there.

11         7.        Beginning in the 1960s and 1970s, however, DVA's predecessor ceased
12 accepting new residents at the WLA Campus, and structures dedicated to permanent
13 housing were repurposed or fell into disuse and became badly in need of repair and
14 renovation.  All new construction and renovation projects were focused on
15 expanding medical and short-term treatment facilities.  There are today more than
16 100 buildings on the WLA Campus, many vacant, closed, or underutilized.  In
17 contrast to what once existed, no permanent housing is available to disabled veterans
18 on the WLA Campus.  VA GLA does not offer, on the WLA Campus or elsewhere
19 within VA GLA's service area, permanent housing collocated with or readily
20 accessible to necessary medical, mental health, and other supportive services for
21 homeless veterans with severe mental disabilities or brain injuries that render them
22 unable to obtain the treatment and care they desperately need without stable housing.

23         8.        Plaintiffs in this case include severely disabled veterans with mental
24 disabilities and/or brain injuries who, as a result of their disabilities, are homeless
25 and cannot access necessary medical and mental health treatment for which they are
26 otherwise eligible and which they require to have a chance at leading the normal life
27 that was theirs before they began military service.

28         9.        Greg Valentini is an Army veteran who served in Afghanistan as part of

Operation Enduring Freedom (OEF) and in Iraq as part of Operation Iraqi Freedom (OIF). His unit, the 101st Airborne Division, participated in the initial invasion of Afghanistan in 2001 and the assault on Tora Bora intended to capture Osama bin Laden and other senior al Qaeda and Taliban leaders. His unit also was part of the initial invasion force in Iraq in 2003 and saw heavy combat in Karbala. While in Afghanistan and Iraq, Mr. Valentini witnessed numerous fellow soldiers and civilians die and was himself regularly in great peril under heavy fire. Upon his return to the United States following his discharge, Mr. Valentini began experiencing symptoms of what was later diagnosed as a severe case of PTSD. He was constantly on alert and unable to concentrate on basic details of everyday life, he had graphic nightmares about things he witnessed during his wartime service, and he began to think about suicide as a way to escape the constant stress of feeling that he never left the combat zone. Mr. Valentini began self-medicating himself with methamphetamine to cope with the recurring violent thoughts and stress. Eventually, Mr. Valentini became homeless. When he went to the WLA Campus for help, he was briefly housed in a short-term treatment program, but was discharged and returned to the street. He has now been sporadically homeless for several years and requires a safe, secure, and stable residence in order to meaningfully access necessary treatment for his mental disabilities.

    10.    Adrian Moraru is a Marine veteran who was deployed to Iraq as part of the initial invasion force in OIF. While he was stationed in Karbala following the initial invasion, he always had to remain "on alert" and needed eyes in the back of his head, because of the constant threat he and his comrades faced. In contrast to the initial invasion, when he knew who the enemy was, during this period he could not interact with civilians without worrying that he would be attacked. He also was exposed to a chemical without chemical warfare gear while he was in Iraq. Following his discharge, he experienced a violent seizure and developed painful boils on his groin, back, and arms. Mr. Moraru recalls going "schizo" when he

1  returned to his home in Philadelphia, causing him to destroy his mother's living
2  room and to have the impulse to kill her.  He thereafter lived in a car for several
3  months.  After other violent incidents, Mr. Moraru eventually came to Los Angeles,
4  where he was homeless and spent his days and nights marching up and down
5  Wilshire Boulevard.  When he went to the WLA Campus and sought residential
6  services, he was housed at a temporary shelter in a room with three other men and
7  was discharged when he assaulted another resident.  He was thereafter arrested in
8  Santa Monica and charged with making a criminal threat.  As a result of his mental
9  disability, Mr. Moraru is at times overcome by strong impulses and often is not able
10  to understand why he behaves as he does.  He requires a safe, secure, and stable
11  residence to meaningfully access treatment for his mental disabilities.

12       11.    Jane Doe[2] is an Army veteran who completed Advanced Individual
13  Training in Radio Communications at Fort Dix, New Jersey in 1974.  While serving
14  in the military, she experienced several sexual assaults.  VA GLA psychiatrists have
15  diagnosed Ms. Doe with PTSD secondary to military sexual trauma.  She
16  experiences frequent flashbacks and nightmares and has been unable to secure or
17  maintain a job as a consequence of her mental disabilities.  She has been homeless
18  for many years.  Ms. Doe requires a safe, secure, and stable residence to
19  meaningfully access appropriate treatment for her mental disabilities.

20       12.    Floyd Summers is an Army veteran who was stationed as a
21  communications specialist in Germany.  He was honorably discharged in 1977.  In
22  the following decades, he experienced symptoms of bipolar disorder and PTSD,
23  including mood swings and depression.  As a result of his mental disabilities, he has
24  struggled to hold stable employment and maintain relationships.  In 1995, he was

25  _____

26  [2] Jane Doe has been the victim of several sexual assaults and is currently experiencing
extreme PTSD symptoms, such that public disclosure of her trauma may compound and exacerbate
her symptoms, and she is currently seeking medical, mental health and other services and benefits
27  from DVA and consequently fears retaliation.  For these and other reasons, a pseudonym is used to
protect her identity and to protect her from harm.  Plaintiffs have filed an application seeking
28  permission to allow Ms. Doe to proceed under a pseudonym concurrently with this Complaint.

diagnosed with bipolar disorder by VA GLA doctors.  After a brief stay in the psychiatric ward at the WLA Campus, he became homeless.  He has since screened positive for PTSD and was assigned to a PTSD support group offered through VA GLA.  He has lived on the streets and in his car on and off for over two decades. Recently, Mr. Summers was turned down for transitional housing at the WLA Campus because he was deemed too "unstable" due to his mental disability.  He requires a safe, secure, and stable residence to meaningfully access necessary treatment for his mental disabilities and resulting substance abuse disorder.

13.    Zachary Isaac is a Navy veteran who served on a guided missile destroyer and was stationed in various locations across the Pacific Ocean.  He was discharged in 2010.  During his time in the Navy, Mr. Isaac was involved in combat and experienced the death of a sailor under his command.  Mr. Isaac began having violent flashbacks during his service and recently has experienced approximately five to six flashbacks a day, preventing him from being able to find a stable job.  He has been homeless since March 2011, and his flashbacks are exacerbated by living on the streets.  In particular, the shared sleeping arraignments of temporary shelters remind him of his service and trigger flashbacks.  He requires a safe, secure, and stable residence to meaningfully access necessary treatment for his mental disabilities.

14.    Willie Floyd is an Army veteran who served in Vietnam as a combat engineer.  The nature of his duties within the Army placed him in constant danger, as his team would enter the jungle after deforestation efforts with the goal of establishing fortifications for new Army camps and positions.  Mr. Floyd saw the death of numerous U.S. servicemen and engaged in many firefights with enemy troops.  To cope with the stress, he began using drugs while in Vietnam and returned to the U.S. with a drug addiction.  After his return, Mr. Floyd was diagnosed with depression, anxiety, and anti-social disorder.  He has been sporadically homeless in the Los Angeles area for at least 10 years and continues to experience violent

6

flashbacks to Vietnam.  Mr. Floyd participated in a PTSD group at the WLA campus, and, although he found the program helpful, he stopped attending meetings because he found the trip from Skid Row to the WLA campus too difficult to manage. Recently, Mr. Floyd completed a drug treatment program and obtained a housing voucher from VA GLA, but he lost the voucher because he did not submit renewal papers on time.  Since the withdrawal of his housing voucher, Mr. Floyd has been on the streets of Skid Row.  He requires a safe, secure, and stable residence to meaningfully access necessary treatment for his mental disabilities.

15.   Leroy Smith, Jr. is a Marine veteran who served in San Diego and was injured before his deployment to Vietnam.  After his discharge, Mr. Smith was diagnosed with schizophrenia by DVA doctors.  He became homeless after his father and grandmother passed away, and consequently has difficulty keeping track of the medicine prescribed to treat his schizophrenia.  He began taking drugs to cope with his pain and life on Skid Row.  In February 2011, he was admitted to a short-term housing program at the WLA Campus.  Mr. Smith attempted to secure a housing voucher to prepare for his discharge from the program, but he was unable to navigate the application process on his own and did not receive the support necessary to complete the application.  Upon his discharge from the program, Mr. Smith returned to Skid Row, where he currently resides.  He was recently talked down from a bridge that spans the Los Angeles River, where he had blacked out, climbed over the railing, and was threatening to jump.  He requires a safe, secure, and stable residence to meaningfully access necessary treatment for his mental disabilities.

16.   Leslie Richardson is an Army veteran who was assigned to the narcotics division of the Military Police in Germany from 1978-1980.  During his time in Germany, Mr. Richardson's responsibilities included undercover narcotics investigations and investigating drug overdose cases.  He noticed changes in his behavior and emotions as a result of the stress, and he began drinking heavily.  When he returned home after his discharge, Mr. Richardson worked as a police officer, but

1  ultimately quit because of job-related stress.  Soon thereafter, he was diagnosed with

2  depression at a DVA facility in San Bernardino.  He drank heavily to cope with his

3  disability and had difficulty sustaining work as a security guard.  After cycling

4  through a number of VA GLA housing programs from 2007 through 2009, Mr.

5  Richardson received a housing voucher from VA GLA in January of 2009.  Later

6  that year, a fellow veteran in his building committed suicide, and seeing the coroner

7  cart the body away triggered a flashback to the times that Mr. Richardson observed

8  dead bodies during his investigations in Germany.  In March 2010, he had a

9  breakdown and was placed in the psychiatric ward on the WLA Campus for 19 days,

10  after which he was placed in an emergency housing shelter and other short-term

11  housing programs by VA GLA.  After relapsing, he was required to enroll in a sober

12  living program, and he has been living at a sober living house in Long Beach since

13  June 2011.  He does not know where he will go after his term at that program is

14  complete.  Mr. Richardson requires a safe, secure, and stable residence to

15  meaningfully access necessary treatment for his mental disabilities.

16      17.      Wayne Early is an Army veteran who, during basic training, watched a

17  fellow soldier die from a gunshot wound.  Mr. Early has been homeless for about ten

18  years, has severe depression, and has difficulty complying with his mental health

19  treatment program because of his homelessness.  Lawrence Green is a Marine

20  veteran who spent 20 months in Vietnam, including several months handling body

21  bags for deceased American soldiers.  He has been homeless for about four years and

22  believes he has a serious mental disability.  He has been unable to secure permanent

23  housing through VA GLA despite completing a sober living programming at the

24  WLA campus.  Demetrious Kassitas is a Navy veteran who served in Desert Storm

25  between 1990 and 1992.  Although he served as a nurse, he was engaged in at least

26  one direct combat incident.  He has been diagnosed with bipolar disorder and has

27  been homeless twice since leaving the military.   Mr. Early, Mr. Green, and Mr.

28  Kassitas require a safe, secure, and stable residence to meaningfully access necessary

1   treatment for their mental disabilities.

2        18.    Plaintiffs and other similarly situated veterans are being denied access

3   to the medical, mental health, and other services offered by VA GLA for which they

4   are otherwise eligible, solely by virtue of their disabilities, which represents unlawful

5   discrimination under Section 504 of the Rehabilitation Act of 1973.

6        19.    The VA GLA service delivery system has been designed and operated

7   in a manner that prevents veterans like Plaintiffs with severe mental disabilities from

8   accessing mental health, housing, and other supportive services. They are explicitly

9   excluded from participation in housing programs and other services offered by VA

10  GLA *because of* the severity and nature of their disabilities, and VA GLA has not

11  created and does not make available alternative programs to veterans who are denied

12  admission to existing programs because of the severity of their mental health

13  disabilities. "When viewed in relation to similarly situated nondisabled individuals,

14  [disabled veterans are being] denied [services] by [VA GLA] solely because of their

15  disabilities; that is, had they not been disabled, they would have received [services]."

16  *Lovell v. Chandler*, 303 F.3d 1039, 1045-46 (9th Cir. 2002). Additionally, although

17  aware that VA GLA serves numerous veterans with serious mental disabilities who

18  require stable housing linked with supportive services to access necessary treatment

19  and care, VA GLA officials have elected to deliver necessary medical, mental health,

20  and other services only at the WLA Campus and a few other sites scattered across

21  VA GLA's large service area (i.e., have elected not to provide community-based

22  services), and have not located any permanent or long-term housing programs

23  geographically proximate to those sites. Just as the intentional decision to eliminate

24  programming that "focuses on needs of disabled individuals . . . and that provides

25  services disproportionately required by the disabled and available nowhere else" is

26  unlawful facial disability discrimination, *Rodde v. Bonta*, 357 F. 3d 988, 997 (9th Cir.

27  2004), VA GLA's decision to offer benefits to veterans, but to exclude from those

28  benefits the core and necessary component of treatment for the severely disabled,

1   constitutes facial discrimination in violation of the Rehabilitation Act.

2       20.    Plaintiffs and other similarly situated veterans also have been and are

3   being denied meaningful access to benefits offered by VA GLA because of their

4   disabilities in violation of the Rehabilitation Act.  The program structure and design

5   of benefits offered by VA GLA denies them meaningful access, because without

6   stable housing collocated with or readily accessible to the necessary mental health

7   and other supportive services offered by VA GLA, they cannot access the benefits

8   offered by VA GLA on equal terms as nondisabled veterans and less severely

9   disabled veterans.  Thus, the current structure of VA GLA's services denies "certain

10  individuals meaningful access to government-provided services because of their

11  unique needs, while others . . . retain access to the same class of services." *Rodde*,

12  357 F. 3d at 998.

13      21.    Because permanent supportive housing is the only approach that

14  consistently allows individuals like Plaintiffs with serious mental disabilities

15  meaningful access to the medical, mental health, and other services to which they are

16  entitled by virtue of their service to this country, VA GLA is obligated to provide

17  permanent supportive housing to Plaintiffs and other homeless veterans with serious

18  mental disabilities as a reasonable accommodation for their disabilities.

19      22.    For seriously disabled veterans in the Los Angeles area, permanent

20  supportive housing is an especially reasonable accommodation because the WLA

21  Campus was donated to DVA's predecessor in 1888 for the express purpose of

22  establishing and permanently maintaining housing for disabled veterans.  The WLA

23  Campus has numerous vacant and underutilized buildings that could be used for that

24  purpose.  Such a use would be fully consistent with the intent of the individuals who

25  donated the land to the federal government in 1888 for the purpose of establishing

26  and permanently maintaining a home for disabled veterans.

27      23.    The donation of the land on which the WLA Campus now sits created a

28  charitable trust, under which DVA, as the successor trustee, is obligated to use the

1  land only for purposes that directly contribute to the public purpose for which the

2  land was donated.  Although VA GLA does offer medical care and residential care

3  on the WLA Campus, it has misappropriated a substantial portion of the land for uses

4  that are in no way related to housing or caring for veterans.  In lieu of the permanent

5  housing that once operated on the WLA Campus, numerous commercial and other

6  non-DVA programs now operate on the WLA Campus pursuant to leases,

7  memoranda of understanding, revocable licenses, or enhanced sharing agreements

8  entered into by VA GLA – perhaps because, according to VA GLA, the WLA

9  Campus "is perceived to be one of the most valuable parcels of real estate in the

10  western United States."  WEST LOS ANGELES VA MEDICAL CENTER, VETERANS

11  PROGRAMS ENHANCEMENT ACT OF 1998 (VPEA) DRAFT MASTER PLAN 8 (Jan. 2011)

12  [hereinafter "VA GLA MASTER PLAN"], *available at*

13  http://www.scribd.com/doc/48127448/WLA-VA-Draft-Master-Plan.[3]  As a result of

14  these land deals, veterans have limited access to, or are altogether prohibited from

15  accessing, approximately 110 acres of the 387-acre WLA Campus (nearly 30 percent

16  of the grounds).  In fact, the current agreements render those 110 acres unavailable to

17  provide housing or otherwise expand the services offered to disabled veterans.

18        24.    There has never been a public accounting of how much money VA

19  GLA receives under these land deals; who receives payments under these deals; the

20  purposes for which the revenue received, if any, has been used; or the process by

21  which these deals were negotiated.  The VA GLA-approved private uses of land on

22  the WLA Campus include:

23      • Ten acres near the hospital are leased to Enterprise Rent-A-Car and

24         Tumbleweed Transportation, a charter bus operator, for vehicle storage and/or

25         sales;

26

27         [3] The VA GLA Master Plan was issued as a draft plan on January 19, 2011, *see* 76 Fed. Reg.

28  3209 (Jan 19., 2011), and was approved as a final on June 23, 2011, *see* 76 Fed. Reg. 36955 (June 23, 2011).

- Sodexho Marriott operates a laundry facility and an adjacent water softening unit for processing linen from surrounding hotels;
- An energy company has been operating active oil wells on approximately 2.5 acres for 23 years and 1.5 acres are subject to an enhanced sharing agreement with TMC, LLC to operate a farmer's market;
- Richmark Entertainment operates the Wadsworth Theater for commercial productions, and, although it was originally constructed as an entertainment center for veterans, veterans are charged full price for all events held there; Richmark also operates the Brentwood Theater on the WLA Campus;
- Westside Services LLC operates parking areas throughout the WLA Campus on behalf of businesses and other establishments in the surrounding community;
- UCLA utilizes the Jackie Robinson Baseball Stadium and complex for its collegiate team and summer baseball camps;
- Brentwood Private School utilizes 20 acres, on which it has constructed athletic fields, a track, tennis courts, and a swimming pool;
- The City of Los Angeles utilizes 12 acres as a public park, which includes a fenced dog run, athletic fields, and a parking lot;
- Two soccer clubs use MacArthur Field, where veterans once played softball, and an adjacent parking lot; and
- Movie and television production companies utilize portions of the WLA Campus for short-term, non-recurring filming projects, and other private parties rent portions of the land for one-time events, such as fundraisers and weddings.

    25.    DVA and VA GLA officials, including Defendant Eric Shinseki, the Secretary of DVA, and Defendant Donna M. Beiter, the Director of VA GLA, have resisted attempts by descendants of the individuals who donated the land in 1888, including Plaintiff Carolina Winston Barrie and her family, along with veterans,

1 community, and philanthropic organizations to obtain information about these land

2 deals and to retain the original intent of the 1888 land grant. At the same time, VA

3 GLA transferred a parcel of land on the WLA Campus to the State of California to

4 build a geriatric care facility, and inserted a provision in the deed under which title

5 will revert to the federal government if the State ceases using the land "as a nursing

6 home or for domiciliary uses, as agreed upon in the original deed." VA GLA

7 MASTER PLAN at 10. Thus, VA GLA has acknowledged the original intent behind

8 the 1888 land transfer and even imposed a duty to honor that intent on the State,

9 while openly using portions of the WLA Campus for purposes plainly inconsistent

10 with that intent.

11        26.     Through this suit, Plaintiffs seek to vindicate their rights while shining a

12 light on the crisis of homelessness among veterans, particularly in the Greater Los

13 Angeles area, and on the misuse of the WLA Campus. For now the Obama

14 administration's goal of ending homelessness among veterans is merely a lofty

15 aspiration. Concrete action is necessary to accomplish that goal. As DVA has

16 acknowledged, a critical step in achieving that goal is to provide permanent

17 supportive housing as a reasonable accommodation for veterans like Plaintiffs

18 Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson, Early, Green,

19 and Kassitas who have a mental disability and/or brain injury that renders them

20 unable to obtain or maintain stable housing and who require stable housing to

21 meaningfully access the services to which they are entitled. Given the purposes of

22 the 1888 donation of the land that created a charitable trust and the Greater Los

23 Angeles area's status as the capital of veteran homelessness, it is especially

24 reasonable and appropriate to provide permanent supportive housing for veterans in

25 Los Angeles. Through this lawsuit, Plaintiffs seek to compel defendants to do just

26 that.

27        27.     Plaintiffs Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith,

28 Richardson, Early, Green, and Kassitas seek declaratory and injunctive relief on

1 behalf of themselves and a class of similarly situated disabled homeless veterans to

2 remedy the unlawful discrimination against Plaintiffs solely by reason of their

3 disabilities, and Plaintiff Vietnam Veterans of America joins them in seeking this

4 relief.  Additionally, all Plaintiffs seek declaratory, injunctive, and mandamus relief

5 to enforce the charitable trust that was created by the 1888 deed that transferred the

6 land to the federal government for the express purpose of establishing and

7 *permanently* maintaining a home for disabled veterans and seek a full accounting of

8 all trust property, including an accounting of proceeds, if any, from the diversion of

9 trust property through the land deals and other for-profit use of the WLA Campus

10 inconsistent with the trust.  Finally, all Plaintiffs seek declaratory and injunctive

11 relief to vacate existing land deals on the WLA Campus into which VA GLA

12 officials entered in excess of statutory authority and to prevent VA GLA officials

13 from entering into similar land deals in the future.

14

15                                    **JURISDICTION**

16        28.     This Court has jurisdiction over Plaintiffs' claims for injunctive relief

17 based on 28 U.S.C. § 1331, because those claims arise under federal statutes and

18 federal common law.

19        29.     Additionally, this Court has jurisdiction over Plaintiffs' claims under

20 Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) based on 28 U.S.C.

21 § 1343(a)(4), because those claims seek to secure equitable relief under an Act of

22 Congress.

23        30.     To the extent Plaintiffs' claims to enforce the terms of the charitable

24 trust and for an accounting of profits do not present a federal question sufficient to

25 confer jurisdiction under 28 U.S.C. § 1331, this Court has jurisdiction over those

26 claims under 28 U.S.C. § 1367.

27        31.     Finally, this Court has jurisdiction over Plaintiffs' alternative claim for

28 mandamus relief under 28 U.S.C. § 1361.

1    32.    Pursuant to the Court's jurisdiction over this matter, Plaintiffs Valentini,

2   Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson, Early, Green, and Kassitas

3   bring this action on behalf of themselves and all other persons similarly situated,

4   with respect only to the first and second causes of action in this Complaint.

5

6                                      **VENUE**

7    33.    Venue is proper in the Central District of California under 28 U.S.C.

8   § 1391(b) because all of the acts and/or omissions complained of herein occurred or

9   will occur in the District.

10

11                                    **PARTIES**

12    34.    Plaintiff Greg Valentini is a 33-year old citizen of the United States and

13   a resident of Los Angeles County, California.  Mr. Valentini is an Army veteran who

14   became severely disabled as a result of his service to this country, including tours of

15   duty in Afghanistan and Iraq.  He is eligible for medical benefits from DVA.

