Priority        ____
Send            ____
Enter           ____
Closed          ____
JS-5/JS-6       ____
Scan Only       ____

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 11-04846  SJO (MRWx)**        **DATE:  March 16, 2012**

**TITLE:       Gregory Valentini, et al. v. Eric Shinseki, et al.**

========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                              Not present
Courtroom Clerk                               Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**          **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                   Not Present

========================================================================
**PROCEEDINGS: ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS** [Docket No. 32]

This matter is before the Court on Defendants Eric Shinseki and Donna M. Beiter's (collectively, "Defendants" or "Government") Motion to Dismiss ("Motion"), filed on October 7, 2011. On October 21, 2011, Plaintiffs filed their Opposition to which the Government filed its Reply on October 25, 2011.  The Court received *amicus curiae* briefs filed by Metabolic Studio, LLC, and the City of Santa Monica in opposition to the Government's Motion to Dismiss.

The Court found this matter suitable for disposition without oral argument and vacated the hearing scheduled for December 5, 2011. See Fed. R. Civ. P. 78(b).  For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss.

I.      FACTUAL AND PROCEDURAL BACKGROUND

The First Amended Complaint ("FAC") sets forth the following allegations.  The individual Plaintiffs in this case are severely disabled veterans with mental disabilities, brain injuries, or both.[1]  (*See* FAC ¶¶ 8-17, ECF No. 24.)  As a result of their disabilities, they are homeless and cannot access necessary medical and mental health treatment.  (FAC ¶¶ 8-17.)

On June 8, 2011, Plaintiffs filed a lawsuit against the Government.  Defendant Eric Shinseki ("Shinseki") is the Secretary of the United States Department of Veterans Affairs ("DVA"), whose official duties include execution and administration of all laws and programs governed by the DVA. (FAC ¶¶ 47, 48.)  Shinseki is responsible for ensuring that the DVA complies with contracts and land grants.  (FAC ¶ 48.)  Defendant Donna M. Beiter ("Beiter") is the Director of the Veterans

_____

[1]  The individual Plaintiffs are joined by the Vietnam Veterans of America ("VVA"), which asserts associational standing on behalf of its members.  (FAC ¶ 45; Opp'n 1 n.1, ECF No. 35.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846 SJO (MRWx)</u>        **DATE:** <u>March 16, 2012</u>

Affairs Greater Los Angeles ("VA GLA") Healthcare System, whose official duties include supervising daily operations and services of all programs operated by the West Los Angeles Campus ("WLA Campus"). (FAC ¶¶ 49, 50.)

Plaintiffs assert six claims: (1) facial discrimination in violation of section 504 of the Rehabilitation Act; (2) denial of meaningful access in violation of section 504 of the Rehabilitation Act; (3) breach of duty as trustee of a charitable trust; (4) accounting for profits; (5) breach of fiduciary duty as trustee of a charitable trust; and (6) improper land deals executed in violation of the Administrative Procedure Act ("APA"). (*See generally* FAC.)

A.    <u>Overview of the Veterans' Benefits Program</u>

In 1865, Congress created the National Home for Disabled Volunteer Soldiers ("National Home"). (FAC ¶ 85; Act of Mar. 3, 1965, ch. 91, 13 Stat. 509.) The National Home created a series of branch homes for veterans throughout the country. (FAC ¶ 85.) In addition to housing, the National Home also provided the veteran residents food, medical care, recreation activities, and employment opportunities. (FAC ¶ 85.) In 1887, Congress authorized the National Home's Board of Governors to establish a branch home west of the Rocky Mountains. (FAC ¶ 88.) In 1888, the Pacific Branch of the National Home ("Pacific Branch Home") opened and housed veterans. (FAC ¶ 90.) In 1930, Congress consolidated the National Home with other veterans' programs and established the Veterans Administration ("VA"). (FAC ¶ 93; Exec. Order No. 5398 (July 21, 1930).) Accordingly, the branch homes were transferred to the VA. (FAC ¶ 93.) In 1958, Congress repealed the statutory authorization for the National Home. *See* Act of Sept. 2, 1958, Pub. L. No. 85-857, 72 Stat. 1105 (1958).

In 1989, the DVA, VA's successor-in-interest, was established as a cabinet-level agency. (FAC ¶ 94.) The DVA is currently divided into three administrations: the Veterans Health Administration ("VHA"); the Veterans Benefits Administration ("VBA"); and the National Cemetery Administration ("NCA"). (FAC ¶ 73; 38 U.S.C. § 301(c).) The VHA is obligated to provide veterans with medical and hospital services. (FAC ¶ 73; 38 U.S.C. § 7301(b).) To qualify for VHA benefits, a person must have performed active duty in the military and been "discharged or released" from service "under conditions other than dishonorable." (FAC ¶ 74; 38 U.S.C. § 101(2).)

To receive the "medical benefits package," a veteran must be enrolled in the VA health-care system. *See* 38 C.F.R. § 17.36(a)(1). Veterans who qualify for VHA benefits are placed into one of eight priority groups. *See* 38 C.F.R. § 17.36(b). The priority groups are established by the DVA's regulations to determine a veteran's eligibility for benefits. (FAC ¶ 75; 38 C.F.R. § 17.36(b).) Depending on funding, the DVA may prioritize the higher priority groups and provide VHA benefits only to veterans in those groups. (FAC ¶ 75.)

Eligible veterans receive VHA benefits through twenty-one Veterans Integrated Services Networks ("VISN") around the country. (FAC ¶ 79.) One of the VISNs is the VA Desert Pacific Health

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 11-04846  SJO (MRWx)**          **DATE:  March 16, 2012**

Network, which provides services in Southern California through the VA GLA.  (FAC ¶ 80.)  The VA GLA provides health-care services to veterans at its WLA Campus.  (FAC ¶ 83.)  The VHA benefits package includes: outpatient medical, surgical, and mental health care; inpatient hospital, medical, surgical, and mental health care; prescription drugs coverage; emergency care; substance abuse treatment; and other services.  (FAC ¶ 78; 38 C.F.R. § 17.38(a).)

In addition to VHA's benefits program, the DVA must provide hospital and medical services "to any veteran for a service-connected disability." 38 U.S.C. § 1710(a)(1)(A).  Veterans who meet certain requirements must be provided hospital care and medical services, regardless of whether the veteran is enrolled in the VHA benefits program.  (FAC ¶ 77; 38 C.F.R. § 17.37(a).)

B.      History of the WLA Campus

In 1888, United States Senator John P. Jones and Arcadia B. de Baker donated land - what is now the WLA Campus - for the purpose of establishing and permanently maintaining a branch home for disabled war veterans.  (FAC ¶ 84.)  The deed (the "1888 Deed") conveyed 300 acres to the National Home.  (FAC ¶ 89.)  The 1888 Deed states:

> And whereas, the parties hereto of the first part [grantors] in consideration that the party hereto of the second part [National Home] should locate, establish, construct, and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers on a site to be selected by its Board of Managers . . . .  Now therefore, in consideration of the premises and of the location, . . . owners of the said Rancho San Vicente y Santa Monica, by such location have given and granted and by these presents do give and grant . . . all the following described land and premises, situate lying and being in the County of Los Angeles, State of California . . . for the purpose of such branch Home for Disabled Volunteer Soldiers to be thereon so located, established, constructed and permanently maintained.

(FAC ¶ 89; Exs. 1, 2.)  In 1899 and 1921, successors to Senator Jones and Mrs. de Baker conveyed additional land to the National Home.  (FAC ¶ 89.)  The entire WLA Campus conveyed by the 1888 Deed and two later deeds is approximately 387 acres.  (FAC ¶ 6.)

For about eighty years, the VA operated the Pacific Branch Home at the WLA Campus, which provided a permanent home for disabled veterans as anticipated by the grantors of the 1888 Deed.  (FAC ¶ 6.)  During the 1960s and 1970s, the VA ceased accepting new residents at the WLA Campus.  (FAC ¶ 94.)  Currently, there are approximately 104 buildings on the WLA Campus.  (FAC ¶ 95.)  Many of the buildings that were once dedicated to permanent housing are now repurposed or have fallen into disuse.  (FAC ¶¶ 7, 95.)

The WLA Campus offers care in the following areas: medicine, surgery, psychiatry, physical medicine and rehabilitation, neurology, oncology, dentistry, geriatrics, and extended care.  (FAC

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **CV 11-04846  SJO (MRWx)**          **DATE:**  **March 16, 2012**

¶ 98.)  Additionally, the WLA Campus offers approximately 1,500 beds, and more than 1,150 beds are dedicated to inpatient hospital care or skilled nursing care for elderly veterans.  (FAC ¶ 105.) These beds are not available as permanent supportive housing and are used as temporary shelter for veterans with limitations on eligibility.  (FAC ¶ 105.)  However, there is no permanent housing available to disabled veterans on the WLA Campus.  (FAC ¶ 95.)

In addition to the WLA Campus providing health-care services for veterans, the campus is also used for private activities.  Many commercial and other non-DVA programs operate on the WLA Campus pursuant to leases, memoranda of understanding, revocable licenses, or enhanced sharing agreements. (FAC ¶¶ 24, 96.)  Currently, there are twenty-one land-use agreements with eighteen different partners for the WLA Campus.  (Dep't of Veterans Affairs, West Los Angeles VA Medical Center, Veterans Program Enhancement Act of 1998 (VPEA) Master Plan (2011) ("Master Plan").)  The following are land-use agreements on the WLA Campus: Brentwood School leases twenty acres of land; Richmark Entertainment operates the Wadsworth and Brentwood theaters; Sodexho Marriot Laundry Services operates an old laundry facility in Building 224; South Coast AQMD conducts studies on pollution levels out of a temporary trailer; TCM, LLC utilizes 1.5 acres of land at the Veterans Garden and adjacent parking areas for a community farmer's market; Twentieth Century Fox has an agreement to build a temporary butler building for storage in the industrial area of the campus; University of California, Los Angeles utilizes the baseball stadium for their baseball program; Westside Breakers Soccer Club and Galaxy Alliance Soccer have non-exclusive use of the Macarthur Field and parking lot thirty-eight; West Side, LLC operates vehicular parking areas throughout the WLA Campus; and movie and television production companies use portions of the WLA Campus for short-term, non-recurring filming projects.  (FAC ¶ 24; see Master Plan at 36-37.)  Due to these land-use deals, veterans have limited access to, or are prohibited from accessing, 110 out of the 387 acres of the WLA Campus.  (FAC ¶ 96.)

     C.    Housing Services at the WLA Campus

VA GLA provides services for veterans at the WLA Campus, three ambulatory clinics, and nine community clinics located throughout its service area.  (FAC ¶ 114.)  Although the VA GLA offers medical services at these facilities, it does not offer permanent supportive housing to disabled veterans at the WLA Campus.  (FAC ¶ 104.)  However, temporary shelter services are offered through the Domiciliary Residential Rehabilitation and Treatment Program ("Domiciliary").  (FAC ¶ 104.)  Many of the beds at the Domiciliary are dedicated to programs focused on substance abuse recovery, not serious mental health issues.  (FAC ¶ 104.)  The Domiciliary refuses admission to veterans who have serious mental disabilities involving psychosis or who take psychotropic medication.  (FAC ¶ 104.)  The VA GLA offers beds, including the beds at the Domiciliary, as temporary shelter with limitations on eligibility that often exclude homeless veterans with serious disabilities.  (FAC ¶ 105.)

In addition to the programs operated by the VA GLA, several residential programs are operated by third parties on the WLA Campus.  These third-party programs are not designed to meet the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**   CV 11-04846  SJO (MRWx)          **DATE:**  March 16, 2012

needs of veterans with severe mental disabilities or brain injuries.  (FAC ¶¶ 106, 110.)  Lastly, veterans have access to additional transitional housing beds through VA GLA's contract with off-site providers and to a permanent housing through VA GLA's housing voucher program, but these beds are not located near the WLA Campus or other VA GLA facilities where VHA benefits are offered.  (FAC ¶¶ 113-14.)

      D.      <u>Plaintiffs' Claims</u>

Plaintiffs' claims fall into three categories:

      (1)      claims for violations of the Rehabilitation Act (claims 1 and 2);
      (2)      claims related to the charitable trust, including breach of fiduciary duty and an accounting (claims 3, 4, and 5); and
      (3)      a claim for violations of the APA (claim 6).

First, Plaintiffs bring two claims under the Rehabilitation Act.  (FAC ¶¶ 116, 117.)  In support of Plaintiffs' facial discrimination claim, Plaintiffs assert that the Government refused to provide them admission to housing programs or services that are necessary for treatment of severe mental disabilities.  (FAC ¶ 116.)  According to Plaintiffs, the Government facially discriminates against Plaintiffs because of their severe mental disabilities.  (FAC ¶ 116.)  Additionally, Plaintiffs posit that the Government denied Plaintiffs meaningful access to services, including the reasonable accommodation of permanent supportive housing.  (FAC ¶ 117.)  Plaintiffs pray the Court to declare that: the design and implementation of the VHA benefits program within VA GLA facially discriminates against Plaintiffs solely by reason of their disability; and the Government is denying Plaintiffs meaningful access to the VHA benefits offered by the VA GLA solely by virtue of their disability.  (FAC Req. for Relief.)  Plaintiffs seek an injunction directing that the Government provide Plaintiffs permanent supportive housing as a reasonable accommodation for their disabilities.  (FAC Req. for Relief.)

