STUART F. DELERY
Acting Assistant Attorney General

ANDRE BIROTTE JR.
United States Attorney
LEON W. WEIDMAN
Chief, Civil Division
ALARICE M. MEDRANO
(SBN 166730)
Assistant United States Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: (213) 894-0460
Facsimile: (213) 894-7819
E-mail: Alarice.Medrano@usdoj.gov

JUDRY L. SUBAR
Assistant Branch Director
ELISABETH LAYTON
Senior Counsel
KAREN S. BLOOM
KAREN P. SEIFERT
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20001
T: (202) 514-3183;F: (202) 616-8470
Email: Elisabeth.Layton@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY VALENTINI, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ERIC SHINSEKI, et al., <br> Defendants | ) Case No.: CV-11-04846-SJO-MRW <br> ) <br> ) CERTIFICATION OF THE <br> ) ADMINISTRATIVE RECORD <br> ) <br> ) <br> ) <br> ) [Before the Honorable James S. Otero] <br> ) <br> ) |

I, Ralph D. Tillman, do hereby declare:

1.    I am employed by the U.S. Department of Veterans Affairs ("VA"), and have served as the Chief of Communications And External Affairs for the Greater Los Angeles Healthcare System ("GLAHS") since November 2009 . From January 2000 to November 2009, I previously served as the Chief of Asset Management for GLAHS. During the timeframe January 2000 to January 2012 I've been a warranted VA Contracting Officer for the GLAHS. In that capacity as to VA's Enhanced Sharing Authority, I was authorized to enter into land use-related and other types of Enhanced Sharing Agreements ("ESAs") on VA's behalf, with sharing partners at VA's West Los Angeles ("WLA") campus. In that regard, my authority and responsibilities included conducting negotiations with potential sharing partners, including for contemplated land use ESAs on the WLA campus; determining with input from other VA personnel, whether VA should agree to enter proposed ESAs; and serving as VA's authorized signatory for consummated ESAs. I also assist with administering executed ESAs.

2.    I hereby certify that the attached administrative record, to the best of my knowledge, information, and belief, reflects the non-privileged information and materials (exclusive of information and materials that implicate the privacy of third parties, or that constitute or consist of confidential business information) considered by VA in reaching decisions to enter into each of the eleven ESAs identified in the administrative record as the subjects of that record.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: October 22, 2012

Ralph D. Tillman

1

# ADMINISTRATIVE RECORD

*Valentini v. Shinseki*
2:11-cv-04846

# ADMINISTRATIVE RECORD
## <u>TABLE OF CONTENTS</u>

I. Authorities and Guidance ...................................................................................000001

    A.  Selected Legal Authorities...........................................................................000002

    B.  Agency Guidance ........................................................................................000015

    C.  Reports to Congress ....................................................................................000089

    D.  Other Materials ..........................................................................................000140

II. Enhanced Sharing Agreements in Effect as of June 2011 ..................................000190

    A.  Brentwood School.......................................................................................000191
           1.  Proposal Documents ...............................................................000192
           2.  Agency Review Documents......................................................000196
           3.  Executed Agreement ...............................................................000247
           4.  Revenue Report .......................................................................000290

    B.  Rancho Santa Ana Botanical Garden...........................................................000292
           1.  Proposal Documents ...............................................................000293
           2.  Agency Review Documents......................................................000299
           3.  Executed Agreement ...............................................................000310

    C.  Sodexo Marriot Laundry Services, Inc. ......................................................000332
           1.  Proposal Documents ...............................................................000333
           2.  Agency Review Documents......................................................000336
           3.  Executed Agreement ...............................................................000340
           4.  Revenue Report .......................................................................000379

    D.  The Regents of University of California........................................................000382
           1.  Proposal Documents ...............................................................000383
           2.  Agency Review Documents......................................................000388
           3.  Executed Agreement ...............................................................000414
           4.  Revenue Report .......................................................................000445

    E.  The Salvation Army – Building 212 .............................................................000447
           1.  Proposal Documents ...............................................................000448
           2.  Agency Review Documents......................................................000451
           3.  Executed Agreement ...............................................................000459
           4.  Revenue Report .......................................................................000520

i

F.  The Salvation Army  – Building 207 ............................................................000522
        1.  Proposal Documents ............................................................000523
        2.  Agency Review Documents............................................000527
        3.  Executed Agreement ............................................................000585
        4.  Revenue Report ............................................................000610

G.  Twentieth Century Fox Television ............................................000612
        1.  Proposal Documents ............................................................000613
        2.  Agency Review Documents............................................000618
        3.  Executed Agreement ............................................................000647
        4.  Revenue Report ............................................................000666

H.  US Vets Initiative............................................................................000668
        1.  Proposal Documents ............................................................000669
        2.  Agency Review Documents............................................000754
        3.  Executed Agreement ............................................................000791

I.  Veterans Park Conservancy ............................................................000824
        1.  Proposal Documents ............................................................000825
        2.  Agency Review Documents............................................000829
        3.  Executed Agreement ............................................................000860

J.  Westside Breakers Soccer Club ............................................000877
        1.  Proposal Documents ............................................................000878
        2.  Agency Review Documents............................................000882
        3.  Executed Agreement ............................................................000894
        4.  Revenue Report ............................................................000916

K.  Westside Services ............................................................................000918
        1.  Proposal Documents ............................................................000919
        2.  Agency Review Documents............................................001010
        3.  Executed Agreement ............................................................001046

# I.
# AUTHORITIES AND GUIDANCE

# I.A.
# SELECTED LEGAL AUTHORITIES

Westlaw.

38 U.S.C.A. § 8152

Page 1

C

## Effective: January 23, 2002

United States Code Annotated Currentness
  Title 38. Veterans' Benefits (Refs & Annos)
    Part VI. Acquisition and Disposition of Property (Refs & Annos)
      Chapter 81. Acquisition and Operation of Hospital and Domiciliary Facilities; Procurement and Supply; Enhanced-Use Leases of Real Property
        Subchapter IV. Sharing of Medical Facilities, Equipment, and Information (Refs & Annos)
          → → § 8152. Definitions

For the purposes of this subchapter--

(1) The term "health-care resource" includes hospital care and medical services (as those terms are defined in section 1701 of this title), services under sections 1782 and 1783 of this title, any other health-care service, and any health-care support or administrative resource.

(2) The term "health-care providers" includes health-care plans and insurers and any organizations, institutions, or other entities or individuals who furnish health-care resources.

(3) The term "hospital", unless otherwise specified, includes any Federal, State, local, or other public or private hospital.

CREDIT(S)

(Added Pub.L. 89-785, Title II, § 203, Nov. 7, 1966, 80 Stat. 1373, § 5053, and renumbered Pub.L. 102-40, Title IV, § 402(b)(1), May 7, 1991, 105 Stat. 238; amended Pub.L. 102-54, § 14(f)(8), June 13, 1991, 105 Stat. 288; Pub.L. 103-210, § 3(b), Dec. 20, 1993, 107 Stat. 2497; Pub.L. 104-262, Title III, § 301(b), Oct. 9, 1996, 110 Stat. 3191; Pub.L. 107-135, Title II, § 208(e)(8), Jan. 23, 2002, 115 Stat. 2464.)

Current through P.L. 112-174 (excluding P.L. 112-140, 112-141, and 112-166) approved 9-20-12.

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

38 U.S.C.A. § 8153

Page 1

C

**Effective: January 4, 2011**

United States Code Annotated Currentness
  Title 38. Veterans' Benefits (Refs & Annos)
    Part VI. Acquisition and Disposition of Property (Refs & Annos)
      ⤷ Chapter 81. Acquisition and Operation of Hospital and Domiciliary Facilities; Procurement and Supply; Enhanced-Use Leases of Real Property
        ⤷ Subchapter IV. Sharing of Medical Facilities, Equipment, and Information (Refs & Annos)
          →→ **§ 8153. Sharing of health-care resources**

**(a)(1)** To secure health-care resources which otherwise might not be feasibly available, or to effectively utilize certain other health-care resources, the Secretary may, when the Secretary determines it to be in the best interest of the prevailing standards of the Department medical care program, make arrangements, by contract or other form of agreement for the mutual use, or exchange of use, of health-care resources between Department health-care facilities and any health-care provider, or other entity or individual.

**(2)** The Secretary may enter into a contract or other agreement under paragraph (1) if such resources are not, or would not be, used to their maximum effective capacity.

**(3)(A)** If the health-care resource required is a commercial service, the use of medical equipment or space, or research, and is to be acquired from an institution affiliated with the Department in accordance with section 7302 of this title, including medical practice groups and other entities associated with affiliated institutions, blood banks, organ banks, or research centers, the Secretary may make arrangements for acquisition of the resource without regard to any law or regulation (including any Executive order, circular, or other administrative policy) that would otherwise require the use of competitive procedures for acquiring the resource.

**(B)(i)** If the health-care resource required is a commercial service or the use of medical equipment or space, and is not to be acquired from an entity described in subparagraph (A), any procurement of the resource may be conducted without regard to any law or regulation that would otherwise require the use of competitive procedures for procuring the resource, but only if the procurement is conducted in accordance with the simplified procedures prescribed pursuant to clause (ii).