16   Because he resides in Los Angeles, he seeks treatment from VA GLA.

17    35.    Plaintiff Adrian Moraru is a 37-year old lawful permanent resident of

18   the United States and a resident of Los Angeles County, California.  Mr. Moraru is a

19   veteran who became severely disabled after serving this country as a Marine,

20   including a tour of duty in Iraq.  He is eligible for medical benefits from DVA.

21   Because he resides in Los Angeles, he seeks treatment from VA GLA.

22    36.    Plaintiff Jane Doe is a 54-year old citizen of the United States and a

23   resident of Los Angeles County, California.  Ms. Doe is an Army veteran who

24   became severely disabled as a result of her service to this country.  She is eligible for

25   medical benefits from DVA.  Because she resides in Los Angeles, she seeks

26   treatment from VA GLA.

27    37.    Plaintiff Floyd Summers is a citizen of the United States and a resident

28   of Los Angeles County, California.  Mr. Summers is an Army veteran who became

severely disabled as a result of his service to this country.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

38.     Plaintiff Zachary Isaac is a citizen of the United States and a resident of Los Angeles County, California.  Mr. Isaac is a Navy veteran who became severely disabled as a result of his service to this country.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

39.     Plaintiff Willie Floyd is a 64-year old citizen of the United States and a resident of Los Angeles County, California.  Mr. Floyd is an Army veteran who became severely disabled as a result of his service to this country, including a tour of duty in Vietnam.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

40.     Plaintiff Leroy Smith, Jr. is a citizen of the United States and a resident of Los Angeles County, California.  Mr. Smith is a Marine veteran who became severely disabled as a result of his service to this county.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

41.     Plaintiff Leslie Richardson is a citizen of the United States and a resident of Los Angeles County, California.  Mr. Richardson is an Army veteran who became severely disabled as a result of his military service in Germany.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

42.     Plaintiff Wayne Early is a citizen of the United States and a resident of Los Angeles County, California.  Mr. Early is an Army veteran who became severely disabled as a result of his service to this country.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

43.     Plaintiff Lawrence Green is a 56-year old citizen of the United States and a resident of Los Angeles County, California.  Mr. Green is a Marine veteran

who became severely disabled as a result of his service to this country.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

44.    Plaintiff Demetrious Kassitas is a citizen of the United States and a resident of Los Angeles County, California.  Mr. Kassitas is a Navy veteran who became severely disabled as a result of his service to this country, including a tour in Desert Storm.  He is eligible for medical benefits from DVA.  Because he resides in Los Angeles, he seeks treatment from VA GLA.

45.    Plaintiff Vietnam Veterans of America (VVA) is a membership-based organization with over 65,000 members across the country.  It is the only national Vietnam veterans organization congressionally chartered and exclusively dedicated to Vietnam-era veterans and their families.  VVA's goals are to promote and support the full range of issues important to Vietnam veterans, to create a new identity for this generation of veterans, and to change public perception of Vietnam veterans.  VVA operates 46 state councils, including the Vietnam Veterans of America, California State Council (VVA-CSC).  Hundreds of VVA-CSC members reside within VA GLA's service area.  Some of these members have serious mental disabilities and are homeless.

46.    Plaintiff Carolina Winston Barrie is a citizen of the United States and a resident of Los Angeles County, California.  Ms. Barrie is a direct descendant of Arcadia B. de Baker, who, together with United States Senator John P. Jones, donated the land on which VA GLA's WLA Campus is now located.

47.    Defendant Eric Shinseki is the Secretary of DVA.  He is sued in his official capacity.  DVA is a federal agency with headquarters in Washington, D.C. and successor entity to the National Home for Disabled Volunteer Soldiers.  DVA oversees the Veterans Health Administration, which operates the United States' largest integrated health care system consisting of 153 medical centers and numerous community-based outpatient clinics, community living centers, vet centers and

17

1  domiciliaries.

2      48.    Defendant Shinseki's official duties as Secretary of DVA include the

3  proper execution and administration of all laws and programs administered by DVA

4  and the control, direction, and management of DVA. *See* 38 USCA § 303. As

5  Secretary of DVA, Defendant Shinseki has the ultimate responsibility for ensuring

6  that DVA and its constituent agencies and programs comply with relevant federal

7  law, regulations, and policies, as well as ensuring that DVA maintains compliance

8  with contracts and land grants such as the 1888 deed referenced in this Complaint.

9      49.    Defendant Donna M. Beiter is the Director of VA GLA. She is sued in

10 her official capacity. VA GLA maintains its headquarters in Los Angeles, California,

11 and serves veterans in Los Angeles, Ventura, Santa Barbara, San Luis Obispo, and

12 Kern counties in Southern California. VA GLA is one of five health care systems

13 operated by VA Desert Pacific Healthcare Network, which is one of 21 Veterans

14 Integrated Services Networks (VISNs) operated nationwide by DVA to provide

15 preventive and primary care, acute hospital care, mental health services, specialty

16 care, and long-term care to veterans.

17     50.    Defendant Beiter's official duties as Director of VA GLA include

18 supervising the day-to-day operations and services offered by all the institutions

19 operated by VA GLA, including all programs operated at the WLA Campus, and

20 ensuring that VA GLA complies with relevant federal law, regulations, and policies.

21 As the Director of VA GLA, Defendant Beiter has final authority to approve matters

22 related to program design, criteria for admission and continued treatment, and the

23 particular components and nature of all services offered by VA GLA, as well as final

24 decision-making authority related to use of the WLA Campus and any contracts with

25 third parties for access to and use of the WLA Campus.

26 //

27 //

28 //

# FACTUAL ALLEGATIONS

## The Crisis of Veteran Homelessness

51.    As Defendant Shinseki said in 2009, "Those who have served this nation as Veterans should never find themselves on the streets, living without care and without hope."  Sadly, tens of thousands of veterans find themselves in that position every night, homeless like Plaintiffs Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson, Early, Green, and Kassitas.  The majority of these individuals, including Plaintiffs Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson, Early, Green, and Kassitas, have serious mental disabilities and/or brain injuries.

52.    One out of every 168 veterans experiences homelessness during the course of a year,[4] and DVA estimated that 107,000 veterans were homeless on any given night in 2009.[5]  Veterans are overrepresented in the homeless population and are about 50 percent more likely to become homeless compared to all Americans.[6]

53.    Although reliable data is difficult to find, recent veterans who served in OEF and OIF and related operations are at especially high risk of becoming homeless.  In December 2010, DVA estimated that over 9,000 OEF/OIF veterans were homeless, and that number is expected to grow as additional service members leave military service.[7]

---

[4] U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT & U.S. DEPARTMENT OF VETERANS AFFAIRS, VETERAN HOMELESSNESS: A SUPPLEMENTAL REPORT TO THE 2009 ANNUAL HOMELESS ASSESSMENT REPORT TO CONGRESS i, *available at* http://www.hudhre.info/documents/2009AHARVeteransReport.pdf (last accessed May 29, 2011).

[5] JOHN KUHN AND JOHN NAKASHIMA, THE SIXTEENTH ANNUAL PROGRESS REPORT: COMMUNITY HOMELESSNESS ASSESSMENT, LOCAL EDUCATION AND NETWORKING GROUP (CHALENG) FOR VETERANS (FY 2009) SERVICES FOR HOMELESS VETERANS ASSESSMENT AND COORDINATION 23 (March 17, 2010), *available at* http://www.va.gov/HOMELESS/docs/chaleng/chaleng_sixteenth_annual_report.pdf.

[6] U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT & U.S. DEPARTMENT OF VETERANS AFFAIRS, VETERAN HOMELESSNESS: A SUPPLEMENTAL REPORT TO THE 2009 ANNUAL HOMELESS ASSESSMENT REPORT TO CONGRESS 12, *available at* http://www.hudhre.info/documents/2009AHARVeteransReport.pdf (last accessed May 29, 2011).

[7] Bob Woodruff, Ian Cameron & Christine Romo, "Coming Home Homeless: The New Homeless Among Veterans," ABC NEWS (Dec. 26, 2010), *available at* http://abcnews.go.com/ThisWeek/coming-home-homeless-homeless-veterans/story?id=12478952.

54.     Between 44,000 to 66,000 veterans are believed to be experiencing chronic homelessness.[8] Individuals meet the federal definition of chronic homelessness if they have "a disabling condition" and have "either (a) been continuously homeless for a year or more OR (b) [have] had at least 4 episodes of homelessness in the past three years." 24 C.F.R. §91.5. Veterans are more likely to be chronically homeless than non-veterans.[9]

### Causes of Chronic Homelessness

55.     In the early 1990s, researchers began studying individuals who remained homeless for extended periods, often for years and decades, or who frequently cycled in and out of homelessness, to try to understand the causes of chronic homelessness and the barriers that prevent these individuals from attaining and maintaining stable housing.[10] This body of research has established the close correlation between homelessness and disabilities, particularly mental health and substance abuse disorders.[11] It has also identified numerous barriers that prevent chronically homeless individuals from accessing the services intended to assist them.

56.     First, for individuals with serious mental disabilities, the disability itself is a barrier both to acquiring and maintaining stable housing and to accessing

---

[8] UNITED STATES INTERAGENCY COUNCIL ON HOMELESSNESS, OPENING DOORS: FEDERAL STRATEGIC PLAN TO PREVENT AND END HOMELESSNESS 20 (2010), *available at* http://www.usich.gov/PDF/OpeningDoors_2010_FSPPreventEndHomeless.pdf.

[9] *See* MARTHA R. BURT, HOMELESSNESS: PROGRAMS AND THE PEOPLE THEY SERVE 11-3 to -6 (1999), *available at* http://www.huduser.org/portal/publications/pdf/home_tech/tchap-11.pdf (finding that 32 percent of homeless veterans reported being homeless for over 13 months, while only 17 percent of homeless non-veterans reported this extended length of homelessness).

[10] *See* Randall Kuhn & Dennis P. Culhane, *Applying Cluster Analysis to Test a Typology of Homelessness by Pattern of Shelter Utilization: Results from the Analysis of Administrative Data*, 26 AM. J. COMMUNITY PSYCHOL. 207, 225 (1998) (finding the chronically homeless have higher levels of mental health, substance abuse, and medical problems).

[11] *See, e.g.*, David P. Folsom et al., *Prevalence and Risk Factors for Homelessness and Utilization of Mental Health Services Among 10,340 Patients with Serious Mental Illness in a Large Public Mental Health System*, 162 A.J. PSYCHIATRY 370 (2005) (finding that between one-fourth and one-third of persons experiencing homelessness have current severe psychiatric conditions, such as schizophrenia, major depression, and bipolar disorder, and that 50 percent of these individuals have co-occurring substance abuse disorder).

medical and mental health care, shelter, and other vital services once these individuals become homeless.[12]  Without supports or assistance, these individuals cannot access available services to treat the disability or to meet their basic needs. For example, many individuals with severe mental illness or cognitive impairment cannot complete applications or persist through intake processes without substantial assistance, which is often not provided.[13]  Similarly, individuals with PTSD frequently experience memory loss and other cognitive impairments that result in difficulty remembering appointments, which can lead to dismissal from programs for "noncompliance."  Additionally, for some individuals with severe mental disabilities, their disabilities prevent them from functioning in the settings in which the services are offered, such as individuals whose disabilities prevent them from sharing living space or sleeping quarters with others, but who are required to complete a transitional housing program that requires dorm-style living before they are eligible for permanent housing.

57.     Lack of housing also exacerbates mental disabilities and creates new health problems, thereby impairing the individual's ability to function and impeding the individual's ability to access necessary services.  For example, the experience of homelessness is inherently stressful, requiring constant vigilance to avoid danger, and exposes homeless individuals to increased risks of trauma, leading to PTSD or aggravating already existing PTSD and other mental disorders.[14]  For individuals whose disability causes paranoia or severe anxiety, the uncertainty and diminished

---

[12] *See, e.g.,* Amy L. Drapalski et al., *Perceived Barriers to Medical Care and Mental Health Care Among Veterans with Serious Mental Illness,* 59 PSYCHIATRIC SERVICES 921 (2008), *available at* http://ps.psychiatryonline.org/cgi/content/abstract/59/8/921 (finding that psychiatric symptoms and mental illness severity pose one of the most significant barriers to medical and mental health care).

[13] *See* Michael D. Nino et al., *Who are the Chronically Homeless? Social Characteristics and Risk Factors Associated with Chronic Homelessness,* 19 J. SOC. DISTRESS & HOMELESS 41 (2010) (finding chronically homeless individuals were more likely to report that paper work for government benefits was too difficult to complete).

[14] *See* Bruce D. Levy & James J. O'Connell, *Health Care for Homeless Persons,* 350 NEW ENG. J. MED. 2329, 2330 (2004) (finding that life on the street increases social isolation and the risk of psychiatric conditions).

21

security and safety created by homelessness exacerbate the mental disability.[15]  For many individuals with serious mental disabilities, effective health treatment presupposes stability and regularity, which is simply not possible for chronically homeless individuals to achieve.[16]  Additionally, individuals experiencing homelessness frequently experience chronic and acute health conditions that are caused or exacerbated by the lack of stable shelter, including respiratory disorders, cardiovascular diseases, frostbite and hypothermia, skin diseases, diabetes, liver disease, and traumatic injuries due to assaults, falls, and accidents.[17]

58.     Thus, homelessness resulting from mental disability, and mental disability aggravated by homelessness, interfere both with the ability to obtain treatment and with amelioration of the mental disability itself, including the ability to obtain appropriate psychotropic medications.  Accessing these services requires capacities to understand and follow procedures and to tolerate waiting rooms and other conditions that are frequently beyond the abilities of chronically homeless individuals with mental disabilities.  Lacking effective access to appropriate medication and supervised treatment, homeless individuals with mental disabilities frequently resort to inappropriate medication, in the form of illegal drugs that can have powerful psychotropic effects but are also most often addictive and come with

---

[15] *See* Kevin M. Fitzpatrick et al., *Dangerous Places: Exposure to Violence and Its Mental Health Consequences for the Homeless*, 69 A.J. ORTHOPSYCHIATRY 438, 444-45 (1999), *available at* http://onlinelibrary.wiley.com/doi/10.1037/h0080392/pdf (finding that patients experiencing anxiety and paranoia were "significantly affected by the perceived dangers inherent in the homeless environment").

[16] *See* Deborah L. Dennis et al., *The Physical and Mental Health Status of Homeless Adults*, 2 HOUSING POL'Y DEBATE 815, 822 (1991), *available at* http://www.knowledgeplex.org/kp/text_document_summary/scholarly_article/relfiles/hpd_0203_d ennis2.pdf ("Homeless persons present a more advanced state of [mental] illness and are less likely, due to their homeless situation, to follow even the simplest of treatment regimens.").

[17] *See* Bruce D. Levy & James J. O'Connell, *Health Care for Homeless Persons*, 350 NEW ENG. J. MED. 2329, 2330 (2004); *see also* Mayur M. Desai & Robert A. Rosenheck, *Unmet Need for Medical Care Among Homeless Adults with Serious Mental Illness*, 27 GEN. HOSP. PSYCHIATRY 418 (2005) (finding that 43.6 percent of persons who are homeless and have serious mental illnesses had unmet needs for medical care at the time of program entry).

1  negative side effects.[18]

2       59.    The lack of housing itself, especially combined with a serious mental

3  disability, is a formidable barrier to accessing services.  For many homeless

4  individuals, the immediacy of the daily struggle for shelter, food, and other

5  necessities relegates medical and mental health needs to a distant priority.[19]  Thus,

6  common illnesses and injuries are left untreated, leading to increased emergency

7  hospital visits and acute care admissions.[20]

8       60.    In sum, a robust body of research and years of practical experience have

9  established that the subset of the homeless population who, like Plaintiffs Valentini,

10  Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson, Early, Green, and Kassitas,

11  have severe mental illnesses, such as PTSD, paranoid schizophrenia, and bipolar

12  disorder, are unable to meaningfully access the range of services offered to homeless

13  individuals to meet their day-to-day needs, including shelter, or to obtain appropriate

14  health care, mental health care, or addiction treatment, due to symptoms of their

15  disabilities and their lack of stable housing.

16

17  **Factors that Make Veterans Especially Susceptible to Chronic Homelessness**

18       61.    Like other homeless populations, homeless veterans' risk factors for

19  chronic homelessness include poverty, joblessness, mental illness, and substance

20  abuse.[21]  Due to the relatively higher incidence of mental illness and substance abuse

21

22       [18] *See* Timothy P. Johnson & Michael Fendrich, *Homelessness and Drug Use: Evidence from a Community Sample*, 32 AM. J. PREVENTATIVE MED. S211, S212 ("Homeless individuals . . .

23  abuse drugs and alcohol in an attempt to provide self-medication for psychiatric or physical health problems.").

24       [19] *See* Dennis, *supra* note 15, at 826 (finding mentally ill homeless persons often do not receive needed physical and mental health care because they "giv[e] higher priority to other basic

25  needs, such as procuring food and shelter on a daily basis.").

26       [20] Margot B. Kushel et al., *Factors Associated with the Health Care Utilization of Homeless Persons*, 285 JAMA 200 (2001) (finding that compared with the general population, the homeless

27  are 3 times more likely to seek emergency care at least once in a year).

28       [21] Robert A. Rosenheck & Peter Koegel, *Characteristics of Veterans and Nonveterans in Three Samples of Homeless Men*, 44 HOSP. & COMMUNITY PSYCHIATRY, 858, 861 (1993).

disorders among veterans, however, veterans are particularly vulnerable to chronic homelessness.[22]  Although military service as such is not predictive of homelessness, military service is strongly associated with factors that contribute to homelessness.[23] For example, combat exposure and the stress related to deployment contribute to high levels of social isolation upon returning home, psychiatric disorders, and substance abuse disorders, all of which, in turn, contribute directly to homelessness.[24]

62.    Veterans of the post-Vietnam All-Volunteer Force era have an even higher risk of mental-illness-induced homelessness than veterans from earlier eras.[25] Researchers have identified several causes for the increased risk of mental illness and subsequent homelessness of veterans of recent conflicts, including waning public support and lower morale among troops, the nature of modern warfare resulting in unexpected threats to life via roadside bombs and improvised explosive devices, and multiple and more-lengthy deployments.[26]  According to one study, one in five soldiers who were deployed as part of OEF/OIF returned home with symptoms of

---

[22] *See, e.g.,* Robert Rosenheck et al., *The Proportion of Veterans Among Homeless Men*, 84 AMERICAN J. OF PUB. HEALTH 466 (1994) (finding that higher prevalence of psychiatric illness, substance abuse, and, especially, antisocial personality disorder among veterans is a contributor to their greater vulnerability to homelessness).

[23] *See, e.g.,* Robert Rosenheck & Alan Fontana, *A Model of Homelessness Among Male Veterans of the Vietnam War Generation*, 151 AM. J. PSYCHIATRY 421, 425 (1994) (reporting significant indirect effects on homelessness resulting from war zone traumatic experience).

[24] *Id.* at 421 (finding that post-military social isolation, psychiatric disorder, and substance abuse had the strongest direct effects on homelessness).

[25] *See, e.g.,* Karen H. Seal et al., *Trends and Risk Factors for Mental Health Diagnoses Among Iraq and Afghanistan Veterans Using Department of Veterans Affairs Health Care, 2002-2008*, 99 AM. J. PUB. HEALTH 1651 (2009) (documenting that 37 percent of veterans returning from Iraq and Afghanistan who utilized DVA health care system between 2002 and 2008 received a mental health diagnosis); Anna Kline, et al., *The Relationship Between Military Service Eras and Psychosocial Treatment Needs Among Homeless Veterans with a Co-Occurring Substance Abuse and Mental Health Disorder*, 5 J. DUAL DIAGNOSIS 358 (2009) (finding that mentally ill, substance-abusing veterans of recent conflicts became homeless at an earlier age than other veterans and were more likely to attribute their homelessness to mental health problems).

[26] *See* Seal, *supra* note 24, at 1656; *see also* Charles S. Milliken, et al., *Longitudinal Assessment of Mental Health Problems Among Active and Reserve Component Soldiers Returning from the Iraq War*, 298 JAMA 2141 (2007) (finding combat exposure was associated with higher rates of PTSD among veterans of OIF).

1 | PTSD or major depression, which is a substantially higher rate than the general
2 | population.[27]

3 |
4 |               **Without Stable Housing, Seriously Disabled Individuals**
5 |                 **Cannot Meaningfully Access Critical Services**

6 |          63.     Although addressing the needs of homeless individuals with serious
7 | mental illness is complex, research conducted over the last few decades confirms that
8 | stable housing is a precondition to effective treatment of severe mental disorders
9 | and/or associated addiction disease.  With the stability and security of permanent
10 | housing, the formerly homeless veteran with severe disabilities can meaningfully
11 | access mental health, physical health, substance abuse, vocational, and other services.
12 | Permanent supportive housing is thus intended specifically for homeless individuals
13 | with disabilities who, without housing, cannot access and make effective use of the
14 | treatment and services they need to stay stable; and who, without such treatment and
15 | supportive services, cannot access and maintain stable housing.

16 |          64.     A significant body of evidence demonstrates that permanent supportive
17 | housing has successful long-term housing outcomes for previously chronically
18 | homeless persons, including those with the most severe impediments.[28]  In addition
19 | to housing stability, studies have shown enormous benefits for participants in
20 | permanent supportive housing programs.  Documented outcomes include improved
21 | mental health status, decreased substance abuse, increased average income, and

22 |
23 |
_____

24 |     [27] THE INVISIBLE WOUNDS OF WAR: PSYCHOLOGICAL AND COGNITIVE INJURIES, THEIR
      CONSEQUENCES, AND SERVICES TO ASSIST RECOVERY, at xxi (Terri Tanielian & Lisa H. Jaycox
25 |     eds., RAND Corporation 2008), *available at*
      http://www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG720.pdf.