Second, Plaintiffs assert that the 1888 Deed created a charitable trust whereby the DVA holds the WLA Campus in trust for disabled veterans as the intended beneficiaries.  (FAC ¶ 301.)  Plaintiffs allege that the Government's authorization of uses that do not directly contribute to the operation of a home for disabled veterans is a breach of the charitable trust.  (FAC ¶ 302.)  Plaintiffs pray the Court to declare that: the Government's acceptance of the land transferred under the 1888 Deed created a charitable trust; and the Government has breached and continues to breach its fiduciary duties as trustees of the charitable trust.  (FAC Req. for Relief.)  Plaintiffs seek an injunction mandating that the Government faithfully execute its obligations as trustee and use the WLA Campus solely for purposes directly related to providing supportive housing for disabled veterans, or, in the alternative, a court order mandating that the Government refrain from allowing the current use of the WLA Campus for purposes not related to supportive housing for disabled veterans to continue.  (FAC Req. for Relief.)  Plaintiffs also seek an injunction requiring an accounting of profits of all money received by the DVA or VA GLA from land-use agreements for

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**   <u>CV 11-04846  SJO (MRWx)</u>        **DATE:**  <u>March 16, 2012</u>

land that is used for any purpose not directly related to providing supportive housing for disabled veterans and deposit all such money in an account to be used solely for the purpose of providing supportive housing and related services.  (FAC Req. for Relief.)

Third, Plaintiffs assert that land deals entered into by VA GLA were improperly executed under the Veterans' Benefits Act in violation of the APA.  (FAC ¶ 312.)  Plaintiffs allege that they have suffered procedural and substantive injuries.  (FAC ¶ 313.)  Plaintiffs seek an injunction prohibiting VA GLA from executing under 38 U.S.C. §§ 8151-8153 (the statutes that authorize enhanced sharing agreements) any agreements that do not concern the sharing of health-care resources. (FAC Req. for Relief.) Plaintiffs pray the Court to declare that the Government violated 38 U.S.C. §§ 8151-8153 and 8161-8169 by entering into a number of enhanced sharing agreements unauthorized by any law or regulation.  (FAC Req. for Relief.)

> E.    Procedural Background

On October 7, 2011, the Government filed its Motion to Dismiss.  (*See generally* Mot., ECF No. 32.)  First, the Government argues that Plaintiffs' APA claim should be dismissed because Plaintiffs: (1) lack standing; and (2) fail to state a legally viable claim.[2]  (*See generally* Mot.) Second, the Government asserts four arguments to dismiss Plaintiffs' charitable trust claims: (1) lack of standing; (2) sovereign immunity; (3) lack of subject matter jurisdiction; and (4) failure to state a claim for breach of fiduciary duty.  (*See generally* Mot.)  Lastly, the Government asserts that Plaintiffs' Rehabilitation Act claims should be dismissed because: (1) the Veterans' Judicial Review Act bars jurisdiction over section 504 of the Rehabilitation Act; and (2) Plaintiffs fail to state a viable facial discrimination claim.  (*See generally* Mot.)

On October 21, 2011, Plaintiffs filed their Opposition.  (*See generally* Opp'n, ECF No. 35.)  The Court received *amicus curiae* briefs filed by Metabolic Studio, LLC ("Metabolic Studio") and the City of Santa Monica in opposition to the Government's Motion to Dismiss.[3]  (*See generally*

---

[2]  The Government's Motion has a section entitled "Counts One, Three, Four, Five, and Six Fail to State Legally Viable Claims." (Mot. 15.)  Under this section, the Government argues that Plaintiffs have no viable facial Rehabilitation Act claim (claim one); and Plaintiffs have not stated a claim for breach of fiduciary duty (implicating claims three, four, and five). (Mot. 15.)  However, in that section, the Government failed to address whether Plaintiffs have a viable APA claim (claim six).  (Mot. 15.)  The Government only argues, in another section, that Plaintiffs' APA claim fails for lack of standing.  (Mot. 4.)  Because the Government did not sufficiently argue that Plaintiffs failed to state a legally viable APA claim, the Government relies only on the argument that Plaintiffs' APA claim should be dismissed because Plaintiffs lack standing.

[3]  On October 25, 2011, the Court permitted but did not require Defendants to submit a response to the Metabolic Studio's *amicus curiae* brief, which was due on

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846  SJO (MRWx)</u>        **DATE:** <u>March 16, 2012</u>

Metabolic Studio Amicus Curiae Br., ECF No. 44; City of Santa Monica Amicus Curiae Br., ECF No. 41.)  On October 25, 2011, the Government filed a Reply to Plaintiffs' Opposition. (*See generally* Reply, ECF No. 40.)

On October 27, 2011, the Court determined that it would befit from additional briefing pertaining specifically to argument about the creation of a charitable trust. (Oct. 27th Order Req. Additional Br'g, ECF No. 43.)  Both parties submitted Supplemental Briefs, to which the opposing party replied.  On November 18, 2011, the Court notified the parties that the Ninth Circuit withdrew its opinion for *Veterans for Common Sense v. Shinseki*, 644 F.3d 835 (9th Cir. 2011) and decided to rehear the appeal en banc.  (Nov. 18th Order Req. Additional Br'g, ECF No. 56.)  Because both Plaintiffs and the Government cited *Veterans for Common Sense* in their briefs regarding jurisdiction for the Rehabilitation Act claims, the Court allowed additional briefing to address the jurisdictional question for the Rehabilitation Act claims.  (Nov. 18th Order Req. Additional Br'g.)  On November 23, 2011, Plaintiffs filed their Supplemental Brief (Pls.' Suppl. Br. in Supp. of Opp'n, ECF No. 57), to which the Government replied on December 1, 2011 (Defs.' Suppl. Br. in Supp. of Mot., ECF No.59).

II.    <u>DISCUSSION</u>

    A.    <u>Legal Standard</u>

A motion to dismiss pursuant to Rule12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  In evaluating a motion to dismiss, a court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff.  *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).  Dismissal is proper if the complaint lacks a "cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see Ileto*, 349 F.3d at 1200.  "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009).  To plead sufficiently, a plaintiff must proffer "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  Rule 8(a)(2) requires that the allegations in the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Fed. R. Civ. P. 8(a)(2).

---

October 28, 2011.  Defendants did not submit such a response.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846 SJO (MRWx)</u>        **DATE:** <u>March 16, 2012</u>

B.    <u>Plaintiffs' APA Claim</u>

The Government has entered into various land-use agreements at the WLA Campus. (FAC ¶ 24; Master Plan at 36-37.) The law provides three mechanisms the DVA may use to enter into leases or other agreements related to its property: (1) enhanced sharing agreements ("ESAs") under 38 U.S.C. §§ 8151-53; (2) enhanced use leases ("EULs") under 38 U.S.C. §§ 8161-69; and (3) outleases under 38 U.S.C. §§ 8122 and 2412. The parties agree that outleases are not at issue in this case. (Mot. 4-6; Opp'n 7.)

In 2008, Congress prohibited the DVA from entering into EULs on the WLA Campus unless specifically authorized by law. (Mot. 4; *see* 38 U.S.C. § 8162(c)(1) ("[T]he entering into an [EUL] covering any land or improvement described in . . . section 224(a) of the Military Construction and Veterans Affairs and Related Agencies Appropriations Act, 2008 shall be considered to be prohibited by such sections unless specifically authorized by law.").) Under section 224(a), "[t]he Secretary of Veterans Affairs may not declare as excess to the needs to the Department of Veterans Affairs, or otherwise take any action to exchange, trade, auction, transfer, or otherwise dispose of, or reduce the acreage of, Federal land and improvements at the Department of Veterans Affairs [WLA Campus]." Act of Dec. 26, 2007, Pub. L. No. 110-161, 121 Stat. 1844. Thus, as of 2008, the only avenues available for the DVA to enter into land-use agreements for the land on the WLA Campus (unless specifically authorized by law) were ESAs or outleases.

In their APA claim, Plaintiffs allege that the DVA improperly executed its land-use deals as ESAs, even though ESAs only authorize land-use deals pertaining to sharing of health-care resources.[4] (FAC ¶ 312.) Plaintiffs assert that many of the DVA's ESAs have little or no connection to health-care resources (FAC ¶ 272), and therefore entering into these land-use deals as ESAs was unlawful.

According to Plaintiffs, the DVA was required (prior to 2008) to execute those land-use agreements unrelated to sharing health-care resources as EULs (which are not restricted only to deals pertaining to sharing of health-care resources), rather than ESAs (which are so limited). (FAC ¶ 312.) This distinction is relevant because the procedure for entering an EUL mandates additional procedural requirements with which the DVA did not comply. (FAC ¶ 270.) Under EULs, the DVA must determine that the EULs "provide appropriate space for an activity contributing to the mission of [the DVA]" or the proceeds from EULs are used in a way that "would result in a demonstrable improvement of services to eligible veterans." 38 U.S.C.

---

[4] The term "health-care resource" includes "hospital care and medical services (as those terms are defined in section 1701 of this title), services under sections 1782 and 1783 of this title, any other health-care service, and any health-care support or administrative resource." 38 U.S.C. § 8152(1).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 11-04846  SJO (MRWx)</u>          **DATE:** <u>March 16, 2012</u>

§ 8162(a)(2)(A)(I), (a)(2)(B).  If the DVA designates a property to be leased pursuant to an EUL, the DVA is required to provide a public hearing and public notice.  38 U.S.C. § 8163(a)-(c). Plaintiffs claim that after 2008 the DVA was not authorized to enter land-use agreements unrelated to sharing health-care resources at all.  (Opp'n 8.)

The Government moves to dismiss Plaintiffs' APA claim for lack of subject matter jurisdiction because Plaintiffs lack standing.  To determine whether Plaintiffs have standing, the Court must undertake two separate inquiries.  First, the Court must determine whether Plaintiffs have constitutional standing under Article III.  Second, if Plaintiffs meet the requirements for constitutional standing, the Court must determine whether Plaintiffs meet the prudential standing requirements - i.e., whether Plaintiffs have a right to sue under the APA.

      1.   <u>Article III Standing</u>

Article III of the Constitution limits the exercise of judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  For a case to satisfy a federal court's case-or-controversy requirement, Article III, Section 2 requires an "irreducible" minimum of standing.  *Id.* at 560.  "The plaintiff has the burden of establishing the three elements for Article III standing: (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision."  *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008) (citing *Lujan*, 504 U.S. at 560-61)).  The Government attacks Plaintiffs' ability to establish the first and third requirement: injury in fact and redressability.[5]  (Mot. 4-5.)

///

           a.   <u>Injury in Fact</u>

---

[5] Constitutional standing also requires Plaintiffs to establish causation - the injury is fairly traceable to the challenged conduct.  *Lujan*, 504 U.S. at 560-61.  Here, there is no dispute about causation because "this requirement is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant." *Citizens for Better Forestry v. U.S. Dep't. of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003); *see also Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir. 1992) ("The causation question . . . concern[s] only whether plaintiffs' injury . . . is dependent upon [the agency's] policy, or is instead the result of independent incentives governing [the third parties'] decisionmaking process.") (alteration in original).  Here, Plaintiffs' injury is connected to the DVA's affirmative act to enter into land-use agreements pursuant to ESAs instead of EULs.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 11-04846  SJO (MRWx)</u>      **DATE:** <u>March 16, 2012</u>

Under the injury-in-fact requirement, a plaintiff must show "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). This injury can be either substantive or procedural. However, if Plaintiff is asserting a purely procedural injury, then "[t]o satisfy the injury in fact requirement, a plaintiff . . . must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Citizens for Better Forestry v. U.S. Dep't. of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003) (internal quotation marks omitted). "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation - a procedural right *in vacuo* - is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

The Government argues that Plaintiffs have failed to allege a substantive injury, and that to the extent Plaintiffs rely on a purely procedural injury, the injury is not coupled with a "concrete interest" such that Article III standing exists. (Mot. 4, 5 n.5.) Plaintiffs argue that they have alleged both substantive and procedural injury sufficient to establish standing.  (FAC ¶¶ 274-75.)

　　　　　　　　　　i.　　<u>Substantive Injury</u>

Plaintiffs contend that they suffered a substantive injury.  (FAC ¶ 275.)  According to Plaintiffs, when the VA GLA entered into ESAs after 2008, Plaintiffs lost the assurance that land deals unrelated to the sharing of health-care resources on the WLA Campus would result in appropriate space for activities for veterans.  (FAC ¶ 275; Opp'n 8-9.)

The Government characterizes Plaintiffs' claimed substantive injury as the denial of supportive housing for disabled veterans by the DVA's decision to enter into land-use agreements under ESAs.  (Mot. 5.)  The Government argues that Plaintiffs do not have a **right** to supportive housing for disabled veterans (Mot. 4), and therefore Plaintiffs are not injured by the DVA's decision to enter into land-use agreements as ESAs rather than as EULs.  (Mot. 5.)