**(ii)** The Secretary, in consultation with the Administrator for Federal Procurement Policy, may prescribe simplified procedures for the procurement of health-care resources under this subparagraph. The Secretary shall publish such procedures for public comment in accordance with section 1707 of title 41. Such procedures shall permit all responsible sources, as appropriate, to submit a bid, proposal, or quotation (as appropriate) for the resources to be procured and provide for the consideration by the Department of bids, proposals, or quotations so submitted.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(iii)** Pending publication of the procedures under clause (ii), the Secretary shall (except as provided under subparagraph (A)) procure health-care resources referred to in clause (i) in accordance with all procurement laws and regulations.

**(C)** Any procurement of health-care resources other than those covered by subparagraph (A) or (B) shall be conducted in accordance with all procurement laws and regulations.

**(D)** For any procurement to be conducted on a sole source basis other than a procurement covered by subparagraph (A), a written justification shall be prepared that includes the information and is approved at the levels prescribed in section 3304(e) of title 41.

**(E)** As used in this paragraph, the term "commercial service" means a service that is offered and sold competitively in the commercial marketplace, is performed under standard commercial terms and conditions, and is procured using firm-fixed price contracts.

**(b)** Arrangements entered into under this section shall provide for payment to the Department in accordance with procedures that provide appropriate flexibility to negotiate payment which is in the best interest of the Government. Any proceeds to the Government received therefrom shall be credited to the applicable Department medical appropriation and to funds that have been allotted to the facility that furnished the resource involved.

**(c)** Eligibility for hospital care and medical services furnished any veteran pursuant to this section shall be subject to the same terms as though provided in a Department health care facility, and provisions of this title applicable to persons receiving hospital care or medical services in a Department health care facility shall apply to veterans treated under this section.

**(d)** When a Department health care facility provides hospital care or medical services, pursuant to a contract or agreement authorized by this section, to an individual who is not eligible for such care or services under chapter 17 of this title and who is entitled to hospital or medical insurance benefits under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.), such benefits shall be paid, notwithstanding any condition, limitation, or other provision in that title which would otherwise preclude such payment to such facility for such care or services or, if the contract or agreement so provides, to the community health care facility which is a party to the contract or agreement.

**(e)** The Secretary may make an arrangement that authorizes the furnishing of services by the Secretary under this section to individuals who are not veterans only if the Secretary determines--

**(1)** that veterans will receive priority under such an arrangement; and

**(2)** that such an arrangement--

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(A)** is necessary to maintain an acceptable level and quality of service to veterans at that facility; or

**(B)** will result in the improvement of services to eligible veterans at that facility.

**(f)** Any amount received by the Secretary from a non-Federal entity as payment for services provided by the Secretary during a prior fiscal year under an agreement entered into under this section may be obligated by the Secretary during the fiscal year in which the Secretary receives the payment.

**(g)** The Secretary shall submit to the Congress not later than February 1 of each year a report on the activities carried out under this section during the preceding fiscal year. Each report shall include--

**(1)** an appraisal of the effectiveness of the activities authorized in this section and the degree of cooperation from other sources, financial and otherwise; and

**(2)** recommendations for the improvement or more effective administration of such activities.

CREDIT(S)

(Added Pub.L. 89-785, Title II, § 203, Nov. 7, 1966, 80 Stat. 1374, § 5053; amended Pub.L. 91-496, § 4, Oct. 22, 1970, 84 Stat. 1092; Pub.L. 93-82, Title III, § 303, Aug. 2, 1973, 87 Stat. 195; Pub.L. 94-581, Title I, § 115(a)(1), Title II, §§ 206(c), 210(e)(11), Oct. 21, 1976, 90 Stat. 2852, 2859, 2865; Pub.L. 96-151, Title III, § 304, Dec. 20, 1979, 93 Stat. 1096; Pub.L. 97-295, § 4(95)(A), Oct. 12, 1982, 96 Stat. 1313; Pub.L. 98-160, Title VII, § 702(20), Nov. 21, 1983, 97 Stat. 1010; Pub.L. 99-576, Title II, § 231(c)(1), Oct. 28, 1986, 100 Stat. 3264; Pub.L. 101-366, Title II, § 202(b), Aug. 15, 1990, 104 Stat. 438; renumbered § 8153, Pub.L. 102-40, Title IV, § 402(b)(1), May 7, 1991, 105 Stat. 238; amended Pub.L. 102-54, § 14(f)(9), June 13, 1991, 105 Stat. 288; Pub.L. 102-83, § 4(a)(3), (4), (b)(1), (2)(D), (E), Aug. 6, 1991, 105 Stat. 404, 405; Pub.L. 103-210, § 3(c), Dec. 20, 1993, 107 Stat. 2498; Pub.L. 104-262, Title III, § 301(c), (d)(1), Oct. 9, 1996, 110 Stat. 3191 to 3193; Pub.L. 105-114, Title IV, § 402(d),(e), Nov. 21, 1997, 111 Stat. 2294; Pub.L. 106-419, Title IV, § 404(b)(2), Nov. 1, 2000, 114 Stat. 1866; Pub.L. 108-170, Title IV, § 405(d), Dec. 6, 2003, 117 Stat. 2063; Pub.L. 111-350, § 5(j)(8), Jan. 4, 2011, 124 Stat. 3850.)

Current through P.L. 112-174 (excluding P.L. 112-140, 112-141, and 112-166) approved 9-20-12.

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

38 C.F.R. § 17.142

Page 1

C

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 38. Pensions, Bonuses, and Veterans' Relief
    Chapter I. Department of Veterans Affairs
    (Refs & Annos)
      🖳 Part 17. Medical (Refs & Annos)
        🖳 Delegations of Authority
          → **§ 17.142 Authority to approve sharing agreements, contracts for scarce medical specialist services and contracts for other medical services.**

The Under Secretary for Health is delegated authority to enter into

(a) Sharing agreements authorized under the provisions of 38 U.S.C. 8153 and § 17.210 and which may be negotiated pursuant to the provisions of 41 CFR 8–3.204(c);

(b) Contracts with schools and colleges of medicine, osteopathy, dentistry, podiatry, optometry, and nursing, clinics, and any other group or individual capable of furnishing such services to provide scarce medical specialist services at Department of Veterans Affairs health care facilities (including, but not limited to, services of physicians, dentists, podiatrists, optometrists, nurses, physicians' assistants, expanded function dental auxiliaries, technicians, and other medical support personnel); and

(c) When a sharing agreement or contract for scarce medical specialist services is not warranted, contracts authorized under the provisions of 38 U.S.C. 513 for medical and ancillary services. The authority under this section generally will be exercised by approval of proposed contracts or agreements nego-

tiated at the health care facility level. Such approval, however, will not be necessary in the case of any purchase order or individual authorization for which authority has been delegated in § 17.99. All such contracts and agreements will be negotiated pursuant to 41 CFR Chapters 1 and 8.

(Authority: 38 U.S.C. 512, 513, 7409, 8153)

[45 FR 6938, Jan. 31, 1980; 61 FR 21965, May 13, 1996; 62 FR 17072, April 9, 1997]

SOURCE: 54 FR 34978, Aug. 23, 1989; 57 FR 31015–31018, July 13, 1992; 57 FR 38610, Aug. 26, 1992; 57 FR 41701, Sept. 11, 1992; 59 FR 28265, June 1, 1994; 59 FR 49579, Sept. 29, 1994; 59 FR 53355, Oct. 24, 1994; 61 FR 21965, May 13, 1996; 70 FR 71774, Nov. 30, 2005; 73 FR 65553, Nov. 4, 2008; 74 FR 30228, June 25, 2009; 75 FR 69883, Nov. 16, 2010, unless otherwise noted.

AUTHORITY: 38 U.S.C. 501, and as noted in specific sections.

38 C. F. R. § 17.142, 38 CFR § 17.142

Current through October 4, 2012; 77 FR 60802

© 2012 Thomson Reuters.
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Pub. L. No. 110-161, Section 224, 121 Stat. 1844 (2007)

SEC. 224. PROHIBITION ON DISPOSAL OF DEPARTMENT OF VETERANS AFFAIRS LANDS AND IMPROVEMENTS AT WEST LOS ANGELES MEDICAL CENTER, CALIFORNIA. (a) IN GENERAL.—The Secretary of Veterans Affairs may not declare as excess to the needs of the Department of Veterans Affairs, or otherwise take any action to exchange, trade, auction, transfer, or otherwise dispose of, or reduce the acreage of, Federal land and improvements at the Department of Veterans Affairs West Los Angeles Medical Center, California, encompassing approximately 388 acres on the north and south sides of Wilshire Boulevard and west of the 405 Freeway. (b) SPECIAL PROVISION REGARDING LEASE WITH REPRESENTATIVE OF THE HOMELESS.—Notwithstanding any provision of this Act, section 7 of the Homeless Veterans Comprehensive Services Act of 1992 (Public Law 102–590) shall remain in effect. (c) CONFORMING AMENDMENT.—Section 8162(c)(1) of title 38, United States Code, is amended— (1) by inserting ''or section 224(a) of the Military Construction and Veterans Affairs and Related Agencies Appropriations Act, 2008'' after ''section 421(b)(2) of the Veterans' Benefits and Services Act of 1988 (Public Law 100–322; 102 Stat. 553)''; and (2) by striking ''that section'' and inserting ''such sections''. (d) EFFECTIVE DATE.—This section, including the amendment made by this section, shall apply with respect to fiscal year 2008 and each fiscal year thereafter.