26 |     [28] *See, e.g.* Sam Tsemberis & Ronda F. Eisenberg, *Pathways to Housing: Supported
      Housing for Street-Dwelling Homeless Individuals with Psychiatric Disabilities*. 51 PSYCHIATRIC
27 |     SERVICES 487, 491 (2000) (finding 88 percent housing-retention rate for permanent supportive
      housing program over five-year period – a much lower risk of homelessness than in traditional
28 |     residential treatment programs);.

improved quality of life.[29]

65.    Aside from individual benefits for veterans, permanent supportive housing also provides substantial cost savings to government at all levels.  When left on the streets, the homeless utilize a substantial array of community resources in the form of increased health care utilization, emergency room care, public health services, and continuing use of expensive temporary shelters.  Numerous studies have demonstrated that permanent supportive housing offers substantial cost savings when compared to alternative homeless interventions.  For example, Dennis Culhane, a professor at the University of Pennsylvania who also serves as the Director of Research for the National Center on Homelessness Among Veterans at DVA, conducted a comprehensive study of permanent supportive housing that tracked the costs associated with nearly 10,000 homeless persons with mental illness in New York City for two years while they were homeless and two years after they were housed.  Dr. Culhane found that supportive housing created average annual savings of $16,282 per person.  Seventy-two percent of the savings resulted from a decline in the use of public health services, 23 percent of the savings resulted from a decline in shelter use, and the remaining 5 percent of the savings resulted from reduced incarceration of homeless people.  The reduction in expenditures in these areas nearly covered the cost of developing, operating, and providing supportive housing services, resulting in a net cost to the government of only $995 per unit per year.[30]  A study conducted by the Economic Roundtable for the Los Angeles

[29] *See, e.g.,* PERLMAN , *supra* note 27 (finding that 50 percent of residents in the Denver program had improved mental health status, 64 percent reported improved quality of life, and 15 percent had decreased substance abuse, and that average monthly income rose from $185 to $431); Joy A. Livingston & Debra Srebnik, *Approaches to Providing Housing and Flexible Supports for People with Psychiatric Disabilities*, 16 PSYCHOSOCIAL REHABILITATION J. 27 (1992) (finding participants in permanent supportive housing programs had greater housing satisfaction, improved housing stability, and greater psychological well-being).

[30] *See* Dennis P. Culhane et al., *Public Service Reductions Associated with Placement of Homeless Persons with Severe Mental Illness in Supportive Housing*, 13 HOUSING POL'Y DEBATE 107 (2002); *see also* DANIEL FLAMING ET AL., WHERE WE SLEEP: COSTS WHEN HOMELESS AND HOUSED IN LOS ANGELES 26 (2009) (documenting $2,291 average monthly cost savings for each chronically homeless Los Angeles participant); MASSACHUSETTS HOUSING AND SHELTER ALLIANCE, HOME AND HEALTHY FOR GOOD: A STATEWIDE HOUSING FIRST PROGRAM (2010)

*(cont'd)*

1  Homeless Services Authority found that the public costs attributed to chronically

2  homeless persons in permanent supportive housing averaged $27,504 per year less

3  than the costs attributed to similar persons when they were on the streets or in

4  shelters.[31]

5       66.    Finally, communities with permanent supportive housing programs are

6  safer, more efficient, and more attractive.  In some instances, property values in

7  neighborhoods surrounding permanent supportive housing programs have

8  increased.[32]

9       67.    The success of permanent supportive housing has been replicated in Los

10  Angeles, as exemplified by Project 50 and later by other similar projects in the

11  region.  Spearheaded by Los Angeles County Supervisor Zev Yaroslavsky, the goal

12  of Project 50 was to identify, then place into permanent supportive housing, the 50

13  most vulnerable people who were sleeping on the streets of Skid Row.  Many of

14  these individuals had been designated "shelter resistant," because they preferred

15  sleeping on the streets to being in a crowded shelter situation.  But all of those

16  offered their own housing, albeit a small, private room in a nonprofit housing

17  facility, accepted the offer.  Forty-nine people were placed into permanent supportive

18  *(cont'd from previous page)*
(documenting cost savings of $9,507 per resident per year, including reduction in medical costs

19  from $26,124 per person per year to $8,500); Tia E. Martinez & Martha R. Burt, *Impact of
Permanent Supportive Housing on the Use of Acute Care Health Services by Homeless Adults*, 57

20  PSYCHIATRIC SERVICES 992 (2006) (documenting $1,300 public cost reduction per resident in San
Francisco); THE HEARTLAND ALLIANCE, SUPPORTIVE HOUSING IN ILLINOIS: A WISE INVESTMENT

21  (2009) (documenting overall savings of $854,477 over two years); ERIC HIRSCH & IRENE GLASSER,
RHODE ISLAND'S HOUSING FIRST PROGRAM FIRST YEAR EVALUATION (2007) (documenting cost

22  savings of $8,839 per person per year).

23       [31] FLAMING, *supra* note 29.

24       [32] *See, e.g.*, FURMAN CENTER FOR REAL ESTATE & URBAN POLICY, THE IMPACT OF
SUPPORTIVE HOUSING ON SURROUNDING NEIGHBORHOODS: EVIDENCE FROM NEW YORK CITY 6-7

25  (2008), *available at*
http://furmancenter.org/files/FurmanCenterPolicyBriefonSupportiveHousing_LowRes.pdf

26  (examining the impact of 7,500 supportive housing units in New York City and finding a
statistically significant rise in the value of nearby properties); ARTHUR ANDERSEN, CONNECTICUT

27  SUPPORTIVE HOUSING DEMONSTRATION PROGRAM: FINAL PROGRAM EVALUATION REPORT chp. III
(2002), *available at* http://documents.csh.org/documents/pubs/CT2002Evaluation.pdf (finding

28  supportive housing improved neighborhood safety and beautification and increased or stabilized
property values).

housing, and 88 percent remained housed one year later.  Ninety-one percent of tenants were diagnosed with a mental illness and 84 percent reported a history of substance abuse.  Similar to other studies, Project 50 showed that health care costs for participants declined from $677,000 the year prior to participation in the program to $185,000 for the year after they began living in supportive housing.[33]

68.     In short, both experience and empirical research have demonstrated that permanent supportive housing is the only approach that consistently ensures that individuals with serious mental disabilities are able to meaningfully access necessary medical care, mental health services, and other social services.

69.     These lessons can and must be applied to address the crisis of chronic veteran homelessness in order to ensure that our veterans receive the medical care and support to which they are entitled and that they deserve, as even DVA itself has recognized.  According to a report recently co-authored by DVA, "[f]or the large percentage of veterans with disabilities, permanent supportive housing would be effective in helping them achieve long-term stability."[34]

**The Crisis of Veteran Homelessness in the Greater Los Angeles Area**

70.     According to a 2009 survey conducted by VA GLA staff, there were 8,197 homeless veterans on any given day within VA GLA's coverage area, so approximately 8 percent (8,197 of the estimated 107,000) of all homeless veterans in the United States lived within VA GLA's coverage area in 2009.[35]

71.     In 2011, VA GLA released data about the homeless veteran population that had received services from VA GLA in fiscal year 2010.  Of the 6,397 homeless

---

[33] See *Project 50 – 1 year Progress Report*, L.A. CNTY. BD. SUPERVISORS (Feb. 4, 2009), http://zev.lacounty.gov/wp-content/uploads/Project50-ONE-YEAR-SNAPSHOT-2.4.09.pdf.

[34] U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT & U.S. DEPARTMENT OF VETERANS AFFAIRS, VETERAN HOMELESSNESS: A SUPPLEMENTAL REPORT TO THE 2009 ANNUAL HOMELESS ASSESSMENT REPORT TO CONGRESS 30, *available at* http://www.hudhre.info/documents/2009AHARVeteransReport.pdf (last accessed May 29, 2011).

[35] See JOHN NAKASHIMA, CHALENG 2009 SURVEY RESULTS SUMMARY VISN 22, *available at* http://www.va.gov/HOMELESS/docs/chaleng/chaleng_visn_22.pdf.

28

1 | veterans that VA GLA documented as having received services in fiscal year 2010,
2 | more than half served in the U.S. Armed Forces after the Vietnam War. Their
3 | average age was 51. Ninety-five percent were male, 52 percent were African-
4 | American, 29 percent were white, and 14 percent were Latino. About 34 percent had
5 | been homeless for one year or longer. Forty-eight percent indicated a serious
6 | substance abuse problem. In total, 46 percent had a serious psychiatric disorder,
7 | including psychosis and PTSD. Twenty-six percent had both a substance abuse
8 | problem and a serious psychiatric disorder, and 52 percent reported at least one
9 | serious medical problem. VA GLA reported providing services to 130 homeless
10 | veterans who had served in Iraq or Afghanistan.[36]

11 |     72.    Thus, Defendants know or should know that the population of veterans
12 | served by VA GLA includes numerous disabled individuals, who, like Plaintiffs
13 | Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson, Early, Green,
14 | and Kassitas, cannot meaningfully access the medical and other benefits to which
15 | they are entitled unless they are provided permanent supportive housing.

16 |

17 | **Overview of Veterans' Benefits Programs**

18 |     73.    There are three administrations within DVA: the Veterans Health
19 | Administration (VHA), the Veterans Benefits Administration (VBA), and the
20 | National Cemetery Administration (NCA). The VHA is tasked with providing "a
21 | complete medical and hospital service for the medical care and treatment of
22 | veterans . . . ." 38 U.S.C. § 7301(b).[37]

---

23 | [36] *See* JOHN NAKASHIMA, VA PROGRAMS FOR HOMELESS VETERANS AT VA GREATER LOS
24 | ANGELES HEALTHCARE SYSTEM: AN OVERVIEW OF THE COMPREHENSIVE HOMELESS CENTER (January 14, 2011).

25 | [37] The VBA administers "nonmedical benefits programs . . . which provide assistance to
veterans and their dependents and survivors." 38 U.S.C. § 7701(a). To be eligible for disability
26 | compensation benefits from the VBA, veterans must present: evidence of a medical diagnosis of
the current impairment; evidence of an in-service incident or an aggravation of the disease or injury
27 | causing the impairment; and medical proof of a connection between the in-service incident or
aggravation and the current disability. For the purposes of disability compensation, "[s]ervice-
28 | connected means . . . that such disability was incurred or aggravated . . . in line of duty in the active
military, naval, or air service." 38 C.F.R. § 3.1(k). If a veteran is found eligible for disability

*(cont'd)*

74.    To qualify for VHA benefits, a former service-member must have been "discharged or released" from service "under conditions other than dishonorable," 38 U.S.C. § 101(2), and must have performed "active duty" in the military, 38 U.S.C. § 101(2).  There is no length of service requirement for former enlisted persons who started active duty before September 8, 1980, or for former officers who first entered active duty before October 17, 1981.  38 U.S.C. § 5303A(b)(2).  All other veterans must have 24 months of continuous active duty unless they qualify for an exception to the minimum service requirement.  38 U.S.C. § 5303A(b)(1).  Exceptions to the minimum service requirement include discharges "for a disability incurred or aggravated in the line of duty."  38 U.S.C. § 5303A(b)(3)(B).

75.    Veterans who qualify for VHA benefits are placed into one of eight "priority groups" established by DVA regulations to determine their eligibility for benefits.  *See* 38 C.F.R. § 17.36(b).  Veterans in the highest priority groups, 1 through 3, have service-connected disabilities of varying degrees.  38 C.F.R. § 17.36(b)(1)-(3).  Veterans in priority group 4 have serious disabilities that are not service-connected.  38 C.F.R. § 17.36(b)(4).  Priority group 5 consists of low-income veterans.  38 C.F.R. § 17.36(b)(5).  Priority group 6 includes veterans exposed to certain toxic substances, as well as recent combat veterans.  38 C.F.R. § 17.36(b)(6).  Veterans in priority groups 7 and 8 have no compensable service-connected disabilities and have greater incomes than those in priority group 5.  38 C.F.R. § 17.36(b)(6)-(7).  "A veteran will be placed in the highest priority category or categories for which the veteran qualifies."  38 C.F.R. § 17.36(d)(3)(ii).

76.    Depending on the amount of funding provided by Congress, DVA may "prioritize" the higher priority groups and provide VHA benefits only to veterans in those priority groups.  Currently, however, any veteran who falls within any one of

---

*(cont'd from previous page)*
compensation, DVA uses a schedule to set the amount of earnings impairment on a percentage basis.  38 U.S.C. § 1155.  The NCA is "responsible for the internment of deceased servicemembers and veterans," and controls all "cemeteries under the jurisdiction of the Veterans' Administration . . . ."  38 U.S.C. § 2400.

1 the first seven priority groups is eligible for the full VHA benefits package, and some

2 veterans who fall within priority group 8 are also eligible.

3        77.     Additionally, regardless of whether a veteran is enrolled in the VHA

4 benefits program, DVA must provide hospital care and medical services "to any

5 veteran for a service-connected disability," 38 U.S.C. § 1710(a)(1)(A), "[e]ven if

6 [the veteran is] not enrolled in the VA healthcare system."  38 C.F.R. § 17.37(b).

7 DVA must also provide hospital care and medical services "to any veteran who has a

8 service-connected disability rated at 50% or more," regardless of whether the

9 treatment concerns the disability, 38 U.S.C. § 1710(a)(1)(B), and even if the veteran

10 is not enrolled in the medical benefits program.  38 C.F.R. § 17.37(a).

11        78.     The benefits package offered through VHA includes outpatient medical,

12 surgical, and mental healthcare; inpatient hospital, medical, surgical, and mental

13 healthcare; prescription drug coverage; emergency care; substance abuse treatment,

14 and other services.  *See* 38 C.F.R. § 17.38(a).  Subject to congressional

15 appropriations, the VA must also "provide nursing home care . . . (1) to any veteran

16 who is in need of such care for a service-connected disability, and (2) to any veteran

17 who is in need of such care and who has a service-connected disability rated at 70

18 percent or more."  38 U.S.C. § 1710A(a).  Thus, VHA provides preventive and

19 primary care, acute hospital care, mental health services, specialty care, and long-

20 term care, which includes residential treatment and housing services in some

21 circumstances.  These services are collectively referred to herein as "VHA benefits."

22

23        **VA GLA Serves Veterans in the Greater Los Angeles Area**

24        **Who Are Eligible for VHA Benefits**

25        79.     VHA provides VHA benefits to eligible veterans through twenty-one

26 (21) Veterans Integrated Services Networks (VISNs) around the country.

27        80.     VA Desert Pacific Healthcare Network is the VISN that provides

28 services to veterans in Southern California and Southern Nevada.  These services are

1   delivered through five healthcare systems – one in Southern Nevada and four in

2   Southern California.  Each healthcare system operates a medical center with a

3   hospital and other inpatient and outpatient services, as well as varying numbers of

4   community clinics and vet centers.

5       81.    VA GLA is one of these healthcare systems.  The coverage area for VA

6   GLA includes all or parts of Los Angeles County, Ventura County, Kern County,

7   Santa Barbara County, and San Luis Obispo County.

8       82.    As the Director of VA GLA, Defendant Beiter is the VA GLA official

9   with final responsibility and authority to approve, modify, or terminate programs or

10  services offered as part of the VHA benefits delivered by VA GLA, and she is the

11  sole VA GLA official with responsibility and authority to approve specific uses of

12  the WLA Campus, including entering into land use agreements with private and

13  public entities.

14      83.    The focal point of services offered by VA GLA is the WLA Campus.

15  The WLA Campus is a 387-acre parcel located about five miles from the Pacific

16  Ocean in an unincorporated area of Los Angeles County surrounded by the City of

17  Los Angeles.  It is located between Sunset Boulevard to the north, Ohio Avenue to

18  the south, Interstate Highway 405 to the east, and San Vicente Boulevard to the west.

19  In addition to the array of services available at the WLA Campus, VA GLA operates

20  three ambulatory care centers, nine community clinics, and five vet centers

21  throughout its coverage area.

22

23               **History of the WLA Campus**

24      84.    The land on which the WLA Campus is now located was donated to the

25  federal government in 1888 by United States Senator John P. Jones and Arcadia B.

26  de Baker for the purpose of establishing and permanently maintaining a soldier's

27  home for disabled war veterans on that land.

28      85.    In 1865, Congress incorporated the National Home for Disabled

32

Volunteer Soldiers ("National Home") to operate branch homes throughout the nation for soldiers who had been honorably discharged. The branch homes were intended as true homes offered as a debt of gratitude to those who had served the country. Accordingly, residents were provided housing, food, medical care, recreation activities, and employment opportunities. There were no limitations on how long a veteran could stay at a branch home once admitted.

86. Additionally, "disability" for the purposes of admission was interpreted broadly. Veterans with physical wounds from their military service were admitted, as well as individuals with recurring illnesses or psychological trauma that rendered them unable to support themselves in civilian life. Although veterans could receive medical treatment while they stayed at a branch home, many residents of the branch homes did not require or receive ongoing medical care.

87. Thus, the National Home offered the promise of a *permanent* home for veterans who had served their country and, by virtue of their service, were not able to support themselves in civilian life.

88. Between 1865 and 1870, the National Home's Board of Governors opened four branch homes east of the Rocky Mountains. In 1887, Congress authorized the National Home's Board of Governors to establish a branch home west of the Rocky Mountains. The legislation authorized the Board of Governors to acquire land for this purpose.

89. In 1888, Senator John P. Jones and Arcadia B. de Baker donated the land on which the WLA Campus now sits to the National Home for the purpose of establishing and permanently maintaining the branch home authorized by the 1887 legislation.[38] The deed conveying the land ("1888 Deed") provided, in pertinent part,

---

[38] The 1888 Deed conveyed 300 acres to the National Home. In 1899 and 1921, successors to Senator Jones and Mrs. de Baker conveyed additional land to the National Home to further the purpose of permanently maintaining the National Home. All 387 acres of the WLA Campus were conveyed through the 1888 Deed and the two later deeds from the original donors' successors.

In 1888, John Wolfskill also conveyed 300 acres of adjacent land to the National Home. The land conveyed by that deed is now used as a national cemetery and federal buildings and is not a part of the WLA Campus.

WITNESSETH: That whereas by an act of Congress approved March 2nd, 1887, to provide for the location and erection of a branch home for disabled volunteer soldiers West of the Rocky Mountains, the Board of Managers of the National Home for Disabled Volunteer Soldiers, were authorized, empowered and directed to locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers, to be by such Board, located at such place in the States West of the Rocky Mountains as to said Board should appear most desirable and advantageous. . . .

And whereas, the parties hereto of the first part [grantors] in consideration that the party hereto of the second part [National Home] should locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers on a site to be selected by its Board of Managers along the dividing line between the Ranchos San Jose de Buenos Ayres and San Vicente y Santa Monica offered to the said party of the second part, three hundred acres of land, being a portion of said Rancho San Vicente y Santa Monica, belonging to them, the said parties of the first part, on which to locate, establish, construct and permanently maintain such branch of said National Home for Disabled Volunteer Soldiers. . . .

Now therefore, in consideration of the premises and of the location, establishment, construction and permanent maintenance of a branch of said National Home for Disabled Volunteer Soldiers on such tract of land so selected and of the benefits to accrue to the said parties of the first part, owners of the said Rancho San Vicente y Santa Monica, by such location have given and granted and by these presents do give and grant unto the said party of the second part, all the following described land and premises, situate lying and being in the County of Los Angeles, State of California and particularly bounded and described as follows: . . . for the purpose of such branch Home for Disabled Volunteer Soldiers to be thereon so located, established, constructed and permanently maintained.

A true and correct copy of the 1888 Deed is attached as Exhibit 1, and a true and correct copy of a typed transcription of the 1888 Deed is attached as Exhibit 2.

90. The Pacific Branch of the National Home ("Pacific Branch Home") opened in 1888 and housed approximately one thousand veterans in temporary barracks until the permanent quarters were completed in 1891 and 1893.

91. Consistent with the goal of providing a home for soldiers, the grounds at

the Pacific Branch Home were transformed into a beautiful, park-like setting. A hospital and other buildings were erected on the campus throughout the 1890s. The Pacific Branch Home also built a trolley line and erected a streetcar depot, which transported freight and mail to and from the campus. Residents could easily travel to the nearby Santa Monica beaches from the campus for rest and recreation. A chapel was built in 1900 to hold daily services and burial services for deceased veterans. In the early 1900s, the Pacific Branch Home built dormitories with wide porches to replace the original barracks and opened a dining hall that could seat 760 members at one time. A post office with more than 600 private letter boxes operated on the campus, as well as a store where residents could eat lunch and purchase cigars, fruits, candy and other articles.

92.   In addition to ensuring residents' access to housing, food and medical care, the Pacific Branch Home also developed the campus to provide educational and vocational activities for the veteran residents. For example, the Pacific Branch Home boasted a library with more than 10,000 volumes and newspapers and periodicals from around the country. The residents grew vegetables and tended orchards and livestock on the campus, supplying their own needs and selling the surplus. The Pacific Branch Home maintained a baseball team and athletic facilities, built a billiard hall for the residents, founded an aviary where residents could spend time, and developed work programs to employ residents around the campus in various capacities. The Pacific Branch Home also had a home band that performed daily, and lectures and movies were regularly hosted on the campus. Residents could attend all events on the campus free of charge. By 1922, approximately 4,000 veterans were provided permanent housing at the Pacific Branch Home, with about 600 of them under hospital care.

93.   In 1930, Congress consolidated the National Home with other veterans' programs in the newly established Veterans Administration, the immediate predecessor to DVA. Accordingly, control over the various branch homes, including

the Pacific Branch Home, transferred to the Veterans Administration. Title to the land upon which the branch homes were situated was also transferred to the Veterans Administration as the National Home's successor-in-interest to all land to which the National Home held title.

94.     The Pacific Branch Home campus experienced tremendous development from the 1930s to 1950s, and many of the existing buildings on the WLA Campus were erected during this time. For instance, the Veterans Administration built additional hospital buildings and medical care centers on the campus, in addition to updating and upgrading the hospital and the residences for disabled veterans who continued to reside on the campus. It appears, however, that, beginning in the 1960s and 1970s, new residents were not accepted at the campus, and the structures formerly dedicated to permanent housing were repurposed or fell into disuse. DVA was established as a cabinet-level agency in 1989.

95.     Today, there are approximately 104 buildings on the WLA Campus. Many of the buildings are vacant, closed, or underutilized. No permanent housing is available to disabled veterans on the WLA Campus. Instead, VA GLA offers only inpatient hospital care and emergency or transitional shelter beds for disabled and homeless veterans on the WLA Campus, even though it has built 13 houses on the WLA Campus to house VA GLA senior staff. Indeed, in contrast to the original intent of the grantors that the land be used to provide a permanent home to disabled veterans, the mission statement of VA GLA, which now operates and controls the WLA Campus, focuses exclusively on providing medical treatment to veterans and serving as a research and teaching hospital.