The substantive injury in this case is not simply that Plaintiffs do not have permanent supportive housing; rather, it is that portions of the WLA Campus are not being used to benefit veterans.  The purpose and mission of the DVA, combined with the statutes that regulate the DVA's ability to lease its land, create a background rule that absent compliance with the land-leasing statutes, any land owned by the DVA must be used in a manner that benefits veterans.

The purpose of sharing health-care resources, which the DVA is authorized to do pursuant to the ESA statutes, is "to strengthen the medical programs at Department facilities and **improve the quality of health care provided veterans** . . . by authorizing the Secretary to enter into agreements with health-care providers in order to share health-care resources . . . **while ensuring no diminution of services to veterans**." 38 U.S.C. § 8151 (emphases added).  Thus, any land-use agreements made pursuant to ESAs are to benefit veterans by improving health care for veterans.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 11-04846  SJO (MRWx)          DATE:  March 16, 2012**

Similarly, the restrictions placed on EULs support the assumption that property owned by the DVA must be used in a manner that benefits veterans.  Before entering an EUL, the DVA must determine that the following three criteria have been met:

>   (i)     at least part of the use of the property under the lease will be to provide appropriate space for an activity contributing to the mission of the Department;
>   (ii)    the lease will not be inconsistent with and will not adversely affect the mission of the Department; and
>   (iii)   the lease will enhance the use of the property.

38 U.S.C. § 8162(a)(2)(A)(i)-(iii).  Even if the DVA determines that these three criteria have not been met, the DVA may enter into an EUL if the proceeds from the EUL are used in a way that "would result in a demonstrable improvement of services to eligible veterans."  38 U.S.C. § 8162(2)(a)(B). Any lease made pursuant to EULs requires the property itself or the proceeds derived therefrom be used for the benefit of veterans.  The combination of these two land-use statutes (authorizing ESAs and EULs) makes it clear that Congress's intention was to ensure that property leased to third parties is primarily used to benefit veterans.

After 2008, Congress prohibited the DVA from entering into EULs at the WLA Campus.  *See* 38 U.S.C. § 8162(c)(1).  Unlike EULs, land-use agreements made pursuant to ESAs do not require any additional procedural requirements.  After 2008, the DVA's land-use agreements entered into pursuant to ESAs that do not provide for sharing of health-care resources were unauthorized and resulted in lost access to space and opportunities that benefit veterans on the WLA Campus. Because these allegedly unauthorized ESAs do not benefit veterans, this lost access to space and opportunities is a substantive injury sufficient to satisfy Article III's standing requirements.

ii.    Procedural Injury

Plaintiffs allege that ESAs can only be used for activities that benefit veterans or for improvements in the VA GLA's services.  (FAC ¶ 275.)  Plaintiffs have argued that prior to 2008, if the DVA wanted to enter land-use agreements unrelated to sharing health-care resources, it was required to execute the agreements as EULs, rather than ESAs. (Opp'n 9.)  EULs have certain procedural requirements, including: a public hearing; notice of the proposed lease and of the hearing; and notice of the DVA's intention to enter into such lease in the Federal Register. 38 U.S.C. § 8163(a)-(c).  Therefore, Plaintiffs also allege that they have suffered procedural injury, because they were denied procedural protections, including the opportunity to make their views known at public hearings and the opportunity to have access to publicly available descriptions and justifications of the DVA's proposed and final land deals.  (FAC ¶¶ 274, 313.)

In a case involving procedural injury, a plaintiff must allege that: "(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interest; and (3) it is reasonably

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 11-04846  SJO (MRWx)**        **DATE:  March 16, 2012**

probable that the challenged action will threaten their concrete interests."  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (alteration in original) (quoting *Citizens for Better Forestry*, 341 F.3d at 969-70).

The Government appears to concede that Plaintiffs have sufficiently alleged a procedural injury, but argues that the procedural injury is not connected to a "concrete interest" such that the procedural injury satisfies Article III's standing requirements.  The Government characterizes the "concrete interest" put forward in this case as Plaintiffs' interest in a particular form of supportive housing for veterans, and argues that this interest is not harmed by the DVA's decision to enter into ESAs rather than EULs.  (Mot. 4.)  Plaintiffs, however, allege that they have a concrete interest that property on the WLA Campus leased pursuant to ESAs be used for activities that benefit veterans - e.g., health-care resource sharing.  (Opp'n 8-9.)

Plaintiffs do have a concrete interest in how the WLA Campus is used.  The WLA Campus was created to benefit veterans.  (*See* Master Plan at 6 (WLA Campus was "donated to establish the Pacific Branch of the National Home for Disabled Veterans").)  Currently, the WLA Campus provides a "full continuum of medical services" to benefit veterans.  (Master Plan at 6.)  Plaintiffs have used and would like to continue to use the services provided at the WLA Campus.  (FAC ¶¶ 118-250.)  These interests are concrete.  Where the agency action complained of pertains to land-use decisions, Plaintiffs hoping to meet the "concrete injury" test "must allege that they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected by the [agency's] policy." *Citizens for a Better Forestry*, 341 F.3d at 971.  Here, the individual Plaintiffs are homeless veterans in the Los Angeles area who used, and would like to continue to use, the services at the WLA campus.  (FAC ¶¶ 118-250.)  Plaintiffs established a geographic nexus because they will suffer harm by virtue of their proximity to the WLA Campus if the land is not used for their benefit.  This is not a situation where Plaintiffs are veterans who live at the other end of the county from the WLA Campus with no intent or plan to use the services provided at the WLA Campus.

It is precisely these interests that the procedural rules sought to protect.  The explicit purpose of ESAs, which do not require the additional procedural requirements, is "to strengthen the medical programs at Department facilities and improve the quality of health care provided veterans . . . by authorizing the Secretary to enter into agreements with health-care providers in order to share health-care resources." 38 U.S.C. § 8151.  Any ESA that does not provide for sharing of health-care resources results in lost access to space and opportunities that benefit veterans.  Under EULs, the DVA must determine that the EULs "provide appropriate space for an activity contributing to the mission of [the DVA]" or the proceeds from EULs are used in a way that "would result in a demonstrable improvement of services to eligible veterans."  38 U.S.C.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 11-04846  SJO (MRWx)</u>        **DATE:** <u>March 16, 2012</u>

§ 8162(a)(2)(A)(I), (a)(2)(B).   The combination of these statutes makes crystal clear that Congress's intention was to ensure that the DVA's land was used primarily to benefit veterans.[6]

Finally, it is already demonstrated that the failure to abide by the procedures has resulted in injury to the concrete interest.  Plaintiffs were not given their procedural rights to comment on the proposed land-use agreements before they were executed, and as a result, land on the WLA Campus is being used in ways that do not benefit veterans.  "Plaintiffs alleging procedural injury 'must show only that they have a procedural right that, if exercised, *could* protect their concrete interest.'"  *Salmon Spawning*, 545 F.3d at 1226 (citation omitted).  If Plaintiffs had been provided notice of the proposed land-use leases or given an opportunity to participate in public hearings, they could have protected their interest in ensuring that the WLA Campus be used in a manner that benefits veterans.  It is true that no one knows for sure whether the existing land-use agreements would have been entered anyway even if the DVA had followed the EUL procedures; but absolute certainty in what decisions would have been reached had different procedures been followed is neither possible nor required.

The Government misses the mark in arguing that Plaintiffs do not have a **right** to permanent supportive housing.  In their APA claim, Plaintiffs are not seeking an injunction ordering the Government to provide permanent supportive housing.  Plaintiffs merely seek an injunction forbidding the Government from executing agreements as ESAs that do not concern sharing of health-care resources.  (FAC Req. for Relief.)  Because Plaintiffs have alleged both a substantive injury (that the land at the WLA Campus is not being used to benefit veterans) and a procedural injury coupled with a concrete interest (denial of notice and ability to comment, plus an interest in how the WLA Campus is used), Plaintiffs have met Article III's injury-in-fact requirement to establish standing to pursue their APA claims.

    b.    <u>Redressability</u>

In addition to the injury-in-fact requirement, Plaintiffs must also establish that their injury is likely to be redressed by a favorable court decision.  *Lujan*, 504 U.S. at 560-61.  "Only a person who has been accorded a procedural right to protect his concrete interest can assert that right without meeting all the normal standards for redressability and immediacy."  *Summers*, 555 U.S. at 496 (internal quotation marks omitted).

Where, as here, Plaintiffs allege procedural injury, the redressability requirement is relaxed.  For procedural injury, Plaintiffs "need not demonstrate that the ultimate outcome following proper procedures will benefit them."  *Cantrell v. City of Long Beach,* 241 F.3d 674, 682 (9th Cir. 2001).

---

[6] For land-use agreements entered into after 2008, Plaintiffs' substantive injury and threat to their concrete interest are the same - i.e., the WLA Campus is not being used for the benefit of veterans.  *See supra* Part II.B.1.a.i.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** **CV 11-04846  SJO (MRWx)**        **DATE:** **March 16, 2012**

Instead, "[p]laintiffs alleging procedural injury . . . need to show only that the relief requested - that the agency follow the correct procedures - may influence the agency's ultimate decision of whether to take or refrain from taking a certain action." *Salmon Spawning*, 545 F.3d at 1226-27; *see also Lujan*, 504 U.S. at 573 n.7 (noting that a plaintiff "living adjacent to the site for a proposed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will be withheld or altered."). Accordingly, Plaintiffs need not assert that the DVA's land-use agreements pursuant to EULs would have resulted differently - for instance, permitting activities that only benefit veterans. For the purpose of redressability, it is sufficient that the DVA's decision to lease property could have been influenced by a public hearing to address possible effects the proposed leases would have on services to veterans. *See* 38 U.S.C. § 8163(a).

The Government contends that even if Plaintiffs were injured by the DVA's decision to enter into ESAs - thereby depriving them of certain procedural protections that apply to proposed EULs - Plaintiffs' injury cannot be redressed by a favorable court decision because the DVA is now prohibited from entering into EULs. (Mot. 5.) Because the DVA is prohibited from using EULs, the Government asserts that Plaintiffs are not injured by the denial of procedural protections that Congress has now prevented the DVA from providing. (Mot. 5.)

The relief Plaintiffs seek under their APA claims is not that land-use agreements be executed as EULs going forward. (FAC Req. for Relief.) Rather, Plaintiffs seek: (1) a declaration that the existing land-use agreements entered as ESAs unrelated to sharing health-care resources are unauthorized by law or regulation; and (2) an injunction prohibiting the DVA from entering into ESAs in the future that do not concern the sharing of health-care resources. (FAC Req. for Relief.) "Redressability depends on whether the court has the ability to remedy the alleged harm." *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006). The Court has the ability to declare unlawful the current land-use agreements entered into pursuant to ESAs that do not relate to health-care resource sharing and to enjoin the Government from entering into future ESAs unrelated to health-care resource sharing. Such relief would free the land on the WLA Campus to be used to benefit veterans and thereby remedy Plaintiffs' asserted harm.

For the foregoing reasons, Plaintiffs have established the requirements for Article III standing.[7]

---

[7]  Because the individual Plaintiffs established constitutional standing, Plaintiff VVA has also established associational standing on behalf of its members.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth*, 528 U.S. at 181. Here, Plaintiff VAA's members have standing to sue in their own right, the interests at stake are germane to VAA's purpose to promote and support a full range of issues important to Vietnam

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846  SJO (MRWx)</u>          **DATE:** <u>March 16, 2012</u>

       2.    <u>Prudential Standing</u>

The Government contends that Plaintiffs lack prudential standing.  (Mot. 6-8.)  Under prudential standing, the Court must determine whether "a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit."  *City of Sausalito*, 386 F.3d at 1199.  Because the Veterans' Benefit Act does not provide for a private right of action, Plaintiffs' challenge to the DVA's decision to enter into certain land-use agreements must be brought under the APA.

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "Where no other statute provides a private right of action, the 'agency action' complained of must be '*final* agency action.'"  *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 61-62 (2004) (emphasis in original) (quoting 5 U.S.C. § 704).  The scope of the judicial review is explained in § 706:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall --
> (1)    compel agency action unlawfully withheld or unreasonably delayed; and
> (2)    hold unlawful and set aside agency action, findings, and conclusions found to be --
>     (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>     (B)    contrary to constitutional right, power, privilege, or immunity;
>     (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>     (D)    without observance of procedure required by law;
>     (E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>     (F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.  Notwithstanding this provision, a plaintiff "cannot seek *wholesale* improvements of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (emphasis in original).  The Government argues that Plaintiffs' APA

───────────────────────

veterans, and the relief requested does not require participation of individual members.  As such, Plaintiff VAA has established associational standing.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 11-04846  SJO (MRWx)</u>       **DATE:** <u>March 16, 2012</u>

claim is improper because they do not challenge agency actions that are discrete or final.  (Mot. 6-8.)

        a.     <u>Discrete Agency Action</u>

The Government argues that Plaintiffs lack prudential standing under the APA because they fail to allege a **discrete** agency action.  (Mot. 6.)  An agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  "All those categories involve circumscribed, discrete agency actions."  *SUWA*, 542 U.S. at 62.