**P.L. 105-368, Section 707:**

## SEC. 707. MASTER PLAN REGARDING USE OF DEPARTMENT OF VETERANS AFFAIRS LANDS AT WEST LOS ANGELES MEDICAL CENTER, CALIFORNIA.

(a) REPORT.—The Secretary of Veterans Affairs shall submit to Congress a report on the master plan of the Department of Veterans Affairs relating to the use of Department lands at the West Los Angeles Department of Veterans Affairs Medical Center, California.

(b) REPORT ELEMENTS.—The report under subsection (a) shall set forth the following:

(1) The master plan referred to in that subsection, if such a plan currently exists.

(2) A current assessment of the master plan.

(3) Any proposal of the Department for a veterans park on the lands referred to in subsection (a), and an assessment of such proposals.

(4) Any proposal to use a portion of these lands as dedicated green space, and an assessment of such proposals.

(c) ALTERNATIVE REPORT ELEMENT.—If a master plan referred to in subsection (a) does not exist as of the date of the enactment of this Act, the Secretary shall set forth in the report under that subsection, in lieu of the matters specified in paragraphs (1) and (2) of subsection (b), a plan for the development of a master plan for the use of the lands referred to in subsection (a) over the next 25 years and over the next 50 years.

Shell Lake Municipal Airport, Shell Lake, WI.

A recently-completed boundary survey of the airport found that a privately-owned structure encroaches onto land owned by the airport. This finding has resulted in a proposal to transfer the affected parcel of airport land to the neighboring owner in exchange for that owner transferring a parcel of its own land to the airport. Release of the 0.101 acre parcel from land assurances would allow the encroaching structure to remain standing. The parcel to be acquired by the airport in the land exchange (0.021 acres) would give the airport ownership of a key parcel of land located within the 14 CFR part 77-defined, primary surface of Runway 14/32.

A categorical exclusion for this land release action was prepared by Wisconsin Dept. of Transportation–Bureau of Aeronautics and issued on February 28, 2011.

The aforementioned land is not needed for aeronautical use, as shown on the Airport Layout Plan. There are no impacts to the airport by allowing the airport to dispose of the property.

The parcel to be released was originally acquired with local funds in 1961. To compensate for the uneven exchange of land area (0.101 acres to be released by the airport vs. 0.021 acres to be acquired by the airport), the airport will receive $1,000 in additional compensation to be used at the airport for maintenance and/or improvement purposes.

In accordance with section 47107(h) of title 49, United States Code, this notice is required to be published in the **Federal Register** 30 days before modifying the land-use assurance that requires the property to be used for an aeronautical purpose.

**DATES:** Comments must be received on or before July 25, 2011.

**ADDRESSES:** Mr. Daniel J. Millenacker, Program Manager, Federal Aviation Administration, Airports District Office, 6020 28th Avenue South, Room 102, Minneapolis, MN 55450–2706. Telephone Number (612) 713–4350/Fax Number (612) 713–4364. Documents reflecting this FAA action may be reviewed at the following locations: Federal Aviation Administration, Minneapolis Airports District Office, Delta F Building, 7200 34th Ave. So., Suite B, Minneapolis, MN 55450; or at the Wisconsin Department of Transportation, 4802 Sheboygan Ave., Room 701, Madison, WI 53707.

**FOR FURTHER INFORMATION CONTACT:** Mr. Daniel J. Millenacker, Program Manager, Federal Aviation Administration,

Airports District Office, 6020 28th Avenue South, Room 102, Minneapolis, MN 55450–2706. Telephone Number (612) 713–4350/Fax Number (612) 713–4364. Documents reflecting this FAA action may be reviewed at the following locations: Federal Aviation Administration, Minneapolis Airports District Office, Delta F Building, 7200 34th Ave. So., Suite B, Minneapolis, MN 55450; or at the Wisconsin Department of Transportation, 4802 Sheboygan Ave., Room 701, Madison, WI 53707.

**SUPPLEMENTARY INFORMATION:** Following is a description of the subject airport property to be released at Shell Lake Municipal Airport in Shell Lake, Wisconsin and described as follows:

Parcel of land in Government Lot 3, Section 36, T38N, R13W, 4th Principal Meridian extended, City of Shell Lake, Washburn County, Wisconsin.

Said parcel subject to all easements, restrictions, and reservations of record.

Issued in Minneapolis, MN on May 31, 2011.

**Steven J. Obenauer,**

*Manager, Minneapolis Airports District Office, FAA, Great Lakes Region.*

[FR Doc. 2011–15744 Filed 6–22–11; 8:45 am]

**BILLING CODE 4910–13–P**

---

## DEPARTMENT OF VETERANS AFFAIRS

### West Los Angeles VA Medical Center Veterans Programs Enhancement Act of 1998; Master Plan

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final Notice.

**SUMMARY:** On January 19, 2011, the Department of Veterans Affairs (VA) published a notice in the **Federal Register** inviting public comment on the Draft Master Plan (DMP) for the West Los Angeles VA Medical Center. This document responds to the public comments received and affirms as final, with no changes, that Draft Master Plan.

**FOR FURTHER INFORMATION CONTACT:** For Master Plan issues, contact Ralph Tillman, Chief of Communications and External Affairs, Greater Los Angeles Healthcare System (00PA), Department of Veterans Affairs, 11301 Wilshire Boulevard, Los Angeles, CA 90073. Telephone: (310) 268–3340 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:** In a notice published on January 19, 2011 [76 FR 3209], VA presented its Draft Master Plan for the West Los Angeles VA Medical Center campus (hereafter "WLA campus") of the VA Greater Los Angeles Healthcare System (VA

GLAHS), and solicited public comment on the DMP for a period of 30 days. The purpose of the DMP was to satisfy the legislative mandate of the Veterans Programs Enhancement Act of 1998 regarding "a master plan for the use of the lands * * * over the next 25 years and over the next 50 years." This is a land use plan that guides the physical development of the campus to support its mission of patient care, teaching, and research. The plan reflects legislative restrictions on the property and discusses developmental goals and design objectives for the campus. The plan includes guidelines and criteria for land use and reuse on the campus, which provides a variety of services including inpatient and outpatient medical care, rehabilitation, residential care, mental health care and long-term care services. In addition, the campus serves as a center for medical research and education.

We received 29 comments on the DMP. All of the comments opposed at least one portion of the DMP. The majority of comments included one or more of the following topics: homeless housing for veterans on the WLA campus, existing land use, bicycle access within or through the campus, and the plan's level of detail regarding specific projects. The subject matter of most of the comments can be grouped into several categories, and we have organized our discussion of the comments accordingly.

### Comments Concerning Homeless Housing

There were a number of comments regarding how the DMP addressed homeless housing for veterans, particularly permanent housing on the grounds of the WLA campus. A single commenter expressed concern that increasing services to homeless veterans would negatively impact the surrounding community, stating that the VA already attracts "homeless pedestrians" who "offend customers by requesting donations." The eradication of homelessness among veterans has been deemed a priority mission by Secretary Shinseki, and it is only in pursuing that mission that vagrancy problems are likely to be eliminated. We therefore make no change based on this comment.

The majority of commenters believed the DMP should address the increased need for housing and services by veterans who are homeless. The DMP did address this issue, under the heading, "Community Care/Homeless Programs." (p. 38) This section details the numbers of emergency shelter beds (55), transitional housing beds (1,500),

Department of Housing and Urban Development (HUD) Section 8 permanent housing vouchers (940), and community residential beds for veterans with chronic disabilities (300). In addition, under the heading, "Domiciliary Residential Rehabilitation and Treatment," the plan describes the existing 321-bed facility, which houses both male and female veterans and provides coordinated, integrated, rehabilitative, and restorative mental health care in a residential program. (p. 38)

Several commenters expressed concern that plans to renovate Building 209 were not sufficient to meet the need for homeless veterans housing. Citing a pressing need and possible cost efficiencies, several commenters suggested that Buildings 205 and 208 be renovated at the same time as building 209. The DMP states that Buildings 205, 208, and 209 have been identified for potential renovation, to serve as housing for homeless veterans. As stated in the DMP, VA "* * * does not commit to any specific project, construction schedule, or funding priority." As projects are further evaluated and authorized, both the needs of the veterans and the historical and environmental impacts of the projects will be considered. We therefore make no change based on this comment.