96.     According to VA GLA, the WLA Campus "is perceived to be one of the most valuable parcels of real estate in the western United States." VA GLA MASTER PLAN at 8. Numerous commercial and other non-DVA programs operate on the WLA Campus under leases, memoranda of understanding, revocable licenses, or enhanced sharing agreements, all of which were approved by Defendant Beiter or her

1   predecessors as Director of VA GLA.  As a result of these land use deals, veterans

2   have limited access to or are altogether prohibited from accessing 110 acres of the

3   387-acre WLA Campus, and DVA and VA GLA cannot utilize that land to provide

4   housing to veterans or otherwise expand the services offered to veterans on the WLA

5   Campus.  In addition, portions of the land have been offered for rent in connection

6   with events and for various other for-profit uses, including filming for movies and

7   television shows.

8       97.    There has not been a public accounting of how much money VA GLA

9   has received under these private deals and where any such revenue has been directed.

10

11              **Services Currently Offered by VA GLA at the WLA Campus**

12      98.    The VA GLA operates the West Los Angeles Medical Center on the

13  WLA Campus, offering care in the following areas: medicine, surgery, psychiatry,

14  physical medicine and rehabilitation, neurology, oncology, dentistry, geriatrics, and

15  extended care.  Research and academic medical training are also conducted on-site.

16  In addition to the services offered on the WLA Campus, veterans can access certain

17  outpatient services from VA GLA through three ambulatory care centers and eleven

18  community treatment centers.  The WLA Campus contains numerous medical and

19  residential treatment facilities, including inpatient and outpatient health care and

20  mental health care and geriatric long-term care services.

21      99.    Unfortunately, as the experiences of Plaintiffs Valentini, Moraru, Doe,

22  Summers, Isaac, Floyd, Smith, Richardson, Early, Green, and Kassitas detailed

23  below demonstrate, the system has been designed and is operated in a manner that

24  prevents the most severely disabled veterans from accessing VHA services and

25  benefits for which they are otherwise eligible, including the establishment of

26  eligibility criteria that prohibit veterans with serious mental health disabilities from

27  participating in housing and other programs for which they are otherwise eligible.

28  Additionally, seriously disabled veterans like Plaintiffs Valentini, Moraru, Doe,

1   Summers, Isaac, Floyd, Smith, Richardson, Early, Green, and Kassitas cannot

2   meaningfully access the medical and residential care services to which they are

3   entitled under the VHA benefits program.

4        100.   The 953-bed James Wadsworth Hospital provides inpatient and

5   outpatient services to veterans.  Inpatient medical services include all acute medical,

6   surgical, rehabilitative, and mental health care for veterans in the Greater Los

7   Angeles area.  The hospital is also the primary referral center for cardiology,

8   neurosurgery, and radiation oncology.  Outpatient services provided at the hospital

9   include primary care exams, services provided by clinical specialists, immunizations,

10   and preventative screenings.

11        101.   VA GLA operates a skilled geriatric nursing facility on the WLA

12   Campus.  The Community Living Center has 352 beds for elderly veterans, although

13   only 226 of the beds are currently operating.

14        102.   VA GLA provides long-term rehabilitative care on the WLA Campus at

15   the West Los Angeles Polytrauma Site.  This facility is dedicated to patients with

16   injuries to more than one physical region or organ system resulting in physical,

17   cognitive, psychological, or psychosocial impairments and functional disabilities.

18   Services are provided primarily on an outpatient basis.

19        103.   VA GLA offers psychiatric, mental health, and substance abuse services

20   at several facilities on the WLA Campus.  Treatment programs are available for

21   alcohol and substance abuse, PTSD, and serious mental illness.  VA GLA offers

22   some of these services on an outpatient basis, including counseling, group sessions,

23   medication management, and a day treatment center.

24        104.   VA GLA offers no permanent supportive housing to disabled veterans.

25   Temporary shelter services are offered through the 321-bed Domiciliary Residential

26   Rehabilitation and Treatment Program ("Domiciliary").  This program provides

27   temporary shelter beds along with medical, psychiatric, and substance abuse

28   treatment, as well as other therapeutic services.  A substantial number of the beds are

dedicated to programs focused on substance abuse recovery and not tailored to
address serious mental health needs. Veterans are assigned to a Domiciliary bed on a
short-term or intermediate basis; the length of stay ranges from 30 days to a
maximum of two years. The Domiciliary is structured so that residents generally
live in a barracks-style room with two or three other residents, even if they have a
mental health condition that makes it difficult or impossible to function in such tight
quarters with other people, particularly strangers. Although a limited number of
single rooms are available (fewer than 20), veterans generally must "earn" their way
into in a single room by maintaining compliance with the treatment program over a
period of time. Additionally, veterans assigned to a Domiciliary bed are discharged
if they use alcohol or drugs and may be discharged for not fully participating in
treatment or group sessions mandated by the Domiciliary staff, or for failing to make
sufficient progress toward treatment goals. Finally, the Domiciliary refuses
admission to veterans who have serious mental disabilities involving psychosis
and/or who must take psychotropic medication.

     105.    In total, VA GLA operates facilities on the WLA Campus with
approximately 1500 beds, of which more than 1150 are dedicated to inpatient
hospital care or skilled nursing care for elderly veterans. VA GLA stated in a
January 2011 report, however, that it currently operates only 740 beds on the WLA
Campus, including 261 acute hospital beds, 158 nursing home beds, and 321
Domiciliary beds. Additionally, VA GLA stated in its 2010 Annual Report that it
operates only 770 beds, including 226 acute hospital beds, 188 skilled nursing home
beds, 52 non-acute hospital beds, and 304 Domiciliary beds. These beds, however,
are not made available as permanent supportive housing, but rather are used as
temporary shelter with limitations on eligibility that often exclude homeless veterans
with serious disabilities. Moreover, of these beds, a substantial number are set aside
for substance abuse treatment programs, and these programs are not designed to
provide services sufficient or appropriate to address serious mental health conditions.

106.   In addition to the beds operated by VA GLA, several residential programs are operated by third parties on the WLA Campus, including a geriatric care facility operated by the State of California and shelter and residential treatment programs operated by two non-profit organizations.

107.   The Veterans Home of California, which opened on the WLA Campus in 2010, is run by the State of California and provides nursing care for veterans over age 62.  The 396-bed home includes an 84-bed elderly residential care facility, a 252-bed skilled nursing facility, and a 60-bed unit designed for Alzheimer's and dementia patients.  At present, this facility is operating at less than 10 percent of its maximum capacity.

108.   The Haven is an emergency housing program run by the Salvation Army of Southern California on the WLA Campus.  Its goal is to provide housing and support services to 225 homeless or at-risk veterans.  The Haven includes five programs: short-term housing for 35 veterans in Alpha Center, transitional housing focused on substance abuse recovery for 95 veterans at Victory Place, supportive housing for 15 female veterans at Naomi House, a board and care facility for 90 mentally ill veterans at Exodus Lodge, and senior housing for 25 male veterans age 60 and older.

109.   New Directions, Inc. operates two residential programs on the WLA Campus.  The New Directions' Regional Opportunity Center serves 156 veterans, including 24 beds for detoxification, 24 beds for "Shelter Plus Care" transitional housing for elderly or disabled veterans, and 108 beds for residential substance abuse and mental health programs.  The New Directions North provides substance abuse treatment and mental health services for up to 50 homeless veterans with co-occurring mental illnesses.

110.   As with the VA GLA-run Domiciliary, virtually all of the emergency and transitional beds operated by the non-profit providers on the WLA Campus require residents to share rooms.  Moreover, although the services provided at these

facilities are appropriate and necessary for some veterans and the availability of
emergency and transitional beds is important for some veterans, these programs are
neither designed nor intended to meet the needs of veterans with severe mental
disabilities or brain injury.  Finally, by their nature as short-term and transitional
beds, these programs cannot provide the long-term stability that veterans with severe
disabilities require in order to meaningfully access medical and therapeutic services
offered by VA GLA.

111.   The Salvation Army also operates the 40-unit Westwood Transitional
Village on the WLA Campus.  Only homeless families are eligible.  Approximately
150 individuals live in the Village, with families of veterans making up 40 percent of
the residential population.  The Village provides residents with counseling, case
management, educational training, employment placement assistance, medical clinic
services, and childcare.

112.   In addition to the residential beds available on the WLA Campus, VA
GLA has contracted with private providers within its service area to secure around
1,200 transitional housing beds for veterans.  The duration of these programs is
between three and eighteen months.  VA GLA also contracts with private providers
in the community for short-term residential treatment (detoxification) beds.  Veterans
in these programs have to travel to the WLA Campus or another VA GLA service
location if they wish to access services from VA GLA.

113.   VA GLA also reported that in fiscal year 2010 it received 550 housing
subsidy vouchers for veterans.  A 2009 report prepared by VA GLA reflected that
there were only 1,317 permanent housing beds accessible to veterans in its service
area that are "veteran-specific." These beds are not located near the WLA Campus,
so disabled veterans, including veterans with serious mental disabilities or brain
injuries, who are placed in these beds must travel to the WLA Campus or another
VA GLA service location if they wish to access services from VA GLA.

114.   In short, VA GLA provides services for veterans only at the WLA

1 | Campus and the three ambulatory clinics and nine community clinics located
2 | throughout its service area, such that veterans must travel to these locations to access
3 | medical, mental health and other therapeutic services from VA GLA.  VA GLA
4 | offers only a limited number of emergency or transitional beds and time-limited
5 | residential treatment beds on the WLA Campus with qualification requirements that
6 | often exclude disabled veterans who are chronically homeless.  To the extent that
7 | veterans have access to additional transitional housing beds through VA GLA
8 | contracts with off-site providers and to a limited stock of permanent housing through
9 | VA GLA's housing voucher program, these beds are not located near the WLA
10 | Campus and other VA GLA facilities where VHA benefits are offered.

### Plaintiffs Have Been Denied Access to the VHA Benefits Offered by VA GLA Solely by Reason of Their Disabilities

115.   Although Defendant Shinseki and other senior officials within DVA and, more specifically, Defendant Beiter and other senior officials within VA GLA, are aware that a substantial number of veterans eligible for VHA benefits within the VA GLA service area have severe mental disabilities or brain injuries that require that they have stable housing in order to access necessary services, Plaintiffs' experiences demonstrate that Defendants have discriminated and will continue to discriminate against Plaintiffs and other veterans with serious mental disabilities solely by virtue of their disabilities.

116.   Defendants have made decisions that facially discriminate against Plaintiffs because of their disabilities, including:

- Refusing Plaintiffs admission to housing programs offered by VA GLA because of their severe mental disabilities or because they must take psychotropic medication to treat their severe mental disabilities; and

- Refusing to provide services that are necessary for the treatment of Plaintiffs' severe mental disabilities, while providing services necessary for the treatment

1  of veterans who do not have severe mental disabilities.

2      117.   Defendants have also denied Plaintiffs meaningful access to services

3  offered by VA GLA in numerous ways, which include, but are not limited to:

- Imposing conditions for access to or continued participation in programs or services that Plaintiffs cannot satisfy as a result of symptoms or characteristics of their disabilities;

- Providing services or treatment in settings that Plaintiffs are unable to access as a result of symptoms or characteristics of their disabilities;

- Failing to provide sufficient assistance to Plaintiffs when the symptoms or characteristics of their disabilities prevent them from identifying available services from which they would benefit, or applying for or otherwise navigating the intake, screening, or referral processes to access those services;

- Failing to provide treatment and support that is necessary for the appropriate treatment of Plaintiffs' disabilities, while providing appropriate treatment and support to veterans who do not have disabilities or who have different disabilities; and

- Failing to provide the reasonable accommodation of permanent supportive housing to those veterans who, by reason of their mental disabilities, are unable to meaningfully access appropriate treatment without it.

As a consequence, the design and structure of the VHA benefits delivery system within VA GLA, including the procedural and screening requirements imposed to access services and the decision to locate all services only at the WLA Campus and the few other sites operated by VA GLA, effectively excludes these veterans or creates substantial and, in some cases, insurmountable barriers to accessing necessary medical, mental health, and other services to which these veterans are entitled.

//

//

43

**Greg Valentini**

118. Plaintiff Greg Valentini was born in Hawaiian Gardens and grew up in Southern California. He is currently 33 years old. He served multiple combat tours in Afghanistan and Iraq. Since coming home, he has been diagnosed with severe PTSD and has struggled with homelessness, substance abuse, and thoughts of suicide.

119. Mr. Valentini grew up in Long Beach and Lakewood. He went to Lakewood High School, where he played baseball and basketball. His father, a Marine, instilled in him a sense of duty and service. After working with the Lakewood Department of Parks and Recreation and several other odd jobs, Mr. Valentini decided to join the Army to finance his higher education and enlisted in May 2000.

120. Mr. Valentini received basic training in Fort Benning, Georgia, and was selected for further training at Fort Bragg, North Carolina. He was assigned to the 82nd Airborne Division and then to the 101st Airborne Division. In October 2001, he was deployed to Afghanistan as part of the initial assault on the Taliban and al-Qaeda after September 11.

121. Mr. Valentini's first mission was to take control of the Taliban-held airport at Kandahar, which involved heavy combat. Many of his fellow soldiers were killed. He also witnessed a number of civilian deaths and was tasked with transporting the dead bodies of the civilians.

122. In February and March of 2002, Mr. Valentini's unit was part of Operation Anaconda in the Tora Bora Mountains, searching for Osama bin Laden and other elements of the al-Qaeda and Taliban leadership. He took part in significant ground fighting, under nearly constant sniper fire and mortar bombardment. Again, he witnessed the gruesome deaths of numerous civilians, including children.

123. In February 2003, Mr. Valentini's unit was taken out of Afghanistan and reassigned as part of the invasion force in Iraq. The unit's assignment was to

clear, secure, and hold certain key areas near Karbala while other forces moved toward Baghdad.  He again experienced heavy combat, involving the deaths of soldiers and civilians.

124.    Although his tour of duty was slated to end in March 2003, Mr. Valentini was "stop-lossed" and continued to serve in combat operations in Iraq for several more weeks.  He was honorably discharged in May 2003.

125.    In recognition of his service, Mr. Valentini has received the Army Commendation Medal, the Army Achievement Medal, the National Defense Service Medal, the Armed Forces Expeditionary Medal, the Army Service Ribbon, and the Expert Marksmanship Qualification Badge with Rifle Bar.  As a consequence of his service and experiences in Afghanistan and Iraq, he also developed what was later diagnosed as a severe case of PTSD.

126.    On returning to life as a civilian, Mr. Valentini moved back in with his father in the Long Beach area and tried to attend Long Beach City College on the "G.I. Bill."  He studied the administration of justice with the goal of becoming a police officer, but he had trouble relating to his classmates and controlling his emotions.  When someone would comment on the Iraq or Afghanistan wars, for example, he became uncontrollably angry, leading to several altercations.

127.    Mr. Valentini felt constantly "on alert," as if he was in combat.  He could not focus on conversations, instead paying attention to his surroundings, as if expecting an ambush.  He would repeatedly get up to check if doors were locked and stare compulsively at passing cars to see if anything seemed suspicious.  He was paranoid that passers-by were investigating him in some way.  Because he felt that he had to be constantly vigilant to protect himself and the people around him, he had trouble sleeping.  When he managed to sleep, he had graphic nightmares about things he witnessed during his wartime service.

128.    Mr. Valentini soon began to think about suicide as a way to escape the constant stress of feeling that he never left the combat zone.  Three or four times a

week, he spent hours thinking about where and how to kill himself. As he became
angrier, the suicidal thoughts increased in frequency. He told those closest to him
that he wished he had died in Afghanistan or Iraq; coming home in a flag-draped
coffin, he said, would have been better than coming home to a community that did
not understand what he was going through.

129.   In order to deal with the stress, Mr. Valentini started using
methamphetamine. The methamphetamine kept him awake, and kept his mind away
from thoughts of war. It also made him so exhausted that he was able to fall asleep
instead of lying awake thinking about what he saw in Iraq and Afghanistan, and
when he slept, he experienced fewer nightmares. Eventually his father ordered him
to go to the DVA hospital in Long Beach. A doctor there diagnosed Mr. Valentini
with severe PTSD.

130.   Mr. Valentini managed to remain sober for about 16 months, from 2004
to 2006, and continued living with his father during this time. Eventually, however,
he again turned to methamphetamine to cope with the recurring violent thoughts and
stress, and he left his father's house. In 2006, he began sleeping in a tent near the
Long Beach Airport. He collected cans, and paid $1 to shower at the YMCA. When
he ran out of money he ate discarded fast food he found on the street, first wiping off
the ants, and bathed in the lake by a golf course. He learned which public restrooms
he could use in the area. He stole from businesses to pay for the drugs he used to
cope with his stress and to take his mind off a reality that embarrassed him.
Sometimes other homeless veterans joined him by the airport, sleeping nearby.

131.   Mr. Valentini continued living on the streets until 2008, when, after
several rainstorms, his father agreed to let him move back into the house. When he
began using methamphetamine again after four months, however, his father asked
him to leave. Mr. Valentini was again homeless, and aside from a few short respites,
has been homeless since. He was briefly admitted to the Domiciliary but felt that the
staff seemed more interested in finding reasons to kick him out than helping him,

1  which made him more anxious and stressed.  In the Domiciliary, he was forced to

2  share a room with three other veterans also struggling with addiction and who also

3  had difficulty interacting with other people.  One of those roommates told Mr.

4  Valentini that his brother could supply him with methamphetamine, which made it

5  easier for Mr. Valentini to relapse.  That roommate soon died after overdosing on

6  heroin.

7        132.  Since October 2008, Mr. Valentini has spent time on the streets, in

8  shelters, in his father's house, in a girlfriend's house, and in jail for petty theft or

9  commercial burglary to obtain money for drugs.  He has difficulty managing his

10  PTSD symptoms in these circumstances; he feels constantly in "combat mode,"

11  always on alert, continuously anxious and tense.  As a condition of his probation, he

12  was sent to a transitional housing and treatment facility operated by a non-profit

13  organization, where he is now staying.  He is currently clean, although he has

14  experienced several relapses.

15        133.  Mr. Valentini recently completed his stay at the transitional housing

16  program and received a housing voucher through VA GLA.  He recently obtained an

17  apartment in Hollywood with his voucher, where he is living by himself.  Although

18  he now has a place to live, he worries, based on his mental disability and his past

19  experience, whether he will be able to comply with the housing voucher program

20  requirements and maintain his apartment.

21        134.  Mr. Valentini also worries about his ability to access necessary

22  treatment and services from VA GLA to address his PTSD.  He finds it difficult to

23  take public transportation, because riding with a group of strangers triggers his PTSD.

24  Prior to taking the bus to the WLA Campus to access treatment, he must spend a

25  half-day or more mentally preparing himself for the trip.  Once on the bus, he feels

26  that he must station himself near an exit and maintain a visual map of where the

27  location of everyone and everything.  On numerous occasions he has felt so

28  overwhelmed that he had to get off the bus before reaching his destination, causing

him to miss important appointments.

135.   Mr. Valentini's goal is to complete his college degree and obtain a Masters in Social Work at USC, where there is a military social work program. He is currently taking classes at Los Angeles City College; he sits in the back of the classroom, near the exit, where he feels safest. He wants to help other combat veterans avoid what he has gone through. Unless he can maintain stable housing, however, Mr. Valentini feels unable to manage his PTSD and addiction effectively. He worries that he will be on the streets again soon.

136.   Since coming home after his service in Iraq and Afghanistan, Mr. Valentini has met and befriended many other veterans with serious PTSD who have, like him, medicated themselves with street drugs. He knows that those drugs bring only temporary relief, but he has found it difficult to address his PTSD without a safe, stable place to live.

**Adrian Moraru**

137.   Plaintiff Adrian Moraru is 37 years old. He was born in Romania and is a legal permanent resident of the United States. After his service in Iraq as a Marine, he was diagnosed with PTSD and bipolar disorder.

138.   Mr. Moraru grew up in Philadelphia, Pennsylvania. He enlisted in the Marines in 1999 at age 26 and trained at Parris Island. He was stationed at Twentynine Palms, California, and served in Okinawa before being sent to Iraq as part of the initial invasion force for OIF.

139.   In March 2003, Mr. Moraru's unit encountered a chemical pool while on a convoy to Baghdad. He and his fellow Marines were not wearing chemical warfare protection gear and were exposed to the chemical for 10 to 15 minutes. After his unit reached Baghdad, they were sent to Karbala. In April 2003, while assigned to guard an Iraqi bank, he stated in a media interview that he always had to remain "on alert" and needed eyes in the back of his head. He commented,

48

"Sometimes, it seems like I survived the war and I could be shot in the back by a 9-year-old. It was almost easier during the war. At least you knew where the enemy came from. Here, it could be anyone." When his term of service ended after returning from Iraq in June 2003, he held the rank of corporal.

140.   Mr. Moraru lived in Las Vegas until the summer of 2005, when he moved to Philadelphia to pursue an employment opportunity. He worked for several months installing satellite dishes for Direct TV and lived with his parents.

141.   One day in August 2005, Mr. Moraru suddenly experienced uncontrollable rage and went into his mother's living room and destroyed the contents of the room while his mother hid in the basement. After that incident, he spent a week or two at a mental hospital.

142.   Mr. Moraru stayed with his sister in Philadelphia for several weeks after leaving the hospital, but she had young children and eventually asked him to leave. Because his parents refused to let him back into their house, he moved into a car parked on the street in front of the house, sleeping there for about six months, through the winter, until around March 2006. During this time he developed boils on his hand and groin that he believes are a result of his exposure to the chemical pool in Iraq. Although he was in tremendous pain, his paranoia prevented him from seeking medical treatment. No one from DVA contacted Mr. Moraru or his family during this time, or attempted to connect him to any services that might help him.

143.   Because Mr. Moraru continued to argue with his father, his father no longer allowed him to sleep in the car. Mr. Moraru flew to Las Vegas, where two of his friends from the Marines lived. One of the friends arranged a job for him at a 7-Eleven. Due to his mental state, however, he was unable to work more than one pay period. He took the $430 he earned and took the bus to San Diego, though he had no contacts in the city. After exhausting the last of his money in less than a week, he began collecting cans and eating out of trash bins around Ocean Beach. He stayed in San Diego for about eight months. During that time he lost his ID and his green card

1  expired, and he had no money to renew it.  He also developed a large boil on his
2  back that he believes is a result of exposure to the chemicals in Iraq.  He stopped
3  drinking after getting the boil.

4      144.  After eight months in San Diego, Mr. Moraru's friend in Las Vegas
5  wired him enough money to take the train to Los Angeles.  Things deteriorated
6  further upon his arrival there.  He stopped collecting cans and obsessively marched
7  up and down Wilshire Boulevard between downtown and the beach, walking up to
8  20 miles a day and collapsing to sleep when he could not walk further.