The Government relies on *SUWA* to support its contention that Plaintiffs must allege a discrete agency action to have standing under the APA.  (Mot. 6.)  In *SUWA,* the Supreme Court held that an APA suit under § 706(1) to compel agency action unlawfully withheld or unreasonably delayed "can proceed only where a plaintiff asserts that an agency failed to take a *discrete agency* action that it is *required to take*."  *SUWA*, 542 U.S. at 64 (emphases in original).  "This interpretation effectively precludes enforcement of broad statutory mandates under section 706(1), insofar as a broad mandate typically is not one that requires discrete agency action."  *Public Lands for the People, Inc. v. U.S. Dept. of Agric.*, 733 F. Supp. 2d 1172, 1183 (E.D. Cal. 2010).

However, Plaintiffs bring their APA claim under § 706(2) not  § 706(1).  (FAC ¶ 314.)  The Government claims that the holding in *SUWA* is not limited to challenges brought pursuant to § 706(1), but it equally applies to challenges to final agency action brought pursuant to § 706(2). (Mot. 6 n.6.)  According to the Government, Plaintiffs lack prudential standing because the duty to provide permanent supportive housing is not a discrete duty that the DVA is required to take. (Mot. 6.)

The Court does not agree with the Government that *SUWA*'s holding applies to challenges to final agency actions brought pursuant to § 706(2).  Under § 706(2), a court reviews "the validity of the final agency action that was taken, not - as in *SUWA* - demanding that the agency take some action that it has not taken."  *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1119 (9th Cir. 2010).  A final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," which renders it invalid under § 706(2)(A), need not be a "discrete agency action" under *SUWA*, as the Government suggests.  *See id.*; *see also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681 n.10 (9th Cir. 2007) (finding that *SUWA* "is distinguishable from the instant case because [*SUWA*] dealt with the power of courts to 'compel agency action unlawfully withheld' under 5 U.S.C. § 706(1)[,]" whereas the petitioners challenge a final agency action under § 706(2)).

There are situations where a challenge to an agency action will prevail under § 706(2), but fail under § 706(1).  For example, a final agency action "could be arbitrary and capricious under section 706(2) for failing to analyze specific factors even though the omitted analysis could not

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 11-04846  SJO (MRWx)</u>          **DATE:**  <u>March 16, 2012</u>

separately be compelled under § 706(1) as an action that the agency was 'required to take.'" *Public Lands for the People*, 733 F. Supp. 2d at 1183-84 (citing *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 531 F.3d 1114, 1140 (9th Cir. 2008), *amended and superseded by Or. Natural Desert Ass'n*, 625 F.3d 1092).  There may be situations "where a statutory directive does not require action, [and then] the statute may be so 'broad' that it cannot be enforced under section 706(1) without being too broad to be enforced under section 706(2)." *Id.* at 1184.  Thus, the holding in *SUWA* is inapplicable to challenges under § 706(2)(A), and Plaintiffs do not need to allege a discrete agency action to pursue their claim.

Even if Plaintiffs were required to allege discrete agency actions, they have adequately done so. In their APA claim, Plaintiffs are not challenging the DVA's failure to provide permanent supportive housing.  Plaintiffs are challenging the DVA's decision to enter into specific land-use agreements pursuant to ESAs.  The specific land-use agreements to which Plaintiffs object constitute discrete agency action.

           b.    <u>Final Agency Action</u>

The Government also argues that to the extent Plaintiffs' APA claim is based on the VA GLA's Master Plan, Plaintiffs fail to allege that the Master Plan is a **final** agency action.  (Mot. 7.)  "The right of judicial review under the APA is limited to 'final agency action for which there is no other adequate remedy in a court.'"  *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 553 (9th Cir. 2009) (quoting 5 U.S.C. § 704).  Plaintiffs contend that the DVA violated its statutory mandate under the statutes authorizing ESAs when it executed land-use agreements for activities unrelated to health-care resource sharing.  (Opp'n 11.)

Here, Plaintiffs do not seek wholesale improvements of the DVA's programs through their APA claim.  Plaintiffs do not challenge the VA GLA's Master Plan in its entirety.  Rather, Plaintiffs contest specific land-use agreements between the DVA and private and commercial entities, which are referenced in the VA GLA's Master Plan.  (FAC ¶¶ 260-63; *see* Master Plan.)  An agency action is final if two conditions are met.  "First, the action must mark the consummation of the agency's decisionmaking process - it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation and quotation marks omitted).  The DVA's decisions are not tentative or interlocutory, but rather are finalized land-use agreements.  The DVA's execution of land-use agreements pursuant to ESAs fixes legal obligations between itself and its leasing partners. Because the ESAs are final and fix legal obligations between the DVA and private entities, these ESAs are final agency actions.  Plaintiffs challenge to the DVA's decision to enter into ESAs is sufficient to establish standing pursuant to § 706(2).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 11-04846 SJO (MRWx)**      **DATE: March 16, 2012**

Plaintiffs have established both constitutional and prudential standing. Because standing was the only ground on which the Government sought to dismiss Plaintiffs' APA claim, the Motion is **DENIED** as to claim 6.

    C.    <u>Plaintiffs' Charitable Trust Claims</u>

Plaintiffs' third, fourth, and fifth causes of action (the "charitable trust claims") are based on Plaintiffs' allegation that when Senator John P. Jones and Arcadia B. de Baker donated the land that is now the WLA Campus to the Government, a charitable trust was created for which disabled veterans are the beneficiaries and the Government is trustee.[8] (FAC ¶¶ 300-310.) Plaintiffs allege that under the terms of the charitable trust, the Government, as trustee, may only use the land at the WLA Campus for purposes that "directly contribute to the establishment and permanent operation of a home for disabled veterans." (FAC ¶ 301.) By using the land (and authorizing third parties to use the land) for other purposes, Plaintiffs claim the Government has breached its fiduciary duties as trustee. (FAC ¶ 302.)

The third cause of action alleges breach of fiduciary duty as trustee, the fourth cause of action seeks an accounting, and the fifth cause of action seeks mandamus relief. (*See generally* FAC.) The mandamus claim is pled in the alternative, on the theory that pursuant to the terms of the charitable trust, the Government has a non-discretionary fiduciary duty to use the land at the WLA Campus only for the purpose of housing disabled veterans. (Opp'n 14 n.7.) As relief, Plaintiffs seek an injunction requiring the Government to faithfully execute its obligations as trustee and to utilize the WLA Campus solely for purposes that directly relate to providing a home for disabled veterans or, in the alternative, an order mandating that the Government refrain from allowing the current uses of the WLA Campus not directly related to providing a home for disabled veterans to continue. (FAC Req. for Relief.) Plaintiffs also seek an injunction requiring an accounting of all profits received by the DVA or VA GLA as a result of the land-use agreements for the WLA Campus under which the land is used for any purpose not directly related to providing a home for disabled veterans. (FAC Req. for Relief.)

The Government presents four arguments why the Court should dismiss the charitable trust claims: first, Plaintiffs lack Article III standing for their charitable trust claims (Mot. 8); second, the charitable trust claims are barred by sovereign immunity (Mot. 8-10); third, the Court lacks jurisdiction, as the charitable trust claims do not present a federal question sufficient to invoke the Court's jurisdiction under 28 U.S.C. § 1331, and pendent jurisdiction under 28 U.S.C. § 1367 is not appropriate because the charitable trust claims are not sufficiently related to Plaintiffs' other

---

[8] Plaintiffs allege that the land was originally given to the National Home as trustee, and the DVA is the successor-in-interest to the National Home, and thus the DVA is the current trustee. (FAC ¶ 301.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 11-04846 SJO (MRWx)**      **DATE: March 16, 2012**

causes of action (Mot. 10-13); finally, Plaintiffs have simply failed to state a claim for breach of fiduciary duty (Mot. 17-20).  The Court will analyze each of these arguments in turn.

      1.    <u>Article III Standing</u>

As discussed above, Article III standing requires: (1) that the plaintiff have suffered an injury in fact; (2) that the injury was caused by defendant's conduct; and (3) that the injury is likely to be redressed by a favorable court decision. *Salmon Spawning*, 545 F.3d at 1225.  The Government contends that Plaintiffs have failed to establish redressability, because even if Plaintiffs prevailed on their charitable trust claims, the Government might not have sufficient funding to construct housing for disabled veterans.  (Mot. 8.)  And even if the Government did construct housing for disabled veterans as a result of this lawsuit, other disabled veterans may be found to be in greater need than the individual Plaintiffs in this action.  (Mot. 8.)

The Government also avers, without stating any supporting rationale, that Plaintiffs have failed to allege injury in fact.  (Mot. 8.)  Perhaps the Government seeks to rely on the same arguments it made with respect to the APA claim, although this is not made clear in the Government's brief. Plaintiffs, however, claim that the Government has impaired the trust assets by permitting land usage inconsistent with the purpose of the charitable trust, of which Plaintiffs are the beneficiaries. (FAC ¶ 302.) The Court finds that this allegation - that the assets of the trust (i.e., the land) have been misappropriated - is sufficient to satisfy Article III's injury-in-fact requirement.  Because the injury alleged is misappropriation of trust assets (as opposed to denial of housing), this injury can be remedied by an order requiring the Government to refrain from using the land for purposes not directly related to providing housing for disabled veterans.

Plaintiffs also allege the injury of not receiving housing at the WLA Campus, an injury Plaintiffs hope the Court will remedy by requiring the Government to provide such housing.  That the Government may not have sufficient funds to actually provide the housing if the Court requires it to do so is not sufficient to defeat the redressability requirement of Article III.  If it were, every defendant in every case could argue that it does not have the funds necessary to pay a potential judgment and thereby get the case against it dismissed on standing grounds.  In response to the Government's argument that other disabled veterans may receive the benefit of any housing that is built instead of the individual Plaintiffs in this action, Plaintiffs claim they are being denied even the chance to receive benefits from the charitable trust.  (Opp'n 19.)  Plaintiffs concede that if the Government establishes housing for disabled veterans on the WLA Campus, the individual Plaintiffs in this case might not receive that housing.  (Opp'n 19.)  However, if housing is built, Plaintiffs will at least be able to enter a queue for that housing, with the possibility of obtaining the housing benefit, based on whatever criteria the Government establishes for selection.  The ability to apply for housing redresses Plaintiffs' injury, even if the individual Plaintiffs are not actually granted the housing they seek.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846 SJO (MRWx)</u>    **DATE:** <u>March 16, 2012</u>

This situation is similar to *Regents of University of California v. Bakke*, 438 U.S. 265, 281 n.14 (1978). In *Bakke*, a white, male applicant who was rejected from the University of California at Davis Medical School sued the Regents of the University of California, arguing that the affirmative action program utilized by the admissions committee for the medical school at UC Davis was unconstitutional. *Id.* at 272-77. Several *amici* argued that the plaintiff lacked standing, as he could not prove that he would have been admitted to the medical school were it not for the affirmative action program. *Id.* at 281 n.14. The Supreme Court held that plaintiff's injury was his inability to compete on an even playing field for each spot in the medical school class. *Id.* Thus, even though plaintiff could not prove that he would have been admitted were it not for the affirmative action program, an order requiring the defendant to abandon its affirmative action program would remedy the injury by allowing the plaintiff to adequately compete for each spot in the medical school. *Id.* The Supreme Court found this sufficient to meet Article III's redressability requirement. *Id.* So too here, if the Government constructs housing for disabled veterans as a result of this lawsuit, the individual Plaintiffs will at least be permitted to apply for the housing, and thus their injury will have been sufficiently redressed for the purposes of Article III.

      2.   <u>Sovereign Immunity</u>

The parties do not dispute the general proposition that the United States cannot be sued without consent. (Mot. 8; Opp'n 16-17; *see United States v. Mitchell*, 445 U.S. 535, 538 (1980)). The parties also do not dispute that 5 U.S.C. § 702 includes a waiver of sovereign immunity. (Mot. 9; Opp'n 16-17.) The only dispute before the Court is whether the waiver of sovereign immunity contained in § 702 extends to Plaintiffs' charitable trust claims.

5 U.S.C. § 702 provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. It is well established that the second sentence of § 702, which Congress added in 1976, was intended to waive sovereign immunity. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 524 (9th Cir. 1989) (analyzing legislative intent in depth).

The Government contends that § 702 only waives sovereign immunity where a plaintiff challenges a "final agency action" or alleges a constitutional violation. (Mot. 9.) Thus, according to the Government, the waiver of sovereign immunity contained in § 702 does not extend to Plaintiffs' charitable trust claims, which arise under federal common law. (Mot. 9.) The Court disagrees.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** **CV 11-04846  SJO (MRWx)**        **DATE:** **March 16, 2012**

The Court begins, as it must, by analyzing the text of the statute.  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. . . .  [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  The text of § 702 does not contain the limitation urged by the Government.  Rather, § 702 is worded broadly - under its plain language, the statute waives sovereign immunity for any action alleging injury as a result of agency action (or inaction), so long as the suit does not seek money damages.  The Supreme Court has held that for the purposes of § 702, "complaints [for] declaratory and injunctive relief[] . . . [are] certainly not actions for money damages."  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  And it is undisputed that the instant lawsuit challenges the actions and inactions of the DVA, a federal agency.  Thus, under the plain meaning of § 702, the Government's waiver of sovereign immunity extends to this action.