Some commenters suggested that VA was negligent in its responsibility towards homeless veterans, specifically stating that VA GLAHS was remiss in not providing shelter. In response, we note that VA GLAHS has one of the most recognized programs in the nation for serving homeless veterans, called the Comprehensive Homeless Center. The Comprehensive Homeless Center has many components dedicated to providing shelter for homeless veterans including: access to extended residential care for veterans with serious mental health and medical problems through the aforementioned VA GLAHS Domiciliary, which has 321 beds; case management of over 1,500 veterans with mental health issues living independently in the community through the HUD–VA Supported Housing Program; case management of approximately 300 veterans with a diagnosis of mental illness in board and care and assisted living facilities; same-day access to primary care, mental health care, and housing placement at the centralized screening clinic; and specialty dual diagnosis housing programs for veterans with both mental health and substance abuse issues. In particular, we note that VA operates a widely recognized transitional housing program on the WLA campus, where

approximately 1,200 community transitional housing beds have been secured for homeless veterans. Veterans in transitional housing programs stay for 3-to-18 months while receiving a range of medical, mental health and rehabilitative services; a high percentage of veterans who complete this transitional housing program move on to independent housing.

In addition, the Comprehensive Homeless Center helps homeless veterans develop the skills they need to find jobs that will keep them off the streets. Homeless veterans are provided access to vocational rehabilitation and job-finding programs through private agencies with funding provided by the VA and the Department of Labor's Homeless Veterans Reintegration Program.

The Comprehensive Homeless Center has an active outreach program. Great efforts are made to locate homeless veterans at homeless congregating areas like shelters and rescue missions. Outreach efforts also include area jails for incarcerated homeless veterans.

Because VA GLAHS is already providing these extensive programs to end homelessness among veterans, we make no changes based on these comments.

One commenter was concerned with the fact that the WLA campus has a zero-tolerance policy toward alcohol and drug use on campus, and how that policy affects our programs for homeless veterans.

Substance abuse is a persistent and recurring issue among homeless veterans, especially those coping with mental health problems such as PTSD. The WLA campus is a drug- and alcohol-free campus, and as such does not support a "housing first" model of care. The "housing first" approach provides housing for individuals regardless of whether or not they are currently abusing drugs and/or alcohol. This model differs from traditional approaches that require clients to reach a certain level of functioning through treatment before receiving long-term housing. In order to maintain a substance-free campus for the benefit of veterans undergoing treatment, VA GLAHS partners with various off-campus organizations and agencies throughout Greater Los Angeles to safely house and work with veterans who fall within the "housing first" criteria. We therefore make no change based on this comment.

**Comments on Existing Land Use Agreements**

A number of commenters expressed concerns regarding existing land use

agreements on the WLA campus. These commenters listed the various agreements, and called for the cancellation of all agreements with "* * * all commercial, non-profit, special-interest, non-Veteran entities," expressing the belief that these agreements were a misappropriation of veterans land. The approved Capital Asset Realignment Enhanced Services (CARES) plan, which included public participation, allowed for retaining existing Enhanced Sharing Agreements (ESA) until their respective expiration. It is expected that renewal of these ESAs, as well as any new ESAs will need to adhere to the guiding principles and criteria set forth in the DMP, once the DMP is finalized. Furthermore, each of the existing agreements was executed pursuant to and in accordance with 38 U.S.C. 8151–8153 (commonly referred to as VA's enhanced sharing authority). The existing agreements benefit the veterans' community in some way. For example, the ESA with the University of California at Los Angeles (UCLA) that covers the Jackie Robinson Memorial Stadium provides veterans' organizations such as the American Legion with access to athletic facilities, as well as providing free admission to veterans for all home baseball games.

We also received comments regarding the Veterans Park Conservancy (VPC) agreement. These commenters each brought up a misperception that the VPC agreement will create a park for the public and not for veterans. To clarify, the Veterans Memorial Park exists and is being used for the benefit of veterans, to enhance and support patient-centered care, recreation therapy and mental health programs and staff. The area will have limited public access, as does the rest of the WLA campus. There was concern expressed by one commenter regarding Megan's Law, should children be present on the campus where veterans who are convicted sex offenders may reside. Again, the campus is a place for veterans to heal, and is not available for traditional public use. The development of a Veterans Memorial Park does not in any way change the local policy on public use of the grounds. Megan's Law applies the same today as it will when the VPC project is completed.

One commenter stated that the "inclusion of the State Veterans Home as Federal VA land in all maps" was not consistent with the DMP, which states that 13.5 acres were transferred to the State of California via a quitclaim deed for the use of the State Veterans Home. The acreage in question was in fact deeded to the State of California in March 2007. The transfer took place

prior to congressionally imposed restrictions on the use of the 388 acres composing West LA, *i.e.* Section 224 (a) of the Consolidated Appropriations Act, 2008, Public Law 110–161. The section of the DMP that covers Zone 2, the zone that borders the State Veterans Home, contains a map that reflects this transfer and defines the Zone as "up to the new California State Veterans Home." The 13.5 acre area on which the State Veterans Home is located is not included as within the boundary of Zone 2, as it is in fact State property. (pg. 28)

We also received comments about the parking lot at Barrington Park, which is under the jurisdiction and control of, and operated by, the City of Los Angeles. Some commenters reported that potentially homeless individuals sleep in cars and other vehicles overnight in the lot. As that parking lot is not within VA's jurisdiction and control, we make no change to the DMP due to this information.

We received one comment regarding the Army Reserve area adjacent to the west side of the south area of the WLA campus. Specifically, the commenter asked whether this area will become VA property, should the Army Reserve no longer have need for this area. The land was part of an inter-agency transfer of property to the U.S. Corps of Engineers in 1955. VA does not have a legal interest in the disposition of that property. Therefore, we make no change in the DMP due to this comment.

## Comments That the DMP Lacks Specificity

There were a number of comments regarding the specific details of projects and land use programs addressed in the DMP. The DMP is a general use plan, and is inherently not project-specific.

Commenters sought more detail on the heights of buildings, the operating hours of projects once completed, the distance from proposed project sites to residential homes, square footage of projects, cost projections, environmental and historical impact, and many other project-specific details.

As stated in the plan, VA "does not commit to any specific project, construction schedule, or funding priority." As projects are further evaluated and authorized, both the needs of the veterans and the historical and environmental impacts of the projects will be considered. Several of these comments were in regard to the specific prioritization and timeline for conversion of Buildings 205, 208 and 209.

One commenter expressed concern that the DMP inhibited new programs

on the WLA campus by creating a "maze of redundant processes and unnecessary roadblocks to Veteran-friendly development." The DMP incorporates legislative decisions such as Public Law 100–322, section 421(b) (2), which restrict development with respect to public-private partnerships. VA GLAHS will abide by the guidelines and criteria set forth in the DMP with respect to land use opportunities that provide direct benefit for veterans.

One commenter was concerned that the DMP did not advance the CARES plan, expressing that the CARES process should have included a needs assessment of all under-utilized and vacant asset on the WLA campus. A needs assessment was indeed performed during the CARES process, during VA's subsequent Strategic Capital Investment Planning (SCIP) process, and preparation of the DMP, to identify the assets that can be redirected to better serve the needs of veterans. Therefore, we make no changes based on these comments.

## Concerns That the DMP Fails To Abide by Restrictions of the 1888 Deed

Several commenters felt that the 1888 deed granting the West Los Angeles land formed a charitable trust that requires VA, as trustee of the purported trust, to maintain a National Home for Veterans. Some of these commenters felt that the DMP was a violation of that purported trust by suggesting the land be used for purposes other than housing veterans. VA disagrees with the assertion that the 1888 deed rendered VA a charitable trustee for the WLA campus. The 1888 deed contained certain language expressing the donor's desire that a National Home for Veterans (NHV) be built on the underlying property that was donated to the United States, which land is now under VA's jurisdiction and control. The donor's desire, while merely an expression of purpose and intent of the donation, has been satisfied, as a NHV was built on the WLA campus. Notably, the NHV still exists on the campus.

Moreover, in *Farquhar* v. *United States*, 912 F.2d 468 (9th Cir. 1990), descendents of the original land donors previously challenged the ability of the United States to transfer a portion of the land donated under the 1888 deed. In denying the descendants' position, the U.S. Court of Appeals for the Ninth Circuit held that the creation of the NHV (*i.e.*, the Pacific Branch of the National Home for Disabled Volunteer Soldiers) in the same year that the land was originally deeded to the United States, satisfied the donor's desire (*i.e.*,

purpose and intent) for donating the land to the United States.

Based on the foregoing, we make no change based on this comment.

## Comments on Transit Services and Traffic Issues

Several commenters weighed in on transit services and traffic issues, particularly regarding potential bicycle access on the WLA campus and on the grounds of the Los Angeles National Cemetery. The majority of these comments expressed a desire to include in the DMP access that reflects "* * *the needs of the cycling community." Several commenters expressed a desire to use the National Cemetery as a thoroughfare for cyclists. While we would encourage certain of our veterans to cycle for their health, to encourage cycling on campus and on National Cemetery property would almost exclusively benefit the public, and not veterans. The additional traffic and security concerns that would accompany any increase in cycling activity, combined with the fact that it is not primarily of benefit to veterans, makes including this kind of access for cycling on campus undesirable; however, as projects are further developed and approved, this issue will be further evaluated through VA's compliance with the National Environmental Policy Act (NEPA), 42 U.S.C. 4321, *et seq.* Therefore, we make no changes to the DMP based on these comments.