9      145.  Mr. Moraru eventually stopped marching in Beverly Hills.  One day, he
10  was struck with the impulse to pick up a chain that was used to secure chairs on a
11  restaurant patio.  He does not know what possessed him to take the chain.  Four
12  police officers approached him and told him to drop it.  When he stood up with a
13  stick in his hand, they subdued and arrested him.  During his subsequent arrest and
14  booking, he told everyone that he was God.

15      146.  As a part of a plea deal, Mr. Moraru was released for 30 days served in
16  county jail and received three years probation.  He then walked to Westwood and
17  slept behind the Equinox health club for about three months.  During this time,
18  because he had stopped drinking, he was able to save $160.

19      147.  Around August 2009, Mr. Moraru went back to Las Vegas, where his
20  friend helped him get a ticket to Philadelphia.  He moved back in with his parents,
21  but had trouble staying in a house with other people, and they again asked him to
22  leave.  He then moved his remaining belongings from his parents' house to a lot
23  behind a Wawa convenience store, where he slept.  He told passers-by that he owned
24  the store.  When the police forced him to leave, he moved to another Wawa location.
25  He does not know what possessed him to stay near Wawa stores.

26      148.  After some time, Mr. Moraru's parents allowed him to move into their
27  garage.  His sister helped him renew his green card, because he could not afford the
28  $375 renewal fee.  He never went to DVA facilities in Philadelphia, because he did

1  not believe there was anything wrong with him.

2       149.   After managing to save $90, Mr. Moraru flew back to Los Angeles in

3  August 2010 and again slept behind the Equinox.  The next month he suffered a

4  violent seizure.  Several other homeless residents of the area, whom he had gotten to

5  know, suggested he visit the WLA Campus.  After arriving there early in the

6  morning, he waited hours to be seen and saw other vets with mental disabilities leave

7  because they could not wait any longer.  He briefly saw a doctor who again told him

8  to sit and wait.  After waiting until 4:30 p.m., he left.

9       150.   Mr. Moraru later visited the WLA Campus again and forced himself to

10  wait for his name to be called.  He received a physical, was referred to see a

11  psychiatrist, and was then placed in The Haven, where had to share a room with

12  three other residents.  Moreover, treatment at The Haven focused on alcoholism and

13  drug addiction, but he had stopped drinking and did not use drugs.  VA GLA staff

14  did not inform him of other options where he could have lived, if any existed.  After

15  ten days at The Haven, he assaulted another resident and was forced to leave the

16  program.

17       151.   Before he was discharged from The Haven, Mr. Moraru was assessed

18  for admission to the Domiciliary.  He was denied admission to the Domiciliary

19  during the screening process, before he was even interviewed by Domiciliary staff,

20  because he had a history of psychiatric instability and aggressive behavior.

21       152.   After Mr. Moraru was discharged from The Haven, he again became

22  homeless, this time in Abbot Kinney park in Santa Monica, and his condition

23  continued to deteriorate.  He spent his entire day cleaning up the park, picking up

24  cigarette butts and other garbage.

25       153.   Mr. Moraru continued to try to attend his appointments at the WLA

26  Campus with Dr. McKenna, a psychiatrist.  She diagnosed him with PTSD and

27  bipolar disorder.  He saw Dr. McKenna about once every month to manage his

28  seizure medication.  He received no medication for his PTSD or his bipolar disorder.

51

154.   At one point, a VA GLA employee asked Mr. Moraru if he wanted housing.  He replied that he did not need housing because he was "living" in Santa Monica.  His mental condition prevented him from seeing anything wrong with sleeping in the park and picking up garbage all day.  In addition, his bad experience at The Haven left him with a negative impression of housing offered through VA GLA.

155.   About six weeks ago, Mr. Moraru picked up some pipes in the park that he thought were garbage.  Someone told him to put them down.  He became angry, told the man that he would beat him, and threw the pipes in a dumpster.  The next day, he was arrested and charged with robbery and criminal threat.  Mr. Moraru accepted a plea deal to participate in a transitional housing program run by a non-profit organization in Hollywood for one-year as a condition of probation.  He has been staying there for about a month.

156.   Mr. Moraru wants a private apartment that will allow him to go to the WLA Campus for appropriate treatment and medications.  He does not know what he will do when he finishes the transitional housing program, and he is afraid that if he has to leave the program he will have nowhere to go but back to living on the streets, where his mental health will continue to deteriorate.

**Jane Doe**

157.   Plaintiff Jane Doe was born in Pasadena, California.  She is a veteran and is currently homeless.  VA GLA psychiatrists have diagnosed her with PTSD related to military sexual trauma.

158.   Ms. Doe's family has deep ties to the military, and five of her six brothers served in the military.  Her brother Donald was a Marine and served in Vietnam.  He died in 2005.  Her brother George served in Vietnam and was a POW. He used drugs after the war and died in 2005.  Her brother Bill served seven tours in Vietnam.  He has addiction issues and a 100 percent service-connected disability.

1   Her brother Phillip served in the Gulf War and now has PTSD.  He developed
2   asthma from CS gas exposure and now uses drugs.  Like Ms. Doe, he is homeless
3   and lives in Los Angeles.  Her brother Hamilton served in the Gulf War.

4        159.   Ms. Doe joined the military after obtaining her GED at the age of 16,
5   planning to make a career of it.  In 1974, she went to Fort Jackson, South Carolina
6   for basic training.  She then completed Advanced Individual Training in Radio
7   Communications at Fort Dix, New Jersey.  In the barracks, she was attacked and
8   raped by a group of women.  She was raped again by a mess sergeant in the back seat
9   of military vehicle while another man looked on.

10       160.   In December 1974, Ms. Doe was sent to Germany and worked as a
11  radio operator.  She returned to the United States, was briefly stationed at Fort Sam
12  Houston in Texas, and was then sent back Germany.  While in Germany, she was
13  again sexually assaulted by a group of men.  After that incident, she was hospitalized
14  in a psychiatric care unit.  Because she felt ashamed, she did not report the sexual
15  assaults at the time.

16       161.   Ms. Doe's mother became ill in 1980, and she received a humanitarian
17  discharge to help take care of her.  She obtained a job with Bank of America in the
18  collections department, but quit because of job circumstances that exacerbated her
19  PTSD symptoms.  She then held various security jobs, but had difficulty keeping
20  them because she frequently lost her temper, which is a consequence of her PTSD.
21  During this time, however, she did not realize that she had PTSD.

22       162.   In 1997, Ms. Doe lost her security job, and one of her brothers drove her
23  to the WLA Campus because she was having a mental breakdown.  She was
24  immediately committed to the psychiatric ward and placed on suicide watch.  This
25  was the first time she received services from DVA.

26       163.   Ms. Doe was diagnosed with PTSD secondary to military sexual trauma.
27  Because there was no women's clinic at VA GLA at the time, she was transferred to
28  the Domiciliary.  At that time, there were only five or six other women there, but she

1 | had to share a room with three other women.  She was in constant fear of being
2 | attacked.  When she was able to sleep, she would wake up with nightmares.

3 |       164.   There were no women's therapy groups at the Domiciliary, so Ms. Doe
4 | had to participate in group sessions for addiction, even though she had no addiction
5 | issues.  The sessions did not help with her PTSD, because the sessions focused only
6 | on addiction and the facilitators never discussed flashbacks or nightmares, which
7 | were two of her main problems.  Ms. Doe also met once a week with a psychologist,
8 | Dr. Vivian Gold, who worked well with her.  During these sessions, she was able to
9 | talk about her PTSD symptoms.  She eventually was transferred to a single room,
10 | which lessened her anxiety and fear considerably.  As a result of her sessions with Dr.
11 | Gold and having a safe, secure place to live, Ms. Doe felt like she was starting to
12 | make progress.

13 |       165.   But three or four months later, a board at the VA GLA created a
14 | discharge summary.  Ms. Doe knew that she was not yet in a position to live
15 | successfully on her own.  She told the board that she was still having intense
16 | flashbacks about her trauma, but they nonetheless forced her to leave sometime in
17 | 1999.

18 |       166.   When Ms. Doe left the Domiciliary, there were no transitional services
19 | so she was told to go to Skid Row.  She moved into a room at the Boyd Hotel for
20 | $250 per month.  She never felt safe there, because she could access a bathroom only
21 | by leaving her room and walking down a public hallway and there were people
22 | living in cardboard boxes around the Boyd Hotel and lots of open drug use in and
23 | around the hotel.  Although she tried to continue seeing Dr. Gold, VA GLA told her
24 | that Dr. Gold worked only with people living at the Domiciliary.  She instead
25 | received psychological services at the mental health day treatment building on the
26 | WLA Campus.

27 |       167.   Being forced to leave the WLA Campus for a Skid Row hotel was a
28 | major setback in Ms. Doe's treatment.  She did not feel secure even in her own bed

1  and began having difficulty sleeping and experiencing acute anxiety.  She had to take

2  the bus to the WLA Campus for counseling, but traveling on the bus was difficult

3  because her PTSD caused her extreme anxiety when she was around crowds of

4  strangers.  Consequently, traveling to the WLA Campus to access mental health

5  services was a problem.

6      168.  Ms. Doe then moved back to Pasadena, but when her brother kicked her

7  out of the house, she lived out of her car.  She continued to experience severe PTSD

8  symptoms, because she had not received appropriate treatment or support after she

9  was discharged from the Domiciliary.  She did not know where to turn for help.

10      169.  In 2008, Ms. Doe tried to go back to the Domiciliary but was told it had

11  no programs for women with PTSD.  Instead, she was referred to The Haven, a

12  transitional shelter on the WLA Campus.  She stayed at Naomi House, a women's

13  shelter on the third floor of an otherwise all-male building.  As a rape victim, it was

14  very difficult for her to leave and to enter the building with all the men around.

15  Additionally, there were no programs to meet her PTSD needs.

16      170.  Eventually, the Domiciliary began a program for women with PTSD,

17  and Ms. Doe was accepted.  By the time she transferred there, however, VA GLA

18  had replaced the PTSD program with an addiction recovery program.  When she and

19  a few other women with PTSD who enrolled in the program complained, VA GLA

20  simply changed the title to a "recovery" program without changing the content or

21  therapeutic approach.  The mandated group sessions focused exclusively on drug and

22  alcohol addiction, and her therapist was a drug addiction specialist, with no training

23  in military sexual trauma or PTSD.  Her third session with the addiction specialist

24  focused on discharge planning, which made her feel as though she was being pushed

25  out the door as soon as she had arrived, regardless of whether she was doing better or

26  receiving the care she needed.

27      171.  The Domiciliary tried to discharge her after only four months, but Ms.

28  Doe persuaded the staff to extend her stay by two months.  She had difficulty

1  concentrating on her treatment because she worried about where she would live after
2  the two-month extension ended.

3      172.  Ms. Doe was eventually discharged from the Domiciliary because she
4  did not take a mandatory urine-analysis test.  She simply forgot to show up for the
5  test, which should not have been surprising to the staff because her records reflect
6  that short-term memory loss is one symptom of her PTSD.

7      173.  Ms. Doe told the staff that she did not feel safe on the streets and had
8  not made enough progress to feel stable.  The only options she was offered were a
9  shared room at New Directions or psychiatric hospitalization, and she rejected the
10 former because of the shared-room requirement and the latter because she did not
11 believe it would be helpful.  About an hour before she was supposed to leave, she
12 was handcuffed and taken to the mental lock-up ward, where she stayed overnight on
13 a psychiatric hold.  The doctors at the ward discharged her the next day because she
14 did not meet the criteria for involuntary commitment.  VA GLA referred her to the
15 Salvation Army Bell Shelter, a large dormitory-style homeless shelter, but her PTSD
16 prevented her from staying in such a setting.

17     174.  Two days later, Ms. Doe learned that a slot opened for her at a
18 specialized DVA program in Menlo Park for women who experienced sexual trauma.
19 She was denied admission, however, because she did not meet the admission
20 requirement of having a stable place to live after completion of the program.

21     175.  Ms. Doe is currently living with her sister-in-law and continuing to see
22 a therapist at the WLA Campus.  Her unsettled living situation exacerbates some of
23 her PTSD symptoms, which undermines her treatment.  She continues to have
24 flashbacks and nightmares and is embarrassed when people see her with those
25 symptoms.  When she does not have a private space, she tries to repress her trauma
26 so the symptoms do not surface.  She knows this is not healthy and makes it harder
27 for her to be open in her treatment sessions.

28

176.   Ms. Doe wants to find her own place that is safe and secure and will allow her to access her VA GLA doctor so that she can receive the treatment she needs.  She is trying to find a place to live in Los Angeles, but it has been difficult to find an apartment because her credit history is poor after being homeless for four years.  VA WLA has not offered her any permanent housing.

**Floyd Summers**

177.   Floyd Summers was born on June 2, 1956.  He joined the U.S. Army through a delayed-entry program in April 1975 and began his service in November 1975.  In the Army, he became a communications specialist.

178.   After basic training, Mr. Summers was stationed in Germany, where he saw American soldiers who had returned from Vietnam with serious injuries sustained in combat.  He became very anxious about being sent into combat, but he was required to participate in combat training and maneuvers while stationed in Germany.  During this time, he began having nightmares and hearing voices and developed severe anxiety.

179.   While he was stationed in Germany, Mr. Summers was pulled out of training and informed that his sister had died.  He had four sisters and asked which one had died, but no one could tell him.  He flew back to the United States imagining that each of his sisters had died.  When he got home, everyone was alive, although one of his sisters was in the hospital.  After this experience, Mr. Summers began feeling afraid of the Army and worrying that he could not trust anyone there.

180.   Mr. Summers was honorably discharged from the Army in February 1977, even though his term of commitment had been for longer, due to his mental disabilities.  No one told him about DVA or any of the services and benefits it offered.

181.   After he was discharged, Mr. Summers traveled around the country.  He felt as though he could not stay still.  Staying in one place made him feel

"smothered." He tried to establish and maintain relationships, and he got married three times. Ultimately, he could not sustain relationships or jobs. He argued with everyone. He started using marijuana, heroin, and cocaine to help him cope. He does not remember a lot about this time in his life.

182.   Eventually, Mr. Summers had a daughter, and he wanted to have a positive relationship with her. When she moved to Los Angeles with her mother, he moved there too. His goal was to stop doing drugs. In Los Angeles, he rented a room in a house and got a job in sales. Working was hard for him because he experienced severe mood swings, which he later discovered was a symptom of bipolar disorder. He lost his job in August 1995 and went to the WLA Campus for help with his mental problems.

183.   At the WLA Campus, Mr. Summers was first diagnosed with a "probable" schizophrenic disorder. The staff asked him why he had taken so long to seek psychiatric treatment after being discharged from the Army. Mr. Summers had no answer. He was informed that his illness was not service-connected because too much time had passed. One of the doctors recommended that he stay in the psychiatric ward, but he chose instead to go home because he wanted to be alone.

184.   One night in October 1995, Mr. Summers experienced hallucinations in which he heard voices telling him to behave in certain ways. He felt depressed and hopeless. He went to back to the WLA Campus the next day and told a doctor that he was scared. He told the doctor that he probably would have killed himself the night before if he had had a gun. The doctor checked him in to the psychiatric ward. After 30 days in the psychiatric ward, Mr. Summers was diagnosed with bipolar disorder and depression.

185.   When he left the psychiatric ward, Mr. Summers did not have a place to stay. He stayed with friends when he could. His unstable living arrangements made it hard for him to keep up with his treatment. Additionally, he often felt disoriented and confused as a result of his mental disabilities, and he consequently forgot mental

1  health and other appointments for VA GLA services and missed them.

2      186.   Over the next few months, Mr. Summers returned to the psychiatric

3  ward.  Whenever he left the WLA Campus, he was never given a comprehensive

4  discharge plan.  When he was not on the WLA Campus, Mr. Summers would often

5  sleep on the streets or in a car.  During those times, he spent most of his time looking

6  for food, so it was difficult to go back and forth to doctor's appointments.

7      187.   In September 1998, Mr. Summers tried to reconcile with his wife and

8  daughter.  He told his wife that he felt depressed and that he needed help.  They

9  called the WLA Campus together and asked for help.  His wife told emergency

10  services that she had children at home and that "she is not sure what the [patient] will

11  do to them if he is not admitted."

12      188.   Mr. Summers was referred to New Directions.  When he learned that he

13  could not possess prescription medications if he was admitted to New Directions, he

14  stopped taking his psychiatric and blood pressure medications to conform with this

15  policy.  Nonetheless, he was eventually told that he was not suitable for admission to

16  New Directions.

17      189.   Mr. Summers subsequently went to the emergency room at the hospital

18  on the WLA Campus with chest pains.  During the intake process there, Mr.

19  Summers explained that he had been trying to get housing at New Directions, and he

20  was referred to the Haven.  A VA GLA employee told him that he could stay at

21  Haven II and transfer to Haven I once he was back on his psychiatric medication and

22  had stabilized.

23      190.   Mr. Summers stayed at the Haven for a few weeks, but was not

24  successful in the program.  He felt that the program was too regimented, such that he

25  often felt "rushed" in his treatment and in planning for his discharge.  After a while,

26  Mr. Summers starting feeling sick.  He left the Haven and enrolled in the Addicted

27  Treatment Unit on an outpatient basis.

28      191.   In the meantime, Mr. Summers returned to living on the street.  He

1  experienced feelings of severe hopelessness and depression again.  He returned to the
2  WLA Campus and asked about living in the Domiciliary and went through the
3  screening process.  The social worker helped him apply to the Domiciliary and
4  explained the referral process.  Mr. Summers attended the Domiciliary screening
5  appointment and was admitted.  However, he still had to wait for his admission to be
6  scheduled.  In the meantime, he was living on the streets and it was very cold outside.

7        192.   On December 16, 1998, Mr. Summers moved into the Domiciliary.  A
8  few days before Christmas, he was informed that he had failed a drug test and was
9  being discharged.  A social worker met with Mr. Summers to explain that he had to
10 leave the Domiciliary by December 21 with all of his belongings.  At this meeting,
11 Mr. Summers said that he did not have any money.

12       193.   After being forced out of the Domiciliary, Mr. Summers returned to the
13 streets.  His priorities were staying warm and safe.  He spent most of his time
14 looking for food and riding buses to keep warm.  When he got tired, he would sleep
15 in his car.

16       194.   Mr. Summers has been periodically homeless since then.  One of the
17 hardest things for him about being homeless is getting treatment and medication.  He
18 has to be proactive about going to meetings and refilling prescriptions, which is
19 difficult for him because he has to walk to appointments and is forgetful.

20       195.   Mr. Summers was offered referrals back to the Haven, New Directions,
21 and the Domiciliary over the years.  He tried the Haven again, but it was not
22 effective.  Mr. Summers applied for a housing voucher in 2009, but was told that he
23 could not receive a voucher until he had several months of clean drug tests.  It is hard
24 for him to stay clean when he is not getting psychiatric treatment and living on the
25 streets, where he must worry about what he will eat and his safety.  He experiences
26 highs and lows from his bipolar disorder, and he had often turned to drugs as a way
27 to cope and self-medicate.

28       196.   Recently, Mr. Summers has been trying everything he can to get

1   housing.  He has been clean since January 2011 so that he could become eligible to
2   reapply for a housing voucher.  He attempted to navigate that application process,
3   but he found it a complicated and rigorous process.  He had to get to the WLA
4   Campus by 8:00am, and then wait in line until noon.  Finally, someone told him that
5   the vouchers had been used up and VA GLA was not even accepting names for a
6   waiting list.  He does not think he can undergo the process all over again.

7        197.   In April 2011, Mr. Summers applied for a bed at the Domiciliary after a
8   social worker at the WLA Campus determined that he could greatly benefit from a
9   stable environment where he can work concurrently on his psychological, substance
10  use and employment issues.  Because he has mental disabilities, however, Mr.
11  Summers was rejected from the Domiciliary.  He was not even interviewed because
12  he was "too psychiatrically unstable at this time to be at the Dom[iciliary]."

13       198.   Mr. Summers is desperate for stable, permanent housing so that he can
14  keep up with his medical treatment and maintain his sobriety.  In the meantime, he is
15  living out of his car, because he has found a quiet, safe place to park it at night.  He
16  takes public transportation and walks to the WLA Campus for mental health, medical,
17  and drug treatment appointments, which he attends almost daily at either the WLA
18  Campus or the Sepulveda ambulatory clinic.  He has done everything that he knows
19  of to secure housing through VA GLA, yet he still is homeless and does not know
20  how or when he might be able to secure housing.  Making all of his appointments is
21  like a full-time job that leaves him little time to focus on other things in his life, and
22  he has been able to keep going since January 2011 in large part due to the hope of
23  getting a housing voucher or some other permanent housing.  Mr. Summers does not
24  know how much longer he will be able to continue coping with the daily stress of
25  having to travel to the WLA Campus and Sepulveda clinic and manage his day-to-
26  day needs.

27  //

28  //

**Zachary Isaac**

199.   Plaintiff Zachary Isaac saw combat in the Navy, experiences multiple daily flashbacks, and is currently homeless in Skid Row in Los Angeles.

200.   Mr. Isaac was born and raised in Texas.  He joined the Navy after several of his close family members joined the military.  He served on a guided missile destroyer and was stationed in various locations across the Pacific Ocean. Mr. Isaac saw combat on several occasions, including during encounters with Islamic terrorists and pirates.  Mr. Isaac experienced other traumatic incidents, including the death of a sailor under his command.  That sailor was swept into the blades of a helicopter after he misunderstood an order from Mr. Isaac.  Several of Mr. Isaac's friends in the Navy committed suicide during their service.  Mr. Isaac began experiencing violent flashbacks while still serving in the Navy.

201.   By the time Mr. Isaac was discharged in 2010, he had received the following decorations: the Global War on Terror Service Medal, the Sea Service Deployment Ribbon, the Battle Efficiency Ribbon, the Overseas Deployment Medal, the Expert Marksman Medal, the National Defense Ribbon, and the National Defense Service Medal.

202.   After his discharge, Mr. Isaac came to Los Angeles to find work.  His mental health condition made it difficult for him to keep a job; he finds himself constantly distracted, and unable to focus.  He became homeless in March 2011, and has stayed at various shelters, such as the Los Angeles Mission, since then.