Nevertheless, the Government argues that *Gallo Cattle Company v. U.S. Department of Agriculture*, 159 F.3d 1194, 1199 (9th Cir. 1998), stands for the proposition that § 702 only waives sovereign immunity if the lawsuit is challenging "final agency action" under 5 U.S.C. § 704.  The plaintiff in *Gallo Cattle*, a company involved in the production of cheese, filed a petition with the Secretary of Agriculture challenging on First Amendment grounds an assessment imposed on it by the National Dairy Promotion and Research Board.  *Id.* at 1196.  In its petition, plaintiff sought interim relief: that it be permitted to pay its assessment into an escrow account pending a decision on the merits of the petition.  *Id.*  The judicial officer acting for the Secretary of Agriculture denied the interim relief.  Thereafter, plaintiff filed an action in the Eastern District of California seeking review of the judicial officer's order denying interim relief.  The court held that the waiver of sovereign immunity contained in § 702 is limited by § 704's requirement that only final agency action is reviewable under the APA.  *Id.* at 1198.

The *Gallo Cattle* plaintiff's claim, however, arose under the APA, and was thus necessarily circumscribed by the limitations in § 704.  To read *Gallo Cattle* as imposing § 704's finality requirement on any case relying on the sovereign immunity waiver of § 702 would cause *Gallo Cattle* to conflict with *Presbyterian Church*.  In *Presbyterian Church*, plaintiffs sued the United States, the Department of Justice, the Immigration and Naturalization Services ("INS") and several INS officers for First and Fourth Amendment violations after INS agents conducted an investigation by wearing "body bugs" to church services without a warrant or probable cause that the surveillance would uncover criminal activity.  *Presbyterian Church*, 870 F.2d at 520.  The government argued that "§ 702's waiver of sovereign immunity applies only [to] 'agency action'" as defined by the APA, and that the investigatory action that was the subject of the lawsuit did not fit this definition.  *Id.* at 524-25.  The court rejected this argument, holding that the waiver of sovereign immunity in "§ 702 contains no such limitation.  On its face, the 1976 amendment is an **unqualified** waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable."  *Id.* at 525 (emphasis added).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 11-04846  SJO (MRWx)          DATE:  March 16, 2012**

In the instant case, the Government seeks to reconcile *Gallo Cattle* and *Presbyterian Church* by reading *Presbyterian Church* as narrowly as possible and then mashing the two holdings together. The Government contends that the sovereign immunity waiver in § 702 applies only to final agency action (as in *Gallo Cattle*) or alleged violations of constitutional rights (as in *Presbyterian Church*). (Mot. 9.)  The more principled way to reconcile the cases is to acknowledge that the claims in *Gallo Cattle* were brought under the APA, and were necessarily limited by § 704's requirement of finality.  Thus, the holding of *Gallo Cattle* is that for claims brought under the APA, the sovereign immunity waiver is no broader than the scope of allowable claims - challenges to final agency action.  Where the allegation is that the agency action violates another law - be it statutory, constitutional, or common law - the waiver of sovereign immunity is not so limited, but rather is the broad, unqualified waiver described in *Presbyterian Church* and suggested in the plain language of the statute.

Moreover, even if the waiver of sovereign immunity in § 702 only applied to the extent that the agency action complained of was "final" under § 704, Plaintiffs in this case have alleged final agency action.  Each of the land-use deals objected to is a final agency action, as discussed above.  For the foregoing reasons, the Court finds that Plaintiffs' charitable trust claims are not barred by sovereign immunity.

>           3.          Subject Matter Jurisdiction

The Government contends that none of the statutes cited by Plaintiffs vests this Court with jurisdiction to hear the charitable trust claims.  To establish jurisdiction, Plaintiffs cite 28 U.S.C. § 1331, which provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  The Government contends that Plaintiffs' trust claims do not allege a violation of the Constitution, any federal statute, regulation, or treaty, and therefore do not satisfy § 1331's requirement.   (Mot. 11.)

Plaintiffs argue that because their charitable trust claims allege violations of federal common law, § 1331 jurisdiction is appropriate. (Opp'n 12-13.) Indeed, the Supreme Court has held that § 1331 jurisdiction "will support claims founded upon federal common law as well as those of a statutory origin."  *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972); *see also Sarei v. Rio Tinto, PLC*, No. 02–56256, 2011 WL 5041927, at *9 (9th Cir. Oct. 25, 2011).  The Government, however, argues that there is no federal common law of charitable trusts, and Plaintiffs simply invoke the federal common law hoping that this Court will **create** federal common law, which is inappropriate here.  (Mot. 11-12.)

The Court does not believe it necessary to determine whether there exists an established federal common law of charitable trusts and, if not, whether it would be appropriate to create it.  Rather, the Court finds that jurisdiction is appropriate under § 1331 because the charitable trust claims implicate significant federal issues.  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  A charitable trust claim against the federal government will always require

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846  SJO (MRWx)</u>      **DATE:** <u>March 16, 2012</u>

an initial analysis of whether Congress has passed a statute agreeing to assume fiduciary duties as a trustee of the charitable trust.  *See infra* Part II.C.4.. It is appropriate to provide a federal forum to address these issues.

In *Grable*, the Internal Revenue Service ("IRS") seized real property belonging to the plaintiff to satisfy a tax deficiency.  *Grable*, 545 U.S. at 310.  Plaintiff received notice of the seizure by certified mail before the IRS sold the property to the defendant.  *Id.*  Five years later, plaintiff sued defendant in state court for quiet title, asserting that defendant's record title was invalid because plaintiff had not given proper notice of the seizure.  *Id.* at 311.  The applicable statute, 26 U.S.C. § 6335(a), provided that "notice in writing shall be given . . . to the owner of the property . . . or shall be left at his usual place of abode or business . . . ." 26 U.S.C. § 6335(a).  Plaintiff insisted that the statute required personal service, not service by mail.  *Grable*, 545 U.S. at 311; *see also Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699-700 (2006) (summarizing *Grable*).  Defendant removed the case to federal court, and the Supreme Court held that jurisdiction was proper even though the cause of action for quiet title arose under state law. *Grable*, 545 U.S. at 314-15.  The Supreme Court held that the issue of whether plaintiff had received adequate notice under the federal statute was "an essential element of [plaintiff's] quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case." *Grable*, 545 U.S. at 315.  Because the federal government has a "strong interest in the prompt and certain collection of delinquent taxes," the federal government also had a "direct interest in the availability of a federal forum to vindicate its own administrative actions."  *Id.*  (internal citations and quotation marks omitted).  Finally, the Supreme Court noted that it was the "rare state title case that raises a contested matter of federal law," and thus exercising federal jurisdiction in such cases "will portend only a microscopic effect on the federal-state division of labor." *Id.*

This is such a case.  As discussed in greater detail below, and as Plaintiffs concede (Suppl. Br. in Supp. of Opp'n 2), the federal government does not assume enforceable duties as trustee of a charitable trust absent statutory authorization.  *See Story v. Snyder*, 184 F.2d 454, 456 (D.C. Cir. 1950).  Thus, whether the federal government has in fact assumed any enforceable duties as trustee will always depend on an analysis of a federal statute.  In the instant case, Plaintiffs argue that the Government indicated its consent to assume enforceable duties as a trustee in 24 U.S.C. § 111, 14 Stat. 10 (1866), and the breach of these duties gives rise to the charitable trust claims in this case.  (Opp'n 14-15.)  Thus, an "essential element," *Grable*, 545 U.S. at 315, of Plaintiffs' charitable trust claims is whether the statute indicated Congress's intent to assume enforceable duties as trustee if it accepted donated land.  The meaning of this federal statute is in dispute.  (*Compare* Mot. 17-18, *with* Opp'n 14-15.)  Indeed, as in *Grable*, the federal question presented in this case - whether the Government is subject to enforceable trustee duties - is likely the **only** issue in dispute with respect to the charitable trust claims, as the parties do not appear to dispute that some portion of the land at the WLA Campus is not being used to directly benefit disabled veterans.  Moreover, the federal government has a strong interest in managing and operating its land and real property; consequently, it is appropriate to adjudicate in a federal forum the federal

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 11-04846  SJO (MRWx)          DATE:  March 16, 2012**

government's obligations with respect to land to which it has gained title via charitable donation. Finally, just as the number of state title cases affected by the *Grable* holding was small, so too here, the number of charitable trust cases affected by an exercise of jurisdiction is minuscule.  The only cases affected are those involving land grants to the federal government for charitable purposes.  The vast majority of charitable trust cases, including private charitable trusts, and charitable trusts with a state or municipality as trustee, will not similarly implicate a federal question.

Because the charitable trust claims implicate a significant federal issue - the circumstances in which the federal government assumes enforceable duties as trustee of a charitable trust - jurisdiction is appropriate under 28 U.S.C. § 1331.  The Court need not consider whether jurisdiction is appropriate under 28 U.S.C. § 1367.

> ### 4.     Failure to State a Claim

Plaintiffs allege that the 1888 Deed created a charitable trust and that the DVA, as the successor-in-interest to the National Home (the original grantee), holds the land in trust for the intended beneficiaries: disabled veterans.  (FAC ¶ 301.)  Plaintiffs allege that under the terms of the charitable trust, the land can only be used for purposes "that directly contribute to the establishment and permanent operation of a home for disabled veterans." (FAC ¶ 301.)  Finally, Plaintiffs allege that by authorizing other uses of the land at the WLA Campus, the Government has breached its fiduciary duties as trustee of the charitable trust.  (FAC ¶ 302.)

The Government argues that with respect to the charitable trust claims, Plaintiffs have failed to state a claim on which relief can be granted.  The Government argues: (1) that the instrument Plaintiffs claim created the charitable trust - the 1888 Deed - did not actually signal the grantors' intent to create a charitable trust, and thus no trust was created; and (2) no statute authorized the assumption of an enforceable fiduciary duty with respect to the land at the WLA Campus, and thus the Government cannot be forced to satisfy fiduciary duties it has not assumed.  (Mot. 17-20.)

///

///

> #### a.     Creation of a Charitable Trust

Among other methods, a trust may be created by a transfer, either by will or inter vivos, from a property owner to another person as trustee for one or more persons.  Restatement (Third) of Trusts § 10.  A trust is only created if the settlor properly manifests an intention to create a trust relationship.  Restatement (Third) of Trusts § 13.  If a trust is created, the trustee has certain duties to the beneficiaries, including a duty to administer the trust in accordance with its terms and a duty of loyalty.  *See* Restatement (Third) of Trusts §§ 76-84.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846 SJO (MRWx)</u>        **DATE:** <u>March 16, 2012</u>

The parties agree that the Government has the capacity to serve as trustee of a charitable trust. (Mot. 17.) However, there are several ways in which the Government, as trustee, is different than a private trustee. Ordinarily, "[a] trust can be created without notice to or acceptance by any beneficiary or trustee." Restatement (Third) of Trusts § 14. In contrast, "gifts to the United States which involve any duty, burden, or condition, or are made dependent upon some future performance by the United States, are not accepted by the Government unless by the express authority of Congress." *Story v. Snyder*, 184 F.2d 454, 456 (D.C. Cir. 1950). Although the federal government will not accept a conditional gift absent statutory authorization, Congress has seen fit to pass a number of statutes authorizing such gifts. Some of the statutes authorize the receipt of a specific, contemplated gift. *See, e.g.*, Act of Aug. 10, 1846, 9 Stat. 102 (accepting original gift of James Smithson to create the Smithsonian Institute). Other statutes apply proactively, accepting in advance all future donations for a particular purpose. *See, e.g.*, 10 U.S.C. § 2601 (authorizing acceptance of any gift to the armed forces for the purpose of benefitting a school, hospital, library, museum, cemetery or other institution of the armed forces); 2 U.S.C. § 156 (authorizing acceptance of gifts for the benefit of the Library of Congress).

The 1888 Deed that is central to the instant case included the following conditional language:

> Now therefore, in consideration of the premises and of the location, establishment, construction and permanent maintenance of a branch of said National Home for Disabled Volunteer Soldiers on such tract of land . . . , owners of [the property] do give and grant unto [the Government] all the following described land and premises . . . for the purpose of such branch Home for Disabled Volunteer Soldiers to be thereon located, established, constructed and permanently maintained.

(FAC Exs. 1, 2.) Contrary to the Government's assertions, the language in the 1888 Deed expresses far more than a **hope** on the part of the grantors that the land would be used for certain purposes; the 1888 Deed requires that the land be used as indicated for all time ("permanently maintain . . . ."). The 1888 Deed grants the land to the Government on the **condition** that the land is used to "construct[] and permanently maintain[]" housing for disabled veterans.

As explained above, the Government would not have been permitted to accept this grant without statutory authorization. *Story*, 184 F.2d at 456. In 1888, the Government did have statutory authority to accept the deed. The Government accepted the land that is now the WLA Campus pursuant to 24 U.S.C. § 111, 14 Stat. 10 (1866) (the "1866 Act"). The 1866 Act established the National Asylum for Disabled Volunteer Soldiers, "an establishment for the care and relief of the disabled volunteers of the United States army . . . ." 14 Stat. 10 § 1. The board of managers of the National Asylum was given authority to procure land to erect buildings to house disabled veterans. *Id.* at § 4. Critically, the 1866 Act also provided: "[T]he said board of managers are hereby authorized to receive all donations of money or property made by any person or persons for the benefit of the asylum, and to hold or dispose of the same for its sole and exclusive use." *Id.* at § 5. Thus, although the Government is not permitted to accept conditional gifts without

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 11-04846  SJO (MRWx)</u>          **DATE:** <u>March 16, 2012</u>

statutory approval, such approval was given to accept the 1888 Deed that transferred ownership of the land that is now the WLA Campus to the Government.