We also received comments seeking more information on the proposed Los Angeles County Metropolitan Transit Authority (Metro) Purple Line expansion, which eventually will travel the length of Wilshire Boulevard to Santa Monica. As mentioned in the DMP, (pg. 28) the project is in the initial planning phase and there are no details to provide. Metro has proposed building a station on the WLA campus as part of this expansion project and has identified a few locations that might serve its needs. However, any such station affecting the campus would be subject to applicable law and statutory restrictions, and must not interfere with the VA GLAHS priority of maintaining the peaceful and healing environment of our health care campus.

One commenter asked if the VA would "cooperate with the surrounding governmental jurisdictions to complete traffic studies and provide traffic mitigation for the increased traffic" that may result from any increased land use. As stated in the DMP, traffic, parking, and circulation studies will be conducted as part of VA's compliance with NEPA. (pg. 18) Though the WLA

campus is under the jurisdiction of the Federal Government. Federal agencies generally consider State and local zoning laws and codes when undertaking any new project. We therefore make no change based on these comments.

**Comments on the Need for Separate Facilities for Female Veterans**

One commenter expressed concern that separate supportive housing was not available for female veterans and their children. To clarify, there is dedicated housing for women veterans as part of our Domiciliary Residential Rehabilitation and Treatment Program facility, located on the north campus in Buildings 217 and 214. The program serves male and female veterans with mental health issues such as substance abuse and/or combat trauma.

While there is no specific on-campus housing for female veterans with children, VA GLAHS has an extensive network of off-campus providers who meet this need through HUD–VA Supported Housing and Grant and Per Diem programs throughout Los Angeles County and neighboring counties. VA GLAHS's Comprehensive Homeless Center also includes a dedicated outreach team for homeless female veterans. VA GLAHS has adequate programs in place to meet the housing needs of women veterans with children.

A commenter stated that there was a need for a separate facility dedicated to the general healthcare needs of female veterans. The VA GLAHS's Women Veterans Health Program has dedicated clinicians, programs and facilities to meet the unique needs of female veterans in a safe, women-only environment. Services offered include gynecology services, breast exams and mammography, reproductive health care, and menopause treatment. Additionally, mental health services including treatment for post-traumatic stress disorder and substance abuse are also available for women. Through the Women Veterans Health Program, VA GLAHS provides female veterans the health care and mental health services they need in a safe and supportive, women-only environment. We therefore make no change based on this comment.

**Comments on the National Cemetery Administration Columbarium Project**

There were several comments seeking clarification regarding the National Cemetery Administration's columbarium project. The U.S. Department of Veterans Affairs is comprised of three administrations: the Veterans Health Administration, the Veterans Benefits Administration, and

the National Cemetery Administration. The columbarium enables VA to support the provision of Federally guaranteed benefits offered by the Veterans Benefits Administration and the National Cemetery Administration. One commenter expressed dismay that the project would lower surrounding real estate values. Another commenter felt that the columbarium project was depriving living veterans of land that might be converted to housing for the homeless. Again, the burial benefits offered veterans are entitlements provided by the Federal Government. The land designated for columbaria does not contain any structures that have been identified as potential homeless housing, so the use of the land for columbaria does not in any way deprive homeless veterans of potential living space. As projects such as the columbarium are further evaluated and authorized, both the needs of the veterans and the historical, environmental, and socio-economical impacts of the projects will be considered.

Some commenters wanted to know the exact location of the columbarium. Regarding requests for specific details regarding the size, hours of operation, and access points for this potential project that is only a concept at this stage, VA has not finalized details beyond the information that was contained in the DMP. The NEPA process is complete. The draft Environmental Assessment was released for public comment with none received. The resultant Finding of No Significant Impact was signed on February 2, 2011. We make no change to the DMP due to these comments.

**Comments About Including the Public in the Planning Process**

Several commenters expressed concerns that the public was not being afforded adequate time to offer input on the DMP during the public comment process. The **Federal Register** process in which VA GLAHS engaged to obtain comments from veterans and the public is the most public and transparent process available for including veterans and the public in the development of this DMP. Additionally, the DMP that was published on January 19, 2011, fully incorporates the approved CARES plan, which included a series of public hearings and meetings as part of its approval process. The DMP is also consistent with the recently released SCIP. Finally, VA GLAHS has ongoing meetings with Veteran Service Organizations, community groups, and other local stakeholders, at which

recurring updates on land use at the WLA campus are provided.

Several commenters suggested that a new DMP be created. We have reviewed these comments, and while we respect the opinions of the individual commenters, VA is of the position that this DMP, once finalized, will address the mandate and meet the criteria to be submitted and serve as a final Master Plan for the WLA campus. Therefore, we make no changes based on these comments. As projects outlined in the Master Plan are further evaluated and authorized, both the needs of the veterans and the historical, environmental, and socio-economical impacts of the projects will be considered. Details of these projects will be developed and released to the public for comment through VA's compliance with NEPA.

*Comments That the DMP Serves the Needs of the Community Over Those of Veterans*

There were several comments to the effect that the DMP serves the needs of outside interests over those of veterans. Particularly, these comments referenced a misperception that the agreement with Veterans Park Conservancy would result in the development of a "public park." This DMP provides for land use and reuse for the direct benefit of veterans, and puts in place guidelines and criteria that will assure the land is used to support the mission of offering the highest quality health care, research, education and disaster response to serve the needs of veterans and the community. The 10 Guiding Principles of the DMP clearly state the criteria that VA GLAHS will use in considering any land use or reuse, (p. 24) and none of these 10 principles reflects serving the community as a priority. While the WLA campus does exist within a community and VA GLAHS is proud to be a part of encouraging healthy communities, serving the needs of the community never takes precedence over serving the needs of the veterans. Therefore, we make no change based on these comments.

*Comments That the DMP Does Not Address Therapeutic Recreation Areas for Veterans*

We received several comments regarding recreation for Veterans on campus. Specifically, these commenters wanted to see the development of more outdoor sports facilities for veterans, such as a fitness center and tennis courts, *etc.*

The DMP addressed both planned recreation areas for veterans and green space where veterans can engage in

therapeutic outside activities. A fitness and recreation area, completed in 2010, is located adjacent to the west side of Building 500. It includes machines and stations where veterans can work out at their own pace, as well as a padded surface for a safe area for less ambulatory veterans to get exercise. It is open every day from dawn until dusk.

Regarding outside recreation activities, VA GLAHS continues the long tradition of having a golf course on campus for veterans. The course, operated by United States Veterans Initiative (U.S. Vets), is open from sun-up to sun-down 7 days a week, and Veteran residents and inpatients receive first priority for play. The Veteran community has second priority, finally followed by the general public as space is available. VA also has beneficial use of the athletic facilities at the Brentwood School and MacArthur Field as part of the land use agreements for those spaces.

A planned future recreational and therapeutic area for veterans is provided for under the agreement with Veterans Park Conservancy. The development of a Veterans Memorial Park will be designed in coordination with VA patient-centered care, recreation therapy and mental health programs and staff. An initial phase of the project, the historic Rose Garden, will be completed in fall of 2011. This area, located just across the street from the Domiciliary, will include meditative gardens, tables for chess and checkers, and soothing fountains, making it a space ideal for both for recreational and therapeutic use. Also on the north campus is the

Japanese Garden, a peaceful environment with lush plants, waterfalls, and Koi fish for veterans to enjoy. Finally, on the south campus, adjacent to the American Red Cross facility, there are walking trails, succulent gardens and colorful native plants for veterans, as well as loved ones staying in the Fisher House, to enjoy year-round.

The agreement with UCLA for the Jackie Robinson Stadium includes free admission to home baseball games for veterans.

Physical Therapy and Recreation Therapy programs also exist to provide veterans with unique recreation experiences in a safe and supportive environment. Through these programs, veterans are able to participate in skiing, surfing, and compete in the Golden Age Games each year.

We believe that the DMP adequately addressed therapeutic recreation opportunities for veterans. Therefore, we make no changes based on these comments; however, as projects are further evaluated and authorized, opportunities to provide additional recreational areas to veterans may be considered as part of VA's compliance with NEPA.

*Comments Regarding the Legality of Sharing Agreements*

Two commenters challenged VA's authority to use ESAs as a contracting vehicle for land use programs on the WLA campus. ESAs are legally authorized under 38 U.S.C. 8153, a Federal statute that deals with VA land sharing agreements. All existing

agreements have been legally reviewed and approved at local and national levels, and all future agreements will follow the same approval process. Therefore, we make no changes based on these comments.

*Conclusion*

For the foregoing reasons, we adopt the DMP without change as the Master Plan for the West Los Angeles VA Medical Center. The Master Plan is available at *http://
www.losangeles.va.gov/*. The Master Plan conforms to the relevant laws in effect on the date of publication. A change in law, such as the Administration's proposed Civilian Property Realignment Act, could impact this property. If these laws change, VA will update the Master Plan accordingly.