203.   Mr. Isaac continues to experience violent flashbacks five to six times a day.  During these flashbacks he feels the ground swaying as if on a boat and vividly recalls the sounds of airplanes and helicopters, the smell of sea salt, and the violent incidents described above.  He finds himself walking around at night thinking he is somewhere else, and wakes up in the middle of the night with violent nightmares. The shared sleeping arrangements and showers of the Los Angeles Mission and other shelters remind him of his experiences in the military and trigger flashbacks.  The

1 | police helicopters that often hover over Skid Row also serve as triggers. The
2 | frequency and severity of his flashbacks have increased during the time he has been
3 | homeless.

4 |     204.  Mr. Isaac requires stable, secure housing with access to necessary
5 | mental health and other supportive services. He has had several bad experiences
6 | with VA GLA employees, who gave him conflicting information about the medical
7 | treatment to which he is entitled. He feels as if they have given him "the run-
8 | around." As a result, Mr. Isaac is now pursuing housing through Los Angeles
9 | County.

10 |

**Willie Floyd**

12 |     205.  Plaintiff Willie Floyd served a tour in Vietnam where he participated in
13 | extensive combat. As a result of his traumatic experiences while in the Army, Mr.
14 | Floyd has a variety of mental health problems. He is currently homeless, living on
15 | Skid Row. He is 64 years-old.

16 |     206.  Mr. Floyd was born in Tuskegee, Alabama and raised in Auburn,
17 | Alabama. He did not have any mental illness or other disability until his experiences
18 | in Vietnam.

19 |     207.  Mr. Floyd joined the Army reserves in 1965 after an instructor in a
20 | vocational program suggested it would advance his career as an aspiring engineer,
21 | and he transferred to active duty the following year. Eighteen months later, shortly
22 | after Martin Luther King Jr. was assassinated, he was sent to Vietnam.

23 |     208.  Mr. Floyd spent eleven months in Vietnam, starting in late 1968. He
24 | served the entire time as a combat engineer on convoys. He and his fellow soldiers
25 | took significant fire virtually everywhere they went.

26 |     209.  His platoon's mission was to help clear out parts of the jungle to make it
27 | safe for U.S. troops to set up camp. The process began with U.S. war planes
28 | bombing the area with napalm. Then helicopters would fire on the area with 50-

1 caliber machine guns.  Finally, Mr. Floyd's platoon would enter the area on the

2 ground, a process often involving tree-by-tree fire-fighting.

3     210.   Mr. Floyd saw many people shot and killed directly in front of him.

4 Most of the people he saw die were American troops.  He also saw the pools of

5 blood left behind after the Vietnamese dragged away their deceased.

6     211.   Although Mr. Floyd received extensive training prior to going to

7 Vietnam, he received no training or counseling of any kind to prepare him to return

8 to civilian life.  As Mr. Floyd described the experience, one day he was in the jungles

9 of Vietnam and the next day he was on the streets of Los Angeles.  Mr. Floyd sank

10 into severe depression and was unable to maintain stable employment.  He was

11 ultimately diagnosed with anxiety, depression, and anti-social disorder.

12     212.   Mr. Floyd also returned from Vietnam with a drug addiction.  In Mr.

13 Floyd's words, "[w]e said to ourselves, if we were going to die anyway, why not go

14 out with a bang?"  He has struggled with substance abuse ever since.

15     213.   The mental health and substance abuse problems that he developed as a

16 result of his experiences in Vietnam have prevented Mr. Floyd from maintaining

17 stable housing.  He has been homeless on and off for a total of at least 10 years,

18 sleeping on the streets of Inglewood, Bell Gardens, and Skid Row.  Mr. Floyd

19 currently sleeps on the sidewalk under a building overhang on Broadway, between

20 8th and 9th streets, in downtown Los Angeles.  Most of his possessions are contained

21 in a shopping cart.  He collects and recycles bottles and sometimes plays competitive

22 chess in public parks for income.

23     214.   Mr. Floyd continues to experience violent flashbacks of Vietnam on a

24 daily or near-daily basis.  Several weeks ago, an acquaintance of Mr. Floyd asked

25 him why he doesn't simply forget about his experiences there.  He responded with

26 the question, "How *can* I forget it?"

27     215.   A doctor at VA GLA has encouraged Mr. Floyd to participate in a

28 PTSD group at the WLA campus.  Although Mr. Floyd found the several sessions he

1 attended helpful and he would have liked to continue with the program, he has not
2 been able to participate because he finds it too difficult to make the trip across the
3 city from Skid Row to the WLA Campus.

4     216.   After participating in a drug rehabilitation program at New Directions
5 several years ago, Mr. Floyd was able to obtain a housing voucher through VA GLA.
6 He found an apartment close to the WLA Campus, an arrangement that made it
7 easier to obtain treatment offered at the WLA Campus.

8     217.   After only one year in the apartment, however, his voucher was revoked
9 because he failed to submit necessary paperwork.  The building in which he lived
10 had two different addresses and VA GLA sent the forms to the address for which he
11 did not receive mail.  By the time the building manager gave him the forms, they
12 were past due.  When his voucher was withdrawn, Mr. Floyd returned to living on
13 the streets in Skid Row, and he has been living on the streets since that time.

14     218.   Mr. Floyd requires permanent supportive housing to access the
15 psychiatric care and medication necessary for the treatment of his PTSD, depression,
16 and anxiety.

17

18 **Leroy Smith Jr.**

19     219.   Plaintiff Leroy Smith Jr. is a veteran of the U.S. Marine Corps.  He has
20 been diagnosed with paranoid schizophrenia and is currently homeless on Skid Row.

21     220.   Mr. Smith was born and raised in Los Angeles.  He enlisted in the
22 Marines during the Vietnam War, in 1974.  He served in San Diego, but injured his
23 foot before he could be deployed to Vietnam.  That injury has developed into severe
24 arthritis, which causes extreme pain in Mr. Smith's feet.

25     221.   Mr. Smith was diagnosed with paranoid schizophrenia at the Long
26 Beach VA very soon after leaving the Marines and has taken psychotropic
27 medication for about thirty years.  He lived with his father and grandmother after his
28 discharge, but when they passed away he began living on the streets.  He tries to

1  keep track of his medicine, but loses it sometimes.  Mr. Smith began taking drugs to

2  cope with the pain in his feet and the difficulties of his life on Skid Row.

3       222.   In February 2011, Mr. Smith began a program at the Domiciliary at the

4  WLA Campus.  He was placed in a room with two other veterans.  He stopped using

5  drugs and felt that he was doing well.  As his six-month stay there was ending,

6  however, a parole officer entered his room with a gun.  The presence of a gun in his

7  room upset him greatly, and Mr. Smith felt that he had no control over his

8  surroundings.  He felt that he needed to speak to a psychologist about his feelings,

9  but was told he could participate only in the programs at the Domiciliary and

10  psychiatrist was available.

11       223.   Mr. Smith completed the program at the Domiciliary despite his

12  problems there.  He tried to obtain a housing voucher from VA GLA so that he

13  would have a stable place to live when he was discharged from the Domiciliary, but

14  he was not able to navigate the application process on his own and did not receive

15  sufficient support from VA GLA employees to complete the process.  Accordingly,

16  he was discharged from the Domiciliary to the streets and has returned to Skid Row.

17       224.   In mid-July 2011, Mr. Smith and a friend of his were walking across the

18  Sixth Street Viaduct, a bridge that spans the Los Angeles River.  Mr. Smith blacked

19  out.  When he regained awareness of his surroundings, he was on the other side of

20  the railing on the edge of the bridge.  His friend told him that he had been

21  threatening to jump.  Mr. Smith climbed back over the railing and sat down, terrified

22  that he had nearly killed himself.

23       225.   Because of his mental health condition, Mr. Smith is unable to navigate

24  the processes established by VA GLA to obtain housing.  He has difficulty accessing

25  mental health services from VA GLA because he lives on the streets in Skid Row.

26

27  **Leslie Richardson**

28       226.   Plaintiff Leslie Richardson enlisted in the Army in 1973 and served as a

1   Military Police officer in Germany from 1978-1980.

2       227.   Mr. Richardson worked in narcotics during his time in Germany and,
3   due to the nature of his work, saw a lot of bodies of people who had overdosed or
4   committed suicide.  For example, one soldier locked himself into an armory and set
5   himself on fire, and Mr. Richardson was involved in that investigation.  During his
6   time in Germany, he began to notice changes in his feelings and emotions as a result
7   of the stress.  He also began drinking heavily to cope with the high levels of stress
8   associated with being an undercover narcotics agent.

9       228.   When Mr. Richardson was discharged and returned home, his wife and
10  parents noticed he had become cold and isolated.  He took a job as a police officer to
11  support his family, but could not cope with the high stress levels.  He quit his job
12  after a high speed pursuit resulted in three civilian deaths.

13      229.   In 1995, Mr. Richardson sought help for his mental disability at the
14  Loma Linda VA where he was diagnosed with depression.  He drank heavily in the
15  years following and could not maintain a stable job.  He was taken into custody on
16  psychiatric holds multiple times, including after one incident in 2003 when he
17  blacked out and was later told that he aimed a gun at his head but the bullet had
18  missed his head when he pulled the trigger.

19      230.   In 2007, Mr. Richardson was referred by VA GLA to the US Vets
20  program in Inglewood.  He relapsed and was sent to the Domiciliary for one month.
21  After the one month, he left and lived with a cousin for three weeks.

22      231.   In December 2007, he returned to VA GLA and was referred me to the
23  Jan Clayton Center in Hollywood, where he stayed until November 2008, when the
24  Center closed for renovations.  VA GLA then referred Mr. Richardson to the Russ
25  Hotel on San Julian in Skid Row and spent Christmas there.  While at the Russ Hotel,
26  he thought about *The Christmas Carol*, where he had been in Christmas past and
27  where he was in Christmas present, and when he thoughts about Christmas future, he

28

1  did not know where he would be.  He was scared when he thought about his
2  Christmas future.
3      232.   In January 2009, Mr. Richardson received a housing voucher from VA
4  GLA.  He was worried about moving into a new apartment alone, but he eventually
5  moved into an apartment in South Los Angeles.  He met another veteran with a
6  housing voucher in his apartment building.  Before the holidays that year, that
7  veteran committed suicide, and Mr. Richardson saw the coroner come for the body,
8  which triggered an intense flashback to his time in the Army.
9      233.   Mr. Richardson began having stress-related problems at the job he had
10 obtained, called in sick on three days in a row, and was fired.  He tried looking for
11 more work but could not find any.  The stress eventually became too much for him,
12 and he went a binge.  He ultimately was placed in the psychiatric unit on the WLA
13 Campus for 19 days in March 2010.  Because he had been placed on a psychiatric
14 hold, VA GLA revoked his housing voucher.
15     234.   After being released from the psychiatric ward, Mr. Richardson was
16 placed in the Haven, where he stayed for a while.  In November 2010, Mr.
17 Richardson's sister died, and he had to go the coroner's office to identify her.  That
18 experience triggered a flashback, and he was eventually placed on another
19 psychiatric hold.   After he was released, VA GLA placed him at the Domiciliary,
20 where he spent Christmas.
21     235.   In March 2011, he was discharged from the Domiciliary and was placed
22 at the US Vets program in Long Beach.  He liked that program because he had a
23 private room, which reduced the stress he experienced in his daily life.  He relapsed
24 in June 2011 and was told he could not return to the US Vets program.  He was
25 required to go to a sober living program for 90 days.
26     236.   Since June 2011, he has been at a sober living house in Long Beach.  He
27 does not trust anyone who is living there, because most people placed in the program
28 are there on court order, and he worries what they will do if they find out that he is a

1  former police officer. He must share a room, and he does not get along well with his
2  roommate. As a result, he tries to spend as little time as possible at the house,
3  generally only returning there to sleep.

4       237.  Mr. Richardson requires a cane to walk. He barely makes enough
5  money to cover his rent at the sober living program and food costs every month. He
6  worries that he could end up living on the streets at any point. As a result of his
7  disabilities, he cannot get another security job. He has also been informed by VA
8  GLA employees that he is not a good candidate for another housing voucher from
9  VA GLA because of his history of psychiatric holds. Mr. Richardson requires a
10 stable, permanent living arrangement where he is able to obtain the medical
11 treatment and psychiatric care he needs.

12

13 **Wayne Early**

14      238.  Plaintiff Wayne Early was born in 1958 and grew up in Los Angeles,
15 where he had a healthy childhood. Mr. Early, who is an Army veteran, has
16 depression and PTSD.

17      239.  Mr. Early joined the Army in 1976 when he was 18 years-old. While in
18 training at Fort Jackson in South Carolina, he watched from several feet away as a
19 fellow soldier lifted an M-16 rifle to his own face and fired, killing himself. Mr.
20 Early never learned whether the soldier intended to kill himself or did not know the
21 rifle was loaded. The trauma of this experience sent Mr. Early into a deep
22 depression. He began to have thoughts of suicide himself. He was unable to fulfill
23 his responsibilities and was ultimately discharged from the Army before his
24 assignment was complete.

25      240.  After leaving the Army, Mr. Early continued to experience severe
26 depression. Although he was able to find employment, working as a security guard
27 and in warehouses and shipping, he was unable to maintain the jobs for more than
28 several months at a time. As a result, he could not maintain stable housing. Mr.

Early slept in his car, in friends' backyards, and on the streets of Skid Row. He is presently staying with several couples in a temporary housing arrangement. He has been homeless for most of the past 10 years.

241.   Mr. Early has been prescribed medication to treat his depression. However, because of his homelessness, he has been unable to take the medication on a regular basis. The antidepressants cause him to sleep deeply or lose attentiveness for stretches of 8 hours or more, something he feels he cannot afford when sleeping on the streets or in his car, when he must be alert for his own safety.

242.   Mr. Early seeks a stable, permanent living arrangement where he is able to obtain the medical treatment and psychiatric care he needs.

**Lawrence Green**

243.   Plaintiff Lawrence Green was born and raised in Mississippi. He is 56 years old and is presently homeless, sleeping without shelter near the corner of 6th Street and Gladys Avenue in Skid Row. Although he has never received a formal mental health diagnosis, he believes he has a mental disability that impedes his ability to maintain employment and a stable place to live.

244.   Mr. Green joined the Marines in 1973 and served until 1975. He spent 20 months in Vietnam. During this period, he served for several months on body bag detail, in which he was responsible for collecting the bodies of deceased American soldiers.

245.   Mr. Green has been homeless for approximately four years. He participated in a sober living program at the WLA campus, but was unable, despite his efforts, to secure permanent housing through VA GLA after he completed that program.

246.   Mr. Green requires a stable, permanent living arrangement where he is able to obtain the medical treatment and psychiatric care he needs.

**Demetrious Kassitas**

247.   Plaintiff Demetrious Kassitas was born in Chicago in 1962.  He enlisted in the Navy in 1990 and served in Desert Storm between 1990 and 1992.  He is currently homeless.

248.   Although Mr. Kassitas received training in a variety of areas in the Navy, his primary assignment in Desert Storm was serving as a nurse.  He was responsible for treating American soldiers who were injured in combat, including gunshot wounds.  He was also involved in combat directly, in a friendly fire incident in which his ship and another allied ship fired on one another.

249.   Mr. Kassitas has been diagnosed with bipolar disorder.  As a result of his mental disability, he has been unable to maintain stable employment or to secure stable housing for much of the time since he was discharged.  He experienced a first period of homelessness shortly after leaving the military, from 1995-1997, and a second period from February 2009 to the present day.  Mr. Kassitas presently sleeps without shelter near 4th Street and Flower Street near downtown Los Angeles.

250.   Mr. Kassitas is unable address his bipolar disorder successfully while living on the street because of the constant stress of having to think about where his next meal will come from and how he can avoid violent confrontations with other homeless individuals.

**Permanent Supportive Housing Is a Reasonable Accommodation to Ensure that Plaintiffs Have Meaningful Access to Services to which They Are Entitled**

251.   As the experiences of Plaintiffs reveal, Defendant Beiter has made decisions that facially discriminate against the most severely disabled veterans by excluding veterans with severe mental disabilities from some programs; and by structuring the existing VHA benefits program at VA GLA in a way that does not provide the services necessary to treat Plaintiffs' serious mental disabilities, while providing services that meet the needs of non-disabled veterans and less seriously

71

disabled veterans.  Defendant Shinseki has knowingly allowed this situation to
continue and refused to exercise his authority to remedy the discrimination.

252.   Additionally, as a result of Defendant Beiter's actions and Defendant
Shinseki's refusal to act, veterans with severe disabilities are denied meaningful
access to VHA benefits solely by virtue of their disabilities.

253.   Scholars and researchers have reached the conclusion that permanent
supportive housing is the only approach that consistently enables severely disabled
individuals like Plaintiffs to access a broad array of social services, including
medical care and mental health services.[39]  Accordingly, offering permanent
supportive housing is a necessary and reasonable accommodation to ensure that
Plaintiffs and other veterans with serious mental disabilities and brain injuries can
meaningfully access the VHA benefits that they are entitled to receive from VA
GLA.

254.   As noted above, numerous studies have demonstrated that permanent
supportive housing is cost-effective, underscoring its reasonableness as an
accommodation for seriously disabled veterans.  In addition to those studies, which
measure cost-savings across agencies, several studies have focused on the net
economic impact only for the agency providing the permanent supportive housing.
This research demonstrates that systems like VA GLA that provide medical care,
substance abuse treatment, and emergency and transitional beds are likely to achieve
substantial cost savings as a result of moving to a permanent supportive housing
model for chronically homeless clients, for several reasons.  First, once placed in
permanent supportive housing, tenants' reliance on emergency shelters diminishes to
almost zero.[40]  Second, there is a significant reduction in tenants' reliance on

---

[39] *See generally* U.S. DEP'T OF HEALTH AND HUMAN SERV., MEDICAID AND PERMANENT
SUPPORTIVE HOUSING FOR CHRONICALLY HOMELESS INDIVIDUALS: LITERATURE SYNTHESIS AND
ENVIRONMENTAL SCAN (2011), *available at* http://aspe.hhs.gov/daltcp/reports/2011/ChrHomlr.pdf
(summarizing dozens of published and unpublished studies demonstrating effectiveness of
permanent supportive housing and its economic benefits).

[40] *See, e.g.*, MELANY MONDELLO, ET AL., COST OF HOMELESSNESS: COST ANALYSIS OF
PERMANENT SUPPORTIVE HOUSING (2007), *available at*

*(cont'd)*

1 emergency room and acute medical services.[41]  By shifting tenants away from

2 emergency inpatient treatment, permanent supportive housing puts its residents in a

3 better position to engage in more regular and less expensive outpatient and

4 preventative treatments.  Finally, reliance on substance abuse treatment centers and

5 detoxification facilities significantly decreases for supportive housing participants.[42]

6     255.   Defendant Shinseki recently acknowledged that permanent supportive

7 housing is a critical component of services that need to be available to seriously

8 disabled veterans so that they can access needed mental health and therapeutic

9 services.  He said, "Providing assistance in mental health, substance abuse treatment,

10 education and employment goes hand-in-hand with preventive steps and permanent

11 supportive housing."  He continued, "We continue to work towards our goal of

12 finding every veteran safe housing and access to needed services."  Furthermore, as

13 noted above, DVA recently acknowledged that permanent supportive housing is an

14 effective approach to ensuring homeless veterans with mental disabilities are able to

15 access the services they need to treat their conditions.

16

17 **Providing Permanent Supportive Housing through the WLA Campus**

18 **Is Especially Reasonable**

19     256.   Providing permanent supportive housing to veterans with serious mental

20 disabilities or brain injuries is all the more reasonable within VA GLA's service area

21 for several reasons.

22 _____

*(cont'd from previous page)*

23 http://www.mainehousing.org/Documents/HousingReports/CostOfHomelessness.pdf (finding 98 percent reduction in shelter visits among 99 tenants of Maine program).

24     [41] *See, e.g.*, Tia E. Martinez & Martha R. Burt, *Impact of Permanent Supportive Housing on the Use of Acute Care Health Services by Homeless Adults*, 57 PSYCHIATRIC SERVICES 992 (2006)

25 (finding total number of emergency room visits for sample decreased by 56 percent and total hospital admissions decreased by 44 percent).

26     [42] *See* THOMAS L. MOORE, ESTIMATED COST SAVINGS FOLLOWING ENROLLMENT IN THE

27 COMMUNITY ENGAGEMENT PROGRAM: FINDINGS FROM A PILOT STUDY OF HOMELESS DUALLY DIAGNOSED ADULTS (2006), *available at*

28 http://documents.csh.org/documents/policy/PortlandCostStudy.pdf (finding 93 percent decrease in drug and alcohol treatment nights for residents of Oregon project).

257.   First, the WLA Campus has considerable available land and buildings that could be adapted to provide permanent supportive housing.  Dozens of buildings on the WLA Campus are vacant or underutilized, and some of these buildings formerly provided permanent housing to veterans.  In fact, Defendant Beiter and other VA GLA officials identified three buildings – Building 205, Building 206, and Building 209 – as buildings that could be made available for some homeless housing.  Although VA GLA officials announced in June 2010 a $20 million appropriation from DVA to renovate Building 209, Defendant Beiter and other VA GLA officials have taken no concrete steps to begin that project.  Nor have they released any plans related to the building design or identified the therapeutic approach or scope of housing and supportive programming that would be offered if they do, in fact, renovate Building 209.  Additionally, they have taken no steps to recruit and hire appropriate staff for such a facility.  VA GLA officials have stated that the Building 209 renovation project would take at least four years, and VA GLA acknowledged in January 2011 and reaffirmed in June 2011 that VA GLA is "not commit[ed] to any specific project, construction schedule, or funding priority" for the WLA Campus and that "[e]ach development proposal must be approved individually by [Defendant Beiter], the [VISN Director], and national VA officials."  VA GLA MASTER PLAN at 10.

258.   Additionally, VA GLA recently announced Project 60, which is modeled on the County of Los Angeles' Project 50.  As part of Project 60, VA GLA will "collaborate with Federal, County and local government and non-profit agencies to move 60 of the most vulnerable, chronically homeless Veterans off the streets and into permanent supportive housing," and Project 60 participants will get housing "no matter how ready they are to receive mental health and substance abuse services – or despite any treatment failures and setbacks."[43]  Accordingly, Defendant Beiter does

---

[43] VA GREATER LOS ANGELES HEALTHCARE SYSTEM, PROJECT 60 FACT SHEET, *available at* http://www.losangeles.va.gov/documents/11-02-15_Fact-Sheet_Project_60.pdf (last accessed May 30, 2011).