A host of cases have held that where a grantor gives money or property to the government for a charitable purpose, a charitable trust is established. For instance, in *United States v. Kingsley*, 194 A.2d 735, 742 (N.J. 1963), the court held that the federal government's acceptance of a bequest that the decedent specified was to be used "for the national defense of the country" created a charitable trust. *Story* acknowledges that the Library of Congress Trust Fund Board was authorized to accept donations in trust. *Story*, 184 F.2d at 455. And in *United States v. Cerio*, 831 F. Supp. 530, 535-36 (E.D. Va. 1993), the court held that a bequest to the United States Coast Guard Academy for the purpose of establishing a scholarship fund for graduating cadets "unmistakably create[d] a valid charitable trust."

The Government contends that the 1888 Deed did not seek to impose the duties of a trustee on the Government. (Mot. 18.) The Government believes that the relevant language in the 1888 Deed merely "explains the motivation for the land donation." (Mot. 18.) However, no "magic words" are needed to create a charitable trust. Restatement (Second) of Trusts § 24(2) ("No particular form of words or conduct is necessary for the manifestation of intention to create a trust.") The intent of the donor is the critical factor. "The intention of the parties to the deed should control the construction of the instrument. The object in construing a deed is to ascertain the intention of the parties, and especially that of the grantor, from the words which have been employed in connection with the subject-matter, and from the surrounding circumstances." *Aller v. Berkeley Hall School Found.*, 40 Cal. App. 2d 31, 35 (1940).[9] Moreover, charitable gifts are favored, and devises attempting to benefit charitable purposes will be liberally construed. "[B]ecause charitable bequests are favored, they will be upheld if one can possibly be construed as valid by applying liberal rules of construction designed to accomplish the intent of the trustor or testator." *Estate of Breeden*, 208 Cal. App. 3d 981, 985 (1989).

Through the 1888 Deed, the grantors gave the land to the Government for the benefit of disabled veterans. Pursuant to the 1866 Act, the Government had authorization to accept the gift and, indeed, did accept the gift. Because land was given to the Government for the purpose of benefitting a defined group of beneficiaries, a charitable trust was created, with the Government as trustee and disabled veterans as beneficiaries.

---

[9] Plaintiffs allege their charitable trust claims arise under federal common law, but the substance of this law can be borrowed from California law. (Opp'n 15.) The Government claims there is no federal common law of trusts, and the trust claims are creatures of state law. (Mot. 11.) Whichever side is correct, California state law is relevant to deciding whether the 1888 Deed indicated the grantors' intent to create a trust with the Government as trustee.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 11-04846  SJO (MRWx)        DATE:  March 16, 2012**

b.      Enforceable Duties of Trustee

The other critical difference between a trust where the Government is the trustee and a trust with a private entity as trustee - indeed, the difference that is decisive in this case - is the ability to enforce the trustee's duties.  "The United States or a State has capacity to take and hold property in trust, **but in the absence of a statute otherwise providing the trust is unenforceable against the United States or a State**."  Restatement (Second) of Trusts § 95 (emphasis added); *see also* Restatement (Second) of Trusts § 378 (same rule with respect to charitable trusts specifically).  Thus, unless the Government has signaled its agreement, via statute, to assume enforceable trustee duties, the "duties" it assumes as a trustee are non-enforceable.  As *Story* makes clear, the Government can have three possible relationships with respect to property donated for a charitable purpose: (1) in the absence of a statute authorizing acceptance of the conditional gift, the gift must be rejected; (2) if a statute authorizes the Government to accept the conditional gift but does not assume enforceable trust duties, the Government may accept the gift, a charitable trust will be created, but the obligations of trustee are unenforceable against the Government; and (3) if a statute authorizes the Government to accept the conditional gift and assumes enforceable trust  duties, the Government may accept the gift, a charitable trust will be created, and the Government may be sued for breach of its duties as trustee.

> [G]ifts to the United States which involve any duty, burden, or condition, or are made dependent upon some future performance by the United States, are not accepted by the Government unless by the express authority of Congress. . . .  And Congress has on many occasions not only accepted conditional gifts, but has provided means for the future acceptance and encouragement of special gifts to be devoted to particular purposes. . . . [I]n some instances Congress has been content to provide that the accepting and administering officials shall observe the terms and conditions of the gift.  In others, it has gone farther, and provided means whereby the donor can through court action compel the administering official or agency to observe the terms and conditions of an accepted gift.

*Story*, 184 F.2d at 456.[10]

---

[10]   The Government's refusal to assume enforceable trustee duties is distinct from the Government's assertion of sovereign immunity.  Sovereign immunity provides that the United States and the states, as sovereigns, cannot be sued without their consent, even if they would otherwise be liable.  The refusal to assume enforceable duties of a trustee, by contrast, means the Government has not agreed to assume any duty whose breach would give rise to liability.  If the Government fails to abide by the fiduciary obligations that would have been imposed on a private or municipal trustee, it is not only sovereign immunity that bars the suit, but also the fact that no duty was assumed and thus no duty has been breached.  Thus, even where the Government has waived sovereign immunity,

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**


**CASE NO.:  CV 11-04846  SJO (MRWx)**          **DATE:** **March 16, 2012**


With this framework in mind, the Court must examine the language of the 1866 Act to determine if, in addition to authorizing the acceptance of conditional gifts, the 1866 Act signaled Congress's intent to accept fiduciary duties as a trustee.  The Court finds that it does not.

Nowhere in the 1866 Act does Congress state that it will assume fiduciary duties, or that it takes on the duties of a trustee, or that failure to treat donated property in a manner consistent with the conditional donation will give rise to suit.  This brings the 1866 Act into contrast with other statutes where Congress has so provided.  For instance, 2 U.S.C. § 159 provides: "The [Library of Congress Trust Fund] board may be sued in the United States District Court for the District of Columbia, which is hereby given jurisdiction of such suits, for the purpose of enforcing the provisions of any trust accepted by it."  2 U.S.C. § 159.  The 1866 Act does not have similar language.

Plaintiffs rely primarily on the following language from 14 Stat. 10 § 5: "And the said board of managers [of the National Home] are hereby authorized to receive all donations of money or property made by any person or persons for the benefit of the [National Home], and to hold or dispose of the same **for its sole and exclusive use**."  14 Stat. 10 § 5 (emphasis added).  As discussed above, this language authorizes the receipt of conditional gifts.  In essence, this statute is a promise to grantors that if a gift is given to the National Home, the gift will be used to benefit the National Home.  Indeed, every statute authorizing the acceptance of conditional gifts makes such a promise.  But is this an enforceable promise?  Does this statutory language "go farther" and suggest that the Government assumes enforceable duties as a trustee with respect to any money or land donated?  The Court cannot stretch the language of this statute so far as to find that the Government intended to assume enforceable duties.  This is not a situation where Congress has "gone farther, and provided means" for enforcement of the trust duties.  *Story*, 184 F.2d at 456.  With respect to donations, the 1866 Act merely authorizes their acceptance, but does not assume fiduciary duties with respect to the donated property.

Plaintiffs' briefing attempts to conflate the issue of whether a charitable trust has been created with the issue of whether the Government has assumed enforceable fiduciary duties with respect to the beneficiaries.  Much of Plaintiffs' briefing argues that the 1888 Deed created a charitable trust.  Plaintiffs cite to numerous cases where donations to the Government were held to have created a charitable trust.  The Court agrees that this is such a case.  The creation of a charitable trust, however, does not establish that the Government has also assumed enforceable fiduciary duties with respect to that trust.

―――――――――――――――――――

there is no claim for breach of fiduciary duty if the Government has not accepted, and therefore not breached, a fiduciary duty.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 11-04846 SJO (MRWx)**          **DATE: March 16, 2012**

Plaintiffs concede that the Government may only accept conditional gifts pursuant to statutory authority. (Suppl. Br. in Supp. of Opp'n 2.) However, Plaintiffs' position is that the Government assumes enforceable fiduciary duties as trustee any time it accepts a gift pursuant to such a statute. Plaintiffs do not believe Congress is required to "go farther" and assume fiduciary duties; rather, Plaintiffs assert that assumption of those fiduciary duties is either not necessary or is implied in any statute accepting conditional gifts. Plaintiffs explain the crux of the issue succinctly:

> Under the Government's proposed rule of decision, a federal agency could, as here, accept a sizeable donation under an instrument that expressly conditions the transfer on the agency's commitment to use the property for specific purposes to benefit the public, but thereafter disclaim any obligation to honor that commitment unless Congress had explicitly authorized the agency to assume fiduciary obligations as to that [] property.

(Suppl. Br. in Supp. of Opp'n 1.) While this result may seem shocking, this is the result the law dictates, and Plaintiffs rely on nothing besides their incredulity to suggest otherwise.

i.    Plaintiffs' Authority - Federal Government as Trustee

The Court gave the parties leave to file additional briefing solely on the issue of charitable trusts. In granting this leave, the Court requested that the parties specifically address the issue: "If statutory, treaty, or regulatory authority is required [to enforce trust obligations against the Government], the degree of clarity required in the language of the statute, treaty, or regulation indicating the [G]overnment's intention to assume obligations as trustee." (Oct. 27th Order Req. Additional Br'g.) The Court also asked the parties to cite to any case enforcing trust obligations against the United States or a state. (Oct. 27th Order Req. Additional Br'g.) Despite being given leave to provide additional briefing on this issue in particular, Plaintiffs were unable to find a single case where fiduciary trust duties were enforced against the federal government.

In *Story*, plaintiff was a real estate broker who provided realty services to the Library of Congress Trust Fund Board. *Story*, 184 F.2d at 455. The plaintiff alleged that he procured a sale for the Library of Congress Trust Fund Board, but defendants - the individual members of the Board - refused to pay the customary commission. *Id.* The D.C. Circuit upheld the district court's dismissal of the case for lack of subject matter jurisdiction. *Id.* at 461. The court held that the language in the statute authorizing suit in federal court for breaches of the trust obligations did not authorize and provide a federal forum for all suits against the Library of Congress Trust Fund Board. *Id.* at 458-59. *Story* did not involve a party seeking to actually enforce trust obligations against the federal government. Moreover, *Story* involved a statute that by its explicit terms provides for suits to enforce the trust obligations, 2 U.S.C. § 159, and is therefore distinguishable from the instant case where the statute authorizing the acceptance of gifts does not so provide. Indeed, it was the *Story* court that noted the difference between statutes that merely authorize

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  CV 11-04846  SJO (MRWx)          **DATE:** March 16, 2012

conditional gifts and those statutes that "go[] farther" and provide means to force the government, through court action, to abide by the terms of the gift.  *Id.* at 456.

Plaintiffs also cite *United States v. Kingsley*, 194 A.2d 735, 742 (N.J. 1963).  In *Kingsley*, a decedent's will left his residuary estate (valued at $138,611.28) to the United States Government "to be used as the Government may see fit for the national defense of the country."  *Id.* at 736. When the State of New Jersey levied a tax on the estate, the federal government brought suit, claiming that the state of New Jersey was not entitled to impose a tax on the federal government. *Id.* at 737.  The *Kingsley* court held that the estate tax imposed by the New Jersey state government was not a tax on the federal government, but was a tax on the testator.  *Id.* 742. "[T]he tax is not on the property passing under the will, nor is it on the person receiving it.  The tax is the price laid upon the testator in return for the right of disposition."  *Id.* at 737.  Although *Kingsley* dealt with a charitable gift to the federal government, the case did not involve any party seeking to enforce trustee duties on the government, and it is therefore inapposite.

*United States v. Cerio*, 831 F. Supp. 530 (E.D. Va. 1993) is similarly unavailing.  In *Cerio*, a retired Coast Guard Captain left a testamentary gift to the United States Coast Guard Academy for the purpose of establishing a trust fund, the annual income of which was to be awarded to the graduating cadet who attains the highest grade point average in chemistry and physics. *Id.* at 531. However, the size of the gift was so large that each year, the proposed cadet would receive an award ranging from $65,000 to $130,000.  *Id.*  The Coast Guard believed that providing such a large gift to one cadet would disrupt its operations and interfere with the attainment of its goals. *Id.*  The federal government brought suit to modify the terms of the trust under the *cy pres* doctrine, seeking court permission to spread the award over multiple cadets.  *Id.*  The Court held that the *cy pres* doctrine permitted the Coast Guard to award the funds in a different manner, eliminating the result of one oversized monetary award to a single cadet, while still adhering to the testator's wish that the funds be used to award cadets who excelled in the sciences. *Id.* at 542-43.

The district court in *Cerio* did not analyze the statute that permitted the government to accept the conditional testamentary gift.  Importantly, in *Cerio* it was the **government** that decided to seek court relief before using the funds in a manner that diverged from the testator's directed use.  Had the government in *Cerio* operated under the framework explained in this order, it would have recognized that it was legally entitled to use the donated funds as it desired without seeking court relief.