*Signing Authority*

The Secretary of Veterans Affairs, or designee, approved this document and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs. John R. Gingrich, Chief of Staff, Department of Veterans Affairs, approved this document on May 19, 2011, for publication.

**William F. Russo,**

*Deputy Director, Office of Regulation Policy and Management, Office of the General Counsel, Department of Veterans Affairs.*
[FR Doc. 2011–15739 Filed 6–22–11; 8:45 am]

**BILLING CODE P**

# I.B.
# AGENCY GUIDANCE

Department of Veterans Affairs                                                          **VHA DIRECTIVE 97-015**
Veterans Health Administration
Washington, DC 20420                                                                    March 12, 1997

## ENHANCED HEALTH CARE RESOURCES SHARING AUTHORITY

**1. PURPOSE:** This Veterans Health Administration (VHA) Directive implements provisions of Public Law (Pub. L.) 104-262, "The Veterans Health Care Eligibility Reform Act of 1996," which significantly expand the Department of Veterans Affairs (VA) health care resources sharing authority in Title 38 United States Code (U.S.C.) Sections 8151 through 8153.

**2. BACKGROUND:** Section 301 of Pub. L. 104-262, dated October 9, 1996, contains provisions which eliminate existing barriers and disincentives to the sharing of health care resources with non-VA entities. The types of resources that can be shared, and who qualifies as a sharing partner, are expanded effective with this directive.

a. VA will publish regulations establishing simplified competitive acquisition procedures applicable to sharing contracts, as permitted by Pub. L. 104-262. Following publication of final regulations, directives implementing these simplified procedures will be issued.

b. Besides providing additional flexibility in the acquisition of services, the statute expands the opportunity for VA health care facilities to sell services and generate revenue, thereby maintaining and expanding services to veterans. *NOTE: One effect of such measures could be the preservation of jobs that otherwise would have to be eliminated to meet budget reductions and cost efficiency targets.*

## 3. DEFINITIONS

a. The primary purposes of the health care resources sharing authority are to strengthen VHA medical programs and to improve the quality of health care provided to eligible veterans. Under this authority, health care providers are defined to include health care plans and insurers, and any organizations, institutions, or other entities or individuals who furnish health care resources. VHA may enter into sharing agreements or contracts with any health care provider, or other entity or individual. VHA may enter into sharing contracts to acquire ("buy") health care resources, to provide ("sell") health care resources, or to exchange health care resources.

b. The term "health care resources" includes hospital and ambulatory care, mental health services, medical and surgical services, examinations, treatment, rehabilitative services, dental services and appliances, preventive health care, prosthetics, and other health care services and supplies. The term also includes any health care support and administrative resources, as well as medical equipment or space. Health care support and administrative resources include those services, apart from direct patient care, determined necessary for the operation of VA facilities. Whereas health care support resources serve medically related purposes (e.g. biomedical equipment repair, patient transport), administrative resources include services not unique to the provision of medical care, but deemed necessary to support such care (e.g. security guard services, grounds maintenance). *NOTE: Nursing home care is to be acquired solely under the authority of 38 U.S.C. 1720; however,*

000016

VHA Directive 97-015 - Enhanced Health Care Resources Sharing Authority

Case 2:11-cv-04846-SJO-MRW Document 96-1 Filed 10/22/12 Page 22 of 32 Page ID #:1284

http://vaww.va.gov/oa&mm/policy/97015d.htm

*nursing homes are appropriate sharing partners under this authority for the purchase or sale of health care resources as described in this paragraph.*

## 4. POLICY

a. VA may enter into non-competitive sharing contracts with affiliated health professional schools ("affiliates"), practice groups and other entities associated with an affiliate (e.g., another hospital which has a residency training program with the VA affiliate), blood banks, organ banks, and research centers for health care resources consisting of commercial services, the use of medical equipment, space, or research. The term "commercial services" includes medical or professional services as well as other services. For these non-competitive contracts, a written determination citing the use of 38 U.S.C. Section 8153, and stating the sharing partner meets the above criteria, is required. For all other purchases, established competitive procedures must be followed unless a written sole source justification, containing the information and approved at the levels prescribed in Federal Acquisition Regulation Subpart 6.3, is prepared. The justification shall be maintained in the contract file.

b. When using the sharing authority to acquire or purchase health care resources that previously have been provided by VHA employees, all of the following conditions must be met:

(1) The contract must be cost effective. A cost analysis of existing, in-house services must be performed to determine the actual cost of performing the service or function. This analysis will be used as a basis for comparison of costs with contract providers, including VA affiliates. In deciding which services to provide "in-house," and which services to provide by contract (that is, a "make or buy" decision), services currently provided by contract should not be overlooked. If services being acquired by contract can be provided more cost-effectively by VHA employees, those services should be brought in-house, unless there are significant reasons (such as those identified in subparagraph 3b(2)) not to do so. *NOTE: See Attachment A for additional guidance on how to determine cost effectiveness.*

(2) The contract must be in the best interest of veterans. In addition to an analysis of "in-house" costs, other considerations such as ease of access, service satisfaction, quality of care, continuity of services, and the desirability of maintaining educational programs should be considered and compared to contracted services.

(3) Assistance to displaced employees must be provided. As in the case of contracts covered by 38 U.S.C. Section 8110(c)(8), contractors will be required to give hiring priority to employees displaced by the award of the contract when fulfilling their employment needs. If any such displaced employee cannot be hired by the contractor, the facility or Veterans Integrated Service Network (VISN) will assist the displaced employee in obtaining other employment or entrance (if eligible) into job training programs which may be available, or provide other legally appropriate transitional assistance.

(4) The service being acquired may not be on VHA's list of A-76 Commercial Activities. The sharing authority may not be used to obtain any service, activity or function identified in VHA's current or future inventory of commercial services to be reviewed under the Office of Management and Budget (OMB) Circular A-76. These activities must be handled in accordance with VHA's guidance on A-76.

2 of 7

2/9/2000 7:29 AM
000017

(5)  The contract must be in the best interest of the government.  From a broad perspective, and considering the issues identified above, any contract must be in the best interest of the government.  The decision to acquire services through a sharing contract is complex.  VA management must make this decision based not on any one factor, but by carefully weighing all issues, such as quality of care, ease of access, cost-effectiveness, non-monetary costs, and other issues, some of which have been discussed in the above subparagraphs.

c.  The sharing authority may be used to provide or "sell" health care resources to any eligible sharing partner.

(1)  Contracts to provide or "sell" health care resources to other than eligible veterans may be executed only if a specific determination is made:

(a)  That veterans will receive priority for the services being provided (e.g. no contract will result in the dimunition of existing levels of services to veterans), and

(b)  That the agreement is either necessary to maintain an acceptable level and quality of service to veterans, or will result in the improvement of services to eligible veterans.

(2)  The contract file shall include a certification from the VISN or medical center director that these conditions have been met.  The certification will accompany all "provide" contracts submitted to VA Central Office.  Proceeds from providing or selling services are credited to the appropriate medical appropriation at the facility providing the service.

*NOTE: A separate VHA directive will be issued with additional guidance on selling VA health care resources.*

d.  The Veterans Health Care Eligibility Reform Act of 1996 allows VA, in consultation with the Administrator of Federal Procurement Policy, to establish simplified procedures for the acquisition of health care resources consisting of commercial services or the use of medical equipment or space.  The procedures will not apply to the acquisition of supplies or the leasing of medical equipment or space.  VA must publish the simplified acquisition procedures for public comment in accordance with 41 U.S.C. 418b.  Until these procedures are finalized, the Federal Acquisition Regulation and the VA Acquisition Regulation shall continue to apply to contracts with non-affiliated entities.

e.  Pub. L. 104-262 contains a provision requiring Medicare to reimburse either VA or the sharing partner (as provided in the terms of the sharing contract) at established Medicare rates for Medicare covered services provided to Medicare beneficiaries, other than veterans eligible for VA medical care, under a sharing contract.  A separate VHA Directive will be issued to implement provisions for billing Medicare.  Until this specific VHA Directive is issued, no claims should be submitted to Medicare Fiscal Intermediaries for payment for services provided under sharing agreements.

f.  Any amount VA receives as payment for services provided by VA during a prior fiscal year under a sharing contract may be obligated during the fiscal year in which VA receives the payment.

g. Reimbursement rates and procedures for payment will be negotiated in the best interest of the government. VA facilities will consider local commercial market rates for similar services, as well as the VA cost in providing the services, when negotiating reimbursement rates.

h. The number of Full-time Employee Equivalent (FTEE) involved in providing services under sharing agreements are not to be counted in the FTEE total for the Department for downsizing under the Federal Workforce Reduction Act of 1994.

i. Where other authorities exist that also could be used for the sale or purchase of health care resources, the Medical Sharing Office or the Office of the General Counsel should be consulted to determine the appropriate authority.