1  not need to create a new program or substantially alter existing services to provide
2  permanent supportive housing as an accommodation for Plaintiffs and similarly
3  situated veterans.

4      259.   Finally, the federal government acquired the land that now makes up the
5  WLA Campus under the 1888 Deed, and it is clear that the donors intended that the
6  government use the land to establish and permanently provide housing to disabled
7  veterans.  Citizens donated the land precisely so that the federal government could
8  provide permanent housing and care for disabled veterans like Plaintiffs.

9

10 **Current Commercial Uses of the WLA Campus Do Not Provide Housing and**
11 **Care for Plaintiffs and Other Seriously Disabled Veterans**

12     260.   Beginning at least as early as 1989, VA GLA began leasing portions of
13 the WLA Campus to private entities and has since entered into a range of land use
14 agreements, including long- and short-term leases, memoranda of understanding,
15 revocable licenses, and enhanced sharing agreements, with both for-profit and not-
16 for-profit entities.  Additionally, VA GLA transferred ownership of 13.5 acres to the
17 State of California to construct the 396-bed geriatric care facility that the State now
18 operates on the WLA Campus.  As of January 2011, VA GLA acknowledged 21
19 current land use agreements.  *See* VA GLA MASTER PLAN at 36-37.

20     261.   VA GLA's hospital complex is located on the southern portion of WLA
21 Campus.  VA GLA has leased approximately 10 acres near the hospital to Enterprise
22 Rent-A-Car and Tumbleweed Transportation, a charter bus operator, for vehicle
23 storage.  Since 2001, VA GLA also has allowed Westside Services, LLC to operate
24 parking areas throughout the WLA Campus as remote parking sites for nearby
25 businesses.  The American Red Cross has a 50-year lease on a parcel of land near the
26 hospital and has operated its district headquarters there since 1989.

27     262.   Large sections of the central portion of the campus are also unavailable
28 for veteran housing or services as a result of private land use agreements.

1  For example, Sodexho Marriott operates a laundry facility in Building 224 and an

2  adjacent water softening unit for processing linen from surrounding hotels.

3  Richmark Entertainment contracted with VA GLA to operate the Wadsworth Theatre,

4  which was built in 1939 as an entertainment center for veterans, and the Brentwood

5  Theater.  Veterans are charged full price for all events held at those theaters.  UCLA

6  utilizes the Jackie Robinson Baseball Stadium on the east side of the WLA Campus.

7  An energy company has operated active oil wells on approximately 2.5 acres since

8  1988, and 1.5 acres are subject to an enhanced sharing agreement with TCM, LLC to

9  operate a farmer's market.  Additional land on this portion of the campus is used by

10  Westside Services, LLC as remote parking for non-DVA programs.

11      263.  In the northern area of the campus, the overwhelming majority of land

12  is unavailable for use by veterans or by VA GLA to provide services or housing to

13  veterans as a result of private land agreements.  The City of Los Angeles built

14  Barrington Park, a 12-acre property that includes a parking lot, a baseball diamond,

15  athletic fields, and a dog park.  Brentwood School utilizes 20 acres, on which it has

16  constructed athletic fields, a track, tennis courts, and a swimming pool, under an

17  enhanced use agreement.  Two soccer clubs use MacArthur Field, where veterans

18  once played softball, and an adjacent parking lot.

19      264.  These uses are plainly inconsistent with the intent of the 1888 Deed that

20  the federal government establish and permanently maintain a home for disabled

21  veterans, because they are not directly related to providing housing or medical and

22  other therapeutic care to disabled veterans.

23      265.  Despite repeated efforts by Plaintiff Barrie and her family and several

24  veteran, community, and philanthropic groups to obtain information about these land

25  deals, there has not been a public accounting of how these deals were reached, what

26  their details are, how much revenue is generated by them, and how such revenue, if

27  any, is used.  In fact, the total fiscal year budget reported in VA GLA's 2010 Annual

28  Report has an asterisk next to it, indicating that the figure does not include

"alternative revenue." On or about Thursday, August 11, 2011, Plaintiffs submitted a formal request for an accounting of profits of all money received by DVA or VA GLA as a result of any land-use agreements for the WLA Campus under which the land is used for any purpose that is not directly related to providing a home for disabled veteran. Defendants have not responded to this demand.

266.    Additionally, when DVA transferred the land to the State of California for the operation of the nursing care facility, the deed included a provision specifying that title would revert to the federal government if the State ceased using the land as a nursing home or for domiciliary purposes. VA GLA characterized this provision as requiring the State of California to use the land "as a nursing home or for domiciliary uses, as agreed upon in the original deed." VA GLA MASTER PLAN at 10. Even though VA GLA blatantly uses portions of the WLA Campus for purposes plainly inconsistent with the original 1888 Deed, DVA imposed on the State of California the obligation to use the parcel transferred to it consistent with the original intent, at the risk of losing title to the land.

267.    Defendants have breached and are continuing to breach their obligation under the 1888 Deed to utilize the WLA Campus only for the purpose of providing housing and supportive services to disabled veterans. As a result, the portions of the WLA Campus encumbered by these leases are and will continue to be unavailable for the provision of housing and supportive services to disabled veterans. Consequently, Plaintiffs are being and will continue to be denied a full and fair chance to access housing and care on the portions of the WLA Campus that Defendants have encumbered with leases that are inconsistent with the 1888 Deed.

**Current Commercial Uses of the WLA Campus are Inconsistent with the Statutory Scheme Set out by Congress and Violate Statutory Requirements**

268.    Title 38 of the United States Code sets out DVA's duties. Part I through Part V of Title 38 relate primarily to veterans benefits and organization of DVA. *See*

38 U.S.C. §§ 101-7907. Part VI relates to the "acquisition and disposition of property" and does not concern the provision of veterans' benefits. Part VI authorized three primary mechanisms through which DVA enter into leases or other agreements related to its property: (1) enhanced use leases (EULs) under 38 U.S.C. §§ 8161-8169, (2) health-care resource sharing agreements (HCRSAs) under 38 U.S.C. §§ 8151-8153, and (3) outleases under 38 U.S.C. § 8122 and § 2412.

269.   EULs are the congressionally-approved means of entering into commercial land deals on DVA property. There are only two circumstances in which the Secretary of DVA may enter into an EUL: (1) part of the property must be used "for an activity contributing to the mission of the Department," the lease must "not be inconsistent with" and must "not adversely affect the mission of the Department," and the lease must "enhance the use of the property," 38 U.S.C. § 8162(a)(2)(A)(i)-(iii); or (2) the Secretary must determine that "a business plan proposed by the Under Secretary for Health for applying the consideration under such a lease to the provision of medical care and services would result in a demonstrable improvement of services to eligible veterans in the geographic service-delivery area within which the property is located." 38 U.S.C. § 8162(a)(2)(B). In either circumstance, all funds that are generated by the EUL beyond those incurred by DVA in connection with the lease must be deposited in the DVA Medical Care Collections Fund. *See* 38 U.S.C. § 8165(a)(1).

270.   EULs protect the interests of veterans through their substantial procedural requirements. Section 8163 mandates a public hearing that addresses the local community, DVA programs, and services to veterans and also requires "reasonable notice to the congressional veterans' affairs committees and to the public of the proposed lease and of the [public] hearing," including a detailed description of and justification for the proposed lease. If after the hearing the Secretary still intends to enter into an EUL, the Secretary must again notify congressional veterans' affairs committees and "publish a notice of such intention in the Federal Register," again

1 with a detailed description and justification for the proposed lease.

2    271.   Authority for agreements relating to the sharing of health-care resources

3 is set out in 38 U.S.C. §§ 8151-8153.  Section 8151, the statement of Congressional

4 purpose, explains that this authority is intended only for "agreements with health-

5 care providers in order to share health-care resources with, and receive health-care

6 resources from, such providers while ensuring no diminution of services to

7 veterans."  Section 8153 sets out the authority to enter into HCRSAs, and requires

8 that all such agreements concern "health-care resources."  *See also* 38 C.F.R. §

9 17.240 (mirroring § 8153 and limiting use of HCRSAs to situations where the

10 agreement "will secure the use of a specialized medical resource which otherwise

11 might not be feasibly available" for veterans, or where it "will secure effective use of

12 [DVA] specialized medical resources" underused by veterans).

13    272.   VA GLA does not lease the land at the WLA Campus through EULs.

14 Instead, VA GLA has entered into various "Enhanced Sharing Agreements" (ESAs).

15 VA GLA claims that these ESAs are executed pursuant to and in accordance with 38

16 U.S.C. §§ 8151-8153.  However, nearly all of VA GLA's ESAs have little or no

17 connection to health-care resources, do not involve "specialized medical resources,"

18 and do not fall within the authority provided by those statutes.  The content of the

19 ESAs more closely resembles an EUL than an HCRSA, but VA GLA did not comply

20 with any of the procedural requirements mandated by EUL authority.

21    273.   The execution of each ESA represents final agency action.  Additionally,

22 DVA approved as final the VA GLA Master Plan on June 23, 2011.  The notice

23 announcing the final approval of the Master Plan addressed comments that DVA had

24 received in response to the draft Master Plan objecting to the ESAs and affirmed that

25 the ESAs were valid and would not be reevaluated or rescinded.  *See* 76 Fed. Reg.

26 36955 (June 23, 2011).

27    274.   Plaintiffs have suffered the procedural injuries of losing access to

28 detailed and publicly available descriptions and justifications of the land deals prior

1  to a public hearing; losing the ability to make their views known at public hearings
2  based on those detailed descriptions and justifications; and losing access to DVA's
3  final descriptions and justifications in the Federal Register.

4      275.  Further, when VA GLA entered into § 8153 agreements instead of
5  EULs, Plaintiffs lost the assurance that every land deal unrelated to the sharing of
6  health-care resources on the WLA Campus would result in appropriate space for
7  veterans activities, or would demonstrable improvements in VA GLA's services.
8  Because VA GLA's ESAs do not provide appropriate space for veterans activities
9  and do not result in a demonstrable improvement in VA GLA's services, Plaintiffs
10  therefore also suffered the substantive injuries of lost access to space and lost
11  opportunities for improved services.

12

13  **Defendants Shinseki and Beiter Have Personal Knowledge that VA GLA's**
14  **Current Practices Are Discriminatory and that the WLA Campus Is Being**
15  **Misused and the Direct and Specific Authority to Remedy the Violations**

16      276.  Defendant Shinseki has personal knowledge about the chronic
17  homelessness crisis among veterans.  For example, numerous news accounts reflect
18  that in November 2009 Defendant Shinseki acknowledged the serious problem of
19  homelessness among veterans, and in particular among veterans recently returned
20  from Iraq and Afghanistan.  Additionally, in 2010, the U.S. Interagency Council on
21  Homelessness (USICH), of which Defendant Shinseki is a member, released a report
22  on homelessness.  The report included a discrete section on veteran homelessness,
23  which included quotes from Defendant Shinseki.  That section of the report
24  described the number of homeless veterans and the number of chronically homeless
25  veterans and acknowledged that veterans were overrepresented in the homeless
26  population.  Defendant Shinseki also issued a press release in February 2011
27  announcing that DVA and the U.S. Department of Housing and Urban Development
28  had released a supplement to a 2009 report to Congress on homeless, and that report

1   included substantial data on the number of homeless veterans and chronically

2   homeless veterans in the United States.

3       277.   Defendant Shinseki also has personal knowledge about the necessity of

4   permanent supportive housing for this population to meaningfully access the VHA

5   services to which they are entitled.  For example, when DVA and the U.S.

6   Department of Housing and Urban Development released the supplement to the 2009

7   report to Congress on homeless in February 2011, Defendant Shinseki stated,

8   "Providing assistance in mental health, substance abuse treatment, education and

9   employment goes hand-in-hand with preventive steps and permanent supportive

10  housing."  He continued, "We continue to work towards our goal of finding every

11  veteran safe housing and access to needed services."  Additionally, the 2010 USICH

12  report noted that, "[l]ike other populations, the complexity of navigating systems

13  makes it difficult for Veterans to get their needs met," and that "[v]eterans

14  experiencing chronic homelessness benefit from . . . increasing access to permanent

15  supportive housing."

16      278.   Defendant Shinseki and his predecessors as Secretary of DVA have also

17  received dozens of letters over the years drawing attention to DVA's failure to

18  provide appropriate services at the WLA Campus to homeless veterans with mental

19  disabilities, as well as the misuse of the WLA Campus.  For example, local veterans

20  groups and activists have sent Defendant Shinseki dozens of letters demanding

21  appropriate housing and services for disabled veterans on the WLA Campus.  In fact,

22  Defendant Shinseki received correspondence from local veteran and activist Robert

23  Rosebrock in December 2010 that not only addressed the misuse of land at the WLA

24  Campus, but also specifically mentioned one homeless veteran's circumstances and

25  his need for stable housing in order to meaningfully access services at the WLA

26  Campus.  Additionally, in January 2011, the law firm Dilworth Paxson LLP sent

27  Defendant Shinseki a letter and a detailed report prepared by the Metabolic Studio

28  regarding the history of the WLA Campus and noting DVA's breach of its fiduciary

obligation under the 1888 Deed.  The General Counsel for DVA responded shortly thereafter with a letter contending DVA was fulfilling its obligations under the 1888 Deed.  Plaintiff Barrie also has sent numerous letters to Defendant Shinseki's predecessors regarding VA GLA's misuse of the WLA Campus for purposes unrelated to providing housing or supportive services to disabled veterans and received at least one response from the Office of the Secretary of DVA.

279.  Defendant Shinseki, as Secretary of DVA, also has authority to promulgate regulations that guide DVA's and VA GLA's development and implementation of programs, including VHA benefits.  Although aware that homeless veterans with serious mental disabilities and brain injuries cannot meaningfully access medical, mental health, and other services available under the VHA benefits program, Defendant Shinseki has not promulgated regulations requiring that DVA or its health systems, including VA GLA, provide permanent supportive housing as a reasonable accommodation.

280.  Thus, as a cabinet-level secretary with responsibility for ensuring DVA complies with federal anti-discrimination laws and its fiduciary obligations, Defendant Shinseki has specific knowledge of the violations detailed in this Complaint and direct responsibility and authority to provide the remedies sought in this Complaint, but he has failed to exercise that authority.

281.  Defendant Beiter has personal knowledge that VA GLA serves numerous veterans with serious mental disabilities who are homeless.  As Director of VA GLA, Defendant Beiter is responsible for ensuring that VA GLA complies with all DVA regulations and policies, including the requirements that it convene an annual meeting with community partners to assess the need for services to homeless veterans and that it provide survey results to DVA on the homeless population within its service areas annually.  Defendant Beiter authorized VA GLA to release its 2009 homelessness survey results, which reflected that more than 8,000 homeless individuals resided within VA GLA's service area.

282.   Defendant Beiter has personal knowledge that homeless veterans within VA GLA's service area are denied meaningful access to the services currently offered by VA GLA.  For example, officials from the City of Santa Monica have met with Defendant Beiter and other senior VA GLA officials on numerous occasions and argued that VA GLA is failing to provide homeless veterans who reside within the geographic limits of Santa Monica with meaningful access to VHA services.

283.   Additionally, VA GLA prepared and published a report on January 11, 2011 that purported to summarize the history and current scope of services offered by VA GLA for homeless veterans.  This report acknowledged "there is a sub-population of Veterans who have serious chronic mental health and substance abuse problems: these Veterans require intensive treatment beyond the scope current homeless transitional housing programs."  The report further acknowledged that VA GLA did not currently offer any programs that meet the needs of this group.  As the Director of VA GLA, Defendant Beiter has final authority to approve the preparation and release of reports such as the January 11, 2011 homelessness report and is aware of the contents of that report.

284.   VA GLA also recently launched Project 60.  Through this initiative, VA GLA plans to target 60 vulnerable, chronically homeless veterans and connect them with permanent supportive housing, including the supportive resources and services necessary to stabilize and improve medical and mental health.  The impetus behind the development and planned implementation of Project 60 was the recognition that chronically homeless veterans cannot meaningfully access services offered by VA GLA.  As the Director of VA GLA, Defendant Beiter has final authority to authorize initiatives like Project 60 and is aware of the factors that prompted VA GLA to develop Project 60.

285.   Defendant Beiter's official duties require that she oversee and manage day-to-day operations of VA GLA, including approving program design, authorizing VA GLA to offer particular services, establishing admission and other criteria for the

various programs offered through VA GLA, and ensuring that DVA complies with
federal anti-discrimination laws and its fiduciary obligations. She has, in fact,
approved and authorized the programs and services currently offered by VA GLA
and is the sole official within VA GLA with authority to approve new programs, to
set funding priorities, and to authorize modifications to existing programs that
require renovation or modification of existing structures. *See* VA GLA MASTER
PLAN at 10. Thus, Defendant Beiter has direct control over and responsibility for the
design and implementation of the current VHA benefits program offered through VA
GLA and has elected not to offer permanent supportive housing to Plaintiffs and
similarly situated veterans as a reasonable accommodation for their disabilities.

286. As the Director of VA GLA, Defendant Beiter is also personally aware
of the many contracts and land deals under which private entities utilize the WLA
Campus, where her office is located, for purposes inconsistent with the 1888 Deed.
The Veterans Programs Enhancement Act of 1998 required that VA GLA develop a
master land use plan for the WLA Campus. In January 2011, VA GLA released a
draft master plan, as required by the 1998 legislation. As the Director of VA GLA,
Defendant Beiter was involved in and had direct responsibility to review and
authorize the release of the draft master plan.

287. The draft master plan included a summary of the history of the WLA
Campus, including the 1888 Deed, and acknowledged that the 1888 Deed required
that the land be used for housing disabled veterans. *See* VA GLA MASTER PLAN at
10 (noting use of the land "as a nursing home or for domiciliary uses [was] agreed
upon in the original deed"). The draft master plan also documented the many private
land deals that limit VA GLA's ability to use the WLA Campus to provide housing
and supportive services to disabled veterans. *See* VA GLA MASTER PLAN at 36-37
(summarizing "Current Land Use Agreements").

288. Defendant Beiter has also received correspondence from local activists
detailing the many current uses of the WLA Campus that are inconsistent with the

1 1888 Deed.  She also has been confronted by City of Santa Monica officials

2 regarding the private land deals and her failure to ensure that the WLA Campus is

3 used to provide housing to disabled veterans consistent with the 1888 Deed.

4      289.   As the Director of VA GLA, Defendant Beiter has final decision-

5 making authority related to uses of the WLA Campus.  *See* VA GLA MASTER PLAN

6 at 10 ("Each development proposal [for the WLA Campus] must be approved

7 individually by the GLAHS Director [Defendant Beiter], the [VISN director], and

8 national VA officials as required by VA regulation governing the specific project.").

9 She and her predecessors as Director of VA GLA approved each land deal for the

10 WLA Campus described in this Complaint.

11      290.   Accordingly, Defendant Beiter has specific knowledge of the violations

12 detailed in this Complaint, she or her predecessors as Director of VA GLA were

13 directly responsible for and authorized the conduct that gave rise to the violations

14 detailed in this Complaint, and she has the direct responsibility and authority to

15 provide the relief sought in this Complaint.

16      291.   The violations of Plaintiffs' rights by Defendants outlined above are

17 ongoing and will continue unless this Court grants the relief Plaintiffs seek in this

18 Complaint.

19

20                     **CLASS ALLEGATIONS**

21      292.   Plaintiffs Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith,

22 Richardson, Early, Green, and Kassitas bring the first and second causes of action

23 detailed below on behalf of themselves and all other persons similarly situated

24 pursuant to Federal Rule of Civil Procedure 23.  For those causes of action, those

25 Plaintiffs seek injunctive and declaratory relief applicable to members of the Plaintiff

26 Class, as defined below.

27      293.   The plaintiff class consists of:

28 *Veterans who are eligible for the benefits provided by the Veterans Health*

1  *Administration and reside within the service area of the VA Greater Los Angeles*

2  *Healthcare System, and who have a mental disability and/or brain injury that*

3  *renders them unable to obtain or maintain stable housing.*

4   294.   Class action status for this litigation is proper because:

5      (a)   The plaintiff class is so numerous that joinder of all members is

6  impractical;

7      (b)   There are questions of law and fact common to the class;

8      (c)   Plaintiffs' claims are typical of the claims of the class, in that

9  Plaintiffs are and were denied meaningful access to VHA benefits offered by VA

10  GLA solely by reason of their serious mental or physical disability;

11      (d)   Plaintiffs will fairly and adequately protect the interests of the

12  class as there is no conflict between Plaintiffs and the other class members; and

13      (e)   Plaintiffs can adequately represent the interests of the class

14  members and have retained counsel experienced in class action litigation.

15   295.   Defendants have acted and/or refused to act on grounds generally

16  applicable to the class, thereby making final declaratory and injunctive relief

17  appropriate with respect to the class as a whole, under Federal Rule of Civil

18  Procedure 23(b)(2).

19

20   **FIRST CAUSE OF ACTION**

21  **Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

22  **(Facial Discrimination)**

23  **(Plaintiffs Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson,**

24  **Early, Green, Kassitas, and Vietnam Veterans of America**

25  **Against All Defendants)**

26   296.   Plaintiffs incorporate by reference the foregoing paragraphs of this

27  Complaint as though fully set forth herein.

28   297.   Plaintiffs are disabled within the meaning of the Rehabilitation Act and

otherwise eligible for the VHA benefits offered by DVA, a federal agency, but defendants have defined and provide the VHA benefits offered by VA GLA in a manner that facially discriminates against Plaintiffs because of their severe disabilities, in violation of Section 504 of the Rehabilitation Act of 1973.

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

### (Meaningful Access)

### (Plaintiffs Valentini, Moraru, Doe, Summers, Isaac, Floyd, Smith, Richardson, Early, Green, Kassitas, and Vietnam Veterans of America

### Against All Defendants)

298.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

299.   Plaintiffs are disabled within the meaning of the Rehabilitation Act and otherwise eligible for the VHA benefits offered by DVA, a federal agency, but defendants have defined and provide the VHA benefits offered by VA GLA in a way that effectively denies Plaintiffs meaningful access to those benefits, in violation of Section 504 of the Rehabilitation Act of 1973.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty as Trustee of Charitable Trust (Injunctive Relief)

### (All Plaintiffs Against All Defendants)

300.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

301.   The 1888 Deed created a charitable trust, and, as the successor-in-interest to the National Soldiers' Home, DVA holds that land, on which the WLA Campus now sits, in trust for the intended beneficiaries of the charitable trust, disabled veterans, and must use the land only for purposes that directly contribute to

1 | the establishment and permanent operation of a home for disabled veterans.