The government's conduct in *Cerio* was admirable, if not legally necessary.  As the Court has explained, without a statute authorizing the acceptance of a conditional gift, the Government may not accept any gift that is conditioned on the Government's performance.  A statute that permits acceptance of a conditional gift but does not assume fiduciary duties is essentially an unenforceable promise that funds accepted pursuant to the statute will be used as the grantor desires.  And a statute that assumes enforceable fiduciary duties with respect to donated property

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** **CV 11-04846 SJO (MRWx)**       **DATE:** **March 16, 2012**

provides an avenue whereby the Government can be compelled to use the donated property in accordance with the wishes of the grantor. In *Cerio,* the government appears to have taken its unenforceable promise seriously, and sought the imprimatur of a court before using the funds in a different manner than described in the decedent's will. If the allegations of the FAC in the instant case are true, the Government has essentially ignored the unenforceable promise it made with respect to much of the donated land that is now part of the WLA Campus.

However, *Cerio* cannot be read to stand for the proposition that the Government assumes enforceable fiduciary duties simply by accepting land that is earmarked for a specific charitable purpose. The **court** in *Cerio* did not impose fiduciary duties on the government. (Indeed, the court permitted the government to use the donated property in a different manner than as the grantor required.) Rather, the **government** in *Cerio* decided it would honor its unenforceable promise and deviate from the express wishes of the grantor only with court approval. Plaintiffs in this case can hardly argue (and indeed, they have not) that the government's decision to seek court approval of its disposition of funds in *Cerio* amounts to a binding admission that it has assumed enforceable fiduciary duties in this case (or, more broadly, any time it accepts a gift to be used for charitable purposes).

ii.    <u>Plaintiffs' Authority - State Government as Trustee</u>

Because state governments are also sovereigns, the Court asked the parties to provide additional briefing on any case they found where a court enforced fiduciary trust duties on a state government. (Oct. 27th Order Req. Additional Br'g.) Plaintiffs' cases involving charitable donations to state governments do not support its position.

In *Big Sur Props. v. Mott*, 62 Cal. App. 3d 99, 102 (1976), a grantor donated real property to the State of California to "be used in perpetuity as a public park . . . ." The deed also provided:

> [N]o private right of way for vehicular travel or for the purpose of transporting, hauling or conveying timber, logs, tanbark or any other product produced by logging operations on privately-owned land shall ever be granted to any person, firm or corporation upon or across any portion of the property conveyed to Grantee by this deed. This provision shall not impair or affect Grantee's authority . . . to provide means of ingress to and egress from said real property to provide ready access thereto by the public.

*Id.* The petitioner in *Big Sur Props.* filed a petition for writ of mandate against the State Department of Parks and Recreation when petitioner's application for vehicular access across the donated land was denied. *Id.* at 102-3. The court upheld the lower court's denial of the petition on the ground that the terms of the charitable trust prohibited the vehicular access. *Id.* at 103. This case does not involve a party seeking to impose fiduciary trust duties against the state, and

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 11-04846  SJO (MRWx)          DATE:  March 16, 2012**

cannot be interpreted to mean that the state of California accepted enforceable trust duties when it accepted the deed conveying the land.

The case Plaintiffs cite that is most factually similar to the instant case is *Fitzgerald v. Baxter State Park Authority*, 385 A.2d 189 (Me. 1978).  In *Fitzgerald*, former Maine Governor Percival Proctor Baxter deeded to the state of Maine 201,018 acres of land for the establishment of Baxter State Park and sums in excess of $1.5 million for the care, operation, and maintenance of the park.  *Id.* at 191.  The deed conveyed the land to the state of Maine as trustee to hold the land in trust for the benefit of the people of Maine, subject to certain conditions on the use of the land.  Among other conditions, the deed provided that the premises "forever shall be kept in their natural wild state and as a sanctuary for wild beasts and birds . . . ." *Id.* at 193.  In 1974, Baxter State Park experienced a severe blowdown caused by natural conditions.  *Id.*  The State intended to implement a cleanup program to remove the dead and dying trees in the area.  *Id.*  Plaintiffs, Maine  citizens who frequented Baxter State Park, filed suit seeking an injunction of the cleanup process, arguing that the cleanup program approved by the state exceeded the terms of the trust.  *Id.* at 194-95.  The lower court issued an injunction providing that the defendant was prohibited from using heavy equipment to effect the blowdown cleanup, but that the clearance could continue without the use of heavy equipment and in such a manner as would not unduly disturb the terrain and natural environment.  *Id.* at 191.  The Maine Supreme Court upheld this injunction.

Although the Maine Supreme Court held that the state did have enforceable fiduciary duties to the public to abide by the terms of the trust, *id.* at 202, the case is distinguishable because the terms of the deed that created the trust were accepted by the Maine legislature via statute.  "The legislature, in 12 M.R.S.A. § 900 *et seq.* (1964), has created the Baxter State Park with enumerated statutory restrictions on use, duplicating those which Governor Baxter imposed in his deeds of trust." *Id.* at 195.  Thus, while the deed created the charitable trust, it was the statutes that made the fiduciary duties enforceable against the state.  In the present case, there is no analogous statute whereby the Government agreed to accept enforceable fiduciary duties.[11]

---

[11]  Both sides cite to cases involving land that the federal government holds in trust for Native American tribes.  *See, e.g., United States v. Navajo Nation*, 537 U.S. 488 (2003); *United States v. Mitchell (Mitchell I)*, 445 U.S. 535 (1980); *United States v. Mitchell (Mitchell II)*, 463 U.S. 206 (1983); *Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006); *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975).  The Court does not believe that these cases are directly controlling, especially given that, as has long been recognized, "Indian tribes occupy a unique status under our law." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 851 (1985).  In light of this unique status and the fact that trusts for the benefit of Native American tribes are generally created via congressional action as opposed to a charitable gift, the Court does not believe that the holdings from these cases are easily transferrable to cases not involving Native American tribes.  However, to the extent these cases are analogous or, at the very least,

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **CV 11-04846  SJO (MRWx)**          **DATE:**  **March 16, 2012**

Plaintiffs' other cited cases are less on point, as they do not involve private gifts given to a sovereign government for a charitable purpose. *See Day v. Apoliona*, 496 F.3d 1027 (9th Cir. 2007 (grant of land **from federal government** to State of Hawaii created enforceable trust obligations); *United States v. Swope*, 16 F.2d 215 (8th Cir. 1926) (grant of land **from federal government** to State of New Mexico created enforceable trust obligations); *In re Estate of Hart*, 151 Cal. App. 2d 271 (1957) (concerning land given to County of Los Angeles, a non-sovereign); *Cnty. of Solano v. Handlery*, 155 Cal. App. 4th 566 (2007) (concerning land given to County of Solano, a non-sovereign).

Thus, despite multiple rounds of briefing and instructions to brief particularly on this issue, Plaintiffs have been unable to find a single case, either state or federal, where a sovereign has been required to abide by fiduciary duties as a trustee.  This paucity of cases is certainly not the result of Congress's hesitancy to accept conditional gifts.  On the contrary, Congress has seen fit on a host of occasions to approve the acceptance of conditional gifts.  *See, e.g.*, 16 U.S.C. § 468c (National Trust for Historic Preservation in the United States); 2 U.S.C. § 156 (Library of Congress); 44 U.S.C. § 2112 (National Archives); 38 U.S.C. § 8303 (Veterans' Benefits); 10 U.S.C. § 2601 (Armed Forces).[12]

For the foregoing reasons, the Court finds that the Government has not assumed any enforceable fiduciary obligation with respect to the charitable trust that was created by the 1888 Deed.  Accordingly, the charitable trust claims (claims 3, 4, and 5) are dismissed without leave to amend.

///

///

       D.    Plaintiffs' Rehabilitation Act Claims

Plaintiffs bring two claims under section 504 of the Rehabilitation Act (the "Rehabilitation Act Claims").  First, Plaintiffs assert that the Government established policies that facially discriminate against Plaintiffs because of their disabilities by: (1) denying Plaintiffs admission to housing programs because of their mental illness; and (2) refusing to provide services that are necessary for Plaintiffs to access the care they need for their severe mental disabilities.  (FAC ¶ 116.) Second, Plaintiffs assert that the Government denied Plaintiffs meaningful access to services by its systematic failure to provide permanent supportive housing as a reasonable accommodation.

---

instructive on how trust obligations arise when the federal government is a trustee, these cases support the notion that the federal government only assumes fiduciary duties when it explicitly does so via congressional action.

[12]  A more complete list of statutes authorizing conditional gifts can be found in the appendix to *Story*, 184 F.2d at 461-62.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846  SJO (MRWx)</u>          **DATE:** <u>March 16, 2012</u>

(FAC ¶¶ 116-17, 297, 299.)  Under their meaningful access claim, Plaintiffs assert that they cannot access VHA services because they are individuals with severe mental disabilities who cannot complete applications or persist through intake processes without assistance.  (FAC ¶ 117.)  Under both claims, Plaintiffs seek the reasonable accommodation of permanent supportive housing.  (FAC Req. for Relief.)

The Government attacks Plaintiffs' Rehabilitation Act claims on two grounds.  First, with respect to both the facial discrimination and meaningful access claims, the Government argues the Veterans' Judicial Review Act ("VJRA"), 38 U.S.C. § 511, bars this Court's jurisdiction.  Second, the Government claims Plaintiffs failed to properly allege their facial discrimination claim.  (Mot. 13-17.)[13]

///

///

///

    1.    <u>The Veterans' Judicial Review Act</u>

Congress has provided exclusive channels for the review of the DVA's decisions regarding the provision of benefits to veterans:

> The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any such question shall be final and conclusive and

---

[13]  The Government, in a footnote, also argues that Plaintiffs have failed to state a valid claim for meaningful access. (Mot. 16 n.10.)  The Government argues that if Plaintiffs are attempting to force the DVA to provide a service it does not already provide (permanent supportive housing), this would constitute a fundamental alteration to the DVA's programs, an alteration Plaintiffs cannot compel through a section 504 lawsuit.  (Mot. 16 n.10.)  Plaintiffs counter that their meaningful access claim does not seek a new substantive benefit (permanent supportive housing) as such.  Rather, the failure to provide permanent supportive housing is an obstacle (akin to the lack of a wheelchair ramp) that prevents them from obtaining access to those benefits that the Government already provides.  (Opp'n 4.)  Because Plaintiffs are not seeking a new substantive benefit, but rather seek an accommodation to allow them to access a benefit already provided to other veterans and to which Plaintiffs are otherwise entitled, Plaintiffs have properly pled a valid meaningful access claim.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** __CV 11-04846  SJO (MRWx)__          **DATE:** __March 16, 2012__

may not be reviewed by any other official or by any court, whether by an action in
the nature of mandamus or otherwise.

38 U.S.C. § 511(a).  Thus, when a claimant files for benefits with the DVA, the Secretary shall
decide all questions of law and fact necessary to determine whether to provide the requested
benefits.  *Id.*  A claimant may appeal the denial of a benefits claim or other adverse decision to the
Board of Veterans Appeals ("BVA").  *Id.* § 7104.  The BVA's decisions are final decisions of the
Secretary, and once the Secretary makes a final decision the decisions may not be reviewed.  *Id.*
§ 511(a).[14]  The Government asserts that both the facial discrimination claim and the meaningful
access claim are barred by the VJRA.  (Mot. 13-14.)

Plaintiffs argue that § 511 applies only to individual benefit decisions, not systematic challenges
to the benefits system.  (Opp'n 5.)  Plaintiffs are not seeking (as the Government would have the
Court believe (Mot. 14)) review of individual determinations where the DVA rejected Plaintiffs'
claims for benefits.  Rather, Plaintiffs' Rehabilitation Act claims attack system-wide structures and
seek only prospective relief. (Mot. 5.)  Thus, Plaintiffs argue that § 511 does not bar this action.

The Court agrees with Plaintiffs that § 511 does not prevent this Court from entertaining
challenges to the structure of the DVA's benefits system.

> Section 511(a) does not give the [Secretary] *exclusive* jurisdiction to construe laws
> affecting the provision of veterans benefits.  Rather, it simply gives the [Secretary]
> authority to consider such questions when making a decision about benefits . . . and,
> more importantly for the question of [the district court's] jurisdiction, prevents district
> courts from reviewing the Secretary's decision once made.

*Broudy v. Mather*, 460 F.3d 106, 112 (D.C. Cir. 2006).  Under the rule as explained in *Broudy*, "the
Secretary is the sole arbiter of benefits claims and issues of law and fact that arise during his
disposition of those claims," but district courts still have jurisdiction to resolve disputes that affect
the provision of benefits "as long as the Secretary has not actually decided them in the course of
a benefits proceeding."  *Id.* at 114.[15]

In the instant case, Plaintiffs are not seeking review of an adverse determination on their claim for
benefits.   Indeed,  the  gist  of  the  Rehabilitation  Act  claims  is  that  without  the  reasonable

---

[14]  This rule is subject to certain exceptions not pertinent here.  *See* 38 U.S.C. § 511(b).

[15]  The Court acknowledges that other cases have disapproved of *Broudy*, and that other
circuits have read § 511 to bar a broader set of claims.  *See, e.g., Beamon v. Brown*, 125
F.3d 965, 974 (6th Cir. 1997).  In the absence of controlling authority from the United
States Supreme Court or the Ninth Circuit, the Court is convinced by the reasoning in
*Broudy*.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846  SJO (MRWx)</u>       **DATE:** <u>March 16, 2012</u>

accommodation urged by the lawsuit, Plaintiffs are unable "to challenge the conduct that caused the denial of access in the first place."  (Pls.' Suppl. Br. in Supp. of Opp'n 1.)  The same alleged denial of meaningful access to medical services also "effectively exclude[s] [Plaintiffs] from filing claims or receiving a 'decision' under [] § 511 regarding their denial of access."  (Pls.' Suppl. Br. in Supp. of Opp'n 2.)  Because the Secretary has not made a decision on individual Plaintiffs' benefits in the course of a benefits proceeding, the Court has jurisdiction to hear Plaintiffs' Rehabilitation Act claims.

       2.   <u>Validity of Plaintiffs' Facial Discrimination Claim</u>

Plaintiffs' first cause of action is for facial discrimination under the Rehabilitation Act.  Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).  To establish a violation of section 504, a plaintiff must show: "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance."  *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (internal citation omitted).  Here, the parties dispute whether Plaintiffs have properly alleged the third requirement for facial discrimination - i.e., whether Plaintiffs are denied benefits of the VA GLA program solely by reason of their disabilities.  (Mot. 15-16; Opp'n 3-4.)

Plaintiffs point to two types of system-wide decisions made by the VA GLA that allegedly facially discriminate against Plaintiffs solely by reason of their disabilities.  First, Plaintiffs allege that the VA GLA refuses Plaintiffs admission to housing programs currently offered because of Plaintiffs' severe mental disabilities or because they must take psychotropic medication to treat their severe mental disabilities.  (FAC ¶¶ 104, 116.)  Second, Plaintiffs contend that the VA GLA's refusal to provide permanent supportive housing operates as an effective denial of treatment to veterans with severe mental disabilities; but the VA GLA does provide treatment to veterans who do not have severe mental disabilities.  (FAC  ¶ 116.)  The Court will examine each of Plaintiffs' facial discrimination claims individually.

       a.   <u>Admission to Existing Housing Programs</u>

Currently, the VA GLA offers temporary shelter services through three types of programs: (1) the Domiciliary Residential Rehabilitation and Treatment Program ("Domiciliary") (FAC ¶ 104); (2) third party programs on the WLA Campus (FAC ¶ 106); and (3) the VA GLA's housing voucher program (FAC ¶¶ 113-14).  Plaintiffs allege that the VA GLA refuses Plaintiffs admission to the existing

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 11-04846  SJO (MRWx)          DATE:  March 16, 2012**

housing programs because of their severe mental disabilities or because they must take psychotropic medication to treat their mental disabilities.  (FAC ¶¶ 104, 116.)  Plaintiffs also contend that the VA GLA has not created alternative programs to veterans who are denied admission to existing programs because of the severity of their mental health disabilities.  (FAC ¶¶ 19, 116.)

The Government points out that the FAC does not specify any written policy, regulation, or decision that on its face discriminates against Plaintiffs.  (Mot. 16.)  Indeed, it is unclear how the VA GLA refused Plaintiffs admission to existing housing programs offered by the VA GLA.  If Plaintiffs' allegation of facial discrimination is based on the VA GLA refusing housing to individual Plaintiffs who sought housing benefits, then the VJRA would bar this Court's review of those individual benefits determinations.  *See supra* Part II.D.1.  If, on the other hand, Plaintiffs are alleging that the VA GLA has a rule or policy - whether written or unwritten, whether formal or informal - that individuals with severe mental illness or who are on psychotropic medication are not eligible for housing benefits, this allegation does not appear in the FAC.

Plaintiffs have not pointed to any policy, plan, regulation, or rule that is allegedly discriminatory on its face.  Thus, this case is unlike *Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002), the case upon which Plaintiffs rely to support their claim that the VA GLA's system-wide decision to refuse Plaintiffs admission to housing programs is facially discriminatory.  (FAC ¶ 19; Opp'n 3-4.)  In *Lovell*, 303 F.3d at 1046, the plaintiffs alleged that the State of Hawaii excluded certain disabled people from its health insurance programs on the basis of their disabilities.  The State of Hawaii had a fee-for-service ("FFS") Medicaid program.  *Id.* at 1045.  Persons eligible for this program had to have income no greater than 100% of the federal poverty level and assets not in excess of $2,000.  *Id.* at 1045.  The State eliminated its FFS program, except for aged, blind, or disabled individuals who otherwise qualified for the FFS program.  *Id.*  At the same time the State eliminated its FFS program, the State of Hawaii launched a new health insurance program called QUEST.  *Id.*  A person was eligible for QUEST benefits if their "income was no more than 300% of the federal poverty level, unless they were aged, blind, or disabled."  *Id.*  It was undisputed that the QUEST program categorically excluded individuals on the basis of their age, blindness, or disability.  *Id.* at 1053.  The Ninth Circuit held that "[w]hen viewed in relation to similarly situated nondisabled individuals, those disabled persons were denied QUEST coverage by the State solely because of their disabilities; that is, had they been nondisabled, they would have received QUEST coverage."  *Id.*

Plaintiffs assert that, like the disabled individuals in *Lovell*, they are explicitly excluded from participation in housing programs and other services offered by the VA GLA because of the severity and nature of their disabilities.  (FAC ¶ 19.)  However, *Lovell* does not stand for the proposition that any exclusion of a disabled individual is considered facial discrimination.  The *Lovell* court found that disabled people who otherwise qualify for health insurance were denied coverage because **the terms of the program categorically excluded** people with certain disabilities.  *See Lovell*, 303 F.3d  at 1053.  Here, Plaintiffs have not sufficiently alleged any

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 11-04846  SJO (MRWx)          DATE:  March 16, 2012**

categorical exclusion of disabled veterans from the VA GLA's housing program.  Moreover, Plaintiffs have not provided any explanation as to how disabled veterans have been denied participation in the VA GLA's housing programs.  Plaintiffs merely state that the VA GLA denies them access, without explaining whether this was a system-wide rule or whether Plaintiffs are merely alleging that their own individual attempts to obtain housing were denied for the reasons stated.  Accordingly, the Court finds that Plaintiffs have not sufficiently alleged that the VA GLA's housing program facially discriminates against Plaintiffs solely because of their disabilities.  Because this failure could potentially be remedied via amendment - for instance, if Plaintiffs can point to a rule or regulation (whether written or unwritten) that bars veterans with severe mental illness or who take psychotropic medication from obtaining housing provided by VA GLA - the Court will give Plaintiffs leave to amend this cause of action.

> b.     Refusal to Provide Permanent Supportive Housing

Plaintiffs argue that the VA GLA's refusal to provide the reasonable accommodation of permanent supportive housing to access necessary medical treatment for the severely mentally disabled, while providing other services that are necessary for the treatment of veterans who do not have severe mental disabilities, is facially discriminatory.  (FAC ¶ 19.)  The Government also asserts that Plaintiffs' facial discrimination claim is indistinguishable from their meaningful access claim because both claims identify permanent supportive housing as a reasonable accommodation necessary for the severely mentally disabled to access treatment.  (Reply 3.)

The difference between a facial challenge and a meaningful access challenge is straightforward.  A facial challenge under the Rehabilitation Act challenges a statute, rule, regulation, policy, or decision that **on its face** treats individuals with a disability less favorably than individuals who do not have the disability.  A meaningful access challenge asserts that a statute, rule, regulation, policy, decision, or system, **though neutral on its face**, deprives individuals with a disability meaningful access to benefits to which they would otherwise be entitled were it not for their disability.  Plaintiffs concede that this is the distinction.  (*See* Opp'n 3.)

With this dichotomy in mind, it is clear that Plaintiffs' allegation that they are being denied permanent supportive housing is a meaningful access claim, not a facial discrimination claim.  Nevertheless, Plaintiffs have decided to bring the claim as both a facial challenge (claim 1) and a meaningful access challenge (claim 2).  The VA GLA offers only temporary supportive housing; it does not offer permanent supportive housing as part of its services.  This catalog of available benefits is not facially discriminatory.  The VA GLA offers all veterans - including those with severe mental illness and those without - temporary supportive housing.  The VA GLA does not offer any veterans - neither those with severe mental illnesses nor those without - permanent supportive housing.  To the extent the facial discrimination cause of action (claim 1) is grounded in the denial of permanent supportive housing, the claim is merely a trumped-up meaningful access claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:  CV 11-04846  SJO (MRWx)          DATE:  March 16, 2012

Plaintiffs' true claim is that without permanent supportive housing, veterans with severe mental illness are unable to access the other health benefits the VA GLA provides.  (FAC ¶ 116; Opp'n 3-4 ("The remedy Plaintiffs seek under both [their facial discrimination and meaningful access] theories is the reasonable accommodations of PSH [permanent supportive housing], without which they cannot meaningfully access VHA services for which they are otherwise eligible . . . .").) While Plaintiffs may pursue this theory - that the refusal to provide permanent supportive housing constitutes a violation of the Rehabilitation Act - under their meaningful access claim (claim 2), this theory cannot support a claim for facial discrimination (claim 1).

The case on which Plaintiffs primarily rely to argue that their categorization of the absence of permanent supportive housing as facial discrimination - *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) - is readily distinguishable.  In *Rodde*, the plaintiffs challenged the closure of Rancho Los Amigos National Rehabilitation Center ("Rancho") under the Americans with Disabilities Act ("ADA").[16]  *Id.* at 993.  In *Rodde*, plaintiffs were Medi-Cal patients with special needs that required medical services offered at Rancho - the only county hospital that specialized in rehabilitation and the acute care of patients with chronic diseases.  *Id.* at 990.  The Ninth Circuit held that the county's "planned cutback specifically targets services for the disabled."  *Id.* at 997.  The court found that if the county closes Rancho, "it will reduce, and in some instances eliminate, necessary medical services for disabled Medi-Cal patients while continuing to provide the medical care required and sought by Medi-Cal patients without disabilities."  *Id.* at 998.  The reduction or elimination of medical services by "[e]liminating entirely the only hospital of six that focuses on the needs of disabled individuals . . . and that provides services **disproportionately required** by the disabled and available nowhere else in the [c]ounty" is facially discriminatory.  *Id.* at 997 (emphasis added).

As the fact pattern illustrates, *Rodde* was not the typical facial discrimination case.  In *Rodde*, there was no statute, regulation, or rule that was discriminatory on its face.  Nevertheless, the *Rodde* court held that the county's decision to eliminate a service that it knew was disproportionately required by the disabled and available nowhere else was facially discriminatory. This holding - that the conscious decision to eliminate an existing program disproportionately relied on by individuals with disabilities can constitute facial discrimination - illustrates the outer bounds of a potential facial discrimination claim.  To go one step further, as Plaintiffs argue, and hold that inaction - the failure to provide a service that is disproportionately needed by disabled individuals - constitutes facial discrimination would destroy the distinction between facial discrimination and denial of meaningful access.

---

[16]  While *Rodde* involved claims pursuant to the ADA, "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1046 n.11 (9th Cir. 1999).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**


**CASE NO.:  CV 11-04846  SJO (MRWx)**          **DATE:  March 16, 2012**


Unlike the plaintiffs in *Rodde*, Plaintiffs here do not allege that the VA GLA has reduced or eliminated once-offered services that are required to treat veterans with severe disabilities. Rather, Plaintiffs would like to **add** services that would improve the treatment for disabled veterans.  This is an important distinction.  Because Plaintiffs cannot point to any reduction or elimination of services that disproportionately affect disabled veterans, *Rodde* is factually distinguishable.  The Court finds that extending the holding in *Rodde* to the facts of this case would destroy the distinction between facial discrimination and denial of meaningful access. "Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance.  The [Rehabilitation] Act does not, however, guarantee the handicapped equal results . . . ."  *Alexander v. Choate*, 469 U.S. 287, 302-4 (1985) (internal citation omitted).

Here, all veterans are able to participate in the services provided by the VA GLA and all veterans are subject to the same temporary housing options.  Even though the addition of permanent supportive housing may provide disabled veterans better medical treatment, the VA GLA program does not facially discriminate against disabled veterans by excluding permanent supportive housing to all veterans.

Without Plaintiffs alleging a decision or policy that facially discriminates against veterans with severe mental disabilities, Plaintiffs' facial discrimination claim fails as a matter of law.

III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion, disposing of the claims as follows:

(1)   To the extent Claim One rests on the theory that there is a policy, rule, or regulation that on its face bars veterans with severe mental illness or who take psychotropic medication from obtaining an existing benefit offered by the VA GLA, the Claim is **DISMISSED WITH LEAVE TO AMEND**; to the extent Claim One rests on the theory that the Government fails to provide permanent supportive housing, the Claim is **DISMISSED WITHOUT LEAVE TO AMEND**;

(2)   The Motion is **DENIED** with respect to Claim Two;

(3)   Claims Three, Four, and Five are **DISMISSED WITHOUT LEAVE TO AMEND**;

(4)   The Motion is **DENIED** with respect to Claim Six.

IT IS SO ORDERED.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-04846  SJO (MRWx)</u>        **DATE:** <u>March 16, 2012</u>

VPC