## 5. ACTION

a. VHA facilities may use the revised definitions as they appear above for the sharing of health care resources in developing contracts under the authority of 38. U.S.C. Section 8153.

b. Because of the greater flexibility provided under 38 U.S.C. Section 8153 by Pub. L. 104-262, VHA facilities should consider using this authority instead of that in 38 U.S.C. section 7409 to obtain the services of scarce medical specialists.

c. All of the management controls and pricing guidelines for medical resources sharing and for scarce medical specialist contracting (such as conflict of interest and the protection of rights and privileges of permanent employees) contained in previously published directives and in M1, Part 1, Chapter 34 remain in effect. VA medical centers and/or VISNs should be especially alert to potential conflicts if interest, and should consult with Regional Counsel if there are any questions or concerns in this regard.

d. The delegation of contract review and approval authority to field facilities for non-competitive contracts valued below $500,000 and for competitive contracts valued below $1.5 million remains in effect. The following exceptions, regardless of dollar amount, will continue to require VA Central Office review and approval prior to solicitation:

(1) Any agreement for the VA to provide or sell inpatient services.

(2) Any agreement for the purchase or sale of administrative resources, the use of medical equipment or space, prosthetics, supplies, or laundry services. VA medical centers and/or VISNs considering a sharing contract to provide or acquire the use of space are encouraged to call the Medical Sharing Office to help identify the appropriate legal authority. In some circumstances, the Enhanced Use Leasing Authority (38 U.S.C. Sections 8161 through 8169) may provide significant advantages. *NOTE: Further guidance for sharing space and other administrative resources is being developed. When this guidance is issued, review and approval authority within established dollar thresholds will be delegated to the field.*

(3) Any non-competitive purchase agreement with an "entity associated with an affiliate," other than a practice group or institution having a

residency training program with the affiliate. Practice groups and institutions having a residency training program with the affiliate have been determined to meet the definition of "an entity associated with an affiliate." If VA medical centers and/or VISNs anticipate entering into a non-competitive contract with another type of "entity associated with an affiliate," they are encouraged to consult with the Medical Sharing Office for a preliminary determination on whether the entity meets the statutory requirements. When further guidance on defining "entities associated with an affiliate" is developed and published, review and approval authority within established dollar thresholds will be delegated to the field.

*NOTE: In many instances, VA Central Office review and approval for proposals below the delegated dollar thresholds identified in subparagraphs 4d(1) through (3) can be obtained by fax or telephone by contacting the Rapid Response Team composed of representatives from the Medical Sharing Office (166), Office of the General Counsel (025), and Acquisition Resources Service (95E).*

e. Contracts for the purchase of primary care services at a site away from an existing VA facility may not be executed unless prior approval is obtained for the establishment of a Community Based Outpatient Clinic.

f. As is currently required, copies of all executed sharing agreements and supporting documentation must be forwarded to the Medical Sharing Office (166) within 5days of final award.

## 6. REFERENCES

a. Title 38 U.S.C. Sections 8151-8153.

b. Public Law 104-262, Section 301.

c. M-1, Part 1, Chapter 34.

d. VHA Handbook 1660.4.

**7. RESPONSIBILE OFFICE:** The Director, Medical Sharing Office (166) is responsible for the contents of this Directive. VA medical center Directors and VISN Directors are responsible for compliance with this directive at the local level. Questions may be referred to the Medical Sharing Office at (202) 273-8404 or fax: (202) 273-9056.

**8. RESCISSION:** This VHA Directive will expire on March 12, 2002.

/s/ by Thomas Garthwaite, M.D. for
Kenneth W. Kizer, M.D., M.P.H.
Under Secretary for Health

000020

| **Distribution:** | CO: | E-mailed 3/13/97 |
| | FLD: | RD, MA, DO, OC, OCRO, and 200 - FAX 3/13/97 |
| | EX: | Boxes 104, 88,63,60,54,52,47 and 44 - FAX 3/13/97 |

---

## ATTACHMENT A

### COST GUIDELINES

1. This attachment is to provides general guidance on determining the cost effectiveness of contracting functions or activities under the enhanced sharing authority.

2. Cost effectiveness is determined by performing a cost analysis of in-house costs and comparison to potential contract costs. The level of detail of a cost analysis should be proportionate to the size, type or dollar value of the activity or function under review. A smaller activity may have a less detailed cost analysis and, therefore, a larger activity may have a more detailed cost analysis. Two reference documents that may be utilized are the 'Cost-Benefit Analysis Handbook,' dated August 1989, published by the Assistant Secretary for Finance and Planning, and the 'Revised Supplemental Handbook,' OMB Circular A-76, dated March 1996.

3. There are four general categories of costs:  non-recurring, recurring, sunk and non-monetary costs.  Each of these categories of cost is described as follows:

   a. **Non-recurring Costs.** Includes costs such as equipment procurement and installation, site preparation, one-time overtime, sale or scrap of equipment, conversion to contract and other one-time costs.

   b. **Recurring Costs.**  Includes costs such as personnel, fringe benefits, expendable supplies, normal maintenance and repair, utilities, contract administration, rent, travel and other costs of maintaining and operating the function, activity or system.

   c. **Sunk Costs.**  Includes costs such as repairs that have been made on a system that is still not functioning and other costs that have been expended or incurred as a result of past decisions.  Sunk costs should not be discounted or included in a cost-benefit ratio.  They must, however, be included in the total life cycle costs.

   d. **Non-monetary Costs.**  Includes those costs that cannot be quantified and given a dollar value such as ease of veteran access, service satisfaction, community benefit and/or welfare, best interests of the veteran and quality of care.  While these costs cannot be included in

000021

Case 2:11-cv-04846-SJO-MRW  Document 96-1  Filed 10/22/12  Page 27 of 32  Page ID #:1289

cost-benefit calculations, they are very important and must be considered in determining "make or buy" decisions in the best interests of veterans and the Government.  Quality of care issues may result in "make or buy" decisions that are financially more costly but provide better level of service or care to veterans.

4.  The preceding identified costs are examples of costs in each category, not a comprehensive listing.  Adapt the number and types of costs to your particular cost analysis.  Reduced operating or overhead costs from building closures or reduced administrative support to the function or activity under a "buy" scenario should also be considered.

5.  Both referenced handbooks provide several samples for summarizing costs, cost-benefit ratios, etc.  These formats or other formats may be utilized, or modified, to meet the needs of a specific function or activity under review.  Field staff should contact their local Chief Financial Officer for assistance preparing cost analyses or obtaining referenced handbooks.



[ Policy and Regulation Index | Policies Table of Contents | OA&MM Home ]
[ VA FOIA Electronic Reading Room | E-mail | Top of Page ]

**Department of Veterans Affairs**                    **VHA DIRECTIVE 1660.1**
**Veterans Health Administration**
**Washington, DC 20420**                                    **August 3, 2000**

### ENHANCED HEALTH CARE RESOURCES SHARING AUTHORITY - SELLING

**1. PURPOSE:** This Veterans Health Administration (VHA) Directive further implements provisions of Public Law (Pub. L.) 104-262, "The Veterans Health Care Eligibility Reform Act of 1996," which significantly expands the Department of Veterans Affairs (VA) health care resources sharing authority in Title 38 United States Code (U.S.C.) Sections 8151 through 8153.

**2. SUMARY OF CHANGES:** Expansion of Pub. L. 104-62 and VA health care resource sharing authority requires definition of new guidelines. Veterans Integrated Service Network (VISN) and medical center Directors are responsible for compliance with the requirements outlined in this Directive, for meeting all requirements of law and policy, for meeting all labor management responsibilities, for the establishment of appropriate and legally sound contract terms, for making sound business decisions, for ensuring that staff are properly trained and are fully capable of exercising any delegated authority, for ensuring adequate documentation of the contracting process, and for contract and performance monitoring.

**3. RELATED ISSUES:** VHA Handbook 1660.1.

**4. RESPONSIBLE OFFICE:** The VHA Chief Financial Officer (17) is responsible for the contents of this Directive.

**5. RESCISSIONS:** M 1, Part 1, Chapter 34, Section II, is rescinded.

**6. RECERTIFICATION:** This document is scheduled for recertification on or before the last working day of August 2005.

                              S/ Melinda L. Murphy for
                              Thomas L. Garthwaite, M.D.
                              Acting Under Secretary for Health

Distribution: **RPC: 0005**
FD


Printing Date: 8/00

Case 2:11-cv-04846-SJO-MRW Document 96-1 Filed 10/22/12 Page 29 of 32 Page ID #:1291

## ENHANCED HEALTH CARE RESOURCES SHARING AUTHORITY - SELLING

**1. PURPOSE:** This Veterans Health Administration (VHA) Directive further implements provisions of Public Law (Pub. L.) 104-262, "The Veterans Health Care Eligibility Reform Act of 1996", which significantly expands the Department of Veterans Affairs (VA) health care resources sharing authority in Title 38 United States Code (U.S.C.) Sections 8151 through 8153.

## 2. BACKGROUND

a. Section 301 of Pub. L. 104-262, dated October 9, 1996, contains provisions which eliminate barriers and disincentives to the sharing of health care resources with non-VA entities. VHA Directive 97-015, dated March 12, 1997, contains information on the types of resources that can be shared, and who qualifies as a sharing partner under the expanded authority, but addresses issues primarily related to VA's acquisition of health care resources. This Directive deals primarily with issues related to VA's selling of health care resources.

b. VHA may enter into sharing agreements or contracts for the sale of VHA health care resources with any health care provider, or other entity, group of individuals, corporation, association, partnership, Federal, State or local governments, or individual. For this purpose, a health care provider is defined as including health care plans and insurers, and any organizations, institutions, or other entities or individuals who furnish health care. VHA may not enter into any sharing contracts with prohibited foreign entities (e.g., Cuba, Iran) or with partisan political entities.

c. VHA may enter into sharing agreements or contracts for the sale of health care resources, including hospital and ambulatory care, mental health services, medical and surgical services, examinations, treatment, rehabilitative services and appliances, preventive health care, prosthetics, and other health care services. Services may be offered to a sharing partner for non-veterans only if the service is within the scope of VA's authority and is authorized by law for veterans.

d. The term "health care resources" also includes health care support and administrative resources, the use of medical equipment, or the use of space. Health care support and administrative resources include those services, apart from direct patient care, determined necessary for the operation of VA facilities. (Examples of services provided by VA that are not needed for the operation of VA facilities include child care, fitness centers, and job placement services for displaced workers. These kinds of services may not be included in sharing contracts.) Health care support resources serve medically related purposes (e.g., biomedical equipment repair, patient transport). Administrative resources include services not unique to the provision of medical care, but deemed necessary to support the operation of a medical center (e.g., transcription services, grounds maintenance).

3. **POLICY**

  a. **Contracts to Sell Health Care Resources**

   (1) Contracts to sell health care resources may be executed <u>only</u> if a specific determination is made:

   (a) That veterans will receive priority for services under such an agreement (e.g., no contract will result in the diminution of existing levels of services to veterans); <u>and</u>

   (b) That the agreement is necessary either to maintain an acceptable level and quality of service to veterans, <u>or</u> will result in improvement of services to veterans.

   (2) The contract file must include a certification from the Veterans Integrated Service Network (VISN) Director, or the medical center Director, that the preceding conditions have been met. A copy of this certification must be submitted electronically, along with a copy of the executed contract, to the Office of Finance Sharing and Purchasing Office (SPO) (175), VHA Headquarters, within 5 work days of the contract award.

   (3) All concept proposals to sell VA resources under this authority must be approved by the Rapid Response Team (RRT), consisting of staff from the SPO, Office of General Counsel (025) and Acquisitions and Material Management (095). The concept proposal must be e-mailed over Microsoft Exchange to the SPO and is to be approved by the VISN and/or medical center Director, or their designees.

   (a) The concept proposal should include the following:

   <u>1</u>. The resource to be sold;

   <u>2</u>. Name of the sharing partner;

   <u>3</u>. The term of the agreement; and

   <u>4</u>. The costing methodology or basis of rate reimbursement.

   (b) The SPO will e-mail the results of the RRT review to the facility submitting the contract for review and this response shall be part of the contract file. ***NOTE:*** *Concept approval by the RRT is not a legal or technical review nor approval of the sharing agreement; field facilities will be notified when concept approval for a specific resource is no longer needed.*

   (4) Contracts valued at $500,000 or more may be executed only after legal and technical review by VA Central Office (legal review will be conducted by General Counsel, VA Central Office). Local officials are responsible for incorporating any changes required by the legal and/or technical review before the contract is executed. Contracts requiring legal and technical review should be sent to the Sharing and Purchasing Office over Microsoft Exchange or mailed on a computer disk to VA Central Office. That office (175) is responsible for coordinating the

Case 2:11-cv-04846-SJO-MRW Document 96-1 Filed 10/22/12 Page 31 of 32 Page ID #:1293

review and communicating the results to the facility submitting the contract for review. Following legal and technical review, an appropriately designated VA selling official may execute the contract.

(5) General Counsel field attorneys must have a final review of all contracts with a total value less than $500,000 before they are executed. Approval authority for all contracts to sell services having a total value of less than $500,000 over the period covered by the contract (initial year plus any option years) is delegated to the field.

(6) Proposals to sell inpatient services to non-veterans require the approval the Secretary of Veterans Affairs and the Under Secretary for Health. These proposals might also require presentations to representatives of national veteran service organizations and congressional delegations. The SPO will coordinate these presentations and provide technical assistance on the information required.

b. **Enhanced Sharing Agreements for the Use of VA Space.** Enhanced sharing agreements for the use of VA space (including parking, outdoor recreational facilities, and vacant land) are authorized under 38 U.S.C. Section 8153.

(1) In sharing the use of VA space under this authority, VA must consider the use to which the space would be put by the potential partner to the contract. Potentially controversial uses are to be avoided. For example, VA facilities should not sell use of space for any illegal activity, abortion services, the sale of alcohol or firearms, gambling activities, partisan political activities, correctional-system activity, storage or processing of hazardous materials, billboards, or purposes which would violate community standards. VA facility managers should also consider impacts on patient privacy, VA computer systems, telecommunications and data, parking, and fire, health, and safety, and security and law enforcement issues in sharing the use of VA space.

(2) Sharing partners may use their own resources to make capital improvements to existing VA space. However, VA must approve the proposed capital improvements in advance and must ensure that the project is an overall "good business" decision for VA. VA must require that the sharing partner comply with the minimum wage requirements of the Davis-Bacon Act (40 U.S.C. Section 276a) when renovating or improving VA space, even though Federal appropriated dollars will not be directly expended on the construction project.

(3) VA may use medical care appropriation funds under the non-recurring maintenance (NRM) program to make improvements to VA space for use by a sharing partner. Neither major nor minor construction funds may be used to improve space solely for the purpose of use by a sharing partner.

(4) All proceeds from contracts for the use of VA space under the enhanced sharing authority will be deposited into the medical care appropriation account at the VA facility.

(5) It may be appropriate, as sound business practice, for VA to pay damages to a sharing partner in the event that VA must terminate a use of space contract before the time specified for the contract, particularly if the sharing partner has made a significant capital investment in the

Case 2:11-cv-04846-SJO-MRW Document 96-1 Filed 10/22/12 Page 32 of 32 Page ID #:1294

space, but only if provisions for damages are included in the terms of the initial contract. Such contracts cannot provide for unlimited liability or indemnification. The following provisions must be included in any sharing contract involving liability payments from VA: first, set a dollar limit on the amount of damages that the facility will pay in each year if the agreement is terminated; second, limit VA's liability to the amount of appropriated funds available to the facility at the time payment is made; and third, state that VA does not promise that Congress will appropriate additional funds to meet any deficiency in the event that damages must be paid. In the event that damages are to be paid in accordance with the terms of a contract, the medical center will be responsible for the payment of the damages from the Medical Care Account.

    (6) Contracts for use of VA space by a sharing partner to provide inpatient hospital care to their own patients may be developed under this authority, if the space in question is discrete from VA inpatient beds, the space is staffed by the sharing partner's physicians and nurses, and the partner operates their own admission and discharge system. VA may provide support services, such as housekeeping, food service, or lab and x-ray services to the sharing partner using such space. Contracts of this nature are considered to be use of space, equipment and support services contracts and not contracts for VA to provide inpatient care. Under no circumstances may a sharing partner sub-let use of VA space obtained through an enhanced sharing contract to a third party without prior approval from the Rapid Response Team, VA Central Office.

    (7) Use of space sharing agreements for up to 20 years total may be executed under this authority. The Under Secretary for Health may grant an exception to the 20-year term limit. The VA Central Office RRT must approve the concept for proposed use of space agreements totaling 10 to 20 years. A detailed cost-benefit analysis, market survey results, and a statement of how revenue generated will be used shall be submitted with these requests. Proposals involving new construction and not just renovation of existing space, shall be submitted under the Enhanced-Use Lease Program and not under sharing.

    (8) A use of space agreement for ten years or longer requires an early termination clause.

    (9) Use of space proposals that exceed $600,000 annually, $4 million over term, or $4 million in investment are subject to the VA Capital Investment Process and review by the VA Capital Investment Board.

    c. **Contracts for Use of VA Equipment.** Contracts for use of VA equipment may be executed under the enhanced sharing authority. Appropriate terms should be included in the contract, addressing responsibility for equipment maintenance or loss. The sale, resale, or other disposition of VA or Government property or equipment (such as new or used computers or torn linens) is not authorized under enhanced sharing. Disposition of Government property is governed by Federal Property Management Regulation Title 41 Code of Federal Regulations (CFR) 101 or Federal Management Regulations 41 CFR Parts 102-1 through 102-22. Contracts for the use of equipment may be executed for up to five years or for the useful life of the equipment, whichever is longer.

    d. **Contracts for the Sale of VA Direct Patient Care Services.** Contracts for the sale of VA direct patient care services (inpatient or outpatient care) may be executed under the enhanced