2 |      302.   By authorizing the many uses of the WLA Campus that do not directly

3 | contribute to the operation of a home for disabled veterans, and by failing to take

4 | substantial affirmative steps to administer the trust solely with a view to the

5 | accomplishment of this purpose, Defendants have breached their fiduciary duties as

6 | trustees of the charitable trust.

7 |

8 | **FOURTH CAUSE OF ACTION**

9 | **Accounting for Profits**

10 | **(All Plaintiffs Against All Defendants)**

11 |      303.   Plaintiffs incorporate by reference the foregoing paragraphs of this

12 | Complaint as though fully set forth herein.

13 |      304.   The 1888 Deed created a charitable trust, and, as the successor-in-

14 | interest to the National Soldiers' Home, DVA holds that land, on which the WLA

15 | Campus now sits, in trust for the intended beneficiaries of the charitable trust,

16 | disabled veterans, and must use the land only for purposes that directly contribute to

17 | the establishment and permanent operation of a home for disabled veterans.

18 |      305.   Plaintiffs have requested complete and accurate information regarding

19 | the administration of the charitable trust, including full details regarding the many

20 | leases on the WLA Campus into which VA GLA has entered with private entities

21 | and how the proceeds from those leases, if any, have been used.  Defendants have

22 | not responded to that request.

23 |      306.   By authorizing the many uses of the WLA Campus that do not directly

24 | contribute to the operation of a home for disabled veterans, Defendants have

25 | breached their fiduciary duties as trustees of the charitable trust.  The financial

26 | arrangements and payment structure from these uses are complicated and the

27 | information about them is within the control of the defendant.  An accounting is

28 | necessary to ascertain whether proceeds from the leases on the WLA, if any, are due

to Plaintiffs and other beneficiaries of the charitable trust.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty as Trustee of Charitable Trust (Mandamus Relief)

### (All Plaintiffs Against All Defendants)

307.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

308.  The 1888 Deed created a charitable trust, and, as the successor-in-interest to the National Soldiers' Home, DVA holds that land, on which the WLA Campus now sits, in trust for the intended beneficiaries of the charitable trust, disabled veterans, and must use the land only for purposes that directly contribute to the establishment and permanent operation of a home for disabled veterans.

309.  As trustees of the charitable trust, Defendants have a non-discretionary fiduciary duty, which they have breached by authorizing the many uses of the WLA Campus that do not directly contribute to the operation of a home for disabled veterans, as well as by failing to take substantial affirmative steps to administer the trust solely with a view to the accomplishment of this purpose.

310.  Plaintiffs have no adequate remedy at law to compel defendants to cease breaching their fiduciary duty as trustees of the charitable trust.

## SIXTH CAUSE OF ACTION

### Violation of 38 U.S.C. §§ 8151-8153 and the APA

### (All Plaintiffs Against All Defendants)

311.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

312.  VA GLA's land deals have been improperly executed pursuant to 38 U.S.C. §§ 8151-8153, which authorize only agreements to share health care resources, and not executed pursuant to 38 U.S.C. §§ 8161-8169, which authorize

1  "Enhanced Use Leases."

2      313.   Plaintiffs have suffered legal wrong because they have been denied the

3  procedural protections, the opportunity to make their views known at public hearings,

4  and the publically available descriptions and justifications for the land deals that 38

5  U.S.C. § 8163 requires.  Plaintiffs have also lost the assurance that every land deal

6  unrelated to the sharing of health-care resources on the WLA Campus will result in

7  appropriate space for veterans activities, or demonstrable improvements in VA

8  GLA's services, and therefore also suffered the substantive injuries of lost access to

9  space and lost opportunities for improved services.

10     314.   VA GLA's failure to comply with 38 U.S.C. §§ 8151-8153 and 38

11  U.S.C. §§ 8161-8169 constitutes arbitrary and capricious agency action; is an abuse

12  of discretion; is in excess of statutory jurisdiction, authority, or limitations, or

13  otherwise without statutory right; and is contrary to law and to procedures required

14  by law.  5 U.S.C. § 706(2)(A), (C)-(D).

15     315.   This Court has authority to review Plaintiffs' Administrative Procedure

16  Act claim under to 5 U.S.C. §§ 701-706 and may grant declaratory relief, injunctive

17  relief, and any additional relief pursuant to 5 U.S.C. §§ 705, 706.

18

19                              **REQUEST FOR RELIEF**

20      Plaintiffs therefore respectfully request that this Court grant the following

21  relief:

22      A.     Certify a class for the first and second causes of action in this Complaint

23  pursuant to Federal Rule of Civil Procedure 23, in accordance with the allegations in

24  this Complaint and the forthcoming class certification motion.

25      B.     Enter an injunction directing that Defendants provide Plaintiffs and the

26  Plaintiff Class permanent supportive housing as a reasonable accommodation for

27  their disabilities so Plaintiffs and the Plaintiff Class can reasonably access the VHA

28  benefits for which they are eligible.

C.     Enter an injunction mandating that Defendants faithfully execute their obligations as trustees of the WLA Campus and utilize the WLA Campus solely for purposes directly related to providing a home for disabled veterans or, in the alternative, enter an order mandating that defendants refrain from allowing the current uses of the WLA Campus for purposes that are not directly related to providing a home for disabled veterans to continue.

D.     Enter an injunction requiring an accounting of profits of all money received by DVA or VA GLA as a result of land use agreements for the WLA Campus under which the land is used for any purpose that is not directly related to providing a home for disabled veterans and requiring that Defendants deposit all such money in account to be used solely for the purpose of providing housing and housing-connected supportive services to disabled veterans at the WLA Campus.

E.     Enter an injunction prohibiting VA GLA from executing any agreements under 38 U.S.C. §§ 8151-8153 that do not concern the sharing of health-care resources.

F.     Declare that the design and implementation of the VHA benefits program within VA GLA by defendants facially discriminates against Plaintiffs and the Plaintiff Class solely by reason of their disabilities.

G.     Declare that defendants are denying Plaintiffs and the Plaintiff Class meaningful access to the VHA benefits offered by VA GLA solely by virtue of their disabilities.

H.     Declare that the federal government's acceptance of the land transferred under the 1888 Deed created a charitable trust.

I.     Declare that defendants have breached and continue to breach their fiduciary duties as trustees of the charitable trust by allowing VA GLA to use the WLA Campus for purposes that are not directly related to providing a home for disabled veterans.

J.     Declare that defendants violated 38 U.S.C. §§ 8151-8153, 38 U.S.C. §§

91

1 | 8161-8169 by entering into a number of "Enhanced Sharing Agreements"
2 | unauthorized by any law or regulation.
3 |     K.    Grant such other relief as this Court deems just and proper, including
4 | but not limited to awarding attorney's fees under 29 U.S.C. § 794a and any other
5 | applicable statutes and awarding costs under 28 U.S.C. § 1920 and any other
6 | applicable statute.
7 |
8 | Respectfully Submitted,
9 |
10 | Dated:  August 12, 2011     By:  _Mark D. Rosenbaum (CF)_
11 |       Mark D. Rosenbaum
12 |       ACLU Foundation of Southern California

13 | Dated:  August 12, 2011     By:  _David B. Sapp (CF)_
14 |       David B. Sapp
15 |       ACLU Foundation of Southern California
16 |
17 | Dated:  August 12, 2011     By:  _Laurence H. Tribe (CF)_
18 |       Laurence H. Tribe
19 |
20 | Dated:  August 12, 2011     By:  _Ronald L. Olson (CF)_
21 |       Ronald L. Olson
22 |       Munger, Tolles & Olson, LLP
23 | Dated:  August 12, 2011     By:  _Amos Hartston (CF)_
24 |       Amos Hartston
25 |       Inner City Law Center
26 |
27 | Dated:  August 12, 2011     By:  _James J. Finsten_
28 |       John C. Ulin
      James J. Finsten
      Arnold & Porter, LLP

92

1

2  Dated:   August 12, 2011            By: _Gary L. Blasi_ (dF)
                                            Gary L. Blasi
3

4
   Dated:   August 12, 2011            By: _Jonathan Massey_ (F)
5                                          Jonathan Massey
                                           Massey & Gail LLP
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

405-105-5

acknowledges to me that she executed the same

In Witness Whereof I have hereunto set my hand and affixed my Official Seal at my office in the said County of Los Angeles, the day and year first above written.

[Notarial Seal]                                                R. P. Johnston
                                                              Notary Public

A full true and correct copy of the original recorded at request of Grantee Mar. 15. 1888 at 14 min past 12. M.

                                                    Frank A. Gibson County Recorder
                                              By Ira R. H. White Deputy

---

This Indenture made the third day of March one thousand eight hundred and eighty eight. By and between John P Jones and Arcadia B. de Baker, the parties of the first part and the National Home for Disabled Volunteer Soldiers a corporation formed and now existing under the laws of the United States the party of the second part.

Witnesseth: that whereas by an act of Congress approved March 3rd 1887. to provide for the location and erection of a branch home for disabled volunteer soldiers West of the Rocky Mountains, the Board of Managers of the National Home for Disabled Volunteer Soldiers was authorized, empowered and directed to locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers to be by said Board, located at such place in the State West of the Rocky Mountains as to said Board should appear most desirable and advantageous.

And whereas, the parties hereto of the first part in consideration that the party hereto of the second part should locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers on a site to be selected by the Board of Managers along the dividing line between the Ranchos San Jose de Buenos Ayres and San Vicente y Santa Monica of and

505

[The body of this page is handwritten cursive text, largely faded and illegible. It appears to be a legal conveyance/deed describing land belonging to the National Home for Disabled Volunteer Soldiers, referencing the Board of Managers, the Rancho San Vicente y Santa Monica, and metes-and-bounds descriptions of the tract of land in the County of Los Angeles, State of California.]

tenements and appurtenances thereunto belonging or in any
way appertaining to have and to hold the said land and
premises with appurtenances unto the said party of the sec-
ond part forever for the purpose of such branch Home for
Disabled Volunteer Soldiers to be thereon so located, established
constructed and permanently maintained.

In Witness Whereof the said parties of the first part
have hereunto set their hands and seals the day and year
first above written.

John P Jones
By his attorney in fact Walter Van Dyke
Arcadia B de Baker
By her attorney in fact Robt S Baker

State of California
County of Los Angeles   On this 5th day of March in the
year one thousand eight hundred and eighty eight before me
Charles Worth, a Notary Public in and for said Los Ang-
eles County residing therein duly commissioned and sworn
personally appeared Walter Van Dyke known to me to be the
person described in and whose name is subscribed to the
within instrument as the Attorney in fact of John P Jones
and the said Walter Van Dyke acknowledged to me that
he subscribed the name of John P Jones thereunto as principal
and his own name as Attorney in fact

In Witness Whereof I have hereunto set my hand
and affixed my official seal at my office in the City and
County of Los Angeles the day and year in this Certificate
first above written.

Notarial Seal                          Charles Worth
                                       Notary Public

State of California
County of Los Angeles   On this 5th day of March in the
year one thousand eight hundred and eighty eight before
me Charles Worth, a Notary Public in and for said Los
Angeles County residing therein duly commissioned and
sworn, personally appeared Robt S Baker known to me to
be the person described in and whose name is subscribed
to the within instrument as the Attorney in fact of Arca-

405

some that he subscribed the name of Arcadia B de Baker thereunto as principal and his own name as Attorney in fact.

In Witness Whereof I have hereunto set my hand and affixed my Official Seal at my office in the City and County of Los Angeles the day and year in this Certificate first above written.

Notarial Seal }

Charles Worch
Notary Public

59 A full true and correct copy of the original recorded at request of Grantee Mar 10 1888 at 17 min past 12 M.

Frank A Gibson County Recorder
By Frank Herlihy Deputy

This Indenture made the Eighth day of March in the year of our Lord one thousand eight hundred and eighty eight Between E K Wood of Pasadena Los Angeles County State of California the party of the first part and C N Stanley of the same place the party of the second part.

Witnesseth: that the said party of the first part for and in consideration of the sum of One Thousand One Hundred Thirty six Dollars gold coin of the United States of America to him in hand paid by the said party of the second part the receipt whereof is hereby acknowledged does by these presents grant bargain and sell convey and confirm unto the said party of the second part and to his heirs and assigns forever all those certain lots and parcels of land situate lying and being in the County of Los Angeles State of California and bounded and particularly described as follows to wit

Lots numbered Five and Six in Block E of the Fair Oaks Avenue Tract Pasadena as shown on a map recorded in Book 1 at page 1 of Miscellaneous Records of Los Angeles County State of California

Together with all and singular the tenements hereditaments and appurtenances thereunto belonging or in anywise appertaining and the reversion and

This is a true and certified copy of the record
if it bears the seal, imprinted in purple ink,
of the Registrar-Recorder/County Clerk

JUN 14 2011

Dean C Logan   REGISTRAR-RECORDER/COUNTY CLERK
LOS ANGELES COUNTY, CALIFORNIA

# EXHIBIT 2

This Indenture made the third day of March one thousand eight hundred and eighty-eight, By and Between John P. Jones and Arcadia B. de Baker, the parties of the first part and the National Home for Disabled Volunteer Soldiers, a corporation, formed and now existing under the laws of the United States, the party of the second part,

Witnesseth: that whereas by an act of Congress approved March 2nd 1887 to provide for the location and erection of a branch home for disabled volunteer soldiers West of the Rocky Mountains, the Board of Managers of the National Home for Disabled Volunteer Soldiers were authorized, empowered, and directed to locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers, to be by such Board, located at such place in the States West of the Rocky Mountains as to said Board should appear most desirable and advantageous.

And whereas, the parties hereto of the first part in consideration that the party hereto of the second part should locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers on a site to be selected by its Board of Managers along the dividing line between the Ranchos San Jose de Buenos Ayres and San Vicente y Santa Monica offered to donate to the said party of the second part, three hundred acres of land, being a portion of said Rancho San Vicente y Santa Monica belonging to them, the said parties of the first part, on which to locate, establish, construct and permanently maintain such branch of said National Home for Disabled Volunteer Soldiers.

And Whereas the Board of Managers of said National Home for Disabled Volunteer Soldiers, in consideration of said offer have selected the land and premises hereinafter described for the purpose aforesaid, and have notified the parties of the first part of such selection.

Now, Therefore, in consideration of the premises and of the location, establishment, construction and permanent maintenance of a branch of said National Home for Disabled Volunteer Soldiers on such tract of land, so selected, and of the benefits to accrue to the said parties of the first part, owners of the said Rancho San Vicente y Santa Monica, by such location, have given and granted and by these presents do give and grant unto the said party of the second part, all the following described land and premises, situate, lying and being in the County of Los Angeles, State of California and particularly bounded and described as follows:

Commencing at a point on the boundary line between the Ranchos San Vicente y Santa Monica and San Jose de Buenos Ayres distant 6044 feet Northerly from the corner post on the line between the said Rancho San Vicente y Santa Monica and the Rancho La Ballona, which post is the common corner of the Rancho San Vicente y Santa Monica and the Rancho San Jose de Buenos Ayres running from said point of beginning

South 54-1/2° West 2780-2/10 feet to a stake, being the
Southwest corner of the tract herein conveyed, thence
North 35-1/2° West 4385 feet to a stake being the Northwest
corner of said tract herein conveyed; thence North 54-1/2°
East 2780-2/10 feet to a stake on the boundary line between
the said Ranchos San Vicente y Santa Monica and San Jose de
Buenos Ayres, thence South 35-1/2° East along said
boundary line 4385 feet to the place of beginning containing
three hundred (300) Acres of land;

Together with all and singular the tenements, hereditaments and
appurtenances thereunto belonging or in anywise appertaining,
to have and to hold the said land and premises, with appurtenances,
unto the said party of the second part forever; for the purpose
of such branch Home for Disabled Volunteer Soldiers to be thereon
so located, established, constructed and permanently maintained.

-2-

In Witness Whereof the said parties of the first part have hereunto set their hands and seals the day and year first above written.

                    John P. Jones              (seal)
          By his attorney in fact, Walter Van Dyke (seal)
                    Arcadia B. de Baker      (seal)
          By her attorney in fact, Robert S. Baker

State of California  )
                     )  ss.
County of Los Angeles)      On this 5th day of March in the year one thousand eight hundred and eighty-eight before me, Charles Worth, a Notary Public in and for said Los Angeles County residing therein, duly commissioned and sworn, personally appeared Walter Van Dyke known to me to be the person described in and whose name is subscribed to the within instrument as the Attorney in fact of John P. Jones and the said Walter Van Dyke acknowledged to me that he subscribed the name of John P. Jones thereunto as

principal and his own name as Attorney in fact.

In Witness Whereof, I have hereunto set my hand and affixed my seal at my office in the City and County of Los Angeles the day and year in this Certificate first above written.

(Notarial Seal)

Charles Worth
Notary Public

State of California )
                   ) ss.
County of Los Angeles)      On this 5th day of March in the year one thousand eight hundred and eighty-eight before me Charles Worth, a Notary Public in and for said Los Angeles County residing therein duly commissioned and sworn, personally appeared Robert S. Baker, known to me to be the person described in, and whose name is subscribed to the within instrument, as the Attorney in fact of Arcadia B. de Baker, and the said Robert S. Baker

-3-

acknowledged to me that he subscribed the name of Arcadia B. de Baker thereunto as principal and his own name as Attorney in fact.

In Witness Whereof I have hereunto set my hand and affixed my Official Seal at my office in the City and County of Los Angeles the day and year in this Certificate first above written.

(Notarial Seal)                              Charles Worth
                                             Notary Public


59      A full, true and correct copy of the original recorded at request of Grantee March 10, 1888 at 17 min. past 12N.

                                    Frank A. Gibson, County Recorder

                                    By Frank H. While, Deputy

## PROOF OF SERVICE

1.   I am over eighteen years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 777 South Figueroa Street, 44th Floor, Los Angeles, California 90017.

2.   On August 12, 2011, I served the following document(s):

☑   **AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, MANDAMUS, AND ACCOUNTING RELIEF**

☐   The document(s) served are included in the attached List of Documents.

3.   ☑   I served the document(s) on the following person(s):

☑   The names, addresses, and other applicable information about the persons served is included in the attached Service List.

4.   The documents were served by the following means:

☑   **By U.S. mail**.  I enclosed the document(s) in a sealed envelope or package addressed to the person(s) at the address(es) in Item 3 and **(check one)**:

☐   deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

☑   placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this business' practice for collecting and processing correspondence for mailing.  On the same day the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Los Angeles, California.

☐   **By Overnight Delivery/Express Mail**.  I enclosed the documents and an unsigned copy of this declaration in a sealed envelope or package designated by **[name of delivery company or U.S. Postal Service for Express Mail]** addressed to the persons at the address(es) listed in Item 3, with **[Express Mail postage or, if not Express Mail, delivery fees]** prepaid or provided for.  I placed the sealed envelope or package for collection and delivery, following our ordinary business practices.  I am readily familiar with this business' practice for collecting and processing correspondence for express delivery.  On the same day the correspondence is collected for delivery, it is placed for collection in the ordinary course of business in a box regularly maintained by **[name of delivery company or U.S. Postal Service for Express Mail]** or delivered to a courier or driver authorized by **[name of delivery company]** to receive documents.

☐   **By Messenger Service**.  I served the documents by placing them in an envelope or package addressed to the persons at the address(es) listed in Item 3 and providing them to a professional messenger service for service.  *(See Declaration of Messenger below.)*

☐   **By Facsimile Transmission**.  Based on an agreement between the parties to accept service by facsimile transmission, which was confirmed in writing, I faxed the document(s) and an

unsigned copy of this declaration to the person(s) at the facsimile numbers listed in Item 3 on [type date], at [type time]. The transmission was reported as complete without error by a transmission report issued by the facsimile machine that I used immediately following the transmission. A true and correct copy of the facsimile transmission report, which I printed out, is attached hereto.

☐   **By Electronic Service (E-mail)**. Based on a court order or an agreement of the parties to accept service by electronic transmission, I transmitted the document(s) and an unsigned copy of this declaration to the person(s) at the electronic notification address(es) listed in Item 3 on **[type date]** before 5:00 p.m. PST. **(add, as applicable)**

   ☐   The transmission of the document was reported as complete and without error by electronic receipt of a delivery confirmation, a true and correct copy of which is attached hereto.

   ☐   I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☑   **Via Court Notice of Electronic Filing**. The document(s) will be served by the court via NEF and hyperlink to the document. On **August 12, 2011**, I checked the CM/ECF docket for this case or adversary proceeding and determined that the person(s) listed in Item 3 are on the Electronic Mail Notice List to receive NEF transmission at the email addresses indicated on the attached service list.

☐   **STATE**: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☑   **FEDERAL**: I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Dated: <u>August 12, 2011</u>          Signature: _____

Type or Print Name: <u>Jacqui Tollefson</u>

# Mailing Information for a Case 2:11-cv-04846-SJO -MRW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter J Eliasberg**
  peliasberg@aclu-sc.org,clebano@aclu-sc.org

- **James Jacob Finsten**
  james_finsten@aporter.com

- **Leonard A Gail**
  lgail@masseygail.com

- **Amos E Hartston**
  ahartston@innercitylaw.org

- **Elizabeth Haman Kugler**
  ehaman@gmail.com

- **Elisabeth Layton**
  elisabeth.layton@usdoj.gov

- **Jonathan Massey**
  jmassey@masseygail.com

- **Kristen McKeever**
  Kristen.L.McKeever@usdoj.gov

- **Alarice M Medrano**
  alarice.medrano@usdoj.gov,karolyn.s.li@usdoj.gov

- **Adam Murray**
  amurrayA@innercitylaw.org

- **Ronald L Olson**
  ron.olson@mto.com

- **Jacob Kevin Poorman**
  jacob.poorman@aporter.com

- **Mark D Rosenbaum**
  mrosenbaum@aclu-sc.org,maricela@aclu-sc.org

- **David B Sapp**
  dsapp@aclu-sc.org

- **Laurence H Tribe**
  larry@tribelaw.com

Case 2:11-cv-04846-SJO-MRW   Document 24   Filed 08/12/11   Page 113 of 113   Page ID
#:340

- **Melissa A Tyner**
  mtyner@innercitylaw.org

- **John C Ulin**
  john.ulin@aporter.com,Leyla.cambel@aporter.com,jacquelynn.tollefson@aporter.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Gary Lee Blasi
UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90024